IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| HOME POINT FINANCIAL CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 6:20-cv-01819-CEM-EJK |
| DONALD MARK LANE, CANDACE ROBERTSON, CHRISTOPHER WILKINS, and GUARANTY HOME MORTGAGE CORPORATION, | ) ) ) ) ) ) | Judge Carlos E. Mendoza |
| Defendants. | ) | |

## VERIFIED FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES AND DEMAND FOR JURY TRIAL

Plaintiff Home Point Financial Corporation ("Home Point" or the "Company"), by and through its attorneys, Mayer Brown LLP and Allen Norton & Blue, P.A., and for its Verified First Amended Complaint against Defendants Donald Mark Lane ("Lane"), Candace Robertson ("Robertson"), Christopher Wilkins ("Wilkins") and Guaranty Home Mortgage Corporation ("GHMC") (collectively hereinafter, "Defendants"), alleges as follows:

### INTRODUCTION

1.     This is a lawsuit for injunctive relief and monetary damages to remedy brazen and egregious breaches of Lane's, Robertson's and Wilkins' contractual and other legal obligations to Home Point as well as GHMC's intentional, complicit participation in the unlawful conduct.  Home Point also seeks injunctive relief and

1

damages for Wilkins' covert misappropriation of Home Point's trade secrets and proprietary information, which he emailed from his work computer to his personal email account on the day he resigned from Home Point.

2. Home Point is a national, multi-channel mortgage originator and servicer. Home Point is a licensed mortgage lender in all 50 states and provides conventional, jumbo, FHA, USDA, VA and many other loan products. Home Point was founded in 2015 and has grown rapidly into a top ten industry-leading mortgage lender. Home Point has an office in Maitland, Florida, in which approximately 255 employees work. A critical part of Home Point's business is performed by its Underwriters—who are responsible for evaluating and determining whether or not a consumer's loan application is approved.

3. Historically low interest rates have created intense competition in the market for Underwriters. Further, underwriting and the duties that Underwriters perform are instrumental to Home Point's success. Underwriting is the process a mortgage lender goes through to evaluate—before deciding whether to approve a loan—the likelihood that the loan applicant will repay the loan in accordance with the loan agreement. An Underwriter's job duties include, among other things, determining whether there is sufficient collateral from the borrower to cover the mortgage lender in the event of a default by the borrower. Underwriters assess a variety of factors to assist them in understanding the borrower's financial situation, including the borrower's income, assets and liabilities, debt-to-income ratio, credit score and credit history. The underwriting process occurs before the

lender assumes the actual loan risk.  Underwriting thus helps to create stable markets in financial transactions by exposing potentially unreasonable risks and allowing lenders like Home Point to make more reasonable and competitive offers to those borrowers who have more stable financial circumstances.  Different lenders have different philosophies and strategies with respect to the borrowers they are willing to approve, which impact the Underwriter's review and recommendation.

4.     GHMC is a residential mortgage originator that is based in Tennessee and is one of Home Point's direct competitors.

5.     Robertson formerly worked for Home Point in a managerial role, most recently as its Managing Director – Wholesale Operations for its office in Maitland, Florida.  In December 2019, Robertson signed an employment agreement (the "Operations Agreement") that included a specific contractual provision barring her—both during her employment and for a 12-month period after her separation—from in any way soliciting, recruiting, or hiring any Home Point employees to form or join another business, *and* from aiding or assisting in such solicitations by any other person.

6.     On September 2, 2020, Home Point terminated Robertson's employment with the Company.

7.     Prior to September 18, 2020, Lane held a managerial role as Senior Director – Underwriting Manager in the Company's office in Maitland.  During his employment, Lane owed numerous fiduciary duties to Home Point, especially in

3

his role as a manager.  In addition, Lane owed—and continues to owe—Home Point a specific contractual duty to not directly or indirectly solicit, induce or attempt to induce any Home Point employees to resign from Home Point, either during his employment or for the 12-month period after his separation.

8.     While Lane was still employed and being paid by Home Point, he flouted those and many other duties by doing exactly what he had agreed not to do. Robertson was a knowing and active participant in the scheme.  With the full knowledge and consent of GHMC and its executive leadership team, including Chief Executive Officer Brett Arsta ("Arsta"), Chief Strategy Officer Chip Adkins ("Adkins"), Chief Financial Officer Stuart Lynn ("Lynn"), and Chief Operating Officer Anita St. Pierre ("St. Pierre"), Lane worked covertly, disloyally and proactively to solicit, induce and encourage dozens of the Company's employees to resign from Home Point nearly simultaneously *en masse* and join him at GHMC. In carrying out that scheme, Lane worked closely with Robertson, who actively participated in the recruitment and hiring of those employees. Defendants' actions culminated in a mass resignation on and shortly after September 17, 2020 in which approximately 25 employees from Home Point's Maitland office, including Lane himself, all resigned with the intention of going to work for GHMC.

9.     Robertson and Lane each were angry with Home Point for terminating Robertson's employment.  In retaliation for Home Point's decision to terminate Robertson, the two of them decided that they would attempt to raid Home Point's Maitland employees.  They focused on the Home Point employees

who they viewed as being the most experienced and loyal.

10.     When Robertson began discussions with GHMC regarding potential employment as GHMC's Executive Vice President of National Operations, she made it clear that she wanted to recruit along with her a team of employees from the Home Point office in Maitland, Florida, including Lane.  On information and belief, GHMC knew that Robertson and Lane were well-positioned to conduct the necessary recruiting on GHMC's behalf.  GHMC advised Robertson that GHMC would hire the Home Point employees that she identified.

11.     Defendants Robertson, Lane and GHMC accomplished this piracy scheme through a carefully orchestrated plan in which Lane – who was still employed by Home Point – and Robertson served as the primary agents on GHMC's behalf.  On September 11, 2020, the day after Robertson first began discussions with GHMC about an employment opportunity, Lane and Robertson prepared and communicated about a list of 38 Underwriting Managers and Underwriters whom they wanted GHMC to hire.  Robertson then flew to Tennessee to meet with GHMC's in person on September 13, 2020 to discuss in more detail her and Lane's potential employment with GHMC.  On September 14, 2020, Lane, with Robertson's knowledge, contacted Home Point's Maitland-based employees who had been identified on the list and began directly soliciting dozens of Home Point employees in phone calls, emails, and text messages to lure them away from Home Point and to join GHMC.  Importantly, Lane initiated all of those communications and made specific offers to the Home Point employees regarding

the terms of employment they were being offered by GHMC.  Although Robertson knew Lane was still employed by Home Point, she did not intercede or otherwise instruct Lane not to act while he contacted numerous Home Point employees to solicit them to leave Home Point for GHMC.  Consistent with Robertson's discussions with GHMC, Lane directed the Home Point employees to GHMC's website and instructed them to submit applications.  Lane and Robertson each provided to GHMC the names of Home Point employees, their salary demands, and other pertinent information to facilitate their hiring by GHMC.  Lane also conducted salary negotiations with the Home Point employees on GHMC's behalf, and negotiated sign-on bonuses to induce them to leave Home Point.  In many, if not all instances, GHMC hired the Home Point employees whom Lane had solicited without interviewing or speaking with them—even for an introductory phone call.  Rather, GHMC effectively delegated hiring authority to Lane and Robertson themselves.

12.    Further, Lane coordinated the timing of transmission of GHMC's offer letters to the Home Point Maitland office employees as well as their resignations from Home Point so that he and the other Home Point employees leaving for GHMC could resign *en masse*.  Lane purposefully waited to submit his own resignation until GHMC had sent out offer letters to the five Home Point Underwriting Managers who were among his direct reports, as well as many seasoned Underwriters, all of whom Lane had directly solicited.  Lane's misconduct was performed for GHMC's benefit during normal business hours

while he was being compensated by Home Point and while, of course, he should have been working only in Home Point's best interests.  Lane therefore unjustly received compensation from Home Point while covertly planning, organizing, and successfully carrying out the mass raid with Robertson and GHMC.  All of this piracy and related misconduct inured to Defendants' benefit, and with GHMC's knowledge and substantial assistance, while concurrently causing significant damage to Home Point.

13.     Lane, Robertson and GHMC knew full well that their actions were improper. Not only did Lane and Robertson each sign agreements containing non-solicitation provisions, but they were both well aware of the fact that Home Point required employees in their positions to sign such agreements.  In the course of performing their duties for Home Point, Robertson and Lane each routinely approved offer letters and promotion agreements for their subordinates that contained non-solicitation provisions similar or identical to Lane's own covenant.  For example, Robertson herself approved Lane's agreement containing his non-solicitation provision.  Lane, for his part, routinely approved offer letters or promotion agreements for his subordinate employees that included identical non-solicitation provisions as in his own agreement, including as recently as the very evening before he resigned his employment from Home Point.

14.     On September 14, 2020, Robertson specifically told GHMC's outside counsel, Joshua Ehrenfeld, who was acting as GHMC's agent for purposes of those discussion, that she was "certain" that Home Point's employee handbook

contained either a one-year or a three-year non-solicitation agreement.  GHMC did not tell her to stop the solicitation scheme.  Instead, on September 14, 2020, Robertson provided GHMC with the aforementioned list of employees and their contact information for purposes of facilitating their recruitment to GHMC.

15.    Moreover, GHMC and Robertson each knew that Lane was still employed by Home Point through September 17, 2020, and was thus carrying on his solicitations on GHMC's behalf while he still owed fiduciary duties to Home Point.

16.    The following are just some of the examples of Lane's and Robertson's misdeeds in the days leading up to and including the September 17, 2020 mass resignations:

(a)    On September 11, 2020, Lane emailed Robertson his list, ranked in order of his hiring preference, of 38 Underwriting Managers and Underwriters at Home Point, noting that with respect to the final 8 individuals on that list, he "wasn't sure we could get them or wanted them."  Robertson sent Lane a text thanking him for sending her the list.

(b)    On September 13, 2020, Robertson met in-person with Arsta, Lynn, Adkins, and St. Pierre to discuss her potential employment with GHMC, and secured GHMC's agreement to her and Lane's plan to conduct a mass raid of Home Point's Maitland office;

(c)    That evening, after her meeting, Robertson texted Lane that he would be receiving a salary of $160,000 per year, which was "higher than the

others," and that Lane would receive a bonus of $1.00 per loan that underwriters reporting to him would underwrite;

     (d)    On the morning of Monday, September 14, 2020, Lane sent a group text to his five Underwriting Managers at Home Point – Wilkins, Claudio Betts, Patricia Clark, Michelle Izquierdo and Carla Rigdon – and informed them: "**PLEASE treat this as highly confidential . I trust you all as friends and co-workers.** This will be my landing spot – [GHMC]. I will be managing a local ops center consisting of Underwriters and UW Support. **I want you ALL to come with me** and would be willing to get on a call to discuss." (emphasis added);

     (e)    At approximately 11:35 a.m. on September 14, Lane texted Robertson asking her whether he should "start calling [underwriters] or not?"; Robertson did not respond in writing or otherwise tell Lane not to make such calls;

     (f)    Over the course of the day on September 14, Lane initiated calls and texts to at least a dozen Home Point Underwriting Managers and underwriters to solicit them to leave Home Point for GHMC;

     (g)    At or around 5:12 p.m. on September 14, Lane texted Robertson "OK it is done" with regard to his solicitation efforts that day;

     (h)    At or around 6:57 p.m. on September 14, Lane texted his five Underwriting Managers: **"I did not get a great deal of [Home Point] work done today.  I've been recruiting since our call earlier."** (emphasis added). His text also falsely claimed that the Home Point employees who he had solicited on that date "are all secretly looking forward to sticking it to [Home Point] with a

mass exodus";

(i)     While Lane was busy recruiting Home Point employees on the 14th, over a series of phone calls that day, Robertson provided GHMC with a list of the Home Point employees who Lane had induced to apply for jobs, including their names and personal email addresses and phone numbers, their jobs at Home Point and qualifications, and salary information for each;

