IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

HOME POINT FINANCIAL
CORPORATION,

    Plaintiff,

  vs.

DONALD MARK LANE, CANDACE
ROBERTSON, CHRISTOPHER
WILKINS, and GUARANTY HOME
MORTGAGE CORPORATION,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 6:20-cv-01819-CEM-EJK

Judge Carlos E. Mendoza

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S SUPPLEMENTAL EXPERT REPORT (Dkt. #158)

MAYER BROWN LLP
Andrew S. Rosenman (*pro hac vice*)
Lucy Holifield (*pro hac vice*)
71 South Wacker Drive
Chicago, IL 60606
Phone: 312-782-0600
Fax: 312-701-7711
arosenman@mayerbrown.com
lholifield@mayerbrown.com

and

MAYER BROWN LLP
Ruth Zadikany (*pro hac vice*)
350 South Grand Avenue, 25th Floor
Los Angeles, CA 90071-1503
Phone: 213-229-9500
Fax: 213-576-8179
rzadikany@mayerbrown.com

ALLEN NORTON & BLUE, P.A.
David J. Stefany
Daniel E. Kalter
324 South Hyde Park Avenue
Tampa, FL 33606
Phone: 813-251-1210
Fax: 813-253-2006
dstefany@anblaw.com
dkalter@amblaw.com

This Court should deny Defendants' motion to strike ("Mot.") the supplemental expert report of Robert Crandall ("Crandall"). As Defendants acknowledge, Plaintiff Home Point Financial Corporation ("Home Point") timely served opening and rebuttal reports from Crandall. (Mot. 1.) Collectively, those two reports contained Crandall's opinions on the proper method of evaluating and calculating the damages that Home Point is seeking as a result of Defendants' conduct. (*See generally* Mot., Exs. 1 and 2.[1])

The supplemental report at issue addresses only two developments that occurred following the service of Crandall's rebuttal report. First, Crandall corrected certain inputs in his model of Home Point's damages related to the retention, recruitment, and training of replacements for associates whom Defendants poached as a result of information that was pointed out to him at his deposition two days before the supplemental report was served. While his model's methodology in calculating those damages remained the same, he revised certain of the inputs in the model—ultimately resulting in a *reduction in* that calculation of over $225,000. Second, Crandall revised his calculation of GHMC's estimated profits subject to disgorgement because, over a week after service of Crandall's rebuttal report, Defendant GHMC produced key financial information relevant to the disgorgement calculations that Defendants' expert relied on in an unauthorized "rejoinder report" served weeks after Crandall's rebuttal report. That new material was not previously available to Crandall and provided a more reliable basis to

---

[1] This Opposition cites Crandall's reports, attached as Exhibits 1, 2, and 3 to the Motion.

calculate GHMC's profitability and therefore the appropriate disgorgement amount.

Contrary to Defendants' claims, neither of these changes constitutes a new opinion. Instead, they represent the classic grounds for supplementing an expert's report—they "correct inaccuracies and add information that was not available at the time of the initial report." *Brincku v. Nat'l Gypsum Co.*, 2012 WL 1712620, at *2 (M.D. Fla. May 15, 2012) (cleaned up); *see* Fed. R. Civ. Proc. 26(e). In fact, under Rule 26(e), Crandall was ***required*** to submit a supplemental report to address these issues. And, ironically, they are the same types of corrections and updates that Defendants' own expert has made in supplemental reports in other cases. *See Lincoln Rock, LLC v. City of Tampa*, 2016 WL 6138653, at *7 (M.D. Fla. Oct. 21, 2016) (denying, in relevant part, motion to strike supplemental report that "corrected Dr. Fishkind's calculation").

In short, no matter how construed, Crandall's supplemental report should not be excluded as the updated calculations are substantially justified and Defendants are not harmed by the supplementation. Home Point produced the supplemental report as quickly as possible and within the discovery window—well before any dispositive motions are due, let alone trial. And in the unlikely event Defendants are genuinely surprised or concerned by the updated calculations, there is ample time for a short supplemental deposition (which Plaintiff offered and Defendants summarily rejected, preferring instead to engage in unnecessary motion practice). These circumstances simply do not warrant the "drastic"

sanction of excluding Crandall's testimony.  *SFR Servs. LLC v. Elec. Ins. Co.*, 2021 WL 1193284, at *5 (M.D. Fla. Mar. 30, 2021).

