# Exhibit B

HIGHLY CONFIDENTIAL

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2               MIDDLE DISTRICT OF FLORIDA
 3                   ORLANDO DIVISION
 4
 5   HOME POINT FINANCIAL          )
     CORPORATION,                  )
 6                                 )
          PLAINTIFFS,              )
 7                                 ) Case No.
          VS.                      ) 6:20-cv-01819-CEM-EJK
 8                                 )
     DONALD MARK LANE, CANDACE     )
 9   ROBERTSON, CHRISTOPHER        )
     WILKINS, and GUARANTY HOME    )
10   MORTGAGE CORPORATION,         )
                                   )
11        DEFENDANTS.              )
     _____)
12
13
14       VIDEOTAPED DEPOSITION OF ROBERT CRANDALL
15        TRANSCRIPT MARKED HIGHLY CONFIDENTIAL
16          TUESDAY, JUNE 13, 2023, 9:08 A.M.
17                LOS ANGELES, CALIFORNIA
18
19
20
21
22
23   Reported by Desiree Cooks, CSR No. 14075
24   Job No. 5924059
25   Pages 1 - 208
```

Page 54

[redacted]

Page 55

1  document. It's about a one and a half page document. My
2  questions are going to stick to the first four
3  paragraphs, but feel free to read the rest just to
4  familiarize yourself with the document.
5      A   Okay.
6      Q   Okay. Now, this is a document that was
7  produced by Home Point in this lawsuit, Bates Number
8  HPLANE000521. And it is a compensation change memorandum
9  from Etta Pelletier.
10         Do you see that?
11     A   I do.
12     Q   Or -- sorry -- Etta Pelletier. My bad.
13     A   Well, her name in the other document is
14 Harrietta (phonetic), yes.
15     Q   Yeah. Correct.
16     A   That's -- yeah.
17     Q   So same person.
18     A   Yeah.
19     Q   But if you look, the memorandum says, "This
20 memo is to confirm our discussion about your change in
21 compensation with Home Point Financial."
22         Do you see that?
23     A   I do.
24     Q   Okay. It is dated September 3rd?
25     A   Correct.

Page 56

1      Q   Okay. And the third paragraph says, "You will
2  receive a retention bonus in the amount of $5,000 paid on
3  September 25th paycheck."
4          Do you see that?
5      A   Yes.
6      Q   Okay. So on September 3rd, do you have an
7  understanding as to whether the allegations were that
8  Don Lane and Candy Robertson had begun soliciting any
9  Home Point employees at that point?
10     A   I believe Mr. Lane's actions happened later
11 than September the 3rd.
12     Q   And the employees that left with Don Lane
13 resigned on September 17th.
14         Is that your understanding?
15     A   Correct.
16     Q   Okay. And so this memo would have been two
17 weeks prior to Home Point learning about Mr. Lane's
18 actions; is that correct?
19     A   That's true.
20     Q   So the fact that Home Point committed to pay
21 Ms. Pelletier a retention bonus of $5,000 in the
22 September 5th paycheck prior to any -- prior to it
23 learning of any actions of Don Lane, does that have an
24 impact on your opinion as to whether the defendants
25 should be responsible for that $5,000?

Page 57

1      A   I'm going to have to think about it a little
2  more and get a little more understanding of the facts
3  before I can give a final opinion. Obviously, she
4  received the 20 grand on the 25th. If you were to look
5  at exhibit -- this is 4.
6      Q   Uh-huh.
7      A   So I can think -- I'll think about it and maybe
8  to the extent if I decide to revise it, I'll let you
9  know. But certainly, this is an indication of the social
10 element of you have to pay everybody sort of commensurate
11 with what everybody else is in these kinds of situation.
12         MR. HALL: Okay. And I'm going to have the
13 court reporter show you what's been marked as Exhibit 6
14 the documents that have been produced by Home Point in
15 this lawsuit.
16         (Exhibit 6 marked.)
17 BY MR. HALL:
18     Q   It shows Ms. Pelletier was not given a $20,000
19 and a $5,000, but she was given the $20,000 instead of
20 the $5,000.
21     A   I understand that.
22     Q   Okay. In the document, Exhibit 6, you can see
23 that Jacob Seaton sends an email to Teresa Reber on
24 September 15th saying that "Etta has decided to stay if
25 we bump her base to $98,000 and provide her with a $5,000

Page 122

[redacted]

Page 123

1  Q   From the -- well, that's from the bonuses paid,
2  separate column.  I was just looking --
3  A   Is that in the bonuses?  Okay.  I just don't
4  know.  Obviously, I'm speculating because I have no idea
5  what's in this thing.  It's the first time I've seen it
6  today.
7  Q   Yeah.
8  A   Even still, the bonus is probably doubling if
9  20 grand were in there.  So it was a good market in 2020.
10     MR. HALL:  For sure.  All right.  I'm going to
11 hand you what we'll mark as Exhibit 30.
12     THE WITNESS:  This interrogatory asks only
13 about Maitland, or is this asking about everywhere?  I
14 don't know what HPLANE refers to.  I know it refers to a
15 file, whatever that was.
16     (Exhibit 30 marked.)
17 BY MR. HALL:
18 Q   Yeah, HPLANE 4536 is the document that you --
19 the retention bonus.
20 A   It's the same retention bonus?  Okay.
21 Q   I've given you what's been marked as
22 Exhibit 30.  So this is an email increasing Danny Cook's
23 base salary to $85,000.
24 A   I see that.
25 Q   Okay.  Now, this email itself was dated

Page 124

1  September 7th for the --
2  A   Okay.
3  Q   -- in Table 1 of your report, your salary for
4  the employees.
5  A   Yeah.
6  Q   As of 8-30-2020; is that right?
7  A   Yes.
8  Q   So that would not take into account raises that
9  were received in the first half of
10 September 2020; correct?
11 A   It would miss that first pay period in
12 September of 2020.
13 Q   And if so Danny Cook had been approved a salary
14 of $85,000 prior to his resigning, then the difference
15 per year and the difference per pay period of your
16 calculation would be reduced; correct?
17 A   It would be reduced slightly.  I mean, he
18 obviously got more than that, another ten grand.
19 Q   But you would agree that the difference between
20 what he was actually paying or what he was approved to
21 pay at the end is the correct measure for the difference
22 between what he did when he came back; right?
23     (Reporter clarification.)
24     THE WITNESS:  I'm trying to tie this to the
25 actions of, you know, the Defendants.  And if they gave

Page 125

1  him a raise that appeared -- that's one pay period
2  between August and then when the event happened, then I
3  would make a small adjustment to account for that.
4  BY MR. HALL:
5  Q   Okay.  Because there wasn't -- there wasn't
6  anything in your report where you picked August 30th,
7  other than it was the last month -- end-of-month payment?
8      (Reporter clarification.)
9      THE WITNESS:  It was the last pay period
10 before, you know, some of the things started happening.
11 BY MR. HALL:
12 Q   Now, in Table 1 of your report, you don't take
13 into account any of the bonuses that the six rebounds
14 would have been paid had they stayed employed
15 continuously at Home Point; correct?
16     MS. ZADIKANY:  Objection.  Form.
17     THE WITNESS:  Table 1?  I missed your question.
18 In Table 1?
19 BY MR. HALL:
20 Q   In Table 1, when you're calculating the
21 difference in what their pay was from when they came back
22 to when they left, you don't take into account any of the
23 bonuses that these employees would have received had they
24 stayed employed continuously; correct?
25 A   This is just base pay.

Page 126

1  Q   And why didn't you consider the bonuses that
2  would have been paid out as part of your calculation?
3  A   Because it's a comparison of base pay.
4  Q   Well, it's your opinion on damages; right?
5  A   Yes.
6  Q   Okay. So where do you take into account that
7  they gave up bonuses by leaving in the mid-month of
8  September into your damages calculation?
9  A   I'm not looking at this here at all. Table 1
10 is focused on a difference in base pay. And it's focused
11 on a difference in base pay from the time they started
12 and until they eventually terminated, if they terminated.
13 Q   Do you know if Dora Lopez received any payments
14 under the underwriter appreciation fund after she
15 resigned in September 17th?
16 A   I don't know. I'd have to look in the records.
17     MR. HALL: I'll hand you what's been marked as
18 Exhibit 31.
19     (Exhibit 31 marked.)
20 BY MR. HALL:
21 Q   Now, this is an email from Don Lane to
22 Dora Lopez that was produced in this lawsuit. And the
23 second paragraph, Ms. Lopez says that she's "on pace to
24 make $156,972 this year, excluding the underwriter
25 appreciation bonus rolled out at the end of August, which

Page 127

1  is based on current production is slated for an
2  additional $40,000 minimum in added salary."
3      Do you see that?
4  A   I see that.
5  Q   Okay. So if Ms. Lopez resigned and was no
6  longer eligible for the underwriter appreciation bonus,
7  then that would be money that Home Point didn't have to
8  pay; right?
9  A   So you're suggesting that this was a bonus that
10 was potentially accrued that was not paid?
11     Is that what you're asking?
12 Q   Yeah, let me give you --
13 A   While you're giving that information, the other
14 part of this that's interesting is that Candy and Don
15 offered her 100 grand, which presumably was market or a
16 little above, and she's looking for $115. It's an
17 example of negotiation and why that might be, you know,
18 might be impacting people's salaries.
19     But anyway, let's talk about bonus. Okay.
20 Q   So this appears to be the underwriter
21 appreciation fund that Ms. Lopez is referencing.
22 A   It could very well be, yes.
23 Q   What's that?
24 A   It could very well be. She didn't attach the
25 document.

Page 128

1  Q   Yeah. Correct. And Home Point has testified
2  that that's the only one that was out there. So here,
3  the -- it says on the bottom of the page, "Any new hire
4  that has received a sign-on bonus is excluded"; right?
5  A   I see that there.
6  Q   Okay. And the -- if the individuals had earned
7  this and they were averaging three, four, five loans per
8  day, but they were no longer employed, then Home Point
9  wouldn't pay it out.
10     Do you understand that?
11 A   I understand what this document appears to say
12 that. I'd have to look to see how they were treated upon
13 return, and I don't know that answer yet.
14 Q   Okay.
15 A   I'd also have to look at what other
16 compensation she may have received. Dora got 20 grand,
17 it looks like, so I'd have to understand what that would
18 be and where it would be relative to other things. I
19 don't know what her productivity was in the last quarter.
20 There are a lot of variables that are in play.
21 Q   Would your opinion change if the six employees
22 that left were entitled to bonuses that they -- that were
23 contingent on them being employed at the time of the
24 payment?
25     Would that change your opinion?

Page 129

1  A   I would have to just look at the -- you're
2  asking me questions -- I'm not sure. I'd have to look at
3  the data, see what happened, see what they got. You
4  know, you're asking specific questions about this
5  individual, for example, and what she got.
6  Q   Okay.
7  A   And I'd want to be able to see what her data
8  showed and what her pay was, things like that.
9  Q   Now, how many directors left to go with
10 Don Lane?
11 A   The second level, I thought it was all but one.
12 Q   Is it four or five?
13 A   I don't know. It's somewhere around here, but
14 a decent chunk. At least two, but I would want to say it
15 was more. I thought it was four.
16 Q   Yeah. In Paragraph 40, you say, "five
17 underwriting directors."
18 A   Okay.
19     MR. HALL: So I'll give you what we'll mark as
20 Exhibit 33.
21     THE WITNESS: Thank you.
22     (Exhibits 32 & 33 marked.)
23 BY MR. HALL:
24 Q   If you can take a look at this document.
25 A   Okay.

Page 146

1  there was a recruiter invoice?
2  A    Well, it was date of -- that's how -- I'd have
3  to go look and confirm.  For example, this -- we're
4  looking at things about whether you were hired first.  If
5  there are people that are hired date of hire and it's not
6  necessarily -- I'd have to see people that don't have a
7  recruiter invoice to know if that is true.
8         I'm not sure if that person exists, but you can
9  show me one if you have one and I'll think about it.
10        MR. HALL:  I'm going to do something a little
11 different than that.
12        THE WITNESS:  41.
13        MR. HALL:  Yeah.  So what's marked as
14 Exhibit 41 is the offer letter for Kelly Chapman.
15        (Exhibit 41 marked.)
16 BY MR. HALL:
17 Q    Do you see that?
18 A    I do.
19 Q    Okay.  Kelly Chapman is listed on Table 2 and
20 on Table 3 and on Table 4; correct?
21 A    She is.
22 Q    Okay.  So for Exhibit 40, we've got Ony who was
23 given the offer on September 15th, just two days before
24 Don Lane resigned, and she wasn't to start until
25 October 5th.  But Ms. Chapman, who is on your list, was

Page 147

1  offered the position on September 2nd.
2         Do you see that?
3  A    I do see that.
4  Q    And, in fact, Home Point committed to paying
5  her $30,000 on September 2nd; right?
6  A    That's what this document shows, yes.
7  Q    Okay.  And so Home Point paid Ms. Chapman
8  $30,000 not because of any actions from Don Lane, because
9  they wanted to expand the force; correct?
10 A    That's what this one looks like so the answer
11 would be I would take the next person on the list if I
12 would have swapped out Ms. Chapman.
13 Q    Okay.  So let's take the next person on the
14 list who is Karen Webb-Smith.
15 A    What I meant is the next person on the list of
16 people after the bottom person.
17 Q    Who are those people?
18 A    Off the top of my head, I don't have the names.
19 But there are more hires that we did not use because we
20 capped it at the first 11.  And so we can go back.  There
21 are more people that are out there.
22        I mean just look at Paragraph 40.  They hired
23 over 30 associates.
24 Q    Well, no.  In fact, they didn't; right?
25 A    What's that?

Page 148

HIGHLY CONFIDENTIAL

| Page 154 | Page 156 |
|---|---|
| [redacted] | 1  Home Point; correct?<br>2   A   Okay.  And is there will be other individuals<br>3  in the next group that came in.  I'll just go down the<br>4  list and add those.  You'll see that at some point.<br>5   Q   So how can you identify the individuals that<br>6  were hired to replace the individuals that left?<br>7   A   I am going to assign it to the next group of<br>8  people that came in who have offer dates after Mr. Lane's<br>9  departure and the resignation.<br>10      (Reporter clarification.)<br>11      THE WITNESS:  And we'll see what that does and<br>12  how that may change Tables, 2, 3, and 4.  The names will<br>13  change.  It seems like $30,000 was a frequent signing<br>14  bonus amount.  We'll see, though.<br>15  BY MR. HALL:<br>16   Q   Are you only going to look at recruiter<br>17  invoices when you do that or are you going to look at the<br>18  people who were made offers even if they didn't have a<br>19  recruiter?<br>20   A   We're going to dig in and see the full list and<br>21  we'll see what we have.<br>22      MR. HALL:  I'll show you what we got marked as<br>23  Exhibit 47.<br>24      (Exhibit 47 marked.)<br>25  /// |
| Page 155 | Page 157 |
| [redacted] | 1  BY MR. HALL:<br>[redacted] |

40 (Pages 154 - 157)



Page 162

Page 164

1  Q   Okay. So -- and that would be the same for
2  Table 4; right?
3  A   And if I have a different rationalization once
4  I can remember it, then I'll write that up in more detail
5  in the report.
6  Q   All right. So for training costs, we're back
7  to 12?
8  A   Yes.
9  Q   And so do you -- as you sit here today, do you
10 understand which two of those individuals should not be
11 included in Table 4?
12 A   Well, I'm going to take a look again, and
13 there's going to be probably new names -- well, I know
14 there's going to be new names. They've hired additional
15 people, so Table 4 will be revised. And so I will be
16 able to provide that to you when it's revised.
17     Seems that much of the pay rates, though, will
18 probably be in the same ranges. The signing bonuses,
19 certainly for the underwriters, are probably going to be
20 in the same range.
21 Q   Because they're all plug and play; right?
22 A   Well, it seems that most of the signing bonuses
23 I'm seeing are around $30,000. There's a couple that are
24 20, but that 20 to 30 range for outside hires seems --
25 seems to be what they've been doing.

Page 165

Page 179

1 been factored in. Well, first, on my analysis, I'm using
2 an MBA average initially, and that average could already
3 include recruiting fees.
4      So potentially, it's already there and factored
5 into the expense. The other part of this is, you know,
6 right now, what's been produced by Guaranty, most of the
7 cost elements are redacted. The number that Fishkind
8 came up with is based on -- it looks like, three months
9 in 2020.
10      Obviously, we don't have all of the loans
11 because these people kept working past 2020. So there is
12 a disgorgement element that's not even being factored in
13 that, frankly, if there's additional production of data,
14 such as the loan production and the actual costs or loan
15 profit per loan in 2021 for the individuals, we would
16 have to add that back in.
17      But we don't have that data; it hasn't been
18 produced yet by GHMC. So right now, my numbers are
19 understated.
20   Q   Let's look at Footnote 39 on your rebuttal,
21 which is Exhibit 3.
22   A   Footnote 39. Yeah.
23   Q   It's at the bottom of Page 18.
24   A   Yeah.
25   Q   Okay. You've got "Fully-loaded loan production