# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**Case No.: 6:20-cv-01819-CEM-EJK**

HOME POINT FINANCIAL CORPORATION,

Plaintiff,

v.

DONALD MARK LANE,
et al.,

Defendants.

_____/

**<u>EXPERT REPORT</u>**

May 1, 2023

# Hank Fishkind

Digitally signed by Hank
Fishkind
Date: 2023.05.01 15:21:11 -04'00'

---------------------------------------------------------------

Hank Fishkind, Ph.D., President
Fishkind Litigation Services, Inc.
3504 Lake Lynda Drive, Suite 107
Orlando, Florida 32817
(407) 382-3256
Fishkindls.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
Case No.: 6:20-cv-01819-CEM-EJK**

**I.0    Introduction**

1.0    The Defendants, through their counsel, retained Fishkind Litigation Services, Inc. ("FLS") to provide expert economic analysis about the following topics.

1.1 The amount of economic damage incurred by the Plaintiff, assuming the court finds the Defendants liable on one or more of the counts in their Verified First Amended Complaint.

1.2 A review of the expert report of Robert W. Crandall published on behalf of the Plaintiff.

2.0    In addition, counsel requested that I prepare this expert report, testify at deposition and/or trial if requested, and provide litigation support.

3.0    I conducted the research in this engagement; I drafted this opinion and will offer the testimony. Other members of my firm provided clerical support. My resume is attached as Exhibit #1, and my court experience as an expert is provided in Exhibit #2. The materials reviewed and relied upon in rendering this opinion are presented in Exhibit #3. A list of all publications I have authored in the last 10 years is provided in Exhibit #4.

4.0    My standard hourly fees apply in this engagement. These are as follows:

Dr. Fishkind        $500/hour for office work, and
                    $1,000/hour for testimony at trial or deposition

My compensation is in no way tied to the outcome of this case.

**II.0    Qualifications to Provide Expert Opinion in this Matter**

5.0    I am qualified to provide the Court with my expert report and opinions because of my education and my experience. I am an economist and President of Fishkind Litigation Services, Inc. ("FLS"). FLS assists clients in litigation with expert economic, accounting, and financial consultation and expert testimony. My clients include state and municipal governments, the U.S. Department of Justice, Fortune 500 Companies, and major property developers, including both plaintiffs and defendants in litigation.

6.0    My resume is included as Exhibit #1 which documents my qualifications.  I
       have a Ph.D. in economics with specialties in Urban and Regional
       Economics and in Econometrics.

7.0    For many years I was a Research Economist with the Bureau of Economic
       and Business Research at the University of Florida, and from time-to-time I
       served as its Acting Director and its Associate Director.  During my work at
       the Bureau, I conducted numerous economic studies, mostly concerning
       Florida's economy.  I designed, launched, and administered the Bureau's
       monthly economic confidence index and its economic forecasting program.
       I have served on the State of Florida's Governor's Council of Economic
       Advisors under two different administrations.

8.0    While I was employed at the Bureau, I was also a faculty member in the
       Department of Economics at the University of Florida.  I achieved the rank
       of Associate Professor and obtained tenure before I decided to leave the
       University and work as an economic consultant and financial advisor in the
       private sector.

9.0    I was a founding board member of Engle Homes, a publicly traded
       (NASDAQ) homebuilding company until it was sold to TOUSA.  I was also
       a founding board member of Summit Properties, which was a large, national
       apartment Real Estate Investment Trust (REIT) traded on the NYSE until
       the company was sold to Camden Properties.  As a board member of these
       real estate development companies, I served on their asset allocation and
       audit committees among other assignments.

10.0   I was also a Board Member of the ABT family of mutual funds until the group
       was sold to Evergreen Funds.  I conceived of and launched two mutual
       funds for ABT.

11.0   As the President of FLS, I am often engaged to assist our clients in
       evaluating issues like those raised in this case.

12.0   I have been qualified as an expert witness to provide economic testimony
       on more than 50 occasions by federal and state courts in Florida; in federal
       courts in Tennessee and Washington, D.C.; and in the Court of Federal
       Claims.  I have also served as a court-appointed expert to provide valuation
       reports to the U.S. Tax Court.  Exhibit #2 lists my court experience over the
       last five years.

### III.0  Background

13.0    This case involves a dispute regarding certain Defendants allegedly soliciting some of the employees from Plaintiff's Maitland office[1] and allegedly stole some of the Plaintiff's trade secrets.[2] FLS has been engaged to address the appropriate damages if Plaintiff is successful in its claims.

14.0    Through their expert, Mr. Crandall, Plaintiff claims damages of $3,800,247.[3] He does not attribute any of these damages to the trade secrets claim.

### IV.0  Summary of Expert Opinions

15.0    Assuming the court finds for the Plaintiff on any or all of counts 1-5 in the Verified First Amended Complaint, FLS estimates damages of $107,725 as shown in Table 1.

**Table 1. Summary of Economic Damages**

| *Category* | *Crandall* | FLS |
|---|---|---|
| Estimated Damages Due to Home Point Payment of Lane's Salary In Early September 2020 | $2,773 | $2,773 |
| Estimated Damages Due to Retention Bonuses Paid by Home Point | $2,647,214 | $30,583 |
| Estimated Damages Due to Salary Increases Paid by Home Point | $298,301 | $74,369 |
| Estimated Damages Due to Recruiting Costs for Replacement Associates | $204,811 | $0 |
| Estimated Damages Due to Signing Bonuses Paid to Replace Underwriting Managers | $359,073 | $0 |
| Estimated Damages Due to Training Costs Associated with Replacement Associates | $49,002 | $0 |
| Estimated Disgorgement Due to GHMC's Avoidance of Recruiting Costs for Solicited Associates from Home Point | $239,073 | $0 |
| Estimated Disgorgement of GHMC Profits | TBD | $0 |
| | =========== | =========== |
| **Total** | **$3,800,247** | **$107,725** |

---

[1] Defendants Lane, Robertson, and Guaranty Home Mortgage Corporation.
[2] Defendant Wilkins only.
[3] Crandall (2023), Table 7, page 29.

16.0    Table 1 also compares FLS's estimate for economic damages of $107,725
to Mr. Crandall's damage estimate of $3,800,247.  Mr. Crandall's damage
estimate is grossly inflated for two reasons.  First, he failed to account for
the rapid escalation in industry wages of 19% that occurred in the 12 months
prior to the alleged wrongful recruiting by Defendants in September 2020.
Second, Mr. Crandall did not adjust for the high level of employee turnover,
averaging over 20% per year, in his damage calculations.

## V.0    Wage Trends and Employee Turnover in the Mortgage Banking Industry

17.0    The mortgage banking industry is very sensitive to business cycles.  The
Comptroller's Handbook notes that "Mortgage banking is a cyclical
business, and earnings can be volatile."[4]  A recent Harvard study called the
industry a "highly cyclical industry".[5]

18.0    In its Annual Report for FY2020 Home Point itself explained to investors
how cyclically dynamic its business is.  For example, "Our success depends
largely on the health of the U.S. residential real estate industry, which is
seasonal, cyclical and affected by changes in general economic conditions
beyond our control."[6]  As a result, Home Point cautioned investors that: "The
market price of our common stock may be highly volatile and could be
subject to wide fluctuations."[7]

19.0    Figure 1 illustrates the highly cyclical nature of the mortgage banking
market.  Many times, in the span of just 90-days mortgage applications have
plummeted by 35% to 50%.  The average index value for applications is
140 with a standard deviation of 96.  This means that the ratio of variability
to the mean is 70% indicating very high levels of variation.

20.0    Much of the variability in mortgage application volume is driven by changes
in mortgage interest rates also displayed in Figure 1.  The correlation
between volume and rates is -0.6 meaning that roughly 60% of the variation
in monthly volume is associated with changes in mortgage interest rates.

21.0    Changes in rates have a magnified impact on volumes.  The mean
mortgage rate was 8.2% from 1990-2023 with a standard deviation of 2.4%.
The ratio is 30% compared to 60% for mortgage application volume
meaning that volumes are twice as volatile as rates since 1990.

---

[4] Comptroller's Handbook (2014), page 4.
[5] Layton (2022), page 1.
[6] Home Point (March 2021), page 12.
[7] Home Point (March 2021), page 40.

**Figure 1. Mortgage Applications and Mortgage Rates**



Source: Mortgage Bankers Association

22.0    Because the mortgage market is so volatile over the business cycle, variations in industry employment and wages are similarly dynamic as shown in Figure 2.  Mortgage application volume shot up by 300% from the low point in December 2018 to its peak in March 2020.

23.0    These swings caused industry employment to jump 21% and earnings to soar 47% from December 2018 to March 2022 overshooting the downturn in application volume.  Since then, earnings have only increased by 1% and employment is down 5%.

**Figure 2. Year-over-Year % Change in
Mortgage Industry Earning and Employment**



Source: Bureau of Labor Statistics, Mortgage and Nonmortgage Loan
Brokers Series CES5552231003 and CES5552231001

24.0    Labor turnover rates in the mortgage banking industry are very high. Stratmor, the recognized industry expert, reports that loan officer turnover averaged 38% from 2002-2020.  Turnover was at a survey low of 21% in 2020 at a time when origination volume was high.  During periods of high-volume like in 2020 loan officers are less likely to change companies, because their earnings are high, but there remains a significant turnover rate even in these periods.  During periods of lower volume turnover rates soar, reaching 51% in 2007.  Figure 3 illustrates these trends.

**Figure 3. Loan Officer Turnover Rates**



Source: PGR: MBA and STRATMOR Peer Group Roundtable Program

https://newslink.mba.org/mba-newslinks/2021/may/mba-newslink-tuesday-may-25-2021/mba-chart-of-the-week-may-24-2021-retail-production-channel-loan-officer-turnover/

25.0    Any estimate of economic damages arising from the allegedly wrongful acts of the Defendants must take these trends in employment, earnings, and employment turnover into account. Damages are impacts over and above the broader industry trends. As discussed below, Mr. Crandall's report failed to consider these factors thereby grossly increasing estimated damages.

## VI.0   Analysis of the Crandall Report

## VI.1   Crandall Report Damage Estimate

26.0    As shown above in Table 1, the Crandall Report ("Report") estimated economic damages of $3,800,247 arising from seven categories of impact. Each of these is addressed below.

### VI.2  Payment of Lane's Salary - $2,773

27.0    The Report notes that Mr. Lane is alleged to have wrongfully recruited Home Point's personnel while he was being paid by Home Point as a Senior Director earning $5,546.  The Report assumes that he spent half his time performing work on behalf of Defendant GHMC, thereby estimating damages of $2,773 for this time not spent strictly on behalf of the Plaintiff.[8]

28.0    Without endorsing Mr. Crandall's methodology, and assuming that the court finds for the Plaintiff, this is a reasonable estimate for economic damages arising from this factor.

### VI.3  Damages Due to Retention Bonuses - $2,647,214

29.0    The Report claims that Defendants' solicitation of its employees forced it to pay retention bonuses across the board to all its Maitland office employees to retain their services.[9]  The Report recognized that mortgage application volume had increased dramatically, and that the industry and the Plaintiff was very busy servicing the surge in volume.

30.0    However, the Report failed to adjust the damage estimates to reflect the impact of rising business volume on earnings during this period, which shot up 19% in the 12 months prior to the disputed actions of the Defendants. Furthermore, the Report failed to consider the impact of high employee turnover in the mortgage banking industry and in their own firm.  As noted previously, labor turnover is very high in the industry with a 20% turnover rate even in the best of times.  These factors point to the need for any firm, including the Plaintiff, to provide retention bonuses to its employees when volumes are very high, as they were in September 2020.

31.0    Stratmor notes that retention or signing bonuses are common in the industry.  Loan officers view themselves as "free agents."  "Loan officer turnover data supports this, with average annual turnover typically in the 30-40% range and average tenure in the three- to four-year range."[10] While the employees in this case were operations personnel and not loan officers, the industry trend is supported by the turnover experienced by Home Point shown through the documents produced in this lawsuit and as explained in more detail below.[11]

---

[8] Crandall (2023), ¶ 17.
[9] Crandall (2023), ¶ 32.
[10] Stratmor (2022), page 2.
[11] HPLANE5191

32.0    Furthermore, it is common in the industry for multiple employees to leave and join another company.  It is also common practice for firms to hire multiple employees from a competitor.  In fact, Home Point has done this very thing.[12]

33.0    The Plaintiff also experienced high employee turnover rates at its Maitland office.  As Figure 4 shows, 11% of employees stayed for 1 year or less; 24% had tenure of 2 years or less; and 22% were employed for 3 years or less.  Thus, 56% of all employees left Home Point's Maitland office within 3 years of being hired.  Astonishingly, only 13 of the 203 Maitland employees who received retention bonuses in 2020 are still working at the Maitland office today, this is just 6% who are still employed who received retention bonuses in September/October of 2020.[13]

**Figure 4. Employee Tenure at Home Point's Maitland Office**



Source: FLS based on HPLAN5190

34.0    Despite these facts, the Report uses the unadjusted total amount of the retention bonuses paid by the Plaintiff of $2,647,214.  The Report contends that this is an amount of bonus money that would not have been paid by the Plaintiff, but for the alleged wrongful acts.  This estimate is grossly inflated and not reliable.

---

[12] Deposition of Reber (2020), pages 163-164.
[13] HPLANE 5191.

### VI.4  Damages Due to Salary Increases - $298,301

35.0   The Report claims that the Plaintiff was "compelled to increase the base salaries of the associates to whom GHMC made offers in an effort to retain them. But for Defendants' solicitation, Home Point would not have had to increase compensation for these individuals to match the higher offers GHMC had made."[14]

36.0   The "but for" claim in the Report is distorted and inflated by its failure to account for the rapidly rising trajectory of industry earnings at the time the salary increases were granted.  "But for" economic damages must deduct the overall industry increases in earnings in order to isolate the impact of the alleged wrongdoing.  The Report's damages estimate is therefore grossly inflated.

### VI.5  Damages for Recruiting Costs - $204,811

37.0   The Report argues that Home Point was forced to incur recruiting costs totaling $204,811 to recruit 11 replacement employees due to the alleged wrongdoing by the Defendants.  Once again, this estimate is unreliable, because it failed to consider the high employee turnover rates in the industry and at the Plaintiff's Maitland office.

38.0   Home Point claims that its Maitland office had a headcount of 203 employees who received retention bonuses in September/October 2020. As shown above, the office experienced high rates of labor turnover consistent with industry trends.  In any year, 20% or more of the employees could be expected to leave.  In the case of the Maitland office this would be 46 employees whose employment ended within a year of the payment of the retention.  The Report notes that Home Point hired 30 associates for the Maitland office from 9/28/2020 to 11/30/2020. This is in addition to the at least 45 who were hired from 8/15/2020 to 9/27/2020.[15]

39.0   Yet, despite this, the Report makes no adjustment to the estimate for damages from additional recruiting costs.  As a result, this estimate is grossly inflated and not reliable.

### VI.6  Damages from Signing Bonuses - $359,073

40.0   In addition to extra recruiting costs, the Report claims damages of $359,073 in signing bonuses for 14 new staff to replace those lost to the Defendants' alleged wrongdoing.

---

[14] Crandall (2023), ¶ 35.

[15] HPLANE00005191 shows 45 employees who received a retention bonus during this time. Other employees could have been hired that did not receive a retention bonus.

41.0    This estimate suffers from the same problems that inflated the estimated cost for additional recruitment, as discussed in Sections VI.3 and VI.5. High rates of employee turnover coupled with escalating earnings must be accounted for first to arrive at "but for" damages associated with the alleged wrongdoing by the Defendants.

## VI.7  Damages from Additional Training Costs - $49,002

42.0    These alleged damages flow from the need to train new staff to replace those lost to the alleged wrongful acts of the Defendants.

43.0    As discussed above, this estimate is inflated and unreliable. No account was made for the high labor turnover rates in the industry and at the Maitland office.

## VI.8  Disgorgement of Avoided Recruitment Costs - $239,073

44.0    The Report asserts that Defendant GHMC saved recruitment costs of 14.6% of the salary base for the former Home Point associates that were solicited by GHMC.

45.0    This claim is speculative. There is no evidence that GHMC routinely uses recruiters. GHMC reports that it rarely does so.

## VI.9  Disgorgement of GHMC Profits

46.0    The Report argues that GHMC earned additional profits through its alleged wrongful recruitment of Plaintiff's Maitland office staff. Despite making the claim, the Report failed to provide any estimate for damages. The Report explains that Defendants have yet to provide the necessary data to estimate this damage.

47.0    However, it is not at all clear that a reliable estimate for the incremental profits generated by a small number of specialized staff can be developed. The Report offers no guidance.

48.0    The Report could have attempted to use data from the Plaintiff to estimate profits associated with the small contingent of recruited staff. It is telling that the Report made no such attempt. This is consistent with likely inability to make such an estimate to a reasonable degree of economic certainty.

## VII.0 FLS' Damage Estimate

## VII.1 Summary

49.0    Assuming the court finds for the Plaintiff on any or all of counts 1-5 in the Verified First Amended Complaint, FLS estimates damages of $107,725 as shown in Table 2.

50.0    The remainder of this report describes the FLS approach to calculating damages in this case.  Particular care is taken to account for industry trends in earnings and labor turnover to isolate "but for" economic damages associated with the alleged wrongful actions of the Defendants.

### Table 2. FLS' Estimate of Economic Damages

| Category | FLS |
|---|---:|
| Estimated Damages Due to Home Point Payment of Lane's Salary In Early September 2020 | $2,773 |
| Estimated Damages Due to Retention Bonuses Paid by Home Point | $30,583 |
| Estimated Damages Due to Salary Increases Paid by Home Point | $74,369 |
| Estimated Damages Due to Recruiting Costs for Replacement Associates | $0 |
| Estimated Damages Due to Signing Bonuses Paid to Replace Underwriting Managers | $0 |
| Estimated Damages Due to Training Costs Associated with Replacement Associates | $0 |
| Estimated Disgorgement Due to GHMC's Avoidance of Recruiting Costs for Solicited Associates from Home Point | $0 |
| Estimated Disgorgement of GHMC Profits | $0 |
| | ========= |
| **Total** | **$107,725** |

## VII.2 Damage from Lane's Salary- $2,773

51.0     Assuming that the court finds in favor of the Plaintiff on any or all of counts 1-5 in the Verified First Amended Complaint, FLS estimates damages of $2,733 related to Lane's alleged activities recruiting Home Point's staff while still employed by Home Point.  As discussed above, if there is liability, FLS agrees with the amount estimated in the Report.

**VII.3 Damage from Retention Bonuses - $30,583**

52.0   FLS does not dispute that Home Point paid retention bonuses to 203 associates on 9/25/2020 and 10/09/2020 for a total of $2,647,214.[16] However, simply because Home Point paid these bonuses does not mean that 100% of these costs constitute economic damages to a reasonable degree of economic certainty.  As noted previously, the mortgage banking industry is subject to sharp swings in activity resulting in high rates of employee turnover, and at times dramatic surges in compensation as firms compete for labor.  Furthermore, Home Point had a practice of issuing retention bonuses prior to the alleged wrongful acts.

53.0   Therefore, to accurately calculate "but for" damages, the broader industry trends must first be accounted for with the balance then being damages caused by the alleged wrongdoing by the Defendants.

54.0   Over the 12 months ending September 2020 average hourly earnings for mortgage and nonmortgage loan brokers soared by 19% according to data from the U.S. Bureau of Labor Statistics.[17]  Therefore, the "but for" damages would be amounts Home Point paid to retain employees over and above the broader industry trend that its competitors were paying.  As noted previously, the industry is very competitive at times of high demand, such as those in September 2020.  If Home Point fails to increase its compensation levels to match industry trends, it would lose employees.

55.0   To estimate the damages related to bonus payments, FLS proceeded as follows.

   A. FLS used Home Point's schedule of bonus payments[18] as our foundation.
   B. FLS estimated the salaries for each of the 203 employees based on Home Point's salary information produced in HPLANE5156-5190.
   C. Using the salary information and the bonus amounts, FLS calculated the percentage increase in compensation.
   D. FLS compared the percentage increase in compensation for each employee to the 19% industry increase in earnings for the year ending September 2020.

---

[16] Report, page 15 based on HPLANE00004536.
[17] BLS Series CES5552231003.
[18] HPLANE00004536

E. Economic damages for the bonus payments are the difference between the percentage increase in compensation and 19% multiplied by the salary base. For example, Nilsa Medina was a senior underwriter with an estimated salary of $102,955 in September 2020. She received a $20,000 bonus on 9/25/2020. This was an increase of 19.43% compared to the industry increase of 19.22% for a difference of 0.21%. Multiplying this difference of 0.21% times her base of $102,955 results in a damage estimate of $216.

F. Summing up the impacts across all 203 employees results in a total damage estimate of $30,583.

56.0   All the calculations supporting the estimate for economic damages related to the bonus payments are provided in Exhibit #5. The estimate is conservative, because FLS did not reduce the number for the people who were hired after the exodus or who received a signing bonus and a retention bonus at the same time.

**VII.4 Damage from Salary Increases - $74,369**

57.0   The Report claims that Home Point was forced to increase the salaries for 10 of the solicited associates who agreed to remain with, or return to, the company. But for Defendants' solicitation, Home Point would not have had to increase its compensation for these individuals.[19]

58.0   However, not all of the salary increase can be attributed to the alleged wrongful acts of the Defendants. Once again, the Report failed to adjust the salary increases for the rising industry earnings for the 12 months prior to the salary increases Home Point paid.

59.0   Table 3 presents FLS' estimate for economic damages from increases in compensation paid by Home Point. The dates each employee received their raise varies from September 7, 2020 to February 22, 2021. Therefore, the industry increase in earnings for the prior 12 months also varies by employee.

60.0   All but one of these employees no longer work at Home Point. The number of pay periods reflects the number of payments each employee received at their higher rate.

61.0   The % increase was calculated as the ratio of the salary increase annualized to the annual salary base before the raise. This percentage increase is compared to the increase in earnings for the industry for the 12 months prior to the employee receiving the raise.

---

[19] Report ¶ 35.

62.0 Economic damages are calculated for each employee as the difference between their salary increase and the industry increase in earnings.

63.0 Economic damages are the amounts by which the salary increases exceeded the escalation in industry earnings.  Damages total $74,369.


[The balance of this page left intentionally blank.]

**Table 3. Economic Damages from Salary Increases**

| *Name* | Date | Difference Per Pay Period | # Periods | % Increase | % Industry Increase Prior 12 Months | Difference | Difference Per Pay Period | Damages |
|---|---|---|---|---|---|---|---|---|
| Webb | 11/30/2020 | $758.08 | 32 | 21% | 14% | 6% | $236 | $7,545 |
| Rodriguez | 10/26/2020 | $374.08 | 37 | 10% | 17% | -7% | $0 | $0 |
| Lopez | 10/26/2020 | $736.16 | 53 | 22% | 17% | 5% | $169 | $8,956 |
| Murray | 12/7/2020 | $905.84 | 50 | 26% | 14% | 12% | $405 | $20,230 |
| Herrin | 2/22/2021 | $788.56 | 45 | 23% | 14% | 9% | $309 | $13,900 |
| Cook | 12/21/2020 | $654.24 | 60 | 22% | 12% | 10% | $296 | $17,789 |
| Grant | 10/5/2020 | $193.60 | 55 | 7% | 17% | -10% | $0 | $0 |
| Huber | 9/7/2020 | $769.60 | 57 | 22% | 19% | 3% | $104 | $5,949 |
| Thoennes | 9/7/2020 | $579.52 | 41 | 16% | 19% | -3% | $0 | $0 |
| Hamilton | 9/7/2020 | $618.32 | 37 | 17% | 19% | -2% | $0 | $0 |
| | | | | | | | | ========== |
| **Total** | | | | | | | | **$74,369** |

**VII.5 Damage from Recruiting, Signing Bonuses, and Training Cost  - $0**

64.0    The Report claims economic damages of $204,811 for recruiting costs, $359,073 for signing bonuses, and $49,022 in additional training costs for a total of $612,886.  FLS does not dispute that Home Point incurred these costs.  The issue is whether some or all of these costs can be directly attributable to the alleged wrongful acts of the Defendants to a reasonable degree of economic certainty.

65.0    There is no doubt that the industry is subject to strong swings in mortgage volume causing magnified impacts on industry employment and earnings. As noted above, staff turnover exceeds 20% even during high levels of activity such as 2020.  Home Point experienced similar levels of staff turnover at its Maitland office.  Furthermore, firms in the industry, including Home Point, experience multiple staff members leaving for other firms. Firms in the industry, including Home Point, hire multiple staff members from their competitors.

66.0    The Report claims that there were 11 employees generating the recruitment costs, 12 causing the training costs, and 14 involved in the signing bonus damages.  As Table 4 shows, these employees represent very small fractions of the total staff at the Maitland office in September 2020 which totaled at least 203.

### Table 4. Staff Counts for Damages from Recruiting, Signing Bonuses, and Training

| Category | Employees | % of Total Staff |
|---|---|---|
| Recruitment | 11 | 5% |
| Training | 12 | 6% |
| Signing Bonus | 14 | 7% |

67.0    In September 2020 overall industry turnover was about 20% and Home Point's Maitland office was experiencing significant staff turnover. Therefore, it is speculative for the Report to claim that the alleged wrongful acts by the Defendants were the exclusive cause of these costs that Home Point incurred.  Considering industry trends, and the turnover at the Maitland office, it is just as likely that Home Point would have incurred these costs in any event.

### VII.6 Damage from Saving on Recruiting Cost - $0

68.0   The Report argues that GMHC avoided recruiting costs of $239,037 from its alleged wrongful acts.  This was estimated by multiplying Home Point's recruiting cost margin of 14.62% by the salaries and bonuses paid to the 14 former Home Point staff hired by GMHC.

69.0   These damage calculations are speculative and unsupported.  First, GMHC reports that it rarely uses recruiters.  Second, the Report provides no evidence about the recruitment rate GMHC would have paid to recruit staff in September 2020.   Third, industry turnover is high, and multiple employees leave for competing firms.  Departing employees are likely to contact competitors for positions without resorting to recruiters.  Therefore, there is no basis to assert this claim.

### VII.7 Disgorgement Damages - $0

70.0   The Report argues that the GHMC earned additional profits through its alleged wrongful recruitment of Plaintiff's Maitland office staff.  However, the Report failed to provide any estimate for these damages.  The Report excuses this failure by complaining that the Defendants have yet to provide the necessary data to estimate this damage.

71.0   However, it is not at all clear that a reliable estimate for the incremental profits generated by a small number of specialized staff can be developed.  The Report offers no guidance in this regard.

72.0   The Report could have attempted to use data from the Plaintiff to estimate profits associated with the small contingent of recruited staff.  It is telling that the Report made no such attempt.

73.0   The failure by the Report to attempt to estimate these damages is consistent with FLS' view that it would be difficult, if not impossible, to make such an estimate to a reasonable degree of economic certainty.  There are too few specialized staff associated with the dispute.  Their marginal contribution to GMHC's profits from such a small number of employees cannot be expected to be measurable to a reasonable degree of economic certainty.

### VIII.0 Discovery Remains Open

74.0   FLS is informed that discovery in this matter remains open.  Should additional material become available, FLS will request permission to update our report accordingly.

75.0   However, at this time, my report is complete, and my conclusions are reliable to a reasonable degree of economic certainty.

**Exhibit #1 – Resume**



**SELECT CLIENT LIST**

Akerman
Bell Roper
Boatman Ricci
Burr Forman
Coleman Yovanovich
Conrad Scherer
de la Parte & Gilbert
Fulmer Leroy Albee
Fisher Rushmer
Foley Lardner
Gunster
Hill Ward Henderson
Holland & Knight
Morgan & Morgan
Nabors Giblin
Pendas Law
Smolker Bartlett
Tobin Reyes
Weiss Handler Cornwell
AEGON
Baron Collier
BP
Cemex/CSR/Rinker
City of Miami
Colonial Properties Trust
Collier Enterprises
Falcone Group
Fannie Mae
Florida Power Corporation
Forrest City Enterprises
FPL
King Ranch
Kitson & Partners
Lennar
Major Central FL Attraction Co.
Mosaic
Newland Communities
Perry Capital
Rayonier
Starwood Land Ventures
State of Florida
State of Pennsylvania
St. Joe
U.S. Department of Justice
The Villages
Waste Management, Inc.

# Henry H. Fishkind, Ph.D.
## President

hankf@fishkindls.com

**PROFESSIONAL SYNOPSIS**

With over 30 years of experience in economic analysis and forecasting, Dr. Henry Fishkind is widely regarded as one of Florida's premier economists and financial advisors. Dr. Fishkind's career began in the public sector where he worked as an economist and associate professor at the University of Florida. In 1980, Dr. Fishkind became the associate director for programs at the University of Florida's Bureau of Economic and Business Research. During his tenure at the university, Dr. Fishkind served from 1979-1981 on the governor's economic advisory board. He began his career as a private sector consultant when he became president of M.G. Lewis Econometrics in Winter Park, Florida. In 1988, Dr. Fishkind formed Fishkind & Associates, Inc. as a full service economic and financial consulting firm. In 2019, Dr. Fishkind sold the financial advisory, consulting, and real estate advisory portions of his business while keeping the expert witness portion, Fishkind Litigation Services, Inc.

From 2001-2003 Dr. Fishkind was a member of Governor Bush's Council of Economic Advisors, and also served on the board of directors of Engle Homes, Summit Properties, and ABT Funds until the companies were sold.

**AREAS OF EXPERTISE**

Expert Witness
Economic Analysis
Econometric Modeling
Project Finance & Feasibility
Privacy & Intellectual Property
Fiscal Impact Analysis
Real Estate Economics

**PROFESSIONAL EXPERIENCE**

| | |
|---|---|
| Chairman, FLSAFE | 2008 - 2011 |
| Managing Partner, Woodbridge Vintage Chips | 1994 - 2007 |
| President, Fishkind & Associates, Inc./Fishkind Litigation Services, Inc. | 1988 - Present |
| President, M.G. Lewis Econometrics, Inc. | 1984 - 1987 |
| Associate Director for Programs, Bureau of Economics & Business Research, University of Florida | 1980 - 1983 |
| Economist/Associate Professor, University of Florida | 1975 – 1983 |

**EDUCATION**

Indiana University, Doctor of Philosophy, Economics, 1975
Syracuse University, BA, Economics, 1971

Fishkind Litigation Services, Inc.
3504 Lake Lynda Drive, Suite 107, Orlando, FL  32817
407.382.3256



**Exhibit #2 – Court Experience**

| DEPOSITIONS AND TESTIMONY | *2018-2019-2020-2021-2022* | | | | | | |
|---|---|---|---|---|---|---|---|
| HENRY H. FISHKIND, PH.D. | **FISHKIND LITIGATION SERVICES, INC.** | | | | | | |
| CASE NAME | Court | Case Number | Represented | Opinion | Deposition | Testified | Affidavit |
| Benoit v. Benoit | Twentieth Judicial Circuit In and For Collier County | 19-DR-1569 | Respondent | | yes | no | no |
| Blaine et al. v. North Brevard County Hospital District | United States District Court Middle District of Florida Orlando Division | 6:18-cv-487-ORL-22DCI | Plaintiff | yes | yes | | |
| Blume v. Blume | In the Circuit Court of the Twentieth Judicial Circuit in and for Collier County, Florida, Civil Action | 16-DR-823 | Respondent | yes | no | yes | |
| Brevard County, Florida et al. v. The State of Florida et al. | In the Circuit Court of the Eighteenth Judicial Circuit, In and For Brevard County, Florida | 05-2018-CA-018298 | Plaintiff | yes | yes | yes | |
| Buffalo Rock Company, Inc. v. Pepsico, Inc., et al. | In the Circuit Court of Jefferson County, Alabama | 01-CV-2019-900217.00 | Plaintiff | yes | yes | | |
| Cafifa Media Group, LLC v. Star Over Orlando, Inc. et al. | American Arbitration Association | 01-18-0003-2715 | Respondent | yes | no | yes | |
| Celebrate Virginia South Holding Company, LLC, et al. v. CVAS Property Management, LLC, et al. | In The United States District Court Eastern District of Virginia Richond Division | 3:21-CV-00261 | Plaintiff | yes | yes | | yes |
| Citrosuco North America, Inc. v. Brown International Corporation, LLC | | | Claimant | yes | no | yes | |

| Case | Court | Case Number | Role | | | | |
|---|---|---|---|---|---|---|---|
| Dynamic Motion Rides GMBH, et al. v. Universal City Development Partners Ltd., et al. | United States District Court Middle District of Florida Orlando Division | 6:21-cv-752-RBDLRH | Plaintiff | yes | yes | | no |
| Estate of Hugh Corrigan, IV et al. v. Sebastian River Improvement District | In the Circuit Court of the Nineteenth Judicial Circuit of the State of Florida in and For Indian River County | 31-2019-CA-000811 | Plaintiff | yes | yes | | |
| CSX Transportation, Inc. v. National Railroad Passenger Corporation | National Arbitration Panel, Washington, D.C. | | Claimant | yes | no | yes | no |
| Eveleigh et al. v. Eveleigh et al. | In the Circuit Court, Fourth Judicial Circuit, In and For Duval County, Florida | 01-18-0002-5957 | Defendant | yes | no | yes | |
| Fiddler's Creek, LLC v. Naples Lending Group, et al. | United States Bankruptcy Court, Middle District of Florida, Fort Myers Division | 2020-CA-005712 | Plaintiff | yes | yes | yes | |
| Matthew Finn v. Waterman Broadcasting Corporation | In the Circuit Court of the Twentieth Judicial Circuit In and For Lee County, Florida | 2017-013829-CA-01 (44) | Plaintiff | yes | yes | | no |
| Flagstone Island Gardens, LLC et al. v. City of Miami | In the Circuit Court of the 11th Judicial Circuit in and For Miami-Dade County, Florida, Complex Business Litigation | 33 125 00161 13 | Defendant | yes | yes | | |
| Florida East Coast Railway v. Norfolk Southern Railway | American Arbitration Association | DOAH Case No.: 09-3575EPP; OGC Case No.: 09-3107 | Respondent | yes | yes | yes | |
| Grand Venezia COA, Inc. v. Clearwater Cay Community Development District et al | In the Sixth Judicial Circuit In And For Pinellas County, Florida | 16-001584-CI | Defendant | no | no | yes | no |
| Lynn Hartenberger & Nancy Stevens v. High Desert Investment Corp | Thirteenth Judicial District County of Sandoval State of New Mexico | 2018-CA-000710 | Defendant | yes | yes | no | |
| Hobe Sound Ranch, Ltd. V. Martin County | In the Circuit Court of the Nineteenth Judicial Circuit in and For Martin County, Florida Civil Division | CA11-1249 | Plaintiff | yes | yes | | yes |
| Hernando County Property Appraiser et al v. CEMEX Construction Materials Florida, LLC et al | In the Circuit Court of the Fifth Judicial Circuit In and For Hernando County, Florida | 2020-CA-000201 | Defendant | | | yes | |
| Home Builders Association of West Florida, Inc. et al. v. The Board of County Commissioners, Santa Rosa County, Florida et al. | In The Circuit Court of the First Judicial Circuit In and For Santa Rosa County, Florida | DC-17-00035 | Defendant | | | yes | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Intelitrac v. UMB Financial Corporation, et al. | In the District Court, 95th Judicial District, Dallas County, Texas | 01-20-0001-6804 | Plaintiff | yes | yes | | |
| Island Estate Group, LLC et al. v. Michael J. Carroll, Sr. et al. | American Arbitration Association | 12-11839-LMI | Respondent | yes | yes | | |
| John J. Jerue v. Drummond Company, Inc. | United States District Court For the Middle District of Florida Tampa Division | CA15-1184 | Defendant | yes | yes | | |
| KG Development, LLC et al. v. St. John's County v. South Anastasia Communities Association, Inc. | In the Circuit Court for the Seventh Judicial Circuit In and For St. Johns County, Florida | 2:19-cv-00538-FtM-38NPM | Plaintiff | yes | yes | | |
| Kimberly ReGenesis, LLC et al. v. Lee County | United States District Court Middle District of Florida, Fort Myers Division | 502017CA008420XXXXMB AO | Plaintiff | yes | yes | | |
| Lake Point Phase I, et al. v. South Florida Water Management District et al. | Fifteenth Judicial Circuit in and for Martin County, Florida | CACE 19-019911 (18) | Plaintiff | yes | yes | yes | yes |
| Las Olas Company, Inc. et al. v. Florida Power & Light Company | In the Circuit Court of the Seventeenth Judicial Circuit in and For Broward County, Florida | 1:17-cv-00436-MCW | Defendant | yes | yes | yes | |
| Lemon Bay Cove, LLC v. United States of America | In the United States Court of Claims | 8:15-cv-01374-JSM-TBM | Plaintiff | yes | yes | yes | yes |
| Lincoln Rock, LLC v. City of Tampa | United States District Court Middle District of Florida Tampa Division | 20-82156-CIV-Cannon/Brannon | Plaintiff | yes | yes | | |
| Richard John Lucibella v. Town of Ocean Ridge et al. | United States District Court Southern District Florida | 12-19056-AJC | Plaintiff | yes | yes | | |
| Luke Miller v.Gregg Uliano, et al. | In the Circuit Court for the Eighteenth Judicial Circuit In and for Seminole County, Florida | 2020-CA-000339-08-L | Defendant | yes | yes | | |
| Mizner Court Holdings et al. v. Broken Sound et al. | In the Cirucuite Court For the Fifteenth Judicial Circuit In and For Palm Beach County, Florida | 6:15-cv-11-Orl-41KRS | Plaintiff | yes | yes | | |
| Opperman et al. v. Path, Inc. et al. | United States District Court Northern District of California | 05-2019-CA-057538-XXXX-XX | Plaintiff | yes | | yes | |
| OSM-1, LLC v. Viera East Community Development District | In the Circuit Court of the Eighteenth Judicial Circuit In and For Brevard County, Florida | 14-21242-CIV-MOORE/MCALILEY | Defendant | yes | yes | | yes |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| The Richman Group of Florida, Inc. v. Pinellas County, Florida et al. | In the Circuit Court of the Sixth Judicial Circuit In and For Pinellas County, Florida | 6:18-cv-1646-ORL-22KRS | Plaintiff | yes | yes | yes | |
| River Cross Land Company, LLC v. Seminole County | United States District Court Middle District of Florida Orlando Division | 2016-CA-659 | Defendant | yes | yes | | |
| Jacob T. Rodgers v. William Stormant et al. | In the Circuit Court of the 8th Judicial Circuit, In and For Alachua County, Florida | 8:19-cv-02581-SCB-AAS | Defendant | no | no | yes | no |
| Sensor Systems, LLC et al. v. Blue Barn Holdings, Inc. et al. | United States District Court Middle District of Florida Tampa Division | CACE-15-011648 (09) | Plaintiff | yes | yes | | |
| Shepard, John et al. v. MQ Realty, LLC et al. | In the Circuit Court of the Twelfth Judicial Circuit In and For Manatee County, Florida, Civil Division | 2013-CA-1449-O | Plaintiff | yes | yes | yes | |
| Wayne Sforza v. Custom Homes by Kaye, Inc. d/b/a Kaye Lifestyle Homes | In the Circuit Court of the Twentieth Judicial Circuit in and for Collier County, Florida, Civil Action | 18-CA-2626 | Defendant | yes | yes | yes | no |
| SRQ Taxi Management, LLC v. Sarasota Manatee Airport Authority | United States Bankruptcy Court Middle District of Florida Tampa Division | 12-33641 CA 40 | Defendant | yes | yes | yes | no |
| Summit Construction Management Group, LLC v. City of Oviedo | In the Circuit Court of the Eighteenth Judicial Circuit In and For Seminole County, Florida | 5:13-cv-04080-BLF | Defendant | yes | yes | yes | yes |
| Town Center at Doral LLC, et al | United States Bankruptcy Court, Southern District of Florida, Miami Division | 2018 CA 000360 NC | Debtors | yes | yes | yes | |
| Unicorp Colony Units, LLC v. Colony Beach & Tennis Club Association, Inc. et al. | In the Circuit Court of the Twelfth Judicial Circuit In and For Sarasota County, Florida | 2:13-CV-00670-FtM-38CM | Plaintiff | | yes | | |
| Universal Health Care Group, Inc., et al. v. Warburg Pincus, LLC et al. | United States Bankruptcy Court Middle District of Florida Tampa Division | 2015-CA-010999-O | Defendant | yes | yes | | yes |
| John Van Horn v. Richard Koon et al. | In the Circuit Court of the Ninth Judical Circuit in and For Orange County, Florida | 10-38942 (02) | Plaintiff | yes | yes | | yes |
| Veranda Condominium I, LLC et al. v. Wachovia Mortgage Corporation | In the Circuit Court of the 17th Judicial Circuit, In and For Broward County, Florida | 2016-CA-005297-O | Plaintiff | yes | yes | no | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Walt Disney Parks and Resorts US, Inc. v. Rick Singh et al. | In the Court of the Ninth Judicial Circuit of Florida In and For Orange County Civil Division | 13-14491-cv-Martinez-Lynch | Plaintiff | yes | yes | yes | yes |
| Waters Mark Development Enterprises, LC v. Brevard County, Florida | In the Circuit Court of the 18th Judicial Circuit, In and For Brevard County, Florida | 2013-CA-1728 NC  Division: A | Defendant | no | yes | | yes |
| Wellen Park, LLP et al. v. West Villages for Responsible Government, Inc. et al. | In the Circuit Court of the Twelfth Judicial Circuit In and For Sarasota County, Florida, Civil Division | 2020-CA-003838 | Plaintiff | yes | no | yes | yes |

**Exhibit #3 – Materials Reviewed or Relied Upon**

Documents Filed with the Court:

Home Point Supplemental Rule 26 Disclosures, 03.23.2023
GHMC Response to Plaintiff 2nd RFP, 03.27.2023
Robertson Responses to Plaintiff's 1st RFP, 03.31.2023
GHMC's 2nd RFP to Plaintiff, 03.31.2023
Robertson Response to Rogs, 03.31.2023
Plaintiff's Responses to Robertson Rogs (Executed), 02.07.2023
Plaintiff's Objections and Responses to Defendant Donald Mark Lane's First Set
 of RFP, 11.23.2020
Plaintiff's Home Point Financial Corporation's Rule 26(a)(1) Disclosures,
 12.18.2020
136 – Third Amended Case Management and Scheduling Order, 09.14.2022
Hearing Transcript on Motion for Preliminary Injunction Evidentiary, 12.14.2020
Plaintiff Objections and Responses to Wilkins First ROG's, 11.24.2020
Plaintiff's Objections and Responses to Defendant Donald Mark Lane's First Set
 of ROG's 11, 11.23.2020
11 - Plaintiff's Motion for Preliminary Injunction, 10.05.2020
100 - Amended Complaint, 05.21.2021
141 – Answer & Defenses, 10.21.2022
Plaintiff's Supplemental Responses to Robertson's First Set of Interrogatories


Depositions & Exhibits:

Chip Adkins, 12.08.2020
Donald Lane, 12.04.2020
Teresa Neber, 12.09.2020
Candace Robertson, 12.03.2020
Christopher Wilkins, 12.02.2020


Production:

Employee Earnings, HP 4453 – 4911 (18 items intermittently numbered)
Home Point Document Production, HPLANE00000001 – HPLANE00005191 (884
 items intermittently numbered)

Opposing Expert:

Robert W. Crandall, MBA, 03.31.2023

Annual Reports:

  Finance of America Companies, 2019-2022
  Guild Mortgage, 2020-2022
  Home Point, 2020-2022
  Ocwen Financial Corporation, 2019-2022
  PennyMac Financial Services, 2021-2022
  Rocket Companies, 2022
  United Wholesale Mortgage, 2021-2022

References/Cases/Citations:

Layton, Don, "The PolicyMaking Implications of Record-High Mortgage
 Origination Profits During the Pandemic," Joint Center for Housing Studies, May
 2, 2022

Retail Production Channel: Loan Officer Turnover % (see chart within email
 dated 04.102023

Jensine, Katie, "Loan Officers In For A Rude Awakening: Layoffs, Acquisitions,
 Mergers," National Mortgage Professional, 02.01.2022

Cameron, Jim, "What's Different About This Downturn?", STRATMOR Group,
 November 2022

Comptroller of the Currency, February 2014, Comptroller's Handbook Mortgage
 Banking

Cameron, Jim, "To Pay or Not to Pay: The Question of Signing Bonuses",
 STRATMOR Group, July 2022

Other Consultations:

Stuart Lynn, Chief Financial and Administrative Officer, GMHC

**Exhibit #4 Publications**

## REFEREED PROFESSIONAL ARTICLES

(With Byron Walden) "Correctly Calculating the Present Value of Future Medical Costs in Personal Injury Cases", The Value Examiner, Jan/Feb 2015, pp.24, 25 and 35.

(With Stanley K. Smith)  "Elderly Migration into Rapidly Growing Areas:  A Time Series Approach, "Review of Regional Studies, Spring, 1985, pp. 11-27.

(With Blaine Roberts)  "An Empirical Note on Employment Forecasts," Monthly Labor Review, March, 1978, pp. 105-108.

(With Blaine Roberts)  "The Role of Monetary Forces in Regional Economic Activity:  An Econometric Simulation Analysis," Journal of Regional Science, April, 1979, pp. 15-29.

(With Jerome Milliman and Richard Ellson)  "A Pragmatic Econometric Approach to Assessing Economic Impacts of Growth or Decline in Urban Areas," Land Economics, February, 1978, pp. 442-460.

The Regional Impact of Monetary Policy:  An Econometric Simulation Study of Indiana 1958-1973,"  Journal of Regional Science, April, 1977, pp. 77-88.

"Manitoba Interlake Area – A Review," Journal of Regional Sciences, April, 1977, pp. 151-153.

## BOOKS AND MONOGRAPHS

(With Jerome Milliman)  "An Econometric Approach to Regional Stagnation," in Peter Friedrich's and Walter Buhr's (editors) Planning Under Regional Stagnation, Baden-Baden, West Germany:  Nomos-Verland, 1982.

(With Neil Sipe)  A Primer on Impact Fees in Florida, Tallahassee, Florida:  Florida Home Builders Association, 1981.

"The Impacts of Growth Management Policies on New Home Prices," in Thomas Black's (editor) Urban Land Markets:  Price Indices, Supply Measurers and Public Policy Effects, Washington, D.C.:  Urban Land Institute, 1980, pp. 215-232.

"The Geographic Incidence of Monetary Policy:  An Econometric Analysis," in Peter B. Corbin's and Murray Sabin's (editors)  Geographic Aspects of Inflationary Processes, Volume 2, New York:  Redgrave Publishing Company, 1976,  pp. 17-42.

(With Ernst Stromsdorder and Kamran Moayed-Dadkhan)  Cost Analysis of Manpower Programs:  An Analysis of the Art, Bloomington, Indiana:  Indiana University, 1973 (mimeographed).

## NONREFERRED JOURNALS AND NEWSLETTER

"Econocast," published each quarter November, 1984 - 1994.

"The Florida Outlook", published each quarter 1977-1994 in The Florida Outlook.

Economic Indicators, published monthly, 1979-1982.

Quarterly Forecasts for Florida and its counties on the Internet at Fishkind.com since 1998.

Fund Newsletters for 27 Florida Counties, published monthly 2006-2009

"Econocast Weekly" Dr. Fishkind's weekly economic commentary

"The Big Green – The Fishkind Study", Responses to an Aging Florida, Florida Council on Aging, October, 1998.

Letter Writer's Forum 1999, The Orlando Sentinel, Topic: Light Rail System for Orlando.

"Outlook 2000, A Leveling Off', Florida Realtor, January, 2000.


## GRANT SPONSORED RESEARCH ACTIVITY

(With Jerome Milliman and Neil Sipe) Modeling Financing Alternatives for Capital Improvements, Gainesville, Florida: Bureau of Economic and Business Research, April 1983. For the Department of Community Affairs.

(With Jerome Milliman and Neil Sipe) A Regional Fiscal Impact Model, Gainesville, Florida: Bureau of Economic and Business Research, June, 1982. For the Department of Veterans and Community Affairs.

(With Ron Dodson, Charles McDonald, and Scott Hargrave) A Cost-Benefit Analysis of Consultants in the Florida Department of Transportation, Gainesville, Florida: Bureau of Economic and Business Research, February, 1981. For the Department of Transportation.

The Outlook for Residential Construction in Florida, Gainesville, Florida: Bureau of Economic and Business Research, October 5, 1979. For the Florida Home Builders Association.

The Outlook for Residential Construction, Gainesville, Florida: Bureau of Economic and Business Research, March 15, 1979. For the Florida Homebuilders Association.

(With John Alexander and Carl Feiss) Largo Prototype Assessment Model, Gainesville, Florida, April, 1979. For the Plan Board.

(With Jerome Milliman) <u>An Economic Analysis of Growth Management in Sarasota County</u>, Sarasota, Florida:  Contractors Association, November, 1978.

(With Jerome Milliman) <u>Methodology for Assessing the Physical, Economic and Social Tradeoffs Between Increased Economic Development and Enhanced Environmental Quality</u>, Gainesville, Florida:  Bureau of Economic and Business Research, University of Florida, July, 1978.  For the Department of Administration.

(With Blaine Roberts) <u>A Comparative Regional Housing Market Analysis of Florida and California</u>, Gainesville, Florida:  Bureau of Economic and Business Research, University of Florida, June, 1978.  For California Federal Savings.

(With Blaine Roberts) <u>A Short-Run Manpower Forecasting Model</u>, Gainesville, Florida:  Bureau of Economic and Business Research, University of Florida, 1977.  For the Department of Community Affairs, State of Florida.

(With Blaine Roberts, Jerome Milliman, and Juan Gonzalez) <u>Florida Econometric Manpower Simulation Study</u>, Gainesville, Florida:  Bureau of Economic and Business Research, University of Florida, 1976.  For the Division of State Planning, State of Florida.

(With Jerome Milliman and Richard Ellson) <u>Alachua County Econometric Study</u>. Gainesville, Florida:  Bureau of Economic and Business Research, University of Florida, 1976.  For the Gainesville-Alachua County Regional Utilities Board.

(With Jerome Milliman and Richard Ellson) <u>Development of a Methodology for Determining the Need for Vocational and Technical Education in Urban Areas of Florida</u>, Gaineville, Florida:  Bureau of Economic and Business Research, University of Florida, 1976.  For the Florida State Advisory Council on Vocational and Technical Education.

<u>The Economic Impacts of the Orlando International Airport</u>.  For the Greater Orlando Aviation Authority, 1992.

<u>Tourism:  How Does It Effect Our Economy?  Fiscal Impacts of Tourism on Central Florida</u>.  For the Convention and Visitors Bureaus of Orlando/Orange County, Kissimmee/St. Cloud, and Seminole County, 1996.

<u>The Economic Impact of the Bert Harris, Jr., Private Property Rights Protection Act and the Proposed Property Rights Amendment</u>.  For the Florida Chapter of the American Planning Association, 1998.

<u>South Carolina Private Property Rights Study:  Economic Impact of H.3591</u>.  For the South Carolina Coastal Conservation League, Association of Counties, and Municipal Association, 1998.

<u>Proposed 2 AM Liquor Ban Will Damage Miami Beach Economy forYears to Come</u>, 2021 (For the Miami Herald)

**Exhibit #5    Damages from Bonus Payments**

| Employee No. | Job on 9/30/2020 | Bonus Amount | Amount of Payment | Estimated Salary | % Bonus | % Industry Earning 12-months prior | Damage |
|---|---|---|---|---|---|---|---|
| MH188EGWS | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19.43% | 19.22% | $216 |
| 8X654E5U0 | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| URAL2VVHU | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| GT1L0XME4 | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| M1OK1J05T | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| GG36HRNQY | Senior Director - Underwriting Manager | $20,000 | $20,000 | $130,000 | 15% | 19% | $0 |
| D31YK41UM | Funder | $5,000 | $5,000 | $72,118 | 7% | 19% | $0 |
| SOSYVBT7Z | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| OGX4M9Z1E | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| V6T0TLCCP | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| L8GDKXSJV | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| 7DFDG1POI | Senior Underwriter | $30,000 | $30,000 | $102,955 | 29% | 19% | $10,216 |
| F9F02N8KN | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| DXV3G9USE | Funder | $5,000 | $5,000 | $72,118 | 7% | 19% | $0 |
| RIT0DWW1R | Funder | $5,000 | $5,000 | $72,118 | 7% | 19% | $0 |
| O44DV6FZL | Funder | $5,000 | $5,000 | $72,118 | 7% | 19% | $0 |
| 84NYFR2X0 | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| ZFBNNLZLU | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| 5W170DW2F | Underwriter Support Specialist | $10,000 | $10,000 | $102,955 | 10% | 19% | $0 |
| HPOINT006 | Underwriter Support Specialist | $10,000 | $10,000 | $102,955 | 10% | 19% | $0 |
| SXR9GV9D5 | Underwriter Support Specialist | $10,000 | $10,000 | $102,955 | 10% | 19% | $0 |
| W1W1F6LGH | Underwriter Support Specialist | $10,000 | $10,000 | $102,955 | 10% | 19% | $0 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| O15SDTKGR | Underwriter Support Specialist | $10,000 | $10,000 | $102,955 | 10% | 19% | $0 |
| LBMR26SG5 | Underwriting Pipeline Analyst | $10,000 | $10,000 | $102,955 | 10% | 19% | $0 |
| 1KUI1VJOA | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| BU9GKXXNU | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| F9CFLUKFC | Funder | $5,000 | $5,000 | $72,118 | 7% | 19% | $0 |
| 2U8VUTRZD | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| AKSL5I2PG | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| QDOYGDCTT | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| TFQ8EAVBW | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| AK3COI27A | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| IGJM3VON7 | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| DJ06FIS7P | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| DMW78050W | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| RFULPDOQ2 | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| PQ67JRAVT | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| OIHM6ZZGJ | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| YH7IXZ9X4 | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| QHBZXEEON | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| YZQT51LUF | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| GBPLI8ZMW | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| TYNBC9HHW | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| 79I3EBR9Y | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| F53H885BQ | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| KEU6FRYG3 | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| RGF8GMJPP | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| B0A05FN3O | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| 0E9NRUDK8 | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| 3NYJJ9FCS | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| JEMDY2PAP | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |

| | | | | | | |
|---|---|---|---|---|---|---|
| SXMUDETPH | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| BX43C33DD | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| PY2AKIVFS | Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| VK9S4B8SS | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| 6DELFODO9 | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| V5Y3YAVQO | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| 46YWW3NYA | Closing Coordinator | $5,000 | $5,000 | $75,003 | 7% | 19% | $0 |
| 3QPX7BX9E | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| AY5U62IOK | Director - Closing and Funding Development | $20,000 | $20,000 | $120,200 | 17% | 19% | $0 |
| 867U0XTNK | Director - Loan Coordinator Development | $10,000 | $10,000 | $120,200 | 8% | 19% | $0 |
| U1SD554P1 | Director - Underwriting | $20,000 | $20,000 | $120,200 | 17% | 19% | $0 |
| QUQOZA2E4 | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| SWG0J38RD | Funder | $5,000 | $5,000 | $72,118 | 7% | 19% | $0 |
| 78SPPUY7Q | Funder | $5,000 | $5,000 | $72,118 | 7% | 19% | $0 |
| C7I7MIPK7 | Funder | $5,000 | $5,000 | $72,118 | 7% | 19% | $0 |
| ABGIB5CNW | Funder | $5,000 | $5,000 | $72,118 | 7% | 19% | $0 |
| 81TFTZ342 | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| 0T8MND4KK | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| I7B9Y461N | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| 4B1ZFGCFM | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| 8W51U4IU6 | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| TTYNBPP0G | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| NHE3HZ6JL | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| XXX61UAS3 | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| HCRCL5CCD | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| EWXKGZQWH | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| MTBRYJIQU | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| 3FLSQ4B2V | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| 19Q55QZY7 | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |

| | | | | | | |
|---|---|---|---|---|---|---|
| EMIFU0RXD | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| MYENWP5EA | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| V2JPSMNBD | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| 8TP7STBYU | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| BOO5QYBI3 | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| D1FIC97RJ | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| IJWP037CL | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| 3BVE0F57D | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| AA33MUBMU | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| 6MUVE5HF0 | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| A02PSWPJT | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| ATNP7KJ2M | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| 7R2T2H291 | Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| 9KWO81W7W | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| VJSQFH47P | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| B6IEDVZTY | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| G59034ZTD | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| 3K827RR3Z | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| 6S10HBD5K | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| J6S80HD6W | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| XC5U5DR4V | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| NQE4JLENB | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| P2XOGMCQS | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| VO2ZIL4CJ | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| I1PPJX03V | Loan Coordinator | $15,000 | $15,000 | $75,003 | 20% | 19% | $587 |
| DJOFGZUEC | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| O445C72ID | Loan Coordinator | $18,000 | $18,000 | $75,003 | 24% | 19% | $3,587 |
| LF29P7PP | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| MY8O52J40 | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 5CLON28WN | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| O56RN8QZV | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| VKPNBQBKW | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| OCYGPK0N8 | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| RGU28GWNV | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| R0Y7GV9LR | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| QJ7K4JF5X | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| R1GZWQ4KB | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| A5A1FUYI7 | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| R73PKA7ZW | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| KVRQAOS11 | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| ZT5HZDPW9 | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| YFC2Z26GM | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| 637WA7MNC | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| DHFQOYSM8 | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| O7QL4QMST | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| B3Y4LWZ1H | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| 6XHBY3M9K | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| J405Q16BE | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| NR7489NCN | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| AHVVVS217 | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| L6LQH5MUM | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| 6NKSSAG6N | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| C6RQ40ZQE | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| HC66O6YF6 | Loan Coordinator - Lead | $10,000 | $10,000 | $82,574 | 12% | 19% | $0 |
| IONVIZTY3 | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| YP2YW27W4 | Loan Coordinator Pipeline Analyst | $5,000 | $5,000 | $72,120 | 7% | 19% | $0 |
| IQN4UBDT8 | Senior Director - Closing | $20,000 | $20,000 | $130,000 | 15% | 19% | $0 |
| PX7MTXR61 | Senior Director - Closing and Funding Development | $20,000 | $20,000 | $130,000 | 15% | 19% | $0 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 7X0PAHU5Q | Senior Director - Loan Coordination | $15,000 | $15,000 | $130,000 | 12% | 19% | $0 |
| W0HIBK5OS | Senior Director - Loan Coordination | $15,000 | $15,000 | $130,000 | 12% | 19% | $0 |
| 8JC207A3K | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| K71R00KEG | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| S7WCEDKFQ | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| DBDEB7F5J | Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| 6FI0P477C | Underwriter Support Specialist | $10,000 | $10,000 | $102,955 | 10% | 19% | $0 |
| OV2RN0SBD | Underwriter Support Specialist | $10,000 | $10,000 | $102,955 | 10% | 19% | $0 |
| TF1TEQOWX | Underwriter Support Specialist | $10,000 | $10,000 | $102,955 | 10% | 19% | $0 |
| 7ISJ2ZZPF | Underwriter Support Specialist | $10,000 | $10,000 | $102,955 | 10% | 19% | $0 |
| JV32N0ROS | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| K8FSQEOMK | Underwriter Support Specialist | $10,000 | $10,000 | $102,955 | 10% | 19% | $0 |
| FMBTB97X2 | Underwriter Support Specialist | $10,000 | $10,000 | $102,955 | 10% | 19% | $0 |
| GWZNGYJW2 | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| 1JXRWPIIA | Underwriter Support Specialist | $10,000 | $10,000 | $102,955 | 10% | 19% | $0 |
| FK48XFDT8 | Underwriter Support Specialist | $10,000 | $10,000 | $102,955 | 10% | 19% | $0 |
| 8P386ND3K | Underwriter Support Specialist | $10,000 | $10,000 | $102,955 | 10% | 19% | $0 |
| UH2NXA1C4 | Underwriter Support Specialist | $10,000 | $10,000 | $102,955 | 10% | 19% | $0 |
| 8BS8ZUZNJ | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| T0XLVLMW0 | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| 0XB3GYJDZ | Underwriting Team Lead | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| O9VNGPM7C | Director - Closing | $15,000 | $15,000 | $120,200 | 12% | 19% | $0 |
| OGJGUWIXR | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| 4Z3IRL8VR | Director - Underwriting Manager | $25,000 | $25,000 | $120,200 | 21% | 19% | $1,902 |
| N4WKXEWUL | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| B69XB3G56 | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| 3WFSN1VNC | Loan Coordinator | $10,000 | $10,000 | $75,003 | 13% | 19% | $0 |
| 65Z R1L3Q0 | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| TQBU53HZA | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| NTLXG0I76 | Senior Underwriter | $20,000 | $20,000 | $102,955 | 19% | 19% | $216 |
| YKGKEF8BQ | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| R4VOCMOAA | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| 7OWNF28DX | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| RCCB0OC0O | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| 5AL5Q27K1 | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| GJNEU6L83 | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| EJDB39NPB | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| L41M0YNIP | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| YL68KPTI2 | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| 4L09AS46O | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| UED9OB3T5 | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| URCN30KHK | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| QRAWPU12V | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| Q8YQFNOAA | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| WY64DZIEH | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| 6ZZA34IQU | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| MXKI7VI8I | Closer | $15,000 | $15,000 | $72,118 | 21% | 19% | $1,141 |
| IYFDE9B3T | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| QR6NG2NOA | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| YOKY591EY | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| XS82OJZ4I | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| 86IBWSAJ9 | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| ER0AMAFVK | Closer | $10,000 | $10,000 | $72,118 | 14% | 19% | $0 |
| CKU0OEPVP | Closing Coordinator | $5,000 | $5,000 | $75,003 | 7% | 19% | $0 |
| QXR6YDNJW | Closing Coordinator | $5,000 | $5,000 | $75,003 | 7% | 19% | $0 |
| UG9UBE55L | Director - Closing | $15,000 | $15,000 | $120,200 | 12% | 19% | $0 |
| X0GUF56WO | Director - Closing | $15,000 | $15,000 | $120,200 | 12% | 19% | $0 |
| J2QQIHMRT | Director - Funding | $15,000 | $15,000 | $120,200 | 12% | 19% | $0 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 7AJJAQYNO | Funder | $5,000 | $5,000 | $72,118 | 7% | 19% | $0 |
| WV5PY4F5U | Funder | $5,000 | $5,000 | $72,118 | 7% | 19% | $0 |
| QYHO6BULU | Funder | $5,000 | $5,000 | $72,118 | 7% | 19% | $0 |
| A2YD1GRDE | Funder | $5,000 | $5,000 | $72,118 | 7% | 19% | $0 |
| FYQRXTRL4 | Funder | $5,000 | $5,000 | $72,118 | 7% | 19% | $0 |
| I8OEDMNIU | Funder | $5,000 | $5,000 | $72,118 | 7% | 19% | $0 |
| WIHFAT9PZ | Funding - Lead | $7,500 | $7,500 | $75,003 | 10% | 19% | $0 |

===========
**$30,583**