## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

HOME POINT FINANCIAL
CORPORATION,

     Plaintiff,

v.

DONALD MARK LANE, CANDACE
ROBERTSON, CHRISTOPHER
WILKINS, and GUARANTY HOME
MORTGAGE CORPORATION,

     Defendants.

Case No.  6:20-cv-01819-CEM-EJK

## DEFENDANTS' (CORRECTED) MOTION TO EXCLUDE THE EXPERT WITNESS TESTIMONY OF ROBERT W. CRANDALL
### (Corrected to Include Rule 3.01(g) Certification)

Defendants Donald Lane, Candace Robertson, and Guaranty Home Mortgage Corporation move to exclude the expert witness testimony of Robert Crandall ("Crandall") in its entirety.

## INTRODUCTION

Federal Rule of Evidence 702 requires expert witnesses to consider "sufficient facts or data" and to apply their expertise reliably to the facts of a given a case. Courts do not permit expert testimony that merely parrots a party's allegations or fails to engage meaningfully with the facts at hand. Crandall's opinions do just that, uncritically accepting Home Point's factual and legal narrative of the case under the guise of an expert opinion. His opinions do not

result from the faithful application of his expertise and are not helpful to the fact finder. With respect to his opinion on disgorgement, Crandall's methodology is unreliable and his opinions are not based on the facts of this lawsuit. Crandall's opinions fail to satisfy Rule 702 and should be excluded in their entirety.

## BACKGROUND

Plaintiff claims that Defendants Lane and Robertson breached non-solicitation agreements by organizing a raid of 16 of Plaintiff's underwriting team in September of 2020, and that Guaranty Home Mortgage Corporation ("GHMC") conspired with Lane and Robertson and tortiously interfered with Plaintiff's non-solicitation agreements. [Dkt. 100.]

Plaintiff served Crandall's Expert Report ("Initial Report") on March 31, 2023.[1] After Defendants served their own expert report on damages, Plaintiff served Crandall's Rebuttal ("Rebuttal") on May 15, 2023.[2]

Defendants took Crandall's deposition on June 13, 2023. When asked whether he had any additional updates or changes to his opinion, Crandall responded that he did not have any at that time but reserved the right to supplement his opinion or further reply to Defendants' expert. (Crandall Dep. 31:15-32:13.)[3] Incredibly, just two days after Mr. Crandall's deposition (at 11:57 p.m. on the discovery cutoff date), Plaintiff served Crandall's "Supplemental"

---

[1] The Initial Report is attached hereto as Exhibit 1 and will be cited to as "Initial Rep."

[2] The Rebuttal Report is attached hereto as Exhibit 2 and will be cited to as "Rebuttal."

[3] The transcript from Crandall's June 13, 2023 Deposition is attached hereto as Exhibit 3.

Expert Report. ("Supplemental Report").[4] According to Crandall's latest expert report, Home Point is claiming approximately $8.3 Million in damages. (Supp. Rep. ¶ 26.)[5] Notably, the numbers continue to change in Crandall's opinions—incrementally increasing the purported damages with each report.

Crandall's opinions provide for eight general categories of damages. (*Id.*) The first category of damages is relates to Lane's salary received from Home Point in the week before his resignation. Crandall states that Home Point paid Lane his normal salary for his last pay period, an amount of $5,546. (Initial Rep. ¶ 17.) Crandall then assumes, without citation, that Lane spent half his time working for GHMC during the pay period and that Home Point would have only paid Lane an amount of $2,773 for the time worked. (*Id.*) This is one of only two numbers that is consistent through all three of Crandall's reports.

The second category of damages relates to retention bonuses paid by Home Point to 203 employees in September and October of 2020. In his Initial Report, Crandall reviews a spreadsheet provided by Home Point that listed the names and other information of Home Point employees who received such retention bonuses as well as the amount and dates the bonus was paid. (Initial Rep.¶ 34.) Crandall simply parrots the numbers from this spreadsheet as his opinion. (*Id.*) After his deposition, Crandall conceded that Home Point had already committed to pay

---

[4] GHMC moved to strike Crandall's Supplemental Report, arguing amongst other things, that it was untimely, improper, and there was no justification for Home Point's significant delay in providing the report. (Dkt. 158.)

[5] The Supplemental Report is attached hereto as Exhibit 4 and will be cited to as "Supp. Rep."

some of the retention bonuses and that, in fact, Home Point actually saved money when the employees resigned because they were entitled to bonuses to which new hires would not be entitled. (Supp. Rep. ¶¶ 10-11.) To that end, Crandall does simple math to subtract this $77,000 from the total number provided by Home Point's spreadsheet. (*Id.*)

The third category of damages relates to certain salary increases Home Point asserts it had to pay to retain employees and to pay employees who initially left and then returned to Home Point. Home Point gave a small raise to four employees who did not resign and then ultimately hired back six employees who left to join GHMC but later returned to Home Point. (Initial Rep. ¶ 35.) For his calculation of "but for damages," Crandall merely subtracts the prior pay rate from the new pay rate, then multiplies the difference by the number of hours worked by the employee going forward until their termination date from Home Point. (*Id.*) Crandall revises this number in his Supplemental Report because he initially failed to calculate a raise that had previously been approved by Home Point prior to one of the employees resigning. (Supp. Rep. ¶ 12.)

The fourth category relates to recruiting costs purportedly incurred by Home Point in hiring replacement personnel. Initially, Crandall identifies that Home Point hired over 30 employees between September 28 and November 30, 2020. (Initial Rep. ¶ 40.) Per Crandall, he selects eleven of those based on their position and date of hiring. (*Id.*) As Crandall admitted during his deposition, he only reviewed recruiting invoices in selecting those eleven employees and did not

consider any employee hired by means other than through a recruiter in selecting these eleven employees. (Crandall Dep. 141:19-23.) Crandall then adds the amounts paid to recruiters for those employees, without additional analysis, to determine the amount of purported damages. (Initial Rep. ¶ 40.)

After being confronted at his deposition that the majority of individuals Crandall identifies as "replacement" employees had been offered employment prior to September 17 when the Home Point employees resigned, Crandall significantly changed this category. Instead of <u>eleven</u> employees, the Supplemental Report identifies <u>sixteen</u> employees as "replacement" employees—with only two employees (Michelle Owighowotu and Adam Bertrand) appearing on both lists. (Supp. Rep. ¶ 17, Table S2). Despite changing the number and identity of the "replacement" employees, Crandall asserts that his methodology is unchanged and uses simple math to add the recruiting costs associated with this new set of employees and opines that sum is the harm suffered by Home Point. (*Id.* at ¶ 17.)

The fifth category relates to the purported signing bonuses paid to the "replacement" employees identified by Crandall. In his Initial Report, Crandall indicates that 10 of the 11 "replacement" employees received a signing bonus. (Initial Rep. ¶ 41.) In his Supplemental Report, Crandall changes the number to 11 out of 16 "replacement" employees. (Supp. Rep. Table S3.) In both instances, Crandall simply adds the amount of the signing bonus and opines that the sum, without any modification, was the amount of harm.

Crandall's sixth category also relates to the purported "replacement" employees and also varies between the Initial Report and Supplemental Report. This category is purportedly related to training *costs* incurred by Home Point. However, instead of calculating any hard costs, Crandall merely opines that new hires would be training for two weeks so they would be unproductive for those two weeks. (Initial Rep. ¶ 43.) For that calculation, he simply adds the sums of each employee's base pay for two weeks and opines that sum is the additional training costs suffered by Home Point. (*Id.*; Supp. Rep. ¶ 19.)

The seventh category appears to only apply to claims against GHMC because Crandall describes the category as "disgorgement due to GHMC's avoidance of recruiting costs for solicited associates from Home Point." Crandall wrongfully assumes that GHMC would have had to pay recruiters to hire the individuals from Home Point at the average rate that Home Point paid recruiters to hire the "replacement" employees. (Initial Rep. ¶¶ 44-45.) Despite (1) being calculated on the amounts paid to "replacement" employees and (2) the amount paid to "replacement" employees changes between the Initial Report and the Supplemental Report, the amount Crandall attributes to this category of damages does not change in the Supplemental Report. (Supp. Rep. ¶ 20.)

Crandall's eighth and final category of damages relates to purported disgorgement of GHMC's profits. Crandall does not look to any record evidence of GHMC's profits, as the record is clear that GHMC did not experience any profits attributable to the new hires. Ignoring the record, Crandall compares apples to

oranges by providing an industry average of profits per loan <u>funded</u> and then applies that number to the number of loans <u>processed</u> by the former Home Point employees after they joined GHMC. (Rebuttal ¶ 28; Crandall Dep. 183:17-184) In the Supplemental Report, Crandall increases this number from approximately $3.1M to approximately $4.8M by estimating how many loans the former Home Point employees might have processed from January 2021 through August 2021. (Supp. Rep. ¶¶ 24-25.) This increase was made despite the fact that no information relating to the number of loans processed by these employees for this later time period has ever been produced in this lawsuit or reviewed by Crandall.

## **ARGUMENT**

### I. **Legal Standard**

Federal Rule of Evidence 702 compels the district court to serve as the "gatekeeper" of expert testimony. *U.S. v. Newball May*, 846 Fed. Appx. 831, 836 (11th Cir. 2021). "To faithfully discharge its gatekeeping duty, the trial court must engage in a rigorous three-part analysis and consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *City of Tuscaloosa v. Harcros Chems. Inc.*, 158 F.3d 548, 562 (11th Cir. 1998). Put more simply, the three basic requirements are "qualification, reliability, and

helpfulness," the third of which is also known as relevance. *Rivera v. Ring*, 810 F. App'x 859, 863 (11th Cir. 2020) (citing *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)); *see also Prosper v. Martin*, 989 F.3d 1242, 1249 (11th Cir. 2021) ("[T]he helpfulness inquiry 'goes primarily to relevance.'" (quoting *Daubert*, 509 U.S. at 591)). A party offering testimony from an expert must show by a preponderance of evidence that the testimony is admissible. *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

## II.   Crandall's damages opinions do not assist the jury.

While Crandall may be generally qualified to perform an economic and statistical analysis for purposes of establishing damages, that is not what he did in this case. Rather, his "methodology" is the product of simple arithmetic—primarily tallying columns on a spreadsheet. These types of damages are well within the understanding of the jury, obviating the need for any expert testimony. *See, e.g.*, *LSQ Funding Grp., L.C. v. EDS Field Servs.*, 879 F. Supp. 2d 1320, 1136 (M.D. Fla. 2012) (excluding opinions because expert's "simple arithmetic calculation is not beyond the understanding of the lay person and therefore would not help the trier of fact"); *Advantor Sys. Corp. v. DRS Tech. Servs., Inc.*, 678 F. App'x 839, 860 n.13 (11th Cir. 2017) (affirming exclusion of expert testimony "because it merely performed simple arithmetic" and was therefore "within the understanding of," and "would not be helpful to a jury"); *Perry v. Schumacher Grp. of La.*, 2020 WL 7090751, at *5 (M.D. Fla. Dec. 4, 2020) (collecting cases).

Further, portions of Crandall's opinion are nothing more than a summary of internal payroll records and invoices provided to him by Home Point. This is not an expert opinion. A quick overview of how Crandall arrived at the dollar value for each category of damages in his Initial Report demonstrates the simplicity of his "methodology":

**Damages due to retention bonuses paid by Home Point**: In forming his opinion, Crandall simply accepts as time a spreadsheet provided to him by Home Point. (Initial Rep. ¶ 34.)

**Damages due to salary increases paid by Home Point:** Crandall takes the salary increase for each associate, divides it by 26 (i.e. the number of pay periods in the year), and then multiplies that total by the number of pay periods that each associate worked at Home Point following their raise. (Initial Rep. ¶ 38.)

**Damages due to recruiting costs for replacement associates:** There is no calculation required to establish these damages. Crandall simply tallies the recruiting invoices provided to him by Home Point for the replacement associates at issue. (Initial Rep. ¶ 40.)

**Damages due to signing bonuses to replace the associates allegedly solicited:** Again, no calculation – Crandall just tallies payroll data provided by Home Point. (Initial Rep. ¶ 41.)

**Training costs associated with replacement associates:** Using the employees' annual salary, Crandall calculates how much Home Point paid each replacement associate over a two week "training period." His opinion simply calculates two weeks of base pay for each employee. (Initial Rep. ¶ 43.)

**Disgorgement due to GHMC's avoidance of recruiting costs:** Crandall first calculates the average recruitment fee percentage that Home Point paid recruiters to hire eleven associates to replace the associates who left for GHMC. Crandall then multiplies each departing associates' starting salary at GHMC by that percentage to come up with the total "estimated recruiting costs." (Initial Rep. ¶¶ 44-45.)

Crandall's Supplemental Report changes the numbers to most of these categories of damages but he claims that the methodology does not change. (*E.g.* Supp. Rep. ¶¶ 13, 17, 18, 25.)

It is not necessary for an economic expert to calculate any of these damages. Should the jury decide that any of these damages are appropriate, it is well equipped to make this calculation on its own based on the evidence presented.

## III.   Crandall's analysis is unreliable and inadmissible.

To make matters worse, Crandall routinely conveys and summarizes the information provided to him by Home Point without any independent verification resulting in inadmissible "expert opinions." *See First Premium Servs., Inc. v. Best Western Int'l Inc.*, No. 95-1466-CIV, 2004 WL 7203535, at *3 (S. D. Fla. Jan. 8, 2004) (excluding expert testimony where expert failed to perform any independent analysis of the accuracy of plaintiff's tax returns, which were prepared by plaintiff's president). Indeed, an expert's "blind acceptance of and reliance on one-sided data" provided by one of the parties is grounds to exclude the expert. *PODS Enters., Inc. v. U-Haul Int'l, Inc.*, 2014 WL 12628664, at *4 (M.D. Fla. June 27, 2014).

Had Crandall conducted an adequate and independent analysis, perhaps he would have appreciated the numerous defects described below.

### a) Disgorgement of GHMC's profits

In his Rebuttal Report, Crandall claims that GHMC realized over $3.1 million in ill-gotten profits from October through December 2020 due to hiring

the 10 Home Point employees who remained with GHMC. (Rebuttal ¶ 28.) To arrive at this number, Crandall uses an industry average profit per loan of $3,738 in 2020Q4 multiplied by the number of loans closed by those 10 employees over that 3-month span. (*Id.*)

As explained in its contemporaneously filed Motion for Summary Judgment, as a matter of law, Home Point cannot seek disgorgement of GHMC's alleged profits in this case. However, even if disgorgement damages are permitted, Crandall's opinion should be excluded from evidence because it is premised on Crandall's improper and conclusory assumption that "the associates who moved to GHMC expanded GHMC's capacity during a time period when the demand for loans was at a historic high. The additional capacity **should generate** additional profits." (Initial Rep. ¶ 46 (emphasis added).)

First and foremost, there is no evidence that GHMC realized a net increase in profits by hiring the former Home Point employees. Any such profits could only be realized if GHMC actually processed and funded more loans than it previously had – due to the additional 10 employees. However, the *only* record evidence concerning GHMC's loan volume and profits is that GHMC processed more loans in August of 2020, **the month prior to the alleged solicitation,** than it did for any month during the subsequent calendar year. Plaintiffs' counsel specifically questioned GHMC's corporate representative Stuart Lynn about this issue during his deposition:

-11-

**Q.** So did GHMC hire the individuals it hired in September, 2020, from Home Point to help it process the high volume it was experiencing in August, 2020?

**A.** It hired the team to help improve the output. That did not happen.

**Q.** Did it hire the Home Point team to help it process what you characterized was a peak of loan decisions being made in August, 2020?

**A.** No. We hire underwriters and the support staff that came with them, the closers [] to help improve our throughput, and that did not happen.

**Q.** So it wasn't to help it process loan volume at the time?

**A.** It was to improve our capability with regard to loan volume, and that clearly did not happen. We were already doing that volume without them there. When they came on board, our volume did not go up.

**Q.** But you needed them to help you with the volume that you had, which was large in August and December of 2020?

**A.** No. We were doing the volume before they were there.

...

**Q.** At the time GHMC hired the Home Point underwriters that came from Home Point in September, 2020, what was its motivation in doing so?

**A.** Motivation was in hopes of generating additional capacity to underwrite additional loans, more than we were capable of at that particular point in time.

**Q.** And did the hiring of those individuals result in that?

**A.** No.

**Q.** Why Not?

A. They were unable to add any kind of significant volume into our system. They moved from a highly automated system to a less automated system and they struggled with that.

(Lynn Corp. Rep. Dep. 15:2-16:3; 36:8-36:23.)[6]

Mr. Lynn went on to state that, "[i]f you look at the number of loans

unwritten prior to the [Home Point employees] coming on board versus after they

came on board, there was no appreciable increase in the number of underwritten

---

[6] Transcript excerpts of Stuart Lynn's Corporate Representative Deposition are attached hereto as Exhibit 5.

loans and there was no increase in the number of funded loans." (Lynn Corp. Rep. Dep. 50:18-51:1.) For example, in August 2020, before the 10 Home Point employees were hired, approximately 30 underwriters processed 1,331 loans. There is nothing to say that those 30 underwriters could not have processed the 1,300 loans that were processed in December 2020—as they had processed more than this amount just a couple months before. (Lynn Corp. Rep. Dep. Ex. 248.)

The clear take away is that GHMC had the capacity to process all loans during the period outlined in Crandall's Reports **prior to hiring any Home Point employees**. Far from enjoying any profits, "[t]he derived benefit from [the Home Point employees] coming on was actually a derived loss, because [GHMC] increased [its] payroll [but] did not increase [its] output." (Lynn Corp. Rep. Dep. 51:2-4.)

While Crandall assumes that "[t]he additional capacity should generate additional profits," he has not pointed, and cannot point, to any evidence that establishes that the additional capacity **did** generate additional profits. Put simply, the there is no factual foundation for this category of damages. Crandall's opinion as to disgorgement damages is unreliable and premised on a conclusory assumption about GHMC's capacity to process loans which is contradicted by the only record evidence regarding this issue. *See, e.g.*, *Jordan v. Celebrity Cruises, Inc.*, 2018 WL 3584702, at *8 (S.D. Fla. July 25, 2018) (expert opinions excluded as unhelpful "because they are contradicted by the underlying record and '[e]xpert evidence based on a fictitious set of facts is just as unreliable as evidence based on

-13-

no research at all.'" (quoting *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996))).

### b) Disgorgement of GHMC's avoidance of recruiting costs.

Crandall claims that GHMC "avoided" what he presumably considers to have been inevitable recruiter fees/costs by using Lane/Robertson to recruit the Home Point employees. Specifically, Crandall claims – without any supporting evidence – that "had GHMC relied on recruiters to hire the solicited associates, it likely would have incurred $239,073 in recruiting expenses if a recruiter were able to successfully recruit the associates targeted by Defendants." (Initial Rep. ¶ 45.)

To arrive at this number, Crandall first calculates the average recruitment fee percentage that Home Point paid recruiters to hire eleven associates to replace the associates who left for GHMC. Crandall then simply multiplies each departing associates' starting salary at GHMC by that percentage to come up with the total "estimated recruiting costs" that GHMC purportedly would have had to pay. The issues with this "methodology" are abound.

First, this category of damages is duplicative of, and should be subsumed by, Home Point's "disgorgement of GHMC profits" damages claim. Any "savings" that GHMC would have enjoyed would have been realized in the company's profits. If there is sufficient evidence of GHMC's profits, then Home Point cannot seek to recover "wrongfully retained profits" *plus* some other purported savings over and above those profits. This would be purely punitive and would put GHMC in a position that was worse off than if the acts had never occurred. There is simply no

legal basis to recover the other party's profits plus some additional savings that would have been calculated into those profits.

Additionally, Crandall concedes that he initially only considered employees for which a recruiter was used by Home Point, rather than considering all of the employees hired by Home Point. (Crandall Dep. 141:19-23.) His calculations, thus, wrongfully assume that all employees hired in the mortgage underwriting industry are hired by paying third-party recruiters. That is obviously not the case as both Home Point and GHMC hired individuals without using recruiters. The uncontroverted testimony is that GHMC only used recruiters as a last resort if it could otherwise not fill a position. (Lynn Ind. Dep. 40:20-41:12.)[7] In his Supplemental Report, Crandall implicitly concedes that not all employees are hired using recruiters as he indicates only 12 of the 16 "replacement" employees hired by Home Point were hired through the use of recruiters. (Supp. Rep. ¶ 17.) Moreover, when it comes to calculating Home Point's *losses*, Crandall only considers recruiting costs related to 8 of the "replacement" employees. (Supp. Rep. Table S2.)

Crandall's methodology is unreliable as it requires the unsupported assumption that GHMC will incur a recruiting cost for every employee hired. Such an assumption is inconsistent with the evidence and testimony. Therefore, his "estimate" of what GHMC would have paid to recruiters to hire the equivalent of the 16 former Home Point employees is purely speculative and baseless.

---

[7] Transcript excerpts of Stuart Lynn's Individual Deposition are attached hereto as Exhibit 6.

### c) Retention Bonuses

Crandall claims that Home Point was forced to pay over <u>$2.5 million</u> in retention bonuses to 202 of its "Maitland" employees in order to ward off further recruitment efforts by Lane and/or Robertson. (Initial Rep. ¶ 34.)

In forming his opinion, Crandall simply took a spreadsheet provided to him by Home Point that documents the retention bonuses paid and summarized it in a single paragraph:

> **The records show** that Home Point paid retention bonuses to Maitland associates totaling $2,482,214 on the 9/25/2020 pay date. After this date, Home Point paid an additional 10 retention bonuses to Maitland associates totaling $16,000 on the 10/9/2020 pay date. In total, Home Point paid $2,647,214 in retention bonuses to Maitland associates as a result of Defendant's solicitation efforts and mass raid.

(Initial Rep. ¶ 34 (emphasis added).)

"The records" that Crandall refers to is a single excel spreadsheet, which is a Home Point internal payroll document listing the retention bonuses paid to its Maitland associates during the September 25th and October 9th 2020 pay periods.[8] Crandall takes this spreadsheet at face value and makes no analysis, - i.e, "that's what they paid out and what they haven't recouped to date." (Crandall Dep. 43:21-25.) Crandall does not even account for the fact that Home Point had already committed to pay retention bonuses to some individuals. (Crandall Dep. 59:4-11.)

---

[8] The spreadsheet referenced by Crandall is the document produced at HPLANE00004536 and is attached hereto as Exhibit 7.

As previously addressed, regurgitating a summary of Home Point's payroll record is not an expert opinion.

Regardless, there are numerous issues with Crandall's opinion. For example, the large majority of the retention bonuses in his calculation were paid to Home Point employees who were not even targeted by Robertson or Lane. At worst, as Crandall notes, Robertson/Lane created a list of <u>38</u> employees "who would be targeted." (Initial Rep. ¶ 34.) However, Home Point claims damages based upon retention bonuses paid to <u>202</u> employees—including employees who started *after* Lane and the other employees resigned. (Crandall Dep. Ex. 4 (showing hiring dates of employees receiving retention bonuses include employees hired on September 21, 2020).)[9]

Further, once Home Point sent cease-and-desist letters to Lane, Robertson, and GHMC the day after Lane resigned, GHMC instructed its staff not to hire any more Home Point employees, and there is no evidence that GHMC made any other offers to Home Point employees. (Adkins Dep. 186:2-12.)[10] In other words, the letters did their job of mitigating Home Point's potential damages, which rendered paying retention bonuses to ward off additional hiring unnecessary.

Finally, as Defendant's expert Dr. Hank Fishkind correctly noted, Crandall also failed to consider/account for the high employee turnover that was occurring

---

[9] Exhibit 4 from Crandall's Deposition is attached hereto as Exhibit 8.
[10] Transcript excerpts from the December 8, 2020 deposition of Chip Adkins is attached hereto as Exhibit 9.

in the industry (20%) and at Home Point in particular. (Fishkind Rep. ¶16.0.)[11] Home Point's records show that it hired over 70 people at its Maitland office alone in a four-month span in 2020. (Crandall Dep. Ex. 4; Initial Rep. ¶ 40.) The turnover at Home Point was significant enough that Home Point instituted at least three retention bonus programs in 2020—one for underwriters, one for closers, and the one that Crandall "reviews." (Crandall Dep. 97:2-25; Crandall Dep. Ex. 32.) Combined with the high mortgage loan volume, all underwriting companies (not just Home Point) inevitably had to pay retention and similar types of bonuses to minimize unwanted employee turnover. (Fishkind Rep. ¶ 30.0.) Without adjusting for these factors, Crandall's numbers are grossly inflated and unreliable. Crandall's simply parroting Home Point's records should not be permitted by the Court. *PODS Enters., Inc.*, 2014 WL 12628664, at *4 ("Dr. Leonard's blind acceptance of and reliance on one-sided data from [a party], his failure to apply any analytical methodology whatsoever and his parroting of the generic definition urged by [the party] render his ... opinions unreliable and therefore inadmissible.").

### d) Salary Increases

Crandall claims that Home Point was forced to pay $298,301 in salary increases to 10 Home Point employees to whom GHMC made offers in order to keep them from joining GHMC. Similar to his retention bonus analysis, Crandall failed to account for industry factors including overall earnings increases

---

[11] May 1, 2023 Expert Report of Dr. Hank Fishkind, Defendants' expert witness, is attached hereto as Exhibit 10.

throughout the industry. In reality, not all of Home Point's salary increases were caused by the Defendants' alleged wrongful acts as salaries were inevitably increasing throughout the industry, particularly around September 2020.

Home Point's Senior Director – Underwriting Manager, Melissa Kramer, testified that those who were rehired were just hired back at the market rate. (Kramer Dep. 75:16-23.)[12] And simply comparing the "increased" salaries to the wages being paid to the individuals being hired at the same time demonstrates the same. For example, Crandall opines that the updated salaries for those underwriters who received increases were between $95,014 and $115,003 annually. (Initial Rep. ¶¶ 36-37.) And the annual pay listed in his report for those underwriters allegedly hired in September 2020 to replace those who left range between $89,999 and $115,004. (Crandall Rep. ¶ 43, Table 4.) However, these employees were not actually salaried employees and the hourly rates of these individuals is even more glaring, as new hires with similar experience were making $2 per hour more than the GHMC employees who stayed, even *after* these employees' raises.[13] Home Point did not have to overpay any employee; the market demanded Home Point bring wages up for the employees it was underpaying to the amount it paid its new hires.

---

[12] Transcript Excerpts from the May 2, 2023 deposition of Melissa Kramer are attached hereto as Exhibit 11.

[13] For example, Richardson was hired as an underwriter at an hourly rate of $55.29. (Initial Rep. Table 4.) After receiving the purported raises, Hamilton, Huber and Thoennes received only $52.89 per hour.

### e) Recruiting costs paid by Home Point

Crandall's Initial Report claims that Home Point was forced to pay $204,811 to recruiters in order to replenish 11 of the Home Point employees who left.

Similar to the above, Crandall failed to account for industry factors, particularly the high turnover rate in the industry, including Home Point's turnover rate being higher than the industry average. In fact, Crandall acknowledges that Home Point hired more than 30 people from September 28 through November 30, 2020.[14] (Initial Rep. ¶ 40.) Therefore, it is speculative and improper for Crandall to attribute 100% of recruiter costs to the Defendants' alleged wrongful acts when it is clear that Home Point was going to hire these individuals regardless of Defendants' actions. After considering these other market factors, Dr. Fishkind attributed $0 for this damages category.

Moreover, at his deposition, Crandall admitted that he only looked at those employees who were hired through recruiters. And he did not consider the several who were hired without a recruiter. (Crandall Dep. 143:20-144:19.) Further, his entire analysis fails because these employees were hired prior to Lane's resignation but merely started work after the individuals resigned to leave to GHMC. (*E.g.* Crandall Dep. 146:13-147:12.) So these are *not* replacement employees and were not hired "but for" Defendants' actions. In his Supplemental Report, Crandall even changes the list of employees who were hired to "replace" those who resigned.

---

[14] This number is in addition to the at least 40 new employees hired by Home Point at the Maitland Operations Center in August and September, 2020. (Crandall Dep. Ex. 4).

(Supp. Rep. Table S2.) The reality is Crandall does not know who, if anyone, was actually hired to replace the few individuals who resigned. Home Point continued with its normal hiring practice with no changes, which makes sense considering the small percentage of its staff who went to GHMC. Crandall's wavering testimony should be excluded as his selecting employees at random to use for his calculations is not a reliable methodology.

### f)  Signing bonuses paid by Home Point

Crandall's Initial Report claims that Home Point was forced to pay $359,073 in signing bonuses for 14 new employees to replace those who left for GHMC. Again, Crandall failed to account for industry factors, so his damages estimate is speculative and improper.

Furthermore, as explained in the prior section, these were employees whom Home Point was already going to hire and for whom Home Point had already agreed to pay a signing bonus well before Lane or the other employees resigned on September 17, 2020. Because these employees were not hired "but for" Defendants' actions, no damages can be attributable to them. And again, after his deposition, Crandall chose a different group of employees whom he said were replacing the employees who resigned. Crandall states that his methodology does not change even though the identity of the employees changes and the values change. (Supp. Rep. ¶ 18.) However, Crandall was not presented any new information, he just changed the results. Thus, the different results reached from the same set of facts show the defects with the methodology used by Crandall.

### g) Training costs associated with replacement associates

Crandall claims that Home Point lost $49,002 because it had to train 12 new employees to replace those who went to GHMC. Again, Crandall failed to account for industry factors, so his damages estimate is speculative and improper. And, again, this number changes in the Supplemental Report because the calculations are done with different employees.

Further, Crandall states that during the training stage these employees (whichever set of employees he is using at the time) were not generating revenue because they were not underwriting loans. (Initial Rep. ¶ 43.) However, there is no evidence and no claims that Home Point suffered any loss of productivity or loss of profits because of Defendants' action. There is no evidence or testimony that there was revenue to be generated and certainly no evidence that Home Point was *unable* to underwrite any loans or create more revenue while these employees were in training. It is telling that Crandall does not cite to any sources when he opines that the employees were not able to generate revenue in training.

Finally, these costs are associated with the same employees as the signing bonuses and recruiting costs and suffer from the same defect. These employees were going to be hired and the training costs were going to be incurred regardless of whether Lane and the other employees resigned. And the inclusion of a new set of employees in the Supplemental Report demonstrates the unreliability of Crandall's opinions.

**IV.   Mr. Crandall's factual narrative of the case is not the proper subject of expert testimony**

Mr. Crandall's Initial Report begins with an introductory section in which he offers a skewed factual narrative of the case, culminating with his opinion that "[t]he evidence indicates that Ms. Robertson and Mr. Lane solicited Home Point associates for the purpose of orchestrating a mass exodus of associates to cause a significant disruption to Home Point's business." (Initial Rep. ¶¶ 6-20, 28-30, 32) Crandall was retained by Home Point to evaluate economic damages incurred by Home Point, yet much of his Initial Report reads as if it is a summary judgment motion, summarizing and interpreting whatever "helpful" record evidence he can point to in support of Home Point's *factual* allegations.

It is well settled that expert testimony cannot simply highlight the contents of documents, because a "pure factual narrative … can be presented to the jury directly" by counsel at closing argument and is therefore not the proper role of an expert at trial. *In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1346-47 (S.D. Fla. 2010); *See also United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004). "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004); *In re Seroquel Prods. Liab. Litig.*, 2009 WL 3806436, at *4 (M.D. Fla. July 20, 2009) ("Plaintiffs' counsel may not simply use these expert witnesses to provide a narrative history of [the manufacturer's] marketing and labeling practices, or to

make points that are within the province of counsel, rather than an expert witness.") *Fla. Power & Light Co. v. Qualified Contractors, Inc.*, No. 04-80505-CIV, 2005 WL 5955702, at *3 (S.D. Fla. Dec. 6, 2005) (rejecting expert testimony that was "simply a regurgitation of [plaintiff's] theory of case, without any independent or objective basis"). For this reason, courts exclude "plaintiff-slanted" "summar[ies] or selective quotation from internal [defendant] documents" that are "offer[ed] 'under the guise of 'expert opinion.'" *Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1330 (M.D. Fla. Mar. 30, 2015) (citations omitted).

To be sure, Crandall is not a first time offender in this regard.

> In *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 49 (S.D.N.Y. 2016), Crandall offered rebuttal expert testimony to challenge plaintiffs' assertion that they were misclassified as FLSA exempt. Crandall's review included digesting the company's own data and reviewing plaintiffs' declarations. The challenge to his report was premised upon plaintiffs' claim that Crandall's report "impermissibly weaves legal arguments and legal conclusions into his analysis, placing himself in the role of advocate and trier of fact." *Id.* The Court agreed and precluded Crandall from testifying about what conclusions could be drawn from the evidence gathered. *Id.*

*Goodman v. Burlington Coat Factory*, 2019 WL 4567366, at *13 (D.N.J. Sept. 20, 2009).

Ultimately, Crandall was retained as a damages expert, and for purposes of his analysis he may assume that underlying liability will be established.[15] His

---

[15] *See, e.g.*, *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, 2011 WL 2295269, at *4 (S.D. Fla. June 8, 2011) ("An expert witness [] may assume liability for purposes of calculating damages."); *Sancom v. Quest Commc'ns Corp.*, 683 F.Supp.2d 1043, 1068 (D.S.D.2010) ("it is well-settled that a damages expert ... can testify as to damages while assuming the underlying liability."); *In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646, 660 (N.D.Ill.2006) ("A damages model would, of course, be necessarily consistent with liability, or necessarily assume liability.").

lengthy discussion of the "facts" of this case and his opinion as to the Defendants' liability are both unnecessary and prejudicial. Home Point and Crandall's attempt to smuggle in a factual narrative and attorney argument under the guise of expert testimony should be rejected.

<u>**CONCLUSION**</u>

For the reasons stated above, Defendants respectfully move for the Court to exclude the expert testimony of Robert W. Crandall and strike his various reports.

<u>**LOCAL RULE 3.01(G) CERTIFICATION**</u>

The undersigned conferred with Plaintiff's counsel on August 31, 2023 in good faith regarding the relief requested in this motion and Plaintiff's counsel opposes the requested relief.

*/s/ S. Gordon Hill*
S. Gordon Hill (FBN 0094374)
Gordon.Hill@hwhlaw.com
Matthew F. Hall (FBN 092430)
Matthew.Hall@hwhlaw.com
Debra.Whitworth@hwhlaw.com
Hill Ward & Henderson, P.A.
101 E. Kennedy Blvd., Suite 3700
Tampa, FL 3361-2231
813.221.3900 – Telephone
813.221.2900 – Facsimile
*Counsel for Defendants*