(j)     Over the course of those phone calls, Robertson identified for St. Pierre the individuals to whom GHMC would offer sign-on bonuses, and the amounts of those bonuses;

(k)     During the course of his initial solicitations on September 14, and in subsequent communications with the solicited Home Point employees on the 15th and 16th, Lane served as an agent of GHMC by telling Home Point employees that GHMC would offer a salary higher than what they earned at Home Point, that he had arranged for a sign-on bonus payment for them, and that GHMC's bonus structure for Underwriters was more favorable than what Home Point provided;

(l)     On September 15, Lane sent emails from his  Hotmail email account to more than a dozen Home Point employees' personal email accounts with active links to GHMC's job opportunities portal and directed them to "[a]pply for the Mortgage Loan Underwriter—Nashville position." Lane also encouraging them to apply quickly, writing to every single one of them:  "I could really use this tonight if possible." Lane also instructed Home Point employees to list him as the reference

when they applied for jobs with GHMC;

(m)   Lane sent a follow-up text to one or more Home Point employees whom he had actively solicited to join GHMC while he was still employed by Home Point, exclaiming: "I'm excited that everyone that I am talking to is on board!";

(n)   Lane told the Home Point employees he was soliciting that he wanted to work with Robertson, that he and Robertson were starting something, and that he was putting together a team;

(o)   Lane informed Home Point employees that he was waiting to give notice to Home Point of his own resignation until GHMC had started sending offer letters "to everyone";

(p)   Lane responded to a Home Point employee's question on September 17 about whether he was taking his whole staff with him by saying "there will be a lot of movement today";

(q)   Lane told Home Point employees that he was "trying to coordinate with everyone" about the timing of their resignations;

(r)   Lane also sent text messages on September 17 to the Home Point employees whom he had solicited:  "I recommend that all of you wait until 10 [a.m.] to start resigning.  Any time after that works.";

(s)   Lane told Home Point employees that he and GHMC also would "try to coordinate" the departures of employees in departments other than Underwriting, i.e., departments that he did not oversee;

(t)   Lane cautioned a Home Point employee that "it's best to provide

11

as little information as possible right now" with regard to disclosing the employee's plans after she resigned;

(u)    Lane told a Home Point employee that she could share GHMC's name with a different Home Point employee "[i]f you trust him but we're not throwing that around yet so he would have to put a lid on it.";

(v)    Within mere hours of his own resignation, Lane assisted GHMC in arranging a same-day conference call hosted by Arsta to welcome dozens of former Home Point employees to GHMC;

(w)    In that regard, Lane sent a text message on the day of his resignation in which he informed dozens of Home Point employees that they "should receive an email invitation for a call at 6:00 with our new CEO, Brett Arsta. I know it's short notice but try to make it if you can!";

(x)    GHMC and Robertson made a concerted decision not to have Robertson join that call;

(y)    Lane disparaged Home Point by alleging that Home Point was "in a pretty desperate place" and by spreading a fabricated rumor to Home Point employees that Home Point was contemplating closing its Maitland facility;

(z)    Lane declared that his solicitations of Home Point employees were not over, texting a Home Point employee on the day he resigned:  **"I hope I can take more soon."** (emphasis added); and

(aa)    In other conversations and text messages, Lane repeatedly referenced subsequent waves of Home Point employees who he intended to recruit

12

to GHMC, and told still others that he would affirmatively reach out to them later, "once the dust settle[d]."

17.     Lane, Robertson, and GHMC were acutely aware of the fact that what they were doing was improper. Lane admitted to one Home Point employee that GHMC was "working with attorneys to make sure everything is done properly. Because this will be a BIG deal." (emphasis in original). Lane also sent at least three text messages to different Home Point employees encouraging them to resign quickly "in case we get slapped with a cease and desist" letter.  According to Lane, he used "we" to mean GHMC.

18.     Wilkins was part of Lane, Robertson and GHMC's orchestrated scheme and resigned on the same morning as Lane, with his resignation to be effective at the end of September.  On the very day of his resignation, Wilkins began sending emails from his Home Point account to his personal email account.  Some of those emails plainly violated Home Point's policies regarding the removal of information from the company's systems.   In fact, Home Point's security systems blocked delivery of some of them.   Undaunted, Wilkins manipulated the emails in an attempt to circumvent these security protocols and send the information to his personal account anyway. Much of the information Wilkins sent to himself included trade secrets and other proprietary information belonging to Home Point.

## THE PARTIES

19.     Home Point is a corporation organized and existing under the laws of the State of New Jersey, with its headquarters and principal place of business

located at 2211 Old Earhart Road, Suite 250 in Ann Arbor, Michigan.  Home Point is licensed to operate in the State of Florida and has an office located at 2400 Maitland Center Pkwy #300 in Maitland, Florida.

20.     Defendant Lane is a resident of Casselberry, Florida, and has resided there at all times relevant to the allegations herein.  Lane formerly worked for Home Point as an Underwriting Manager and, beginning in October 2018, Senior Director – Underwriting Manager.  Lane now works for GHMC as Vice President, Underwriting Manager.  Lane was located in Florida at all times and for all events discussed in this Amended Complaint.

21.     Defendant Wilkins is  a resident of Apopka, Florida, and has resided there all times relevant to the allegations herein.  Wilkins formerly worked for Home Point as a Director of Underwriting.  Wilkins now works for GHMC in a similar capacity.  Wilkins was located in Florida at all times and for all events discussed in this Amended Complaint.

22.     Defendant Robertson is a resident of Altamonte Springs, Florida, and has resided there at all times relevant to the allegations herein. Robertson formerly worked for Home Point as Managing Director – Wholesale Operations.  Robertson now works for GHMC as Executive Vice President, National Operations.  Except for a brief, one night trip to Nashville, Tennessee on September 13, Robertson was in Florida at all times and for all events discussed in this Amended Complaint.

23.     Defendant GHMC is a Tennessee corporation with its headquarters at 10 Lea Avenue, Suite 800, Nashville, Tennessee 37210.  On information and belief,

GHMC also has one or more offices located in Florida.  According to its website, GHMC operates in the State of Florida with a license from Florida's Office of Financial Regulation.  GHMC represents on its website that its Mortgage Lender Servicer License in Florida is MLD1748.

24.    GHMC is a competitor of Home Point.  GHMC, like Home Point, offers a variety of mortgage loans, loan servicing and wholesale loan products and services.  For example, GHMC advertises on its website that it is "a market leader in residential mortgage lending" and "has been a leader in providing exceptional Mortgage Lending Services to our lender partners since 1986."  Like Home Point, GHMC offers borrowers, upon information and belief, financing and refinancing options of various types, such as conventional, jumbo, FHA and VA loans.

## JURISDICTION AND VENUE

25.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because this Court has diversity jurisdiction over the claims in this case.  For purposes of diversity jurisdiction, Home Point is a citizen of New Jersey and Michigan, GHMC is a citizen of Tennessee, and Lane, Wilkins, and Robertson are citizens of Florida, where they reside.  Accordingly, the parties are of diverse citizenship.

26.    Personal jurisdiction over GHMC, Lane, and Robertson is proper under, at a minimum, Section 48.193(1)(a)(2) of the Florida Statutes because (i) GHMC, through Lane and Robertson, solicited Home Point employees in Florida; (ii) GHMC directed communications to Robertson and Lane in Florida in

furtherance of the scheme to unlawfully raid Home Point's employees; (iii) GHMC was part of a conspiracy with Lane and Robertson to unlawfully solicit Home Point's employees in Florida and some of the actions taken in furtherance of the conspiracy were committed in Florida; and (iv) the effects of GHMC's unlawful conduct were felt by Home Point in Florida.  GHMC also specifically used Robertson and Lane as its agents for purposes of illegally soliciting, inducing, recruiting and hiring Home Point's employees in Florida.

27.    In addition, Lane never left the State of Florida in September 2020. Accordingly, all of Lane's communications to and from GHMC in Tennessee, as well as all of his communications to and from Home Point employees whom he had solicited on GHMC's behalf, took place by Lane for GHMC in the State of Florida. GHMC knew that Lane was still employed by Home Point at the same time he was soliciting and communicating with Home Point's employees to leave GHMC. When GHMC's Human Resources personnel reached out to the prospective new hires from Home Point's office in Maitland, GHMC's personnel stated that GHMC was following up on "recent conversations" with the candidates, but the only conversations those employees ever had about jobs at GHMC were with Lane— thereby clearly indicating to the Home Point employees that Lane was acting on behalf of GHMC in communicating the offers and negotiating salaries, for example.

28.    GHMC and Robertson decided on September 14 that the Home Point employees should apply for positions through GHMC's online portal.  To effectuate that decision, GHMC relied on Lane to forward the link to GHMC's online job

application portal on September 15 to more than a dozen Home Point employees he was recruiting, and told them the specific positions at GHMC for which they should apply.

29.    Lane also requested that GHMC transmit offer letters to Home Point employees on September 16, 2020 so that all of the employees could resign at the same time as him.  Lane informed St. Pierre in writing that the Home Point Underwriting Managers to whom GHMC was in the process of sending offer letters "will need to give notice [to Home Point of their resignations] at the same time as me, so very important."  GHMC complied with that request and transmitted the offer letters to the Home Point employees—most of whom were located in Florida—via email.  Lane also communicated to GHMC from Florida about changing the salary amount to be offered to one of the Home Point employees.  GHMC made that change and sent the Home Point employee an offer letter with the specific salary Lane had requested for, and communicated to, that employee.  GHMC also communicated from Tennessee to Lane in Florida that it would "need [his] assistance" with another Home Point underwriter's employment application.

30.    Personal jurisdiction over Lane and Robertson is proper because they reside in Florida, breached their respective contracts in Florida and engaged in other unlawful actions described herein in Florida, where they live and worked for Home Point.  Similarly, personal jurisdiction over Wilkins is proper because he too resides in Florida and engaged in misappropriation of trade secrets and other proprietary information from Home Point in Florida.

31.     The amount in controversy exceeds $75,000, exclusive of interest and costs.  Home Point already has incurred well over $100,000 in aggregate damages in the form of retention payments that Home Point has paid to current employees since September 17, 2020 in an effort to maintain sufficient underwriting personnel.  Home Point incurred those retention costs solely as a result of Lane's breaches of contract and fiduciary duties and Defendants' other tortious conduct.

32.     Independent of those damages, Home Point also will incur other damages that it reasonably anticipates will exceed $75,000, exclusive of interest and costs.  For example, Home Point necessarily has incurred and will continue to incur substantial recruiting and retraining costs to replace the personnel whom Lane, Robertson, and GHMC unlawfully lured away.  Home Point's damages also will include, among other things, the substantial value of lost business and projected revenue because of unanticipated personnel shortages proximately caused by Defendants' illegal conduct.  In addition, Home Point's damages will include, among other things, the value of compensation and benefits that it paid to Lane while he was still employed by Home Point but, unbeknownst to Home Point, was secretly working to pirate away Home Point's employees.  Further, Home Point will seek punitive damages for Lane's and Robertson's breaches of contractual and fiduciary duties, Defendants' unfair competition and misappropriation of trade secrets and other proprietary information, and Defendants' other tortious conduct.  Home Point also has incurred substantial damages in the loss of goodwill and employment relationships that it had with

employees who were illegally lured to join GHMC.

33.     In addition, as to the injunctive relief component of the Amended Complaint, the amount in controversy is deemed to be the monetary value of the object of the litigation from Home Point's perspective as the plaintiff. *Technomedia Solutions, LLC v. Scopetto*, 2013 WL 6571558, at *7 (M.D. Fla. Dec. 23, 2013).  If Lane and Robertson are not enjoined from soliciting Home Point's employees in breach of their respective non-solicitation covenants, Home Point will lose hundreds of thousands of dollars for the reasons described above, including, for example, due to a shortage of personnel to handle its volume of business.  This is not merely a hypothetical risk, as Lane repeatedly told Home Point employees in writing that he hopes he can take more Home Point employees soon, that he anticipates multiple waves of hiring of Home Point employees, and he told other employees still employed by Home Point that he would affirmatively reach out to them "once the dust settles."

34.     Furthermore, Home Point reasonably anticipates incurring more than $75,000 in attorneys' fees and costs to pursue written discovery and depositions, to try the case and to otherwise enforce its rights against Defendants in this litigation.  Attorneys' fees and costs count towards the amount in controversy when they are allowed for by statute or contract.  Home Point seeks to recover its attorneys' fees and costs pursuant to Section 542.335(1)(k) of the Florida Statutes for Lane's and Robertson's breaches of their restrictive covenant agreements. *Technomedia*, 2013 WL 6571558, at *7.

35.     Jurisdiction also is proper in this Court under 28 U.S.C. § 1331 because this Court has original jurisdiction regarding Home Point's claims against Wilkins under the Defend Trade Secrets Act ("DTSA"), pursuant to 18 U.S.C. § 1836.  In addition, this Court has supplemental jurisdiction over Home Point's state law claims pursuant to 28 U.S.C. § 1367.

36.     Venue is proper in this District as to all claims pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Home Point's causes of action occurred in the Middle District of Florida, where: (a) Lane and Robertson reside and worked for Home Point; (b) Home Point's office in Maitland was raided by GHMC, Lane, and Robertson; (c) Defendants Lane, Robertson, and GHMC actively recruited and solicited many employees of Home Point—by phone calls, text messages and emails—to resign their employment and join GHMC; (d) many of the targeted Home Point employees continue to live and work; and (e) Defendant Wilkins resides and misappropriated Home Point's trade secrets and proprietary information.

37.     In addition, venue is proper in this District pursuant to 28 U.S.C. § 1391(c)(2) because GHMC is subject to personal jurisdiction in this District.

## BACKGROUND FACTS

### A.     Robertson's Employment with Home Point and Her Non-Solicitation Covenant

38.     Robertson began working for Home Point in Florida in 2015 in the position of Managing Director.  Among other duties, she oversaw Third Party

Originator ("TPO") operations in the Company's Maitland, Florida office.

39.     On December 30, 2019, in connection with her compensation increase as Managing Director – Wholesale Operations, Robertson electronically signed the Operations Agreement with Home Point.   A copy of the Operations Agreement (without competitive pay information contained in attachments thereto) is attached as Exhibit 1.

40.     The Operations Agreement includes a restrictive covenant entitled "Nonsolicitation of Employees" that prohibited – and continues to prohibit – Robertson from soliciting, recruiting, or hiring Home Point employees, or from aiding or assisting any other person from doing so. The covenant provides as follows:

> **Nonsolicitation of Employees.** Employee agrees that, in order to protect Home Point's Protected Information and its significant investment in developing its business, Employee shall not, during Employee's employment or for a period of one year after Employee's employment, in any way solicit, recruit, or hire any other employee of Home Point to form or to join another business and further agrees that Employee shall not aid or assist in such solicitation by another person or entity. Should Employee violate this nonsolicitation provision, this nonsolicitation period shall extend for an amount of time that equals the length of time that the nonsolicitation period was violated.

41.     After she electronically signed the Operations Agreement, Robertson also received a signed copy of that Operations Agreement at her Home Point email address.

**B.    Lane's Employment with Home Point and His Non-Solicitation Covenant**

42.    Lane submitted an employment application to Home Point on May 27, 2015.  In his application, he indicated that he heard about Home Point through a direct call from Robertson.  In his employment application, Lane electronically signed an acknowledgment that stated in part:  "If employed, I understand that as a condition of employment that I may be required to agree to and sign the organization's confidentiality, non-compete and/or other similar agreements."

43.    Lane began working for Home Point in June 2015 in the position of Director – Underwriting Manager in the Company's Maitland, Florida office. When he joined Home Point, Lane reported to Robertson in Wholesale Operations. He continued to report to Robertson throughout the remainder of her employment at Home Point, which ended on September 2, 2020.

44.    On October 15, 2018, Lane signed a memorandum agreement ("Agreement") with Home Point as a condition of and in consideration for a salary increase and related promotion to Senior Director – Underwriting Manager.  A copy of the Agreement, which Robertson approved and provided to Lane, is attached hereto as Exhibit 2 (redacted only to protect competitive pay information).  The Agreement states in part:  "This memo is to confirm our discussion about your new role and compensation with Home Point Financial effective 10/16/2018."

45.    The Agreement includes a restrictive covenant, entitled "Non-

Solicitation", that prohibited—and continues to prohibit—Lane from directly or indirectly soliciting or inducing co-workers to leave their employment with Home Point.  The covenant provides as follows:

> **Non-Solicitation**
> From the date of hire until the first anniversary of your separation of employment with Home Point, you shall not, directly or indirectly, either on your own account or for any entity or person, hire or solicit any existing or former associate and/or client of the Company to leave his/her employment or engagement, and shall not knowingly induce or knowingly attempt to induce any such employee to terminate or breach his or her employment or engagement agreement with the Company.

46.     The final paragraph of the Agreement plainly stated:  "Should you be in agreement with the above terms and conditions, please indicate so by signing below and returning a scanned copy of the signed document to [Robertson]."  Lane then signed and dated the Agreement immediately below that paragraph.

47.     On October 15, 2018, Robertson received by email a fully executed copy of Lane's Agreement.

48.     As a Senior Director – Underwriting Manager at Home Point, Lane had authority to hire and fire employees.  The job responsibilities of the Senior Director – Underwriting Manager include, among other things, leading three to five Underwriting Directors to ensure the Underwriting teams maximize performance in both production and credit quality.  Lane's duties also included producing quality work product from which Home Point can create saleable loans to investors.

**C.     Robertson and Lane Develop a Plan to Raid Home Point's Maitland Office.**

49.     On September 2, 2020, Home Point terminated Robertson's employment.  Robertson and Lane each were angry and upset by that decision.

50.     On September 10, 2020, Robertson spoke to Arsta about a potential job opportunity with GHMC.   On information and belief, during that call, Robertson and Arsta also discussed a plan to bring Robertson's team of Maitland office employees from Home Point with her to GHMC.

51.     On September 11, 2020, Lane sent Robertson an email with the subject line "UW List," which included a list of 38 Underwriting Managers and Underwriters who he and Robertson planned to target for solicitation and stated: "Here is how I rank them."  Lane invited Robertson to weigh in with her comments on the list, "as there may be some disagreement."  With regard to the last 8 of the 38 employees on the list, Lane revealingly wrote:  "I wasn't sure we could get them or wanted them."  He closed the email by stating:  "Let me know what you think! Talk to you later!"

52.     A few minutes after sending that email, Lane texted Robertson to let her know that he had just emailed her the list.  Robertson responded by text: "Thank you so much" without expressing even a modicum of surprise, confusion or puzzlement as to why Lane would be sending her a list of 38 employees, in ranked order no less, of their Home Point underwriting team in Maitland.

**D.     Robertson Meets with GHMC, Confirms a Plan to Hire Lane and Secures GHMC's Participation in the Solicitation Scheme.**

53.     On September 12, Robertson asked Lane via text:  "What are the most important questions for you with the new company?"  On the same day, Lane responded that he wanted to understand his role at the company and how many underwriters and offices there would be.

54.     On September 13, 2020, Robertson flew to Nashville to meet with Arsta and several other members of GHMC's senior management to discuss in more detail a potential job.  During the September 13 meeting, Robertson and GHMC specifically discussed Lane's anticipated position and salary, and agreed that Lane would work directly for Robertson to manage an anticipated team of underwriters and underwriting support staff in Florida.  While she was in Nashville for her meetings with GHMC, Robertson asked Lane via text how much he paid for insurance and whether it covered himself and his wife.  Robertson also texted Lane a copy of GHMC's Employee Benefits Guide and asked him to look at it.  Lane texted back that GHMC offered "decent insurance."  On the evening of September 13, Robertson sent a text message to Lane reporting that Lane's salary "is higher than the others but no issue" to GHMC and that Lane would receive from GHMC a bonus of $1.00 per loan for each loan that his underwriters would underwrite.

55.     During the course of her discussions with GHMC management on September 13, GHMC and Robertson discussed the opportunity for GHMC to hire members of Robertson's team at Home Point away from Home Point and GHMC's

leaders stated that they would be interested in hiring those employees.

56.     On information and belief, following Robertson's meeting with GHMC on September 13, Robertson directed Lane to carry out the recruitment plan she had discussed with GHMC that day.  Lane immediately began to do so.

**E.    Lane Solicits and Induces Dozens of Home Point Employees to Resign from Home Point and Accept Jobs with GHMC.**

57.     On the morning of September 14, 2020, just one day after Robertson's in-person meeting with GHMC in Nashville, Lane began executing on the plan to raid Home Point's Maitland employees.  At approximately 9:30 a.m., Lane sent a group text to his five subordinate Underwriting Managers at Home Point and informed them: "**PLEASE treat this as highly confidential.  I trust you all as friends and co-workers.**  This will be my landing spot – [GHMC].  I will be managing a local ops center consisting of Underwriters and UW Support.  **I want you ALL to come with me** and would be willing to get on a call to discuss." (emphasis added).   Lane also sent his Underwriting Managers the GHMC Employee Benefits Guide that Robertson had sent to Lane one day earlier.

58.     At approximately 11:35 a.m. on September 14, Lane texted Robertson asking her: "So should I start calling [underwriters] or not?"  Robertson neither responded to that text nor directed Lane not to make such calls.

59.     Over the course of the day on September 14, Lane initiated calls and texts to at least a dozen Home Point Underwriting Managers and underwriters to solicit them to leave Home Point for GHMC.  At or around 5:12 p.m., Lane sent

another text to Robertson that noted "OK it is done" with regard to his solicitation efforts that day.   Once more, Robertson did not respond or express any dissatisfaction about Lane's obvious misconduct, even though she knew Lane was still a Home Point managerial employee.

60.     At or around 6:57 p.m. on September 14, Lane sent a group text to his five subordinate Underwriting Managers that said in part:  **"I did not get a great deal of [Home Point] work done today.  I've been recruiting since our call earlier."** (emphasis added).  His text also falsely claimed that the Home Point employees who he had solicited on that date "are all secretly looking forward to sticking it to [Home Point] with a mass exodus."

61.     On September 15, Lane continued his solicitation efforts.   For example, in another group text to the five Underwriting Managers, he noted that he hoped to sound engaged at  a Home Point meeting and "[t]hen I have to get back to recruiting!"

62.     At the same time, Lane and Robertson were helping to coordinate GHMC's hiring of the employees who Lane had solicited.   On September 14, Robertson had multiple conversations with St. Pierre from GHMC in which Robertson provided St. Pierre with a list of the names of the Home Point employees who Lane had solicited and/or was soliciting, along with information relating to their positions, contact information and salaries.   Robertson provided St. Pierre with the email addresses that Lane had obtained from the Home Point employees during his discussions with them.   Indeed, Robertson and St. Pierre had multiple

conversations throughout the day in which information was added to the Home Point employee recruitment list.

63.     According to GHMC's corporate representative, Robertson had provided GHMC with the Home Point employees' contact information so that GHMC would reach out to these employees in connection with recruiting them. Ultimately, however, GHMC and Robertson agreed not to have GHMC contact the employees directly, and instead "chose to just have people that were leaving Home Point apply online."  Lane relayed the message to the Home Point employees and provided them with the link to the applicable page on GHMC's website.

64.     All communications about the application process, job positions, salaries and bonuses therefore were handled for GHMC by Lane and/or Robertson. In addition to providing GHMC with the employee information via Robertson, Lane also facilitated the recruitment and hiring process by making sure that the Home Point employees' applications had been received by GHMC; negotiating the payment of sign-on bonuses; and coordinating the timing of GHMC's issuance of offer letters.  For her part, Robertson passed necessary information to St. Pierre so that GHMC knew who to hire, how much to offer in terms of salary and sign-on bonuses, and where to direct the offer letters.

65.     Many – if not all – of the Home Point employees who were the targets of Lane's and Robertson's efforts to bring over their team: (a) were not looking for jobs at the time, (b) were not planning to leave Home Point, (c) had never told either Lane or Robertson that they were interested in leaving Home Point, and (d)

had no intention of searching for another job, either with GHMC or otherwise.

66.    A day-by-day summary of Lane's communications between September 14 and 17, 2020, with just one of the Home Point employees he actively solicited and induced to resign establishes the widespread flagrancy of Lane's misconduct as well as the choreographed scheme by Lane, Robertson and GHMC to poach Home Point employees to resign and join GHMC immediately:

**"Employee A"**

**September 14, 2020 conduct:**

67.    Employee A is a Senior Underwriter for Home Point who lives and works in the Maitland, Florida area.  On September 14, Lane texted Employee A while she was on vacation and asked if he could call her.  Employee A responded by text that Lane could call her.  Employee A neither was looking for a job at the time nor was planning to leave Home Point.  Employee A also had never told either Lane or Robertson that she was interested in leaving Home Point at the time.

68.    Lane called Employee A during the afternoon of September 14 and told her that Robertson had found a new position and Lane would be resigning from Home Point to go with her.  Lane told Employee A that the company was GHMC.  Lane also told Employee A that he would like to offer her a position with GHMC, and that he would be offering positions to about 15 people.

69.    During the phone call, Lane told Employee A that GHMC would offer her a higher salary than she earned at Home Point.  Lane also told Employee A that GHMC had a (purportedly) better bonus structure, with no minimum daily

thresholds that had to be met before triggering eligibility for bonuses. Lane added that an Underwriter's eligibility for such bonuses began on the first day of employment.  Lane also explained that GHMC was flexible on work hours and would provide as much or as little overtime work as Employee A desired.  Further, Lane told Employee A not to worry about insurance because GHMC would pay for COBRA coverage for the first 30 days and then employees would become eligible for company benefits under GHMC's benefits plan.  Further, Lane asked Employee A for her personal email address so he could send her a link with more information about GHMC.  Employee A then provided it to Lane.  Lane told her that he would send her the job description so she could see it, and there was no harm in Employee A applying for the position.  Employee A told Lane that she would need time to think about it because leaving Home Point would be a big decision for her.

70.     Following that call, Employee A texted Lane back that she had no desire to learn anything new at GHMC and asked about the timing of GHMC's pay dates.  Lane responded by text:  "Of course that is fine.  And I know they get paid biweekly."

71.     Employee A then texted Lane and asked if GHMC's bonus went into effect on day one.  Lane responded: "Yes it does!"

72.     Employee A then responded by text that she would need to figure out when to give notice to Home Point and asked Lane if there was "much of a lag between applying and any screening they do before actually getting hired?"

73.     Lane responded to Employee A by text:  "No it can be right away!"

Significantly, Lane's same text message also stated:  **"And I'm excited that everyone that I am talking to is on board!"**  (emphasis added).

74.    A few hours later on September 14, Employee A texted Lane and asked him to contact her "when you send me the email just to make sure I get it?"  Lane responded:  "Of course."

75.    Employee A next texted Lane to ask:  "Hi, Don, should I be filling out an application or is that what you're emailing me?  The link."  Lane responded by text:  "You can do that online if you can find it thru Linkdin [sic] or [GHMC's] website.  Otherwise we will be getting emails."  Lane stated in another text that he already had applied with GHMC himself and told Employee A that he could "help if you need it."

76.    Employee A responded by text that she had not received the link to apply but that she would wait for it.  Lane replied:  "Yup very impatient right now. I hate waiting."

77.    Employee A then asked Lane by text:  "What's the company name again?"  Lane responded:  "Guaranty Home Mortgage Corp."

78.    In the same text chain, Lane wrote:  "Motivation is not high!  **I'm waiting to give notice until they start sending these [offer letters] out to everyone.**  (emphasis added).

79.    Employee A sought clarification about Lane's use of "they start sending these out to everyone" by texting Lane:  "Ok thanks, and are you talking about the offer letters?

80.    Lane responded by text:  "Yes or at least links and communication. They are working with attorneys to make sure everything is done properly. Because this will be a BIG deal" (capitalization in original).

**September 15, 2020 conduct:**

81.    On Tuesday, September 15, Lane was still employed by Home Point and had not even given his managers notice that he was planning to resign.  At 7:32 p.m. that evening, Lane texted Employee A:  "The link has been sent.  Can you complete tonight?"  Employee A responded by texting Lane to ask him the specific position at GHMC for which she should apply.  Lane responded:  "Underwriter – Nashville."

82.    Employee A then texted Lane:  "[D]o I put anyone down who referred me?"  Lane responded:  "**You can put me.**" (emphasis added).

83.    Employee A texted back:  "It's ok to put [Home Point] number and Corp address right?"  Lane responded:  **"I did.  Just list [me as] your reference."**

84.    After Employee A finished applying for the Underwriter position with GHMC that evening, she texted Lane that she had finished doing so and then asked if he had resigned from Home Point:  "And… did you give notice?"

85.    Lane responded by text:  "Sweet!  **And the offers should be out tomorrow so looks like I'll be resigning Thursday**.  Oh boy!!"

86.    Employee A then asked Lane by text:   "Will there be other departments leaving too or just underwriting for now?  And should I offer my two

32

weeks at the same time as the other underwriters or no?"

87.    Lane texted back:  **"Yes we will try to coordinate that.  And definitely other departments as well** but I haven't been involved in any of that." (emphasis added).

**September 16, 2020 conduct:**

88.    On Wednesday, September 16, at 7:02 p.m., Employee A texted Lane to see if he had any news on the status of the offer letter from GHMC.  Lane responded by text:  "Your offer should be there tonight to your personal email." His text then added:  **"I was able to get you a $5,000 sign on bonus as well."** (emphasis added).

89.    Employee A responded by text:  "Thank you 🙏 so much!!"

90.    Lane then sent another text to Employee A:  "If you feel you need to wait until next Thursday to resign, that is up to you.  It's the only way to ensure that bonus.  I can't confirm that it will be paid if you are on notice.  **I know most people are resigning because they don't want to take the chance in case we get slapped with a cease and desist.  Probably won't happen but you don't know with these people.**" (emphasis added).  According to Lane, he used the word "we" in the phrase "in case we get slapped with a cease and desist" to mean GHMC.

91.    At 7:11 p.m. on September 16, Employee A received an email from Lisa Martin, a Human Resource Generalist at GHMC.  Martin's email to Employee A stated in part:  "I am following up on recent conversations regarding a Mortgage

Loan Underwriter opportunity with Guaranty Home Mortgage."

92.     But the only conversation Employee A ever had about the job opportunity with GHMC was through her phone call and text messages with Lane. Indeed, Employee A never received a single phone call, email or text message from GHMC before receiving her job offer from GHMC.  Employee A also never had an interview, live conversation or a meeting of any kind with anyone at GHMC before receiving her job offer.

93.     Martin's September 16 email to Employee A also included three attachments: (1) an offer letter signed by Craig Parrish, GHMC's VP of Human Resources; (2) a bi-weekly payroll calendar; and (3) a copy of GHMC's Employee Benefits Guide for the 2020-21 Plan Year.

94.     Parrish's letter formally offered Employee A the position of Mortgage Loan Underwriter at GHMC with a tentative start date of September 30, 2020.  The letter specifically offered Employee A the same annual salary that Lane had conveyed to her during their phone call on September 14.  The letter also memorialized the same $5,000 sign-on bonus that Lane had referenced in his text to Employee A just minutes earlier on September 16.  Further, the offer letter stated, among other things, that the Underwriter position "would be eligible for the current GHMC incentive program offered."

95.     In addition, GHMC's offer letter to Employee A included, among other provisions, the following sentence in bold font:  **"Employees with non-compete agreements or any type of employment restrictions from**

previous employers must provide the signed agreement to [GHMC] for review prior to beginning employment."

96.    Following her receipt of the offer letter from GHMC, Employee A texted Lane: "Ok so I guess my question is shouldn't we all resign at the same time? And I just got the offer and accepted it, with a tentative start date it says of 9/30." Lane responded by text: **"Yes I am trying to coordinate with everyone.  If they accept notice it will probably be 10/1 but we can iron all that out."** (emphasis added).

**September 17, 2020 conduct:**

97.    At 8:25 a.m. on Thursday, September 17, 2020, Lane sent a text message to Employee A.  Lane's text message stated:  "Good morning!  I set up a call at 9.  I just want to let my people know that I'm leaving so they don't hear it second hand.  **After that I'm calling my boss and resigning.  I recommend that all of you wait until 10 to start resigning.  Any time after that works.** If for any reason you are not comfortable with that please let me know.  Good luck today and God bless." (emphasis added).

98.    On information and belief, Lane sent that same text message to more than 60 Home Point employees.

99.    Also on the morning of September 17, Lane used Home Point's computer equipment and systems to schedule a 30-minute Microsoft Teams Meeting, identifying himself as the meeting organizer.  Lane then sent his meeting invitation to 64 then-current Home Point employees.   Significantly, Lane's

invitation to them included an accompanying instruction to the invitees: **"Please do Not forward this meeting."** (emphasis added). The 64 invitees included Lane's Team Leads, his underwriting staff, the underwriting support personnel who reported up to Lane, and other employees who did not report to Lane.

100.   Lane conducted the conference call on the morning of September 17, as scheduled. During the call, Lane told the dozens of Home Point employees who attended that he was resigning from Home Point to pursue another opportunity, and he wanted those on the call to hear it from him. He also provided his cell phone number to everyone on the call and invited them to call him if they wanted to talk to him privately.

101.   Home Point's records confirm that several dozen Home Point employees attended Lane's Microsoft Teams Meeting call.

102.   Shortly after he ended the September 17 call, Lane sent a detailed email to the Chief Executive Officer and President of Home Point. In that email, Lane formally resigned his employment from Home Point and wrote, among other things: "I know I still have something to give to this industry, and the opportunity to do so." Although Lane willingly had shared his future plans with his own subordinates and solicitation targets in the preceding several days, Lane conspicuously omitted any reference to GHMC in his email to Home Point's CEO, much less any reference to all of the efforts he had undertaken to pirate away Home Point's employees. Rather, Lane continued to try to conceal all of his blatant misconduct.

103.   Following the Microsoft Teams Meeting call, Employee A texted Lane and asked him to whom she ought to direct her notice of resignation.  Lane texted back that she should send the notice of resignation to her "[d]irect report, me, and Jacob Seaton."

104.   At 1:01 p.m. that afternoon, Employee A texted Lane that Home Point had scheduled a meeting with its Maitland personnel for later that afternoon.  Lane responded by text:  "It doesn't make it any less official.  Let me know how the call goes.  Oh boy!  **Don't let them scare you!**"  (emphasis added).

105.   Subsequently, Employee A texted Lane and noted that another female Home Point employee had asked Employee A if she was going with Lane, and then asked Lane:  "should I just not tell her[?]."  Lane responded:  "Your call.  I'm sure most people assume but **it's best to provide as little information as possible right now.**  She is still team [Home Point] right now.  But you can tell her your [sic] with me." (emphasis added).

106.   Employee A texted back:  "Ok thanks everything is blowing up now huh?"  Lane texted back:  "Yeah but sounds like they have accepted it.  The drama should be over."

107.   Employee A then texted Lane and indicated that another Home Point employee had asked her if GHMC needed to hire a wholesale representative in New England.  Lane responded by text:  "Probably!"

108.   Employee A then asked Lane if she could share GHMC's name with the employee who asked about the New England role.  Lane texted back:  **"If you**

**trust him but we're not throwing that around yet so he would have to put a lid on it."** (emphasis added).

109.   At 5:21 p.m. on September 17, Lane sent the following text to Employee A: "Hello!  First, it is confirmed that everyone that gave 2 weeks notice will get paid for those 2 weeks!  So yayyyy!  Also, you should receive an email invitation for a call at 6:00 with our new CEO, Brett Arsta.  I know it's short notice but try to make it if you can!"  Lane sent a second text shortly thereafter that he was "getting the phone number and the code."  Lane then sent a third text message that included a screen shot of a Microsoft Teams Meeting invite with an accompanying note from Arsta titled "Welcome to Guaranty Home Mortgage Corporation – Next Steps."  The screenshot message from Arsta stated:  "Good afternoon, I'd like to have a quick call with this group to go over a few items of interest and properly welcome each of you to Guaranty Home Mortgage Corporation.  Please mute while I address everyone and then we will do a quick QA.  Thank you all for your time.  Regards, Brett."

110.   On information and belief, Lane texted the same three messages in the immediately preceding paragraph to several dozen individuals who either were then-employed by Home Point or, like Lane, had just resigned from Home Point a few hours earlier that day.  On information and belief, Lane also was conveying to these employees that GHMC would be paying them for two additional weeks that Home Point did not pay as a result of Home Point's decision to end their employment immediately on September 17, 2020, as result of the coordinated

resignations.

111.    Arsta did indeed host a conference call at or around 6:00 p.m. on September 17 with the newly-pirated employees from Home Point.  Employee A participated in that call as well.  Arsta told the group that he knew it had been a stressful day and that GHMC was working quickly to get them onboarded with GHMC.  Arsta said that he wanted to reassure the group that they would be okay financially, which Employee A understood to mean that no one would go without a paycheck during the transition period.  Arsta also added that GHMC was excited to have a presence in Maitland and that the company was working on new leadership in that office, though he was careful not to mention Robertson or Lane by name.  Arsta also told the group to be cautious not to say anything derogatory about the events that had occurred that day.

112.    Also on September 17, Employee A exchanged additional text messages with Lane and informed him about Home Point's attempt to retain her with a retention bonus and salary increase.  Lane responded to Employee A by text: "I figured that was coming.  **They are in a pretty desperate place.  I know they are afraid of losing more people, especially with rumors of them closing Maitland.**  All the people that are still there are ringing me off the hook.  **I hope I can take more soon.**  All the sales people are calling me too." (emphasis added).

113.    Prior to that text message from Lane, Employee A had never heard any rumors that Home Point was contemplating the closure of its Maitland office.

Indeed, Lane's assertion was patently false.  Home Point never has considered closing its Maitland office.

114.    Employee A sent Lane an additional text that Home Point had offered her additional money to stay, and asked Lane if Loan Coordinators were giving notice to Home Point too.  Lane responded by text:  "Oh wow!  I'm sorry about that!  And yes several LC's quit.  And seven closers including Manny the manager.  That company [i.e., Home Point] spends money like water.   It's almost irresponsible what they're doing."

115.    In another text that day, Lane told Employee A:  **"You're the best! If it's any consolation we were offered much more to sign an agreement not to bring anybody with us.  The hell with that!"** (emphasis added).

116.    Lane further texted Employee A:  **"When it slows down this winter they [i.e., Home Point] will be cutting a lot of people loose.  Not my problem anymore!!"** (emphasis added).  And in another text Lane sent to Employee A shortly thereafter:  "There is something very unattractive about desperation.  And I don't think anyone trusts what they are hearing."

117.    Employee A ultimately decided to remain at Home Point, and therefore declined to join GHMC.  On Monday, September 21, 2020, Employee A texted Lane and informed him of her decision.  Lane responded by text, asking her:  "Can you please notify GHMC?  You sent your signed offer in right?  Technically, I'm not even there yet."

## F.     Lane's Solicitations and Admissions to Other Home Point Employees.

118.    The foregoing dozens of paragraphs recounting Employee A's experiences with Lane and GHMC barely scratch the surface with regard to Lane's illegal solicitation efforts, and also are not GHMC's only attempts at aiding and abetting his solicitations and tortiously interfering with Home Point's employment relationships.

**"Employee B":**

119.    Employee B is a Senior Underwriter at Home Point who works remotely but is assigned to the Maitland office.

120.    On September 14 or 15, Lane called Employee B on her cell phone. During the call, Lane told Employee B that he was pursuing other job opportunities.  In particular, Lane told Employee B that he wanted to work with Robertson again and that he and Robertson were "starting something."  Lane added that he was putting together a team, and asked Employee B if she was interested in such an opportunity.  Employee B responded that she is always interested in listening.  Lane then said that he had Employee B's personal email address and that he would get the information about the opportunity to her at a later time.

121.    During the call, Lane also told Employee B that her sister—who is also a Home Point employee—would be a good fit for the new opportunity, and that he was going to reach out to her too.  Lane added that Employee B and her sister both

were hard workers and he had to have them.

122.   Consistent with his promise to Employee B on their phone call, Lane sent an email from his Hotmail account to Employee B on September 15 at 6:29 p.m. with the subject line of "GHMC Link."  The text of Lane's email to Employee B began with the phrase:  "Here is the link," and underneath it was an active link to a GHMC "career portal" that listed various job opportunities at GHMC.  Lane's email further directed Employee B:  "Apply for the Mortgage Loan Underwriter – Nashville position."

123.   Lane's email also pressed Employee B to act quickly.  Lane wrote in his email:  **"I could really use this tonight if at all possible.  Let me know if you need any help."** (emphasis added).

124.   Employee B thereafter applied for the Underwriter position with GHMC.  She subsequently received an offer letter from GHMC even though she never had a conversation with anyone at GHMC.

125.   Ultimately, Employee B thought it was bizarre that GHMC made an offer to her without anyone at GHMC ever talking to her about a position with the company.  Employee B declined the job offer from GHMC.

**"Employee C":**

126.   Employee C is a Senior Underwriter for Home Point who works remotely but is assigned to the Maitland office.

127.   On September 14 or 15, Lane called Employee C and told her that he was unhappy at Home Point and was planning to resign.  He also told Employee C

that he had an opportunity for her and asked if she would be interested in knowing more about it.  Employee C responded that she would consider it.

128.   Lane did not provide additional details at that time.  Instead, Lane asked Employee C for her personal email address, which she provided to him.  Lane told Employee C that he would get her additional information about the new opportunity when he could.

129.   Consistent with his promise to Employee C on their phone call, Lane sent an email from his Hotmail account to Employee C on September 15 at 6:34 p.m. with the subject line of "GHMC Link."  The text of Lane's email to Employee C began with the phrase:  "Here is the link to apply," and underneath it was an active link to the GHMC "career portal" that listed various job opportunities at GHMC.  Lane's email further directed Employee C:  "Apply for the Mortgage Loan Underwriter – Nashville position."

130.   Here too, Lane's email also pressed Employee C to act quickly.  Lane wrote in his email:  "I could really use this tonight if at all possible.  Let me know if you need any help."

131.   Lane also invited Employee C to the September 17 Microsoft Teams Meeting that he organized to announce his resignation to his subordinates first.  Later in the day on September 17, Employee C unexpectedly received a job offer from GHMC.

132.   Employee C declined to accept GHMC's job offer.

**"Employee D":**

133.    Employee D lives and works for Home Point in Maitland, Florida. Employee D is an Underwriter and Team Lead at Home Point.

134.    On the morning of September 17, 2020, approximately 5 to 10 minutes before Lane held the Microsoft Teams Meeting with the dozens of Home Point employees he had invited to that call, he called Employee D, who was one of his direct reports.  Lane told Employee D that he was going to be resigning and taking his management team with him to another company.   Lane apologized to Employee D that he was leaving her behind, but told her that he assumed it was not a good time in her life for such a job move.  Lane did not tell Employee D that he was joining GHMC.

**"Employee E":**

135.    Employee E is a Senior Director of Underwriting at Home Point.

136.    On the morning of September 17, an Underwriter at Home Point who reported to Employee E gave her a heads-up about the forthcoming Microsoft Teams Meeting that Lane had scheduled.  That Underwriter also asked Employee E if she knew anything about the meeting because the invitees to Lane's meeting included personnel, like this particular Underwriter, who reported to Employee E, not to Lane, and she noticed that Lane's meeting invitation included the phrase "Please do Not forward".

137.    Employee E was unaware of the Microsoft Teams Meeting and was not among the list of invitees, so she sent a message to Lane asking him why he

was having a meeting that included members of Employee E's team.

138.   Lane responded by asking Employee E to call him, and she obliged. During their September 17 call, Lane told Employee E that he was resigning from Home Point.  Employee E then said that Lane must be going to join Robertson. Lane responded that Robertson had some things in the works.  Employee E asked Lane if he was taking his whole staff with him, and Lane responded that "there will be a lot of movement today."  Lane also told Employee E that he had reached out only to those employees who had been at Home Point for a year or longer, which was untrue.

139.   After Lane resigned, he continued to send texts to many Home Point employees and encouraged them to reach out to him once "the dust settles."  He asked still other employees whether Home Point co-workers wanted to be added to his list of potential recruits.  In one such instance, he wrote:  "You can let her know that we'll have more opportunities soon."

## G.   GHMC Knew that Robertson and Lane Were Subject to Non-Solicitation Obligations to Home Point and Approved Their Efforts Anyway.

140.   On September 14, 2020, Robertson told GHMC, through Josh Ehrenfeld, the company's outside counsel, that she likely was subject to a non-solicitation covenant.  Specifically, she told  Ehrenfeld that she was certain that Home Point's employee handbook contained either a one-year or three-year non-solicitation covenant.  Lane would have been subject to the same covenant in the employee handbook.

141.   GHMC never confirmed that Robertson was not, in fact, subject to a non-solicitation covenant.

142.   Although GHMC has asserted that its standard practice is to interview employees, GHMC deviated from that standard practice by deciding not to interview or speak to any of the other Home Point employees before offering them positions because Robertson and Lane had vouched for them.  GHMC also did not have its outside counsel review Lane's employment documents, as it (purportedly) normally does with new hires in similar positions.

143.   Lane himself admitted to one Home Point employee that GHMC was "working with attorneys to make sure everything is done properly. Because this will be a BIG deal," and repeatedly expressed concerns in writing to multiple Home Point employees about getting "slapped" with a cease and desist letter.

144.   Moreover, GHMC was aware of the fact that non-solicitation agreements are common in the industry for employees in his and Robertson's positions, and indeed GHMC itself required Lane and Robertson to sign non-solicitation covenants that are substantially similar to the covenants which Lane and Robertson signed with Home Point.

**H.   Home Point's Associate Handbook Specifically Prohibits the Shameless Conflict of Interest that Lane and Robertson Orchestrated for GHMC.**

145.   While Lane was employed by Home Point, he received Home Point's Associate Handbook (hereinafter, "Handbook").  Specifically, on November 5, 2018 at 1:27 p.m., Lane submitted an electronic acknowledgment that he had

received and read the Handbook.   The acknowledgment form stated:   "The Handbook contains policies that you will find important to your employment."  The form further stated:  "After you review, please check the box below and hit 'Submit.' By checking the box, this will confirm you have:  (1) Received and read the 2018 Associate Handbook, and (2) Read and understood the 'Acknowledgment and Receipt' located on the last page of the Handbook."

146.   Robertson also received and acknowledged the Handbook on the same date of November 5, 2018.  Specifically, at 4:16 p.m. on that date, Robertson submitted an electronic acknowledgment that she had received and read the Handbook.  The substance of the acknowledgment form that Robertson signed was identical to the form that Lane submitted.

147.   As Home Point employees, Lane and Robertson each were responsible for reading, understanding and complying with the policies contained in the Handbook.  Indeed, the Handbook specifically provides that "[f]or purposes of all Home Point Policies, Procedures, and this Handbook, 'Associate' shall include all Home Point employees regardless of position or title (i.e. Associate, Sr. Associate, Director, Sr. Director, Managing Director, Sr. Managing Director, Executive Managing Director, Chief, etc.)."  Further, Lane's and Robertson's compliance with all policies in the Handbook was particularly important in light of their respective managerial positions with Home Point.

148.   The Handbook includes a section entitled "Conflicts of Interest," which states in pertinent part:

Home Point is subject to a high degree of public visibility. It is Home Point's policy that all Associates avoid any conflict between their personal interests and those of Home Point.  The purpose of this policy is to ensure that Home Point's honesty, integrity, and reputation, are not compromised. The guiding princip[le] of this policy is that no Associate should have, or appear to have, personal interests or relationships that actually or potentially conflict with the best interests of Home Point or its investors.

It is not possible to give an exhaustive list of situations that might involve violations of this policy.  However, the situations that would constitute a conflict in most cases include but are not limited to:

- Acting as a director, officer, consultant, agent or employee of a supplier, customer, competitor or any entity that engages in business with the Company;

* * *

- Conducting outside activities that materially detract from or interfere with the full and timely performance of an Associate's job duties for the Company;

It is your responsibility to report any actual or potential conflict that may exist between you (and your immediate family) and Home Point. Failure to disclose the fact of a conflict or potential conflict may constitute grounds for disciplinary action up to and including termination.

149.   The Handbook also contains an "Outside Employment" Policy that specifically provides in relevant part:

Home Point respects each Associate's right to engage in activities outside of employment such as those that are of a personal or private nature, to the extent that such activities do not create a conflict of interest as described in the Conflicts of Interest policy set forth in this Handbook or adversely affect the Associate's ability to perform his or her job. . . .

While the Company does not prohibit Associates from holding other jobs, the following types of outside employment are prohibited:

- Employment that conflicts with the Associate's work schedule, duties and responsibilities or creates an actual conflict of

interest;

* * *

- Employment that directly or indirectly competes with the business or the interests of the Company.

150.   Lane's actions on behalf of GHMC, including but not limited to his repeated solicitations and inducements of Home Point employees while still employed by Home Point, blatantly violated Home Point's Conflicts of Interest and Outside Employment Policies.  He also willfully flouted his obligation to report his actual conflict to Home Point, and instead attempted to conceal it entirely.

## I.    Wilkins Sends Numerous Home Point Documents to Himself Shortly Before Providing Notice of His Resignation.

151.   In 2016, Wilkins joined Home Point as a Senior Underwriter in the company's Maitland office.  He initially reported to Robertson directly and later to Lane.

152.   On October 26, 2018, during his employment at Home Point, Wilkins submitted an electronic acknowledgment that he had received and read the Handbook.

153.   The Handbook includes a section entitled "Company Confidential Information," in which, among other provisions, Home Point specifically prohibits unauthorized disclosure of proprietary information outside of the Company without prior approval.   Home Point's policy states in pertinent part (with emphasis added):

> The Company's confidential and proprietary information is vital to its current operations and future success.  Each Associate should use all

reasonable care to protect or otherwise prevent the unauthorized disclosure of such information.

**In no event should Associates disclose or reveal confidential information within or outside the Company without proper authorization or purpose.**

"Confidential Information" refers to a piece of information, or a compilation of information, in any form (on paper, in an electronic file, or otherwise), related to the Company's business that the Company has not made public or authorized to be made public, and that is not generally known to the public through proper means.

By way of example, confidential or proprietary information includes, but is not limited to, nonpublic information regarding the Company's business methods and plans, databases, systems, technology, intellectual property, know-how, marketing plans, business development, products, services, research, development, inventions, financial statements, financial projections, financing methods, pricing strategies, customer sources, Associate health/medical records, system designs, customer lists and methods of competing. Additionally, Associates who by virtue of performance of their job responsibilities have the following information, should not disclose such information for any reason, except as required to complete job duties, without the permission of the Associate at issue: social security numbers, driver's license or resident identification numbers, financial account, credit or debit card numbers, security and access codes or passwords that would permit access to medical, financial or other legally protected information.

154.    The Handbook also includes specific references to the federal Defend Trade Secrets Act and employees' rights thereunder.

155.    At 11:09 a.m. on September 17, 2020, the same date that Lane resigned, Wilkins sent an email providing notice of his resignation too, and stated that his last day would be September 30.

156.    In the hours leading up to his resignation, Wilkins had secretly and improperly begun sending emails to his personal email account beginning within

a matter of minutes after he sent his resignation email.

157.   Specifically, Wilkins sent at least 16 emails from his Home Point email account to his personal email account on September 17.  He neither sought nor received approval from Home Point's management to do so with respect to any of those emails.

158.   Several of the emails that Wilkins sent to himself included multiple attachments containing Home Point's trade secrets and proprietary information, such as calculation worksheets, scripts, underwriting strategies, attorney opinion letters, as well as other proprietary information, all of which he was not permitted to send to himself.

159.   For example, the first email Wilkins sent to his personal email address that day was an email with the Subject line of "a.".  The email attached seven different attachments.  One of those attachments was a detailed excel spreadsheet entitled "Tracking Log" that itself included more than 15 separate, detailed tabs of data.  Included in the voluminous log were substantial details with Home Point's customer names, their loan numbers and loan types, and a variety of other non-public details.  The tracking log also included active links to Home Point's confidential directory lists and proprietary overlay matrices for investor requirements, none of which is publicly available.  In addition, one of the tabs included proprietary scripts for Underwriters that Home Point spent substantial time preparing.  Home Point asks its Underwriters to use such scripts in order to ensure consistency in performance.

160.    Another one of the seven attachments is a proprietary July 2020 "Self Employed Comparative Analysis" spreadsheet that Home Point created for use in connection with investors' changes resulting from the COVID-19 pandemic.  Home Point spent substantial time and resources to develop the spreadsheet, which includes a variety of questions and instructions that Home Point gives to Underwriters to prepare their analyses.

161.    Because of Home Point's security procedures and firewalls, some of the proprietary information that Wilkins attempted to send himself immediately was returned as undeliverable.  Less than a minute after Wilkins sent the above-referenced email with seven attachments to himself at 8:56 a.m., he received an automated response that his message "conflicts with a policy in your organization." He received another email within a minute later that the message was blocked and undeliverable.

162.    Wilkins was undeterred by the firewall.  Instead of contacting Home Point's email administrator for further guidance, Wilkins simply modified the attachments to overcome firewall issues so he could still re-send the detailed "Tracking Log" spreadsheet—this time without the borrowers' loan information but still including Home Point's proprietary information —to his personal email account.  He sent that email at 9:10 a.m. on September 17.

163.    Moreover, in a separate email at 8:58 a.m., Wilkins sent himself an email entitled "FHA" that included five attachments relating to FHA loans, including Home Point's proprietary calculation analyses and worksheets, and

other non-public information about Home Point's work processes.

164.   At 9:01 a.m., Wilkins sent himself an email entitled "USD" with 13 attachments.  Among those attachments was a "TPO USDA Setup" document that is Home Point's proprietary information.

165.   As another example, at 9:38 a.m., Wilkins sent to his personal email address a legal opinion letter that had been prepared by an outside law firm at Home Point's request and expense.

166.   Home Point takes reasonable steps to protect the security of its proprietary information, including trade secrets, and its customers' personal information.   Many of Home Point's databases, for example, are password-protected and accessible only to those employees who have a need to know the information.

## COUNT 1 – BREACH OF CONTRACT
## (against Defendants Lane and Robertson)

167.   Home Point hereby incorporates and re-alleges all preceding paragraphs of this Amended Complaint as if they were fully set forth herein.

168.   Home Point and Lane entered into an Agreement pursuant to which Lane agreed not to "directly or indirectly, either on [his] own account or for any entity or person, hire or solicit any existing or former associate and/or client of the Company to leave his/her employment or engagement," and not to "knowingly induce or knowingly attempt to induce any such employee to terminate or breach his or her employment or engagement agreement with the Company" during his

employment and for a period of 12 months thereafter.

169.    Home Point and Robertson entered into an Operations Agreement pursuant to which Robertson agreed not to "in any way solicit, recruit, or hire any other employee of Home Point to form or to join another business" and not to "aid or assist in such solicitation by another person or entity" during her employment and for a period of one year thereafter.

170.    The Agreement was supported by substantial consideration, such as the salary increase that Lane received from Home Point, the promotion to Senior Director, and other employee benefits.   The Operations Agreement also was supported by substantial consideration, such as the salary increase that Robertson received from Home Point, Robertson's continued employment with Home Point, and other employee benefits that she received.

171.    Home Point, for its part, also fully performed all of its obligations under the Agreement and Operations Agreement.

172.    The Agreement and the Operations Agreement are each binding and enforceable contracts under Florida law, including under Section 542.335(1) of the Florida Statutes, which provides in pertinent part that "enforcement of contracts that restrict or prohibit competition during or after the term of restrictive covenants, so long as such contracts are reasonable in time, area and line of business, is not prohibited."

173.    The non-solicitation covenants in the Agreement and in the Operations Agreement are each eminently reasonable in time, area and line of

business.  The term of each covenant is limited to the period of Lane's and Robertson's employment and 12 months following their separation, which is well within the range of reasonable post-term covenants under Section 542.335(1)(d) of the Florida Statutes.  Further, the only restrictive covenant is a non-solicitation covenant, such that there is nothing that prohibits Lane or Robertson from working in any geographic area or in any line of business, including one that directly competes with Home Point.  Indeed, Home Point does not seek to restrict Lane or Robertson from continuing to work for GHMC, therefore rendering the area or line of business factors set forth in Section 542.335(1) inapplicable.

174.   Each of the non-solicitation covenants is narrowly tailored and furthers Home Point's legitimate business interests under Section 542.335(1)(b)(5) of the Florida Statutes because, among other reasons, Home Point provides extraordinary and specialized training to its employees.

175.   Home Point uses a complex underwriting process that is unique and proprietary and which involves a specifically designed workflow, the use of customized software, and an understanding of Home Point's particular credit risk tolerance.  Consequently, Home Point's training of new employees takes substantial time and requires significant company resources. This is true even for new hires with previous underwriting experience because Home Point's complex processes are unique to the company, so Underwriters with previous experience need to be re-trained and then instructed about Home Point's methods.

176.   In addition to learning Home Point's work flow and processes and

mastering its customized software, Underwriters must also understand Home Point's credit risk tolerance and learn to implement that philosophy in their decision making. After the initial training period, Home Point must assign to more senior employees the duty of monitoring and reviewing the underwriting determinations made by new employees in order to validate the integrity of their work. This secondary training period is very important to Home Point because a mistake in the underwriting process can cost the Company many thousands of dollars.

177.   This secondary layer of review draws those senior employees away from their other work and decreases their productivity on their other job functions.

178.   It takes roughly three to six months of training for even an experienced Underwriter to become proficient with Home Point's proprietary processes and methods of doing business and to achieve full productivity.

179.   Each of the non-solicitation covenants also furthers Home Point's additional legitimate business interests of promoting business productivity and of maintaining a competent and specialized workforce, including of its Underwriters, Underwriting support staff and Loan Coordinators, among other teams, to service its customers within the compressed timeframes required in its line of business to remain competitive within the marketplace.

180.   Each of the non-solicitation covenants thus furthers Home Point's legitimate business in protecting its goodwill with its clients in accordance with Section 542.335(1)(b)(4) of the Florida Statutes. Home Point's customers rely on

it to make timely decisions about loans.  Because of the ramp-up period for new employees and the related loss of productivity by senior employees who must assist the training process, a mass exodus of employees could damage Home Point's ability to maintain its underwriting turnaround time.

181.   Moreover, each non-solicitation covenant protects Home Point's relationships with its employees.  Managerial employees like Lane and Robertson, in particular, know the strengths and weaknesses of subordinate employees, their experience levels, their compensation levels and expectations, and how each employee's job performances compares to that of their peers.  The removal of groups of employees, including, as in this case, an entire layer of five Underwriting Managers in addition to the Underwriters themselves, also is an important and legitimate business interest that the non-solicitation covenant is designed to protect.  The covenants help to guard against Home Point's inability to handle loan escalations and other customer service issues resulting from mass resignations, and from having to move personnel from other tasks to try to cover a shorthanded office, thereby disrupting the company's operations on an even larger scale.  Here, Home Point's ability to service its customers was undercut by the removal of these multiple layers of employees, especially all at once, as reflected in customer complaints brought to Home Point's attention in the wake of Defendants' illegal scheme.

182.   Accordingly, and consistent with Section 542.335(1)(c) of the Florida Statutes, Home Point's non-solicitation covenants with Lane and with Robertson

were reasonably necessary to protect all of the above-referenced legitimate business interests.

183.   As articulated in detail above, Lane repeatedly and materially breached his contractual obligations to Home Point by intentionally targeting, soliciting, inducing and encouraging dozens of employees to resign from Home Point and join GHMC.

184.   As articulated in detail above, Robertson repeatedly and materially breached her contractual obligations to Home Point by conspiring with and aiding and assisting Lane and GHMC to intentionally target, solicit, induce and encourage dozens of employees to resign from Home Point and join GHMC.

185.   Certain impacts of Lane's and Robertson's illegal solicitations and inducements of Home Point employees are incalculable in monetary terms.  Such injuries are irreparable and can only be remedied through issuance of a preliminary and permanent injunction.  Indeed, the risks of future solicitations and other illegal actions by Lane and Robertson are neither based on conjecture nor merely hypothetical.  Rather, Lane has specifically and repeatedly stated, including in writing, that he hopes to take more Home Point employees soon and that "we" (i.e., he, Robertson and GHMC, if not other individuals too) are intentionally coordinating to effect the departures of other Home Point employees in different departments.  Accordingly, injunctive relief is a necessary component of making Home Point whole in this action.

186.   For independent reasons, Home Point also is entitled to monetary

damages for other aspects of Lane's and Robertson's material breaches of contract, which are the direct and proximate cause of substantial, actual damages to Home Point. As just one example, Home Point spent well in excess of $100,000 in aggregate retention payments to employees that it would not have been forced to incur but for Lane's and Robertson's intentional and illegal solicitations.

187. Additional damages proximately caused by Lane's and Robertson's misconduct include, but are not limited to, the substantial value of lost time, money and resources that Home Point invested in its own personnel, and its replacement costs arising out of and related to all employees who departed from Home Point as a consequence of Lane's and Robertson's illegal solicitations, inducements and encouragements.

188. Home Point also suffered further damages by paying Lane to perform his contractual duties as an employee of Home Point on its behalf when, in fact, well prior to his orchestrated resignation from Home Point he was covertly acting on behalf of GHMC.

189. Given Lane's and Robertson's brazen and outrageous misconduct, this Court should also award Home Point its reasonable attorneys' fees and costs pursuant to Section 542.335(1)(k) of the Florida Statutes.

### COUNT 2 – BREACH OF FIDUCIARY DUTIES (against Defendant Lane)

190. Home Point hereby incorporates and re-alleges all preceding paragraphs of this Amended Complaint as if they were fully set forth herein.

191.    As a then-current employee of Home Point, and especially as a managerial employee, Lane owed Home Point a variety of fiduciary duties, including, but not limited to, the duties of loyalty, good faith, honesty and fair dealing, to act in Home Point's best interests, and not to engage in self-dealing or carry out obvious conflicts of interest.   Those duties existed throughout Lane's employment, up to and including the time of his resignation on September 17, 2020.   Lane's fiduciary duties were even weightier than lower-level employees because of his managerial position at the Company.

192.    Lane also specifically acknowledged receiving and reading the Handbook during his employment with Home Point.   As discussed above, the Conflicts of Interest and Outside Employment Policies contained in the Handbook each specifically prohibited the precise course of misconduct that Lane plotted and undertook to benefit his own interests and those of GHMC.

193.    Home Point trusted that Lane would abide by his fiduciary duties. Instead, Lane brazenly violated those duties by secretly performing numerous services on behalf of GHMC while still employed by Home Point.   Among other things, Lane: (1) texted, called and/or emailed dozens of Home Point employees to actively solicit, induce, recruit, encourage and facilitate their applications for jobs at GHMC and corresponding resignations from Home Point while they (and he) were still employed at Home Point; (2) attempted to sell, and sold, Home Point employees on terms of compensation and work hours that (purportedly) are more favorable at GHMC as a specific inducement to lure those employees into resigning

from Home Point; (3) repeatedly instructed Home Point employees to keep information under wraps to reduce the risk of disclosure to Home Point's management; and (4) facilitated a conference call for numerous Home Point employees with Arsta, the Chief Executive Officer of GHMC, on the very day of his own resignation from Home Point, within a matter of hours after that resignation.

194.    Had Home Point been aware of Lane's misconduct prior to September 18, 2020, Home Point would have terminated Lane's employment immediately.

195.    Lane's actions lacked justification, privilege or excuse.

196.    As a direct and proximate result of Lane's willful and malicious breaches of duties, which he conducted with reckless indifference to Home Point's rights, Home Point has incurred and will continue to incur substantial damages.

## COUNT 3 - TORTIOUS INTERFERENCE WITH CONTRACT (against Defendants GHMC and Robertson)

197.    Home Point hereby incorporates and re-alleges all preceding paragraphs of this Amended Complaint as if they were fully set forth herein.

198.   GHMC knew that Lane and Robertson were subject to non-solicitation covenants while they participated in Defendants' orchestrated scheme to recruit, solicit and induce dozens of Home Point employees to resign and join GHMC.  For example, as alleged above, Robertson told GHMC that Home Point's employee handbook contained either a one-year or three-year non-solicitation covenant, but GHMC nonetheless continued working with Lane and Robertson to recruit and hire all of the Home Point Maitland office employees Robertson and

Lane recommended and solicited pursuant to the terms that Lane had negotiated with the employees on GHMC's behalf.

199.   Furthermore, Robertson, for her part, was well aware that Lane's Agreement included a non-solicitation covenant that prohibited Lane, during and after his employment, from soliciting Home Point employees.  Indeed, as reflected in Exhibit 2, the Agreement was provided from Robertson to Lane.  Robertson also knew that Lane was contacting underwriters to solicit them while he was still employed by Home Point.  Lane texted Robertson on September 14 and asked if he should start calling Underwriters, and Robertson never responded, directed him not to do it, or discouraged him from doing so without first reviewing his Agreement.  Nor did Robertson question why Lane sent her an email several days earlier in which he ranked 38 underwriting managers and underwriters and discussed whether they "could get" or "wanted" certain employees.

200.   GHMC directed, encouraged or, at the very least, knowingly or recklessly permitted Lane and Robertson to breach their contractual obligations to Home Point.  Robertson did the same as to Lane's contractual obligations.  As alleged above, Robertson, Lane and GHMC carefully coordinated the entire recruiting process, with Lane and Robertson serving as the conduit of much of GHMC's information.  GHMC delegated to Lane and Robertson the authority to determine who GHMC should hire and relied exclusively on their judgments about who to hire and how to compensate them in order to recruit them from Home Point.  Throughout it all, GHMC and Robertson knew that Lane was still employed

by Home Point too.

201.   That GHMC and Robertson were complicit in all of Lane's actions is glaringly evident from the fact that GHMC deviated from its standard hiring practices and made offers of employment to multiple Home Point employees without ever having a single phone call, virtual or in-person meeting, or interview with any of them.  Instead, GHMC blindly relied on the fact that Robertson and/or Lane had vouched for those employees.

202. Robertson clearly intended that the poaching scheme would undermine Home Point's business and inflict significant damage on Home Point in the Maitland area.  Robertson was motivated to exact revenge against Home Point because she was angry about having been terminated.

203.   While she was employed at Home Point, Robertson also received by email a copy of the Agreement with Lane, which not only contained his non-solicitation covenant, but which also included Robertson's name as the author of the Agreement.  Moreover, during her employment at Home Point, Robertson had submitted an electronic acknowledgment of having received and read the Handbook, which included the above-referenced "Outside Employment" and "Conflict of Interest" policies that specifically prohibited Lane from performing services for GHMC while he was still employed with Home Point.

204. GHMC's and Robertson's respective tortious actions lacked justification, privilege or excuse.

205.  As direct and proximate results of (a) GHMC's tortious, willful and

malicious interference with Home Point's contracts with Lane and Robertson, and (b) Robertson's tortious, willful and malicious interference with Home Point's contract with Lane, Home Point has incurred and will continue to incur substantial damages. Further, punitive damages should be awarded against each of GHMC and Robertson, and in favor of Home Point, as a result of GHMC's and Robertson's tortious conduct.

### COUNT 4 – AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES (against Defendants Robertson and GHMC)

206. Home Point hereby incorporates and re-alleges all preceding paragraphs of this Amended Complaint as if they were fully set forth herein.

207. Robertson and GHMC aided and abetted Lane's breaches of fiduciary duties in numerous ways. Home Point's allegations sufficiently articulate the four elements of this aiding and abetting claim.

208. First, Lane owed numerous fiduciary duties to Home Point, especially as a managerial employee with hiring and firing power.

209. Second, as set forth above, Home Point has pled repeated and material breaches of those fiduciary duties by Lane while he was still employed by and being compensated by Home Point.

210. Third, Robertson certainly had knowledge of Lane's breach. As a long-time managerial employee herself, and as Lane's former supervisor, Robertson knows that employees, especially managers like Lane, owe their employer duties of loyalty and other fiduciary obligations while employed with their employer.

Indeed, Home Point's handbook, which Robertson received and acknowledged reading, also emphasizes those same principles in the "Outside Employment" and "Conflict of Interest" policies. And Robertson was well aware that Lane breached those duties by secretly acting as GHMC's recruiter and agent in countless communications with Home Point employees before he had even resigned from Home Point.

211.   GHMC similarly had knowledge of Lane's breach. As an employer itself, GHMC knows that employees, especially managers like Lane, owe their employer duties of loyalty and other fiduciary obligations while employed with their employer. And GHMC was aware that Lane breached those duties by secretly acting as GHMC's recruiter and agent in countless communications with Home Point employees before he had even resigned from Home Point. GHMC knew that Lane was breaching his fiduciary duties; he informed GHMC's Chief Operating Officer, St. Pierre, in writing that his five subordinate Underwriting Managers would need to resign at the same time as him. GHMC also knew that Lane, while still employed by Home Point, was communicating on GHMC's behalf with Home Point employees about their job applications, salaries and bonuses.

212.   Finally, Robertson provided substantial assistance or encouragement to Lane. As alleged above, Lane and Robertson jointly agreed to conduct a mass raid of Home Point's employees. Robertson tacitly agreed with Lane's conduct and did nothing when Lane, while still employed by Home Point, sent her an email listing the 38 employees they should jointly target, ranked by order of preference.

Robertson also turned a blind eye when Lane asked her on September 14 whether or not he should start calling the underwriters on his list to solicit them to join GHMC.  Despite knowing that Lane still worked for Home Point, she did nothing.  She also did nothing to discourage, deter or stop Lane after he updated her later that same day about his solicitation efforts by texting her: "OK it is done."  Instead, she was busy securing a job for Lane at GHMC and contributing to Lane's breaches by relaying information that Lane had collected about the employees being solicited to GHMC, and serving as a conduit between Lane and GHMC, including with respect to the personal email addresses of employees Lane had solicited.

213.   Similarly,   GHMC   also   provided   substantial   assistance   or encouragement to Lane.  As but one example, Lane made specific oral promises to Employee A about her base salary, and GHMC's subsequent written offer letter, signed by Parrish and communicated by Martin as a result of "recent conversations" that no one other than Lane ever had with Employee A, matched the salary that Lane had verbally offered to Employee A.  GHMC thus was coordinating its orchestrated scheme with Lane to pirate away as many employees as possible, all while GHMC knew that Lane was still employed by Home Point. GHMC never even met with, spoke to or interviewed multiple Home Point employees to whom it offered employment in Underwriting positions.  Instead, GHMC sent them offer letters sight unseen based only on the fact that Lane and Robertson wanted those employees.

214.   Robertson's and GHMC's aiding and abetting of Lane's breach of

fiduciary duties has caused substantial damages to Home Point and merits punitive damages, among other relief.

## COUNT 5 – CIVIL CONSPIRACY
## (against Defendants Lane, Robertson, and GHMC)

215.   Home Point hereby incorporates and re-alleges all preceding paragraphs of this Complaint as if they were fully set forth herein.

216.   Lane, Robertson, and GHMC knowingly and voluntarily conspired to conduct a mass raid of Home Point's employees, and to have Lane serve as GHMC's primary recruiter, agent and cheerleader, all while Lane was still employed by Home Point.  Lane and Robertson then carried out countless overt acts in support of that scheme, as alleged above.

217.   The conspiracy was itself an unlawful act, or, alternatively was a lawful act conducted by unlawful means, by virtue of Lane's and Robertson's legally binding contractual duties during their employment and in the 12-month period thereafter not to solicit or induce any employees to resign from Home Point. GHMC's senior management and Robertson knew that Lane was coordinating the hiring scheme for GHMC while he was still employed by Home Point as aa managerial employee, in obvious violation of his duty of loyalty and other fiduciary duties to Home Point.

218.   Defendants Lane, Robertson, and GHMC's overt acts in furtherance of the conspiracy also continued in the aftermath of Lane's resignation.  Despite the continuing applicability of Lane's non-solicitation covenant after his

resignation, Lane and Arsta coordinated to arrange their same-day conference call on September 17.  Lane forwarded the call-in details to all of the departing (and potentially departing) Home Point employees and proactively encouraged them to participate in that conference all by sending three texts to the entire group and imploring them to "try to make it if you can!"

219.   One of the purposes and objectives of Defendants Lane, Robertson, and GHMC's conspiracy was to compete unfairly with Home Point by poaching Home Point employees despite Lane's and Robertson's non-solicitation covenants. Defendants Lane, Robertson, and GHMC intended that their conspiracy would undermine and severely damage Home Point and its business operations, all to the benefit of GHMC.

220.   As a direct and proximate result of Defendants Lane, Robertson, and GHMC's conspiracy and unlawful conduct, Home Point has incurred and will continue to incur substantial damages.

## COUNT 6 – DEFEND TRADE SECRETS ACT
## (against Defendant Wilkins)

221.   Home Point hereby incorporates and re-alleges all preceding paragraphs of this Com-plaint as if they were fully set forth herein.

222.   The federal Defend Trade Secrets Act ("DTSA") creates a private right of action in favor of the "owner of a trade secret that is misappropriated... if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

223.   Injunctive relief is available under the DTSA to "prevent any actual or threatened misappropriation" of trade secrets. 18 U.S.C. § 1836(b)(3).

224.   Under the DTSA, the term "trade secret" refers to "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if – (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

225.   Under the DTSA, "misappropriation" is defined to include "disclosure or use of a trade secret" without consent by a person who, "at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5)(B)(ii).

226.   In the course of his employment with Home Point, Wilkins learned and now possesses a significant volume of Home Point's trade secrets within the meaning of the DTSA.

227.   Home Point derives economic value from the fact that its trade secrets are not commonly known to its competitors, including GHMC.

228.   Home Point has taken reasonable steps to safeguard the secrecy of its trade secrets and proprietary information, including, but not limited to, restricting access to those employees with a need to know, and requiring employees who *do* have access to use different passwords to access the information.

229.   Home Point's products and services are used in interstate commerce. Home Point contracts with other companies and conducts business with borrowers nationally.

230.   Wilkins had a duty to maintain the secrecy of Home Point's trade secrets and other proprietary information, and not disclose it to anyone, particularly by sending it to himself at a personal email account without the knowledge and prior approval of Home Point.   Indeed, by sending such information to his personal email account, over which Home Point has no oversight, Wilkins may have jeopardized the security of all such information.

231.   By accepting employment with GHMC, there is substantial risk that Wilkins will disclose, if he has not already disclosed, and/or misuse Home Point's trade secrets and other proprietary and confidential information.

232.   The risks to Home Point are particularly acute in light of the circumstances of Wilkins' departure from the Company.  Shortly *after* resigning on September 17, 2020, Wilkins sent numerous emails to his personal email account with many Home Point documents as attachments.  There was no legitimate business purpose for such conduct.

233.   Wilkins' actions were and/or will be willful and malicious.  Even after a firewall blocked his attempt to send Home Point's trade secrets to himself, Wilkins apparently reformatted some of the data in a manner that enabled him to overcome the firewall and send certain materials to his personal email account.  As a result of his actions, Home Point has suffered and will suffer irreparable harm, including but not limited to the risk of Wilkins disseminating Home Point's confidential information and trade secrets, for which Home Point has no adequate remedy at law.  Unless enjoined, Wilkins will continue to harm Home Point's business.

234.   Wilkins has been unjustly enriched by his misappropriation of Home Point's trade secrets and other proprietary information.

## COUNT 7 – FLORIDA UNIFORM TRADE SECRETS ACT (against Defendant Wilkins)

235.   Home Point hereby incorporates and re-alleges all preceding paragraphs of this Com-plaint as if they were fully set forth herein.

236.   Florida's Uniform Trade Secrets Act ("UTSA") creates a private right of action for the threatened or actual misappropriation of trade secrets.  Fla. Stat. §§ 688.001-009.

237.   Injunctive relief is available under the UTSA for "actual or threatened misappropriation" of trade secrets.  Fla. Stat. § 688.001-009.

238.  Under the UTSA, the term "trade secret" is defined to mean "information, including a formula, pattern, compilation, program, device, method, technique, or process that:  (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Fla. Stat. § 688.002(4).

239.   Under the UTSA, "misappropriation" is defined to include, among other things, (a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (b) disclosure or use of a trade secret of another without express or implied consent by a person who, at the time of disclosure or use, either knew or had reason to know that her or his knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.  Fla. Stat. § 688.002(2).

240.   Further, the UTSA defines "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Fla. Stat. § 688.002(1).

241.   In the course of his employment with Home Point, Wilkins learned and now possesses, a significant volume of Home Point's trade secrets within the meaning of the UTSA.

242.   Home Point derives economic value from the fact that its trade secrets are not commonly known to its competitors, including GHMC.

243.   Home Point has taken reasonable steps to safeguard the secrecy of its trade secrets and proprietary information, including, but not limited to, restricting access to those employees with a need to know, and requiring employees who *do* have access to use different passwords to access the information.

244.   Wilkins had a duty to maintain the secrecy of Home Point's trade secrets and other proprietary information, and not disclose it to anyone, particularly by sending it to himself at a personal email account without the knowledge and prior approval of Home Point.   Indeed, by sending such information to his personal email account, over which Home Point has no oversight, Wilkins may have jeopardized the security of all such information.

245.   Wilkins also had a duty to return all company-owned property, including but not limited to his laptop, at the time of his resignation.   Despite repeated requests by Home Point that he do so, Wilkins has failed to return the laptop.

246.   By accepting employment with GHMC, there is substantial risk that Wilkins will disclose, if he has not already disclosed, and/or misuse Home Point's trade secrets and other proprietary and confidential information.

247.   The risks to Home Point are particularly acute in light of the circumstances of Wilkins' departure from the Company.  Shortly *after* resigning on September 17, 2020, Wilkins sent numerous emails to his personal email account with many Home Point documents as attachments.  There was no legitimate business purpose for such conduct.

248.   Wilkins' actions were and/or will be willful and malicious.  Even after a firewall blocked his attempt to send Home Point's trade secrets to himself, Wilkins apparently reformatted some of the data in a manner that enabled him to overcome the firewall and send certain materials to his personal email account.  As a result of his actions, Home Point has suffered and will suffer irreparable harm, including but not limited to the risk of Wilkins disseminating Home Point's confidential information and trade secrets, for which Home Point has no adequate remedy at law.  Unless enjoined, Wilkins will continue to harm Home Point's business.

249.  Moreover, Wilkins has been unjustly enriched by his misappropriation of Home Point's trade secrets and other proprietary information.

## **PRAYER FOR RELIEF**

WHEREFORE, by virtue of the foregoing allegations, Home Point requests that:

A.      This Court issue a Preliminary Injunction:

(1)      restraining and enjoining Defendants Lane, Robertson and GHMC, for a period of 12 months following entry of the injunction, from recruiting or otherwise engaging in any direct or indirect solicitations or inducements of Home Point's employees, whether alone or in concert with others, to leave Home Point for GHMC or any other employer;

(2)      enjoining all of the Defendants and GHMC employees who formerly worked at Home Point from destroying, deleting, erasing or otherwise making unavailable for use in this litigation any documents (as broadly defined in Fed. R. Civ. P. 34, and including but not limited to emails, text messages, voicemails, social media messages, any other electronic communications stored in computer or cloud storage, and any hard copy originals and documents) in Defendants' possession, custody or control and that relate to any of the allegations in this Verified First Amended Complaint; and

(3)      enjoining Defendant Wilkins from directly or indirectly using or disclosing, for any purpose, any of Home Point's trade secrets and other proprietary information that Wilkins learned while employed at Home Point, including but not limited to any information he misappropriated by sending to his personal email account(s), and requiring him to return to Home Point immediately the company-owned laptop that he possesses.

B.      This Court issue, after trial in this action, a permanent injunction to

the same effect as the preliminary injunction requested above.

C.      Pursuant to Section 688.006 of the Florida Statutes and the Federal Rules of Civil Procedure, this Court take such steps as may be necessary during this action to preserve the secrecy of Home Point's trade secrets and proprietary information.

D.      After trial in this action, Defendants be ordered to pay to Home Point all compensatory, exemplary, punitive and other damages to which Home Point is entitled, plus applicable pre- and post-judgment interest.

E.      After trial in this action, this Court issue an order granting Home Point its costs and expenses of litigation, including its attorney's fees and costs pursuant to Section 542.335(1)(k) of the Florida Statutes, the DTSA and the UTSA, and any other applicable statutes or law.

F.      This Court order such other injunctive relief and monetary damages in favor of Home Point as may be recoverable under applicable law.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Home Point hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

HOME POINT FINANCIAL CORPORATION

Dated:  May 21, 2021          By:  /s/ Andrew S. Rosenman  (Trial Counsel)
                              MAYER BROWN LLP
                              Andrew S. Rosenman (*pro hac vice*)
                              Corwin J. Carr (*pro hac vice*)
                              71 South Wacker Drive

Chicago, IL 60606
Phone:  312-782-0600
Fax:  312-701-7711
arosenman@mayerbrown.com
ccarr@mayerbrown.com

and

MAYER BROWN LLP
Ruth Zadikany (*pro hac vice*)
350 South Grand Avenue, 25th Floor
Los Angeles, CA  90071-1503
Phone:  213-229-9500
Fax:  213-576-8179
rzadikany@mayerbrown.com

and

ALLEN NORTON & BLUE, P.A.
David J. Stefany
Barron F. Dickinson
324 South Hyde Park Avenue
Tampa, FL  33606
Phone:  813-251-1210
Fax:  813- 253-2006
dstefany@anblaw.com
bdickinson@anblaw.com

## **VERIFICATION**

I, Laura Nieber, declare and state as follows:

1.      I am employed by Home Point Financial Corporation (hereinafter, "Home Point") as Senior Managing Counsel & Chief Compliance Officer.  I am authorized to make this verification for and on behalf of Home Point.

2.      I have read the foregoing Verified First Amended Complaint by Home Point against Defendants Donald Mark Lane, Christopher Wilkins and Guaranty Home Mortgage Corporation, and know the contents thereof.

3.      Home Point is a large corporation.  Home Point has many employees at numerous locations.  Further, Home Point has many departments and divisions. Accordingly, no one person, to my knowledge, has specific personal knowledge of all of the information that is contained within the Verified First Amended Complaint.

4.      The Verified First Amended Complaint was prepared with the assistance and advice of employees of, and counsel for, Home Point, upon whose assistance and advice I have relied.  The Verified First Amended Complaint includes, for example, information that I gathered and collected from communications with and between employees of the company, as well as information that comes from various documents that I received from other Home Point employees.

5.      Subject to the above paragraphs, I verify under penalty of perjury that, to the best of my knowledge, information and belief, all of the information

contained in the Verified First Amended Complaint is true and correct.

Executed on May 21, 2021.               By: _____
                                             Laura Nieber

79

739737524.2