## STATEMENT OF FACTS

This case is about Defendants' orchestrated hiring raid of over a dozen associates from Home Point's Maitland, Florida office in flagrant violation of enforceable non-solicitation covenants.  *See generally*, Home Point's Mot. for Preliminary Injunction (Dkt. #11).  To assess the impact of the raid, Home Point's counsel retained Robert Crandall, an experienced expert in evaluating economic damages in employment and other litigation matters.  (Ex. 1, ¶ 2.)

On March 31, 2023, Crandall timely served his initial report.  In it, Crandall explained that the first component of his assignment was to "estimate damages Home Point suffered due to Defendants' actions."  (*Id.* ¶ 1).  As he explained, those damages are composed of, among other things: (1) retention bonuses and salary increases Home Point gave following Defendants' raid; (2) costs associated with recruiting replacements, including recruiter fees and signing bonuses; and (3) costs associated with training the new, replacement associates.  (*Id.* ¶¶ 25, 27, 32–43.)  Reviewing depositions and documents produced by the date he issued each report, Crandall itemized each of those components in tables.  For example, in light of the raid, Home Point was forced to raise the salaries of some of the associates who Defendants targeted in order to induce them to remain at (or return to) Home Point.  (*Id.* ¶¶ 35-38 & Table 1.)  Similarly, Home Point had to recruit and hire replacement associates, which entailed considerable costs in the form of recruiter

commissions and signing bonuses.  (*Id.* ¶¶ 39-41 & Tables 2 and 3.)  To calculate those costs, Crandall looked at the records relating to the 11 associates who were first hired after Defendants' raid.  (*Id.*)

Crandall also disclosed in his Initial Report that another component of his economic analysis was to estimate the cost savings and profits that GHMC obtained from the raid.  (*Id.* ¶¶ 44–46.)  With respect to GHMC's profits, Crandall opined that GHMC profited from the work (and added productivity) performed by the poached associates, especially because the raid took place "during a time period when the demand for loans was at a historic high."  (*Id.* ¶ 46.)  But he could not estimate those profits at that time because GHMC had refused to produce *any* information Home Point requested relating to disgorgement—claiming that it did not have any records responsive to those requests.  (*Id.*)  So Crandall expressly reserved the right to supplement his opinions to reflect any new information produced in later productions, as the parties were still meeting and conferring over the requests.  (*Id.*)

About one month after Crandall served his Initial Report, Defendants served a report from their own expert, Dr. Henry Fishkind.  In critiquing Crandall's analysis, Fishkind opined that the damages related to recruiting costs and signing bonuses should be zero because of various market factors (e.g., employee turnover).  Fishkind did not comment on or criticize Crandall's identification of the newly recruited associates.

Crandall then prepared and served a timely Rebuttal Report on May 15, about two weeks after receipt of Fishkind's Report. Besides responding to Fishkind's opinions, Crandall's Rebuttal Report set forth a disgorgement analysis to estimate GHMC's additional profits as a result of the raid. (Ex. 2, ¶ 24.) This was possible because in the intervening period since the Initial Report, GHMC produced information that Crandall believed related to the "number of loans closed by its underwriters, including the solicited associates." (*Id*.) Using additional information from the Mortgage Bankers Association regarding the quarterly average profitability per loan in the industry, Crandall was able to estimate GHMC's extra profitability by multiplying that average profitability by the number of loans closed by the solicited Home Point associates in the fourth quarter of 2020. (*Id*. ¶ 28 & Table R5.) Crandall advised, however, that this calculation "likely understates the profits generated by the work of solicited Home Point associates" because the newly produced information "cuts-off in December 2020," and GHMC had not produced information about the associates' productivity in 2021. (*Id*.) As Home Point had demanded production of 2021 financial information in discovery, Crandall included another caveat that he would "update the analysis" in the event more information was produced. (*Id*.)

As noted above, two key developments occurred after Home Point served Crandall's rebuttal report. First, GHMC made another document production on May 24 that included a spreadsheet (GHMC003297) describing the number of loans that GHMC *funded* (rather than merely worked on) during each month of

2020.  (Ex. 3, ¶ 6.)  Defendants' expert then relied on that and other documents to estimate—at his deposition and in a June 9 Rejoinder Report—GHMC's profits as about $1.8 million.  *Id.*; *see also* Fishkind Dep. Tr. 138:8–17 (confirming GHMC003297 (Deposition Exhibit 250) is "the spreadsheet . . . with the data that you used to calculate" Fishkind's profit per loan estimate).[2]  Crandall did not have either this underlying data or Fishkind's disgorgement opinions before he served his Rebuttal Report.  Importantly, as only became clear at the end of the discovery period, GHMC never produced the 2021 financial data that Home Point requested.

Second, Crandall was deposed on June 13, at which point Defendants identified—for the first time—purported inaccuracies in Crandall's report concerning certain inputs to Crandall's damages model.  For example, Defendants' counsel noted that certain replacement associates listed in Crandall's original damages tables had been offered employment before the raid (but commenced employment afterward), such that Defendants suggested they were not true replacement hires due to Defendants' misconduct.  (*See* Crandall Dep. Tr. 146:13–147:12; Ex. 3, ¶ 3.[3])  Defendants also identified minor offsets that were warranted because (1) certain Home Point associates had been promised salary increases shortly before the raid occurred and (2) the solicited associates forfeited certain unvested bonuses as a result of leaving Home Point, thereby allegedly reducing out-of-pocket damages.  (*Id.* ¶¶ 5, 10.)   When presented this information at

---

[2] This excerpt of Fishkind's deposition is attached as Exhibit A.
[3] Cited excerpts of Crandall's deposition are attached as Exhibit B.

6

deposition, Crandall explained that he would consider the issues and update his report to address them. (*E.g.*, Ex. B, 156:5–14.)

Two days later—on the discovery deadline—Crandall served a Supplemental Report that corrected these issues and revised his disgorgement analysis based on the newly produced spreadsheet of the loans GHMC actually funded in 2020 (GHMC003297), as well as GHMC's ultimate failure to produce 2021 financial information. (Ex. 3.) The Supplemental Report retains the same overall methodology for calculating Home Point's damages and GHMC's profits. When Defendants challenged the propriety of Crandall's Supplemental Report, Home Point's counsel explained that these corrections and revisions were based on updated information and required under Rule 26. Home Point's counsel offered that Crandall could make himself available for a deposition regarding his Supplemental Report. Defendants instead filed this motion.

## ARGUMENT

## I.  The Supplemental Report Does Not Offer New Opinions.

The Rules governing expert reports require timely disclosure but neither demand nor expect perfection. Rule 26(e) requires a party to supplement or correct its expert report "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. Proc. 26(e). This rule, which applies equally to "information included in the [expert] report and

to information given during the expert's deposition," states that "[a]ny additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due"—*i.e.,* 30 days before trial.  *Id*. at (e)(2).

   Home Point's Supplemental Report fits squarely within Rule 26(e)'s ambit. Crandall adhered to the same methodology and maintained his same "core opinions." *In re Accutane Prod. Liab. Litig*., 2007 WL 201091, at *1 (M.D. Fla. Jan. 24, 2007) (denying motion to strike where supplemental report added "a degree of new or additional rationale" but "the core opinions remain the same"). He merely corrected certain inputs in calculating Home Point's sustained damages and updated his prior disgorgement analysis based on more relevant data that *Defendants* produced *after* Crandall already completed and served his rebuttal report.  As explained below, both revisions are within the province of Rule 26(e).

### A.  Home Point's Costs to Retain, Recruit, and Train Employees

   Crandall's initial report laid out his methodology for calculating the costs that Home Point incurred due to Defendants' raid.  In applying that methodology, Crandall looked at the retention bonuses Home Point paid to employees who reported to its Maitland office (Ex. 1, ¶¶ 3, 25, 32–34), as well as salary increases (¶¶ 35–38), recruitment costs and signing bonuses (¶¶ 39–41), and training costs (¶¶ 42-43) that Home Point paid or incurred to replace the raided associates.

   The Supplemental Report corrected inaccuracies in certain of those calculations, as permitted by Rule 26(e).  None of these corrections would have come to Defendants as a surprise, as they were all discussed at Crandall's

deposition when counsel questioned him about certain of his inclusions in the above components.  For example, Defendants' counsel noted that one of the returning associates had received an approved salary increase as of September 7, 2020 (shortly before the raid).  Crandall acknowledged at deposition that given that information he "would make a small adjustment to account for that" pre-raid salary increase.  (Ex. B, at 123:21–125:3; *see also id.* at 55:6–57:11, 126:13–129:8 (similar questioning regarding certain retention bonuses and unvested Underwriter Appreciation Fund amounts).)

As would be expected by an expert witness, Crandall told Defendants' counsel that he would carefully review the data again and might revise his opinion based on the identified information.  (*Id.* at 57:1–5.)  At his deposition, Crandall agreed that using the offer date would result in a more relevant proxy for estimating damages, and stated that he would update his tables.  (*Id.* at 156:5–14.)  Crandall explained, however, that the update would not change his methodology but would instead simply revise which individuals counted as replacement hires and use their respective signing bonuses and recruiting information.  (*Id.*)

Two days later, Crandall's Supplemental Report followed through on those same corrections.  He included the offsets that Defendants flagged at his deposition.  (Ex. 3, ¶¶ 9–13.)  And he updated his list of replacement associates to reflect the first employees with offer dates following the raid (with a short buffer "to ensure the hiring process occurred after the raid").  (*Id.* ¶ 15; *see also id.* ¶¶ 14, 16–19.)  As a result, Crandall calculated that those revisions to his damages model

led him to reduce his estimated damages by around $225,000.  (*Compare* Ex. 1, ¶ 47 (lines 2–6 of Table 7), *with* Ex. 3, ¶ 26 (lines 2–6 of Table S6).)

These garden-variety corrections are precisely the reason Rule 26 requires a supplemental report.  "There is nothing in Rule 26 prohibiting a witness, even an expert witness, from timely providing new or modified opinions to complete or correct information previously provided or reported." *Tampa Bay Water v. HDR Eng'g, Inc.*, 2011 WL 3475548, at *5 (M.D. Fla. Aug. 9, 2011).  The duty in Rule 26 to supplement "extends both to information included in the report and to information given during the expert's deposition."  *Id.*  Ultimately, what is important is that "the core opinions remain the same." *In re Accutane*, 2007 WL 201091, at *1.

In fact, Defendants' own expert has personal experience in correcting initial opinions via a supplemental report in similar circumstances.  In *Lincoln Rock*, 2016 WL 6138653, Fishkind prepared an initial report calculating plaintiff's damages.  The opposing expert challenged certain inclusions in Fishkind's calculations.  *Id.* at *5 (noting Fishkind "included a facility" that he elsewhere said "should not be considered as a comparable facility," and he "failed to account for" a $1 million offset).  Two months later—and on the day of the discovery deadline—Fishkind served a supplemental report that corrected those mistakes.  *Id.* (explaining corrections were based on "a coding error that [the other side's expert] identified").  Despite the delay and the fact that Fishkind's corrections "are based on information available to him at the time of his Initial Report," the trial court

10

concluded they were the type of corrections that Rule 26(e)(1)(A) **requires**.  *Id*. at

*7.  In denying that portion of a request to strike, the court explained that "[t]hese

corrections did not advance a new theory of damages, but instead corrected Dr.

Fishkind's calculation under the method of calculating damages he espoused in his

Initial Report."  *Id*.

      The corrections in Crandall's supplemental report are indistinguishable

from those in Fishkind's supplemental report that the *Lincoln Rock* court

approved.  In both cases, the experts overlooked certain information or omitted

certain offsets to their damages calculations.  In both cases, the other side pointed

out those issues either in deposition or (in *Lincoln Rock*) in a rebuttal report.  And

in both cases, the experts served supplemental reports on the day of the discovery

deadline to address the matters that had been identified.  *See* 2016 WL 6138653,

at *5–7.  The *Lincoln Rock* court accepted the supplemental report over a motion

to strike, and there is simply no basis for a different result here.

      Defendants' arguments to the contrary fall flat.  They complain (Mot. 10)

that Crandall made these corrections after Defendants confronted him with the

issues, and they object (*id*. at 11) that he already had the information underlying

these corrections when he issued his original reports, such that the Supplemental

Report stemmed from "oversight and error."  Yet those are the same arguments

and circumstances considered in *Lincoln Rock*, which the court rejected when it

accepted Fishkind's supplemental report.  *See* 2016 WL 6138653, at *5–7.

Moreover, Home Point acted with remarkable speed to make the necessary

corrections:  Crandall served the Supplemental Report just two days after the inaccuracies surfaced, whereas Fishkind waited over two months to correct his mistakes that were nonetheless accepted.  *Id.* at *5 (noting opposing report served on June 16 and Fishkind's supplemental report served on August 29).  Crandall's supplemental report is also timely because it was disclosed *months* before the *Daubert* deadline, the dispositive motions deadline, the pretrial disclosures deadline under Rule 26(a)(3), and trial.  *See* FRCP Rule 26(e)(2).

### B.   Updates to Crandall's Disgorgement Calculation

Besides the above corrections, Crandall used the Supplemental Report to update his disgorgement analysis with information that GHMC produced *after* service of his rebuttal report.  *See* Fed. R. Civ. Proc. 26(e)(1)(A) (requiring update where disclosure "is incomplete or incorrect").

Defendants, not Home Point, are responsible for the timing of Crandall's updated disgorgement analysis.  As explained in Crandall's initial report, his damages model would account for the profits that GHMC generated as a result of hiring away Home Point's associates.  (Ex. 1, ¶ 31).  At the time of his initial report, however, Defendants had refused to produce any documents responsive to Home Point's requests related to disgorgement.  (*Id.*)  He therefore expressly "reserve[d] the right to supplement [his] report to reflect information learned from any subsequent productions."  (*Id.*)  When Crandall served his rebuttal report, he noted that although GHMC had produced some information about the number of loans that the raided Home Point associates had worked on, the company still had not

produced information related to GHMC's profitability per loan or data after December 2020. (Ex. 2, ¶ 27.) He therefore noted that his disgorgement analysis could be revised in the event GHMC produced new information. (*Id.* ¶ 28 & n.41.)

That is exactly what happened. Over a week after Crandall served his Rebuttal Report, GHMC produced a document that provided new information directly related to Crandall's disgorgement analysis. A document stamped GHMC003297, produced on May 24, 2023, "shows the number of units funded per month through December of 2020." (Ex. 3, ¶ 21.) As Crandall explained, this was the first evidence showing the number of loans *funded*, as GHMC had produced only the number of loans *worked on*. (*Id.* ¶ 21 & n.36.) And this was relevant data that Fishkind also relied on in his own unauthorized supplemental report served after Crandall's rebuttal report. (*See* Ex. A, at 138:8–17.)

Defendants' reliance on *Brincku*, 2012 WL 1712620, is misplaced. (Mot. 7.) *Brincku* is distinguishable because the expert served an untimely supplemental report that introduced an entirely new theory of causation. That case concerned the cause of corrosion to plaintiff's home, and although the expert's original report "stated that sulfur reducing bacteria produce hydrogen sulfide" that contributed to the corrosion, the expert later "informed defendant of a new theory, stating that the cause of the corrosion is sulfuric acid produced by sulfur oxidizing bacteria." 2012 WL 1712620, at *1-2. Far from changing horses midstream as in *Brincku*, Crandall has consistently adhered to his methodology and only revised the numbers based on new information he found to be more relevant. "This newly

obtained evidence provides a sufficient basis for the additive opinions" that Crandall offers in his Supplemental Report. *Aileron Inv. Mgmt, LLC v. Am. Lending Ctr., LLC,* 2022 WL 523549, at *3 (M.D. Fla. Feb. 22, 2022).

## II.     The Supplemental Report Is Justified and Harmless.

Even if Defendants were correct—and they are not—that Crandall's Supplemental Report is not permitted under Rule 26(e), exclusion is still inappropriate here. An untimely disclosure remains acceptable if it is substantially justified or harmless. Fed. R. Civ. Proc. 37(c).  In applying this standard, courts exercise caution before striking expert opinions because "excluding expert testimony is viewed as a 'drastic' sanction requiring careful consideration." *SFR Servs.*, 2021 WL 1193284, at *5 (citations omitted).   Courts weigh five factors to determine whether a failure to disclose evidence is substantially justified or harmless:  (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) how much allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence. *Id.*  None of these factors supports exclusion here.

First, Defendants cannot claim to be surprised.  Crandall repeatedly stated at his deposition that in light of the new information he would revise his tables and calculations.  He then did so within two days of the deposition and just before discovery closed.  Defendants' suggestion (Mot. 15) that they were surprised that Crandall "unexpectedly change[d] the value of seven of his eight categories of

damages" is not credible.  It was Defendants' own counsel who pointed out certain issues at deposition that prompted the substitution of several of the replacement associates—Crandall told him in real time that he would be updating his report. (*See, e.g.*, Ex. B, 156:5–21, 164:12–20.)

Likewise, Crandall's updated disgorgement analysis stemmed from Defendants' stonewalling.  Crandall explained at deposition that the rebuttal report's calculation was "understated" because GHMC had not produced key information about the profitability per loan in 2021.  (*Id.* at 179:10-19.)  To be sure, Home Point's requests for production to GHMC—which were served on February 24, 2023, long before the discovery cutoff—specifically demanded production of 2021 financial information to show the profitability of the raided team members to GHMC.  (*See* Home Point's Second Set of RFPs to GHMC, Request Nos. 10–13.[4])  After reserving the right to supplement for post-December 2020 data (*See* Ex 2, ¶ 28), and as the discovery period closed without GHMC producing those documents, Crandall reasonably used the information that GHMC had produced shortly before the supplemental report to extrapolate GHMC's profits through 2021.

Second, Defendants could have easily cured any supposed surprise.  Home Point offered (and continues to offer) Defendants the opportunity to take a supplemental deposition regarding the Supplemental Report—as permitted under the local rules.  *See* Middle District's Discovery Handbook, § I.F (providing that

---

[4] Home Point's relevant requests for production are attached as Exhibit C.

counsel, by agreement, may conduct discovery after the formal completion date). Even though this is the standard remedy in these situations, Defendants have refused to entertain it, preferring instead to file their unnecessary motion to strike. *See, e.g.*, *SFR Servs.*, 2021 WL 1193284, at *5 ("[A]ny such surprise can be cured at this juncture by reopening discovery solely with respect to [the expert's] testimony"); *Engle v. Taco Bell of Am., Inc.*, 2011 WL 883639, at *2 (M.D. Fla. Mar. 14, 2011) (similar).

Third, Crandall's Supplemental Report has no prospect of disrupting trial. Home Point served the report before the discovery cut-off, more than two months before the motion cutoff deadline (including for *Daubert* motions), and trial is not set to begin until March 2024. Crandall revised his opinions promptly after the inaccuracies and new information were brought to light. This is not a case of eve-of-trial surprise. *SFR Servs.*, 2021 WL 1193284, at *5 (denying motion to exclude expert's opinion because it "would not disrupt the trial, which is still several months away"). Defendants handwave away this consideration by noting (Mot. 16) that Home Point served the supplemental report *earlier* than the report accepted in *SFR Services* that was served in response to a *Daubert* motion. Defendants' suggestion that Home Point should have waited until a *Daubert* motion to supplement is nonsensical.

The fourth and fifth factors weigh heavily in favor of Home Point as well. A complete and accurate damages analysis is obviously important to Home Point's case. And Crandall is Home Point's only expert in the case, "which makes any

16

supplemental analysis contained in his affidavit significant to [plaintiff's] presentation of its case." *Id.* And certain portions of Crandall's supplemental report were necessary given new information first produced by GHMC *after* both of Crandall's reports already had been submitted. Specifically, GHMC003297 was not produced until May 24, well after Crandall's reports were due and timely served under the Third Amended Scheduling Order. As Crandall explained (at Ex. 3, ¶¶ 21-23), this new information was the first evidence of the amount of loans that GHMC actually *funded* (rather than worked on). That is a more relevant data point than loans worked on (sometimes called "decisioned"), as that metric would include loans that may not have closed. (*See id.* ¶ 21 & n.36.) "Using the same methodology from [his] Rebuttal Report," Crandall used the new data to estimate GHMC's profits. (*Id.* ¶ 25.)

Considering all the circumstances, Defendants' protestations and attempts to conjure up harm are unpersuasive. They repeatedly complain that Crandall "waited until *after* his deposition" to produce the Supplemental Report. (Mot. 12, 14.) But, naturally, people cannot correct their mistakes before they come to their attention. And for unexplained reasons, Defendants and Fishkind decided not to identify these inaccuracies in Fishkind's reports, choosing instead to wait until Crandall's deposition (which they knew was scheduled days before the discovery cutoff). Defendants' objection about timing rings particularly hollow given Fishkind's own experience in supplementing a report *months* after learning of his inaccuracies—and also on the day of the discovery cutoff. *See Lincoln Rock,* 2016

17

WL 6138653, at *5.  The invocation of the Court's denial of an earlier requested extension similarly goes nowhere.  (*See* Mot. 12.)  Defendants do not even try to demonstrate that the Supplemental Report will lead to any trial delays.  Home Point promptly offered Crandall for a supplemental deposition, which could easily have been conducted before the Court's established motion deadlines, let alone trial.

Defendants heavily rely on the Eleventh Circuit's decision in *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710 (11th Cir. 2019).  The circumstances in *Guevara* are very different.  There, the party's supplemental reports added new rationales not found in the initial report (which itself was untimely).  *Id*. at 718 (explaining first supplemental report relied on "industry standards" never mentioned in the initial and rebuttal reports).  Although the first supplemental report was  served "on the eve of [the expert's] deposition," the expert then abruptly left the deposition early "after only three hours" of questioning.  *Id*. at 719. The differences are even more stark with respect to the second supplemental report at issue in *Guevara*.  It was served a month *after* the close of the discovery and days *after* the cutoff for dispositive and *Daubert* motions.  *Id*.[5]

*Guevara* actually supports Crandall's supplementation of his disgorgement analysis using GHMC's eleventh-hour production of key metrics, as the Eleventh Circuit noted that the district court did not strike the portions of the first

---

[5] Similarly, the expert affidavit in *Reese v. Herbert*, 527 F.3d 1253, 1264-65 (11th Cir. 2008), was not served until seven weeks *after* the discovery cut off.

supplemental report related to newly produced information. *Guevara,* 920 F.3d at 718. And here, unlike in *Guevara*, not only did Crandall adhere to the same methodology and rationales of his prior reports, he could not have supplemented his report before deposition; he had not discovered the inaccuracies pointed out by Defendants' counsel during deposition.

In sum, Crandall supplemented his opinions promptly and in good faith. Instead it is Defendants' Motion that attempts to play a game of "gotcha," by unjustifiably seeking to bind Home Point to opinions that were based on understandable oversights or incomplete information because of Defendants' own refusals to produce and delays in producing relevant documents. Neither Rule 26 nor common sense supports such tactics.

## CONCLUSION

For these reasons, Defendants' motion to strike the supplemental expert report of Robert Crandall should be denied.

HOME POINT FINANCIAL CORPORATION

Dated: July 19, 2023          By: /s/ Andrew S. Rosenman
                              MAYER BROWN LLP
                              Andrew S. Rosenman (*pro hac vice*)
                              71 South Wacker Drive
                              Chicago, IL 60606
                              arosenman@mayerbrown.com

                              MAYER BROWN LLP
                              Ruth Zadikany (*pro hac vice*)
                              350 South Grand Avenue, 25th Floor
                              Los Angeles, CA  90071-1503
                              rzadikany@mayerbrown.com