1
2
3
4
5
6
7
8

9

**IN THE UNITED STATES DISTRICT COURT**

10

**FOR THE MIDDLE DISTRICT OF FLORIDA**

11

**ORLANDO DIVISION**

12

13  HOME POINT FINANCIAL CORPORATION,

**Case No. 6:20-cv-01819-CEM-EJK**

14          Plaintiff,

15  vs.

**EXPERT REPORT OF ROBERT W. CRANDALL, MBA**

16  DONALD MARK LANE, CANDACE ROBERTSON, CHRISTOPHER WILKINS, and GUARANTY HOME MORTGAGE CORPORATION,

17

18          Defendants.

19

20
21
22
23
24
25
26
27
28

**Table of Contents**

I.      ASSIGNMENT .......................................................................................... 2

II.     QUALIFICATIONS ..................................................................................... 2

III.    DISCUSSION OF AVAILABLE DATA .......................................................... 3

IV.     INTRODUCTION ....................................................................................... 4

V.      DETAILED ANALYSIS OF COSTS INCURRED BY HOME POINT ................. 17

A.      Defendants' raid caused Home Point to pay $2,647,214 in Retention
        Bonuses to Maitland office associates.................................................. 17

B.      As result of Defendants' raid, Home Point was compelled to increase the
        base salaries of 10 associates to retain them or convince them to return.............. 19

C.      Home Point incurred significant recruiting costs to replace the associates
        Defendants raided .............................................................................. 21

D.      Home Point Incurred $359,073 in signing bonuses to replace the associates
        solicited by Defendants ...................................................................... 23

E.      Home Point incurred additional training costs as a result of Defendants'
        solicitation of its already trained and experienced associates ................. 24

F.      Disgorgement: GHMC avoided significant recruiting costs by using Ms.
        Robertson and Mr. Lane to solicit Home Point associates..................... 26

G.      Disgorgement: The solicited associates contributed to GHMC's profits.............. 28

H.      Total Amount in Controversy to Date ................................................... 29

Expert Report of Robert Crandall

## I.   ASSIGNMENT

1.      I have been retained by counsel on behalf of Plaintiff Home Point Financial Corporation ("Home Point") to review the available data, declarations, deposition testimony, and other available legal documents to evaluate economic damages incurred by Home Point in connection with Guaranty Home Mortgage Corporation's ("GHMC"), Candance Robertson's, and Donald Lane's ("Defendants") hiring raid of Home Point's Maitland, Florida office associates. I was asked to estimate the economic damage Home Point incurred as a result of Defendants' efforts to solicit, recruit, and hire Home Point's associates.[1] Generally, my assignment includes three parts: (1) estimate damages Home Point suffered due to Defendants' actions; (2) estimate GHMC's profits and/or cost savings caused by the solicitation and hiring of Home Point's former associates; and, (3) respond to Defendants' expert's analysis and/or opinions, if any.

## II.   QUALIFICATIONS

2.      I am a Partner at Resolution Economics LLC, a firm whose activities include conducting labor economics studies, performing economic and statistical analyses, and providing complex data analysis in connection with litigation and non-litigation issues. I have been retained in an expert or consulting capacity in more than 500 class or collective action matters alleging wage and hour violations under the Fair Labor Standards Act ("FLSA") and various state laws and numerous matters alleging discrimination in hiring. Finally, I have been retained in hundreds of matters where I have been asked to analyze potential economic damages. In connection with this work, I often am asked to measure work related activities, how work is organized within the employer's operations and evaluate employee productivity. In the mortgage industry, I have served as an expert in several matters involving loan originators, underwriters, processors, and/or funders where the project goals were to evaluate the nature of the work employees performed and measure employees' hours worked and productivity. I hold an M.B.A. from Loyola Marymount University, and a B.A. degree in History from the University of Southern California. I have been qualified as an expert witness in

---

[1] It is my understanding that Home Point refers to its employees as associates.

both Federal and State Courts. My resume and a list of the cases in which I have testified as an expert at trial or by deposition during the last 4 years is attached to this report as **Attachment A**. My hourly rate is $800 per hour, which is the rate I customarily charge for both consulting work and expert testimony.

### III.   DISCUSSION OF AVAILABLE DATA

3.     In connection with evaluating Home Point's economic damages associated with Defendants' raid on its Maitland associates, I have been provided with all documents produced in this action by all parties.  Among other things, I reviewed Home Point's associate compensation information from the relevant time period. I have also been provided: (1) data showing the amounts of unscheduled pay increases and retention bonuses Home Point paid to Maitland associates at risk for solicitation and hiring by Defendants; and (2) Home Point's invoices for recruiting fees associated with hiring replacements for the associates who were recruited away during the raid, which represent other costs associated with Defendants' actions. I have <u>not</u> been provided with data related to executive and other administrative time associated with responding to Defendants' raid of associates in Maitland, but this would be another category of damages to Home Point in the form of "lost" productivity that was caused by Defendants' actions.

4.     I also reviewed information produced by the Defendants. Included in Defendants' productions were, among other things: GHMC Job Applications, text messages, emails, GHMC Offer letters, and the GHMC employee benefits handbook. It is my understanding that discovery from GHMC is still ongoing and additional documents may be produced that could be relevant to my analysis, including documents relating to disgorgement of GHMC's profits/benefits.

5.     Finally, I was provided court filings, discovery requests and responses, transcripts from all of the depositions to date (i.e., Donald Lane, Candace Robertson, Christopher Wilkins, Teresa Reber, and Chip Adkins) and the transcript from the Preliminary Injunction hearing. I have been provided with the Complaint, the First Amended Complaint, Defendants' answers, declarations,

1   the parties' requests for production and responses, the parties' interrogatory responses, the Court's

2   Preliminary Injunction Order. A list of materials relied upon is included at the end of this report as

3   **Attachment B**.

4

5   **IV.   INTRODUCTION**

6   6.      It is my understanding that Home Point is a mortgage lending company that provides

7   mortgage services such as FHA, conventional, jumbo, VA, USDA, and other loan products to

8   potential home buyers and other customers.[2] Prior to the raid by Defendants in September 2020,

9   Home Point employed approximately 255 associates in its Maitland office including underwriters,

10  loan coordinators, and funding developers.[3] Collectively, the associates in these job categories

11  worked together processing and approving loan applications and then funding loans. The

12  underwriter's role in the process is to conduct a thorough review of a potential borrower's financial

13  situation to assess whether they will be able to make the payments on the loan based on their current

14  financial obligations, income, and other expenses. Underwriters also assess whether a potential

15  borrower has enough collateral in the event of a default.[4] Mr. Wilkins described the underwriter

16  position as follows:

17          "Q. What does an underwriter do?
18          A. Review credit, review assets, review income for an application.
            Q. So this is an application by a mortgage applicant?
19          A. Yes, sir.
            Q. Is that right? And so you are reviewing the applicant's credit, income, and assets; is that
20          right?
21          A. Yes.
            Q. And what are you viewing that in order to do?
22          A. To approve the loan or deny a loan.
            Q. And you mentioned that you're reviewing it against policies; is that right?
23          A. Yes.
            Q. And what policies are those?
24          A. Fannie -- agencies. Fannie Mae, Freddie Mac, FHA."[5]

25

26  _____

27  [2] Plaintiff's First Amended Complaint, p.2
    [3] The remaining job titles include: closers, support specialists, and analysts.
    [4] Plaintiff's First Amended Complaint, p.2
28  [5] Deposition of Christopher Wilkins p. 16, L7-23

7.      A loan coordinator's role is to manage the intake process of the necessary paperwork and documentation supporting a loan application and interface with the client regarding the underwriter's requests for additional documentation or information.

8.      Finally, a funder's role is to finalize a loan's paperwork and documents and ensure that the correct funds are deposited in the correct escrow accounts. It is common for companies in the industry to employ underwriters, loan coordinators, and funders when running an integrated mortgage lending operation like the operations of both Home Point and GHMC.

9.      Home Point hired Ms. Robertson for a managerial position in 2015 at its Maitland office.[6] Ms. Robertson was the Managing Director of Wholesale Operations with responsibilities for overseeing loan setup, coordination, underwriting, and closing.[7] In other words, she was responsible for overseeing the complete loan approval process from the moment a loan request was generated through the closing of the loan. In connection with her role managing the loan approval process, on December 30, 2019, Ms. Robertson signed an employment agreement ("Robertson Agreement") with Home Point.[8] The Robertson Agreement includes specific provisions prohibiting Ms. Robertson from recruiting, soliciting, or hiring any Home Point associates, or aiding or assisting in any such solicitation of Home Point associates for a one-year period after her with Home Point terminated.[9] On September 2, 2020, Home Point terminated Ms. Robertson's employment.[10] Accordingly, pursuant to the Robertson Agreement, Ms. Robertson was prohibited from recruiting, soliciting or hiring, or aiding or assisting in any solicitation of Home Point's associates until September 2, 2021.

---

[6] Deposition of Candace Robertson, p.18
[7] Deposition of Candace Robertson, p.18
[8] HPLANE00004371-4379.
[9] Plaintiff's First Amended Complaint, p.3
[10] Plaintiff's First Amended Complaint, p.3

Expert Report of Robert Crandall

10.     At Home Point, Ms. Robertson was Mr. Lane's direct supervisor.[11] Ms. Robertson hired Mr. Lane into a managerial role at the Maitland office on June 22, 2015.[12] Mr. Lane was initially hired into the position of Director-Underwriting Manager to manage the underwriting staff.[13] In October of 2018, Mr. Lane was promoted to the Senior Director-Underwriting Manager role.[14] Following his promotion, Mr. Lane's duties included, but were not limited to, hiring and firing associates, reviewing underwriting escalations, and conducting second-level reviews of loan files (i.e., reviewing the work of subordinate underwriters).[15] Mr. Lane was the manager and direct supervisor of all of the underwriters and underwriting managers who were hired away by GHMC and who were offered positions with GHMC but eventually declined. Mr. Lane was also prohibited from soliciting and/or recruiting Home Point associates to new employers. A memorandum agreement Mr. Lane signed on October 15, 2018 ("Lane Agreement") included a non-solicitation provision prohibiting Mr. Lane, from the date of his hire until the first anniversary of his separation from employment, from directly or indirectly hiring or soliciting any of Home Point's associates to leave their employment with Home Point or knowingly inducing or attempting to induce Home Point associates to terminate their employment.[16] Mr. Lane resigned from his position at Home Point on September 17, 2020.[17] Thus, under his agreement he was prohibited from recruiting or soliciting Home Point's associates including, but not limited to, underwriters, loan coordinators, and funders until September 17, 2021.

11.     Immediately after her termination with Home Point, Ms. Robertson began a campaign with Mr. Lane to solicit, recruit and hire Home Point's associates. According to Ms. Robertson, she was having conversations with Home Point competitors Sierra Pacific, Loan Depot, and GHMC about potential employment opportunities.[18] On September 10, 2020, Ms. Robertson had her first

---

[11] Defendant Mr. Wilkins reported to Mr. Lane. Thus, Ms. Robertson was Mr. Wilkens' indirect supervisor.
[12] Deposition of Donald Mark Lane, p. 13.
[13] Deposition of Donald Mark Lane, p.13
[14] Deposition of Donald Mark Lane, p.14
[15] Deposition of Donald Mark Lane, p.15
[16] HPLANE00005154-5155; *See* Deposition of Donald Mark Lane, p. 23, 26-27
[17] Deposition of Donald Mark Lane, p.124
[18] Deposition of Candace Robertson, p.77

Expert Report of Robert Crandall

conversation with GHMC CEO Brett Arsta regarding an opportunity to join GHMC.[19] On the following day, at 9:18 a.m., Mr. Lane texted Ms. Robertson the following: "I just e-mailed you my list."[20] The subject line of Mr. Lane's email to Ms. Robertson was "UW List" and the email included a list of 38 Home Point underwriting associates and/or Underwriting Managers. Regarding the first 30 associates, Mr. Lane wrote in his email, "Here is how I rank them. I'm sure there may be some disagreement, but open to discussion." Regarding the last eight associates, Mr. Lane wrote, "I did not include the following as I wasn't sure we could get them or wanted them," and he ends his email by stating, "Let me know what you think! Talk to you later!"[21]

12.     On September 13, 2020, Ms. Robertson traveled to Nashville to begin in-person discussions with GHMC regarding her potential employment with the company. Ms. Robertson texted Mr. Lane "love this company" while she was still in Nashville on September 13, 2020 at 7:05 p.m. Mr. Lane responded: "so happy to hear that. Can't wait for details".[22] Later that evening (at 8:30 p.m.), Ms. Robertson texted Mr. Lane again to report: "your 160 K is higher than the others but no issue. And there is a bonus of $1 per loan the underwriters under you underwrite."[23] These conversations indicate that during her trip to Nashville, Ms. Robertson had discussions regarding GHMC hiring Mr. Lane.[24] During her deposition, Ms. Robertson admitted to having discussions with GHMC relating to Mr. Lane's potential salary. She testified:

> "A. Apparently I had a conversation I guess. I don't -- I don't remember.
> Q. So now you believe you had a conversation about Mr. Lane's salary?
> A. I don't -- I -- these days are rolling. I -- I don't know. Without looking at the -- calendar and knowing when -- when -- what happened when, yes, obviously I spoke to -- to them, you know, but – just about Don.
> Q. Yeah. I mean -- well, this is September 13. We are still on the day you're in Nashville. You're still in Nashville at this point. So I asked you before did you talk about Mr. Lane when you were meeting with him in Nashville, and you said no. So are you changing your testimony?

[19] Deposition of Candace Robertson, p.58-59
[20] Deposition of Candace Robertson, p.64; First Amended Complaint for Injunctive Relief and Damages, p.24
[21] Bates labeled LANE 000246
[22] Bates labeled ROBERTSON 000068
[23] Bates labeled ROBERTSON 000068
[24] Deposition of Candace Robertson, p.104

Q. Ma'am, did you talk about Mr. Lane's salary with GHMC when you were there on September 13?
A. I did not remember doing so; however, I may have in looking at this at 8:30 at night. So –"[25]

13. She further testified to receiving a list of potential recruits from Mr. Lane and then sharing the list with GHMC:

"Q. Did you ever provide GHMC with a list of names of employees at Home Point along with their positions, personal email address, and salary level?
A. I did have a conversation with someone at GHMC that had stated that they were filling out applications online.
Q. Did you ever give GHMC a list of names of Home Point employees?
A. Yes."[26]

14. The following morning, on September 14, 2020, Mr. Lane began executing their recruitment plan as follows:

- At approximately 9:30 a.m., Mr. Lane texted all five of his subordinate Underwriting Managers at Home Point and informed them: "Hey, guys! PLEASE treat this as highly confidential. I trust you all as friends and co-workers. This will be my landing point - Guaranty Home Mortgage. I will be managing a local ops center consisting of Underwriters and UW Support. I want you ALL to come with me and would be willing to get on a call to discuss. I know you may be busy, Pat! Can any of you make 11? It will need to be by cellphone."[27]

- At approximately 11:35 a.m., Mr. Lane texted Ms. Robertson: "So should I start calling uw's or not?"[28]

- At 5:12 p.m. Mr. Lane texted Ms. Robertson: "ok it is done."[29]

- At approximately 6:57 p.m. Mr. Lane texted the same group of five subordinate Underwriting Managers: "Good evening, my friends! I did not get a great deal of HPF work

[25] Deposition of Candace Robertson, p.104
[26] Deposition of Candace Robertson, p.124-125
[27] Bates labeled LANE 000774
[28] Bates labeled LANE 0000593
[29] Bates labeled Robertson 000058

Expert Report of Robert Crandall

done today. I've been recruiting since our call earlier. I wish that you could have ALL been on my calls today. You would have heard just how unsettled our people have been over Candy's dismissal. And just how excited they were to move on to the next chapter! I was rejuvenated by my discussions and they rekindled my sense of self worth that has been diminishing each day here at HPF. I can tell you honestly that they are all secretly looking forward to sticking it to HPF with a mass exodus but that can't be the only reason. They ALL wanted to make sure that you guys were also part of this! It makes me smile again! Can't wait until the next chapter!"[30]

15.    On September 15, 2020, Mr. Lane continued his recruiting efforts and indicated that there could be more waves of mass exodus. For example, at 10:28 a.m. he texted the same group of five subordinate Underwriting Managers: "This should be an interesting meeting. I hope I sound engaged. Then I have to get back to recruiting!"[31] Approximately 30 minutes later, at 10:59 a.m., he texted Home Point underwriter Jody Thoennes: "Yes a lot of you of course are trying to get your peeps on the list. I promise if I can't accommodate now they can be in the next wave". [32]

16.    Furthermore, Mr. Lane's texts and emails demonstrate that he and Ms. Robertson organized a mass exodus of Home Point associates to join GHMC in which multiple associates would (and did) announce their resignations from Home Point simultaneously. When asked about it, he testified:

> "Q. In the next paragraph you say to Anita, "as far as the offers going out today, I'm hoping they all go out total of 16". How do you know offers were going out that day?
> A. I was -- I was certainly aware that the offers were going out that day. All these people had applied online. There was certainly an interest there in hiring more underwriters again. I did not know how many or to whom. I put my two cents in if it meant anything. But we can tell from the email, I mean, none of it was a certainty."[33]

---

[30] Bates labeled LANE 000777
[31] Bates labeled LANE 000778
[32] Bates labeled LANE 000820
[33] Deposition of Donald Mark Lane, p.60

* * *

"Q. Below the list of those five you wrote "these are all current managers that will need to give notice at the same time as me, so very important". Do you see that?
A. Yes, I do.
Q. Why did you write that this "they will need to give notice at the same time as me"?
A. The only desire or intent there was they all wanted to give two weeks notice to Home Point, and they were also looking to get onboard before October in order to not have a lapse in benefits for them and their families. So the urgency was really just to accommodate Home Point at that point in time."[34]

17.     On September 16, 2020 at approximately 6:13 p.m., Mr. Lane also sent the following text to his five subordinate Underwriting Managers the day before their resignations: "Can we vote? If we all get them tonight, do you just want to get this over with tomorrow?"[35] Notably, during these conversations about recruiting associates and raiding Home Point's Maitland office, Mr. Lane was *still* employed by Home Point as a manager. Thus, Mr. Lane was recruiting Home Point's associates to go to GHMC while he was being paid by Home Point as a Senior Director-Underwriting Manager. More specifically, Mr. Lane was working on behalf of GHMC during the last pay period of his employment with Home Point, for which he was compensated a total of $5,546 by Home Point.[36] Assuming he spent half his time performing work on behalf of GHMC during this pay period, Home Point would have compensated Mr. Lane a total of $2,773 for this time.

18.     The evidence regarding "sharing a list" of Home Point associates who could be induced to leave demonstrates that Mr. Lane and Ms. Robertson worked together to raid Home Point's associates. Mr. Lane's and Ms. Robertson's "insider knowledge" provided several important pieces of information that aided GHMC's efforts to hire Home Point's associates. First, without Mr. Lane and Ms. Robertson serving as "pied pipers," it would have taken far longer to recruit the associates that joined GHMC. Otherwise, GHMC would have needed to expend internal and/or external resources to target, identify, recruit and interview Home Point's associates with no guarantee that

---

[34] Deposition of Donald Mark Lane, p.63
[35] Bates labeled LANE 000780; Deposition of Donald Mark Lane, p.116
[36] Bates labeled HPLANE00004500

Expert Report of Robert Crandall

they would respond. If GHMC had to recruit the associates directly, it would have taken much longer to hire them on a one-by-one basis as opposed to the en masse raid orchestrated by Mr. Lane's and Ms. Robertson's solicitation and recruitment. The evidence suggests that Mr. Lane and Ms. Robertson likely stopped any further raids and were dissuaded from recruiting any other associates because Home Point served them and GHMC with cease-and-desist letters on September 18, 2020. Mr. Lane previously worried about just such cease-and-desist letters and had expressed his concern to multiple Home Point associates. For example, on September 17, 2020, he texted the following to Jaclyn Huber: "Hey Jaclyn! Yes certainly looking forward to it! And "not to sound like a used car salesman, but I just want to make sure you understand the risks of not resigning today. There's a lot going on today as you know and the door may close if they decide to slap a cease and desist on us. Not to be dramatic but I am not underestimating them."[37]

19.     Second, Ms. Robertson and Mr. Lane had knowledge of the Maitland office associates' relative performance, which allowed GHMC to target Home Point's highest performers. Their inside knowledge allowed GHMC to target Home Point's highest performers and reduced the risk of hiring low performers. For example, Mr. Lane ranked the "UW List" that he shared with Ms. Robertson based on his knowledge of the associates, and testified to the following during his deposition:

> "Q. Are they ranked in descending order in some fashion?
>
> A. Yes. I mean, they're numbered.
>
> Q. Okay. So Pat Clark you would describe as the most loyal of these 30 employees; is that right?
>
> A. Without a doubt.
>
> Q. Okay. And Dora and Kellie were up near the 15 top, as well, right?
>
> A. They certainly were" [38]

---

[37] Bates labeled LANE 000794
[38] Deposition of Donald Mark Lane, p.69

20.     Third, Ms. Robertson's and Mr. Lane's knowledge of each associate's compensation at Home Point enabled GHMC to craft effective and economically efficient offers of employment. Due to inside knowledge of associates' pay, Defendants could ensure they were offering higher pay than Home Point without the concern of offering salaries and bonus compensation that were too high relative to each associate's actual productivity, or too low such that the associates would reject the offer. In other words, Ms. Robertson's and Mr. Lane's inside knowledge allowed GHMC to calibrate pay relative to each associate's Home Point earnings to maximize the likelihood of acceptance of GHMC's offer. Also, this knowledge allowed GHMC to avoid overpaying to recruit the associates away from Home Point, which reduced GHMC's labor costs and thereby increased profits.

21.     With Ms. Robertson and Mr. Lane soliciting associates, GHMC avoided the recruiter costs associated with hiring the Home Point associates. GHMC's cost avoidance here is significant. Typically, recruiter fees are a percentage of the employee's first year of compensation. Here, the associates were highly paid, which would translate into significant recruiting costs for GHMC. Indeed, as described in detail below, if GHMC paid recruiter fees for the 16 associates it ultimately took from Home Point at the same percentage of compensation rate Home Point paid its recruiters 14.6%, then GHMC avoided $239,037 in recruiting costs alone, which produced a corresponding increase in profits for GHMC.

22.     The orchestrated simultaneous resignations were designed to create maximum disruption and damage to Home Point's business operations. Because of the level of disruption, Home Point was immediately forced to take steps to (1) defend against Defendants' raid to prevent additional associates from departing, and (2) hire associates to replace the capacity that was lost due to Defendants' raid.

23.     The most obvious defensive tool against a competitor's raid is increasing compensation to match or exceed the level of compensation offered by the competitor, which eliminates or mitigates

the economic incentive associated with taking the competitor's higher offer.  From the employer's perspective, responding to a competitor's recruitment of a specific employee provides the employer the opportunity to increase the employee's compensation to match or exceed the prospective employer's offer. However, in a raid scenario where a large group of employees resign *en masse*, the employer's options are limited because it is forced to respond across large groups of employees to protect the business. Often, the best retention option when groups of employees are being solicited with offers of higher pay is to respond with an across-the-board compensation increase with respect to potentially impacted employees to fend off the raid. First, it removes the economic incentive to depart. Second, it demonstrates to the employees who receive higher compensation that the company values them and seeks to retain them. Furthermore, an across-the-board approach avoids the dissension that would result from picking some but not all employees within a group to try to retain. Indeed, not receiving a retention bonus would be a signal to an employee that the company does not care if they stay or go. It is likely that some or all employees who did not receive the retention bonus paid to their colleagues would consider leaving the company as a result. It is also likely that being left off the retention bonus list would negatively impact employee morale and productivity.

24.     Another issue with an *en masse* raid is that the raided employer is not privy to the raiding employer's plans regarding how many people the raider intends to hire or which positions will be targeted next. Instead, the raided employer can only react to defend their business as information becomes available regarding which employees have received offers that they are willing to discuss with their current employer and who has resigned. However, reacting after-the-fact on a one-by-one basis does not deter the raider. Given that Home Point and GHMC are in the same business, the overlap of needed associates is not limited to only underwriters, but also includes others in mortgage support roles. Indeed, at GHMC Mr. Lane supervised mortgage support associates, such as loan processors and funders, who perform similar duties to the mortgage support associates at Home Point. Thus, a reasonable reaction to Defendants' raid would be to include mortgage support positions in the retention bonus group. As Teresa Reber explained, the mass exodus caused by

Defendants was an "orchestrated event in which several people were… working together. We didn't want to risk additional solicitation and loss."[39]

25.     Two elements of Home Point's damages caused by Defendants' solicitation actions are the increased salary and bonus compensation that Home Point paid to the remaining Maitland associates it sought to retain. Thus, for Home Point, the economic result of responding to the raid of its associates caused an immediate and unexpected increase in labor costs and therefore a corresponding decrease in profitability. In total, Home Point paid retention bonuses to 202 associates on 9/25/2020 and 10/09/2020 for a total of $2,647,214.[40]

26.     In addition, Home Point increased base salary for 10 associates because of the raid. Four (4) associates received salary increases in order to match GHMC's competing offers–and those associates decided to remain with Home Point.  An additional six (6) associates who left for GHMC but returned to Home Point received salary increases upon their return to Home Point (and to induce them to return to Home Point).  As a result, Home Point was forced to absorb increased salary compensation costs which are estimated to be $298,301 to date.

27.     Home Point also incurred recruiting fees in connection with its efforts to replace the group of experienced associates who collectively left Home Point as a result of Defendants' raid. As described in detail below, Home Point had to replace the 16 associates who left during Defendants' raid. The headhunter fees to replace 11 of those associates were approximately $204,811. In addition, Home Point incurred training costs to teach the 16 replacement hires about Home Point's processes and systems. As described in detail below, the training costs associated with these replacement associates is estimated to be $49,002.

---

[39] Deposition of Teresa Reber, p.163
[40] Bates labeled HPLANE00004536. It appears from the file that one retention bonus paid was entirely recouped and is therefore not included in my calculation.

Expert Report of Robert Crandall

28.     It is also my understanding that Ms. Robertson and Mr. Lane claim that the associates they recruited left Home Point because they were "disgruntled with management." However, the associates who testified under oath during the Motion for Preliminary Injunction Evidentiary Hearing testified that they had no intention of leaving, and that they were happy and pleased with their jobs at Home Point. For example, Ms. Armes testified:

> "Q. Ms. Armes, before Mr. Lane called you on September 14th, were you planning on leaving Home Point?
> A. No.
> Q. How would you describe your employment arrangements with Home Point in 2020?
> A. Everything was fine. They were very busy, but I was pleased."[41]

* * *

> "Q. Before Mr. Lane called you on September 14, did you ever tell him that you were interested in leaving Home Point?
> A No, I did not.
> Q Before Mr. Lane called you on September 14th, had you looked for a job at any point in 2020?
> A I did not.
> Q Before Mr. Lane called you on September 14th, did you ever tell Candy Robertson that you were interested in leaving Home Point?
> A I did not.
> Q Before Mr. Lane called you on September 14th, did you ever tell anyone that you were interested in leaving Home
> Point?
> A No."[42]

Ms. Armes further testified to the following:

> "Q Did you end up joining GHMC?
> A. I did not.
> Q. Why not?
> A. Well, it was a big decision to make that move to a company that, you know, I wasn't aware of or familiar with. After several days of discussions with my husband, my family, I decided financially it would be better to stay where I was with Home Point, as well as the fact that I had never had any gripes. I had always been very happy at Home Point. And, you know, I've got tenure there. I've been there since day one. And I was familiar with my co-workers. So I felt for me personally that was the best choice for me."[43]

---

[41] Motion for Preliminary Injunction Evidentiary Hearing, p.8
[42] Motion for Preliminary Injunction Evidentiary Hearing, p.9
[43] Motion for Preliminary Injunction Evidentiary Hearing, p.13

Expert Report of Robert Crandall

Ms. Lopez, who was also solicited and recruited by Mr. Lane, similarly testified under oath:

> "Q. Before Mr. Lane called you on the 14th, Ms. Lopez, were you planning on leaving Home Point?
> A. No.
> Q. Before Mr. Lane called you on the 14th, did you ever tell him that you were interested in leaving Home Point?
> A. No.
> Q. Prior to Mr. Lane's call to you on the 14th, had you looked for a job anywhere in 2020?
> A. No.
> Q. Before Mr. Lane called you, did you ever tell Candy Robertson that you were interested in leaving your job at Home Point?
> A. No.
> Q. Prior to Mr. Lane's call to you on September 14th, did you ever tell Chris Wilkins that you were interested in leaving Home Point?
> A. No.
> Q. And prior to Mr. Lane's call on the 14th, did you ever tell anyone that you were interested in leaving Home Point?
> A. No."[44]

29.     The additional compensation GHMC offered suggests that economic inducements were necessary to persuade the solicited associates to leave Home Point. For example, Ms. Lopez testified:

> "Q. How long did you end up working at GHMC?
> A About two and a half weeks, I think.
> Q Why did you leave GHMC and return to Home Point?
> A When I found out about the actual bonus structure.
> Q What do you mean?
> A So I resigned on a Friday from GHMC, and on that Tuesday -- I believe it was that Tuesday Don had sent out an e-mail to the group confirming what the actual bonus structure was.
> Q And how did the bonus structure at GHMC compare to who what Don had told you it would be?
> A It was night and day.
> Q What do you mean?
> A The bonus structure wasn't what we were told. It was anything after three a day or 15 a week, at which point you started making bonus."[45]

---

[44] Motion for Preliminary Injunction Evidentiary Hearing, p.23
[45] Motion for Preliminary Injunction Evidentiary Hearing, p.33

Expert Report of Robert Crandall

30.     It is also important to note that four associates who initially resigned from Home Point decided to stay, and six others decided to return to Home Point after joining GHMC. Mr. Lane also indicated to some associates that Home Point intended to close the Maitland office.[46]

31.     Finally, the associates whom Defendants raided presumably worked on GHMC loan files, which assisted GHMC in servicing its customers and partners and generated fees for GHMC. The fees generated by the work of the former Home Point associates produced incremental profits for GHMC. Discovery is still on-going related to this issue. In particular, it is my understanding that Home Point served requests for production of documents seeking categories of information relevant disgorgement on February 24, 2023.  It is also my understanding that, to date, GHMC has not produced any documents responsive to such requests.   Accordingly, I reserve the right to supplement my report to reflect information learned from any subsequent productions.

## V.     DETAILED ANALYSIS OF COSTS INCURRED BY HOME POINT

### A.  Defendants' raid caused Home Point to pay $2,647,214[47] in Retention Bonuses to Maitland office associates

32.     The evidence indicates that Ms. Robertson and Mr. Lane solicited Home Point associates for the purpose of orchestrating a mass exodus of associates to cause a significant disruption to Home Point's business. When the raid on associates occurred, Home Point was forced to pay retention bonuses across the board and some salary increases to retain associates and continue their ability to service their business. In considering the timing of events, it is important to understand the context of what was happening in the mortgage industry in September 2020. For example, industry publication www.mortgagenewsdaily.com provides data on the number of mortgage applications that are submitted nationwide per month, which is a proxy for how busy companies like Home Point and GHMC would be over the period if one were to assume a consistent market share. The mortgage application data shows that over a period spanning March 2020 through March

---

[46] First Amended Complaint for Injunctive Relief and Damages, p.39
[47] Bates labeled HPLANE 00004536

2022 there was a significant increase in mortgage applications relative to the average number of applications that could be observed over the 10-year period spanning March 2013 through March 2023.[48] Generally, mortgage rates were falling for much of the period from March 2020 through March 2022, which spurred significant refinance activity. In addition, there was pent up demand for new housing purchases.

33.     The data is consistent with testimony by Home Point's Senior Managing Director of Organization Operations, Teresa Reber, that Home Point and "the industry as a whole was…capacity constrained."[49] During this period of high demand for loans, the capacity to service the business, which requires underwriter and mortgage support positions, is a competitive advantage to drive mortgage finance companies' profitability. Thus, from a strategic perspective, GHMC acquiring a large number of mortgage professionals from Home Point would provide additional capacity to service more business while simultaneously reducing the capacity of Home Point to compete with GHMC in the market.

34.     While ostensibly working for Home Point, Mr. Lane created an initial list containing the names of 38 Home Point associates who would be targeted. Indeed, Mr. Lane's list included Underwriter Support Specialists, and GHMC hired at least one Home Point associate in a mortgage support position. Further, the record indicates that associates in mortgage support jobs would also be solicited. For example, during his deposition Mr. Lane testified to associates in other departments potentially wanting to leave, such as loan coordinators to closers:[50]

> Q. Okay. And the bottom line on the page that you sent is at 8:33 p.m., and you say "yes, we will try to coordinate that and definitely other departments as
> well, but I haven't been involved in any of that". Do you see that?
> A. Yes.
> Q. And you wrote that in response to a question whether other departments would be leaving, too, right?

---

[48] https://www.mortgagenewsdaily.com/data/mortgage-applications
[49] Deposition of Teresa Reber, p.161
[50] Loan coordinators at Home Point handle loan processing duties. Whereas, loan closers handle funder duties.

A. Correct.
Q. How did you know that other departments at Home Point were potentially going to GHMC?
A. I had no prior knowledge of that, but I do know that as many people that were contacting me about being miserable at Home Point were also contacting Candy. And seeing that she managed other departments, I was pretty sure that there were likely other people that would want to leave.
Q. What departments were you referring to?
A. The other departments that were in the Maitland branch of that could have been in that group would be anything from loan coordinators to closers. That's pretty much all we had in Maitland."[51]

The records show that Home Point paid 192 retention bonuses to Maitland associates totaling $2,482,214 on the 9/25/2020 pay date. After this date, Home Point paid an additional 10 retention bonuses to Maitland associates totaling $165,000 on the 10/9/2020 pay date. In total, Home Point paid $2,647,214 in retention bonuses to Maitland associates as a result of Defendants' solicitation efforts and mass raid.[52]

**B. As result of Defendants' raid, Home Point was compelled to increase the base salaries of 10 associates to retain them or convince them to return**

35.    As noted above, the common strategy to retain associates who are provided economic incentives to leave is to increase pay. Due to Defendants' solicitations, Home Point was also compelled to increase the base salaries of the associates to whom GHMC made offers in an effort to retain them. Specifically, Home Point increased the salaries of 10 of the solicited associates who agreed to remain with, or return to, the company. Of these associates, four (4) agreed to stay after submitting a resignation notice to Home Point and six (6) others decided to return to Home Point after joining GHMC. But for Defendants' solicitation, Home Point would not have had to increase compensation for these individuals to match the higher offers GHMC had made – at Mr. Lane and Ms. Robertson's direction.[53]

[51] Deposition of Donald Mark Lane, p. 104-105
[52] Bates labeled HPLANE 00004536
[53] Bates labeled HPLANE 00004537; Bates labeled HPLANE 00005190.

-19-                                    Expert Report of Robert Crandall

36.     Home Point increased the compensation for the following four associates who were part of Mr. Lane's list of 21 associates and had given a resignation notice—in order to persuade them not to leave:[54]

- Christine Grant: Salary increased from $75,005 to $80,038, 6.7% increase.
- Jaclyn Huber: Salary increased from $90,002 to $110,011, 22.2% increase.
- Jody Thoennes: Salary increased from $94,945 to $110,011, 15.9% increase.
- Kellie Hamilton: Salary increased from $93,935 to $110,01, 17.1% increase.

37.     Similarly, Home Point was also forced to increase pay for six associates who decided to return to Home Point after their departure to GHMC:[55]

- Ann Webb: Salary increased from $95,293 to $115,003, 20.7% increase.
- Maraliz Rodriguez: Salary increased from $ 95,293 to $105,019, 10.2% increase.
- Dora Lopez: Salary increased from $ 85,879 to $105,019, 22.3% increase.
- Charlene Murray: Salary increased from $91,451 to $115,003, 25.8 % increase.
- Jarrett Herrin: Salary increased from $87,512 to $108,014, 23.4% increase.
- Daniel Cook: Salary increased from $78,004 to $95,014, 21.8% increase.

38.     In order to calculate the damages associated with the salary increases, I calculated the *but for* increase in compensation per pay period for each associate through their termination date or present date if still employed. In other words, the damages analysis associated with salary increases is calculated as the difference between the incremental increase in the associate's compensation minus the compensation that would have been paid to the associate prior to the increase per pay period. For example, Ann Webb's salary increased from $95,293 to $115,003, an increase of $19,710 ($115,003 - $95,293). In order to calculate the incremental increase per pay period, I divide the $19,710 by 26 pay periods.[56] Thus, the cost associated with Ms. Webb's salary increase per pay period is $758.08. It is also my understanding that Ms. Webb continued to work for Home Point at this increased salary for approximately 32 pay periods after her return GHMC.[57] Therefore, her total salary increase cost is approximately $24,259 ($758.08 x 32). Using the methodology

---

[54] Bates labeled HPLANE 00004537; Bates labeled HPLANE 00005190.
[55] Bates labeled HPLANE 00004537; Bates labeled HPLANE 00005190.
[56] It is my understanding that Home Point operates on a bi-weekly pay period schedule. There are 26 bi-weekly pay periods in a year.
[57] I used the re-hire date (or salary increase date for associates that never left) – last termination date or (3/31/2023) if the associate is current. Only one associate appears to be active.

Expert Report of Robert Crandall

described above, I calculate the damages associated with compensation increases for each of the 10 associates in Table 1. In total, the incremental increased salary cost paid to these associates through their termination date or the present if still employed by Home Point is approximately $298,301.[58]

**Table 1**
**Total Estimated Salary Increase Cost Incurred by Home Point**

| Name | Salary Effective Date or Re-hire Date | Last Termination Date | Salary on 8/30/2020 | Updated Salary | Difference Per Year | Difference Per Pay Period | Total Number of Pay Periods Post Salary Increase | Total Estimated Salary Increase Cost |
|---|---|---|---|---|---|---|---|---|
| Ann Webb | 11/30/2020 | 2/11/2022 | $95,293 | $115,003 | $19,710 | $758.08 | 32 | $24,259 |
| Maraliz Rodriguez | 10/26/2020 | 3/25/2022 | $95,293 | $105,019 | $9,726 | $374.08 | 37 | $13,841 |
| Dora Lopez | 10/26/2020 | 11/1/2022 | $85,879 | $105,019 | $19,140 | $736.16 | 53 | $39,016 |
| Charlene Murray | 12/7/2020 | 11/1/2022 | $91,451 | $115,003 | $23,552 | $905.84 | 50 | $45,292 |
| Jarrett Herrin | 2/22/2021 | 11/1/2022 | $87,512 | $108,014 | $20,503 | $788.56 | 45 | $35,485 |
| Daniel Cook | 12/21/2020 | - | $78,004 | $95,014 | $17,010 | $654.24 | 60 | $39,254 |
| Christine Grant | 10/5/2020 | 11/1/2022 | $75,005 | $80,038 | $5,034 | $193.60 | 55 | $10,648 |
| Jaclyn Huber | 9/7/2020 | 11/1/2022 | $90,002 | $110,011 | $20,010 | $769.60 | 57 | $43,867 |
| Jody Thoennes | 9/7/2020 | 3/29/2022 | $94,944 | $110,011 | $15,068 | $579.52 | 41 | $23,760 |
| Kellie Hamilton | 9/7/2020 | 1/26/2022 | $93,935 | $110,011 | $16,076 | $618.32 | 37 | $22,878 |
| | | | | | | | **Total:** | **$298,301** |

**C. Home Point incurred significant recruiting costs to replace the associates Defendants raided**

39.     In addition to the costs associated with retaining associates who were at risk due to Defendants' raid, Home Point also incurred expenses recruiting replacements for the 16 individuals GHMC hired away. To find replacement associates, Home Point utilized recruiting agencies to

---

[58] Bates labeled HPLANE 00004537; Bates labeled HPLANE 00005190.

assist with the search. Home Point received assistance from recruiting firms: Parker & Lynch, Park Hudson, Model Match, Judge Technical Staffing, and Insight Global. These recruiting companies charge Home Point 15-20% of the placed associate's salary as a fee.

40.     I have reviewed recruiting invoices over the period spanning from 9/28/2020 to 11/30/2020. The fees invoiced show that Home Point hired over 30 associates during this period. However, I include in my damages analysis only 11 of those newly hired associates based on the position filled and date of hiring.  Specifically, I included the nine Senior Underwriters, one Underwriter Support Specialist, and one Director of Underwriting Manager who replaced, in part, the 10 Senior Underwriters, five Underwriting Directors, and one Underwriting Support Specialist that left for GHMC.[59] The invoices show that Home Point incurred recruiting costs totaling $204,811 to recruit 11 replacement employees. Table 2 below identifies the recruiting expenses Home Point incurred in replacing the positions held by the Maitland associates who left for GHMC.

**Table 2**
**Total Estimated Recruiting Costs Incurred by Home Point[60]**

| No. | Name | Hire Date | Job Title | Recruiting Firm | Recruiting Invoice Amount |
|---|---|---|---|---|---|
| 1 | Chapman, Kelly S | 9/28/2020 | Senior Underwriter | Park Hudson | $20,700 |
| 2 | Webb-Smith, Karen | 9/28/2020 | Senior Underwriter | Model Match | $19,050 |
| 3 | Bingham, Gregory | 9/28/2020 | Senior Underwriter | Park Hudson | $16,920 |
| 4 | Wilson, Tyesha I | 9/28/2020 | Senior Underwriter | Park Hudson | $19,440 |
| 5 | Cooper, Diana | 9/28/2020 | Senior Underwriter | Model Match | $18,000 |
| 6 | Richardson, Chontaye | 9/28/2020 | Senior Underwriter | Park Hudson | $20,700 |
| 7 | Williams, Lasheries | 9/28/2020 | Senior Underwriter | Parker & Lynch | $15,001 |
| 8 | Dantzler, Holly | 10/19/2020 | Senior Underwriter | Park Hudson | $19,800 |
| 9 | Owighowotu, Michele | 10/26/2020 | Senior Underwriter | Park Hudson | $20,700 |
| 10 | McGaugh, Dontae L | 10/19/2020 | Underwriter Support Specialist | Park Hudson | $13,500 |
| 11 | Bertrand, Adam | 11/30/2020 | Director - Underwriting Manager | Model Match | $21,000 |

Total:     $204,811

---

[59] Table 2 excludes associates from the recruiter invoices that had 9/21/2020 hire dates who also received retention bonuses on 10/9/2020.
[60] Bates labeled HPLANE00004502-HPLANE00004535

Expert Report of Robert Crandall

### D. **Home Point Incurred $359,073 in signing bonuses to replace the associates solicited by Defendants**

41.     To replace associates that were solicited by Defendants, Home Point incurred additional costs associated with signing bonuses. Review of the offer letters and payroll data shows that Home Point offered a total of $269,073 in signing bonuses to 10 of the 11 individuals who were hired through recruiting agencies to replace the employees who were solicited as an incentive to join Home Point so they could continue servicing their business.[61] In addition to these 10 associates, Home Point also offered one signing bonus totaling $30,000 to an additional replacement Underwriting Manager Director (Brian Gorton) who did not appear in the recruiter invoices, and $60,000 total in signing bonuses to three Senior Underwriters who had left for GHMC and then returned to Home Point. Table 3 below presents the total signing bonus per associate, and demonstrates that Home Point incurred signing bonus costs that totaled $359,073 as a result of Defendants' mass raid.

**Table 3**
**Total Signing Bonus Costs Incurred by Home Point[62]**

| No. | Name | Job Title | Signing Bonus Amount |
|---|---|---|---|
| 1 | Chapman, Kelly S | Senior Underwriter | $30,000 |
| 2 | Webb-Smith, Karen Y | Senior Underwriter | $30,000 |
| 3 | Bingham, Gregory | Senior Underwriter | $30,000 |
| 4 | Wilson, Tyesha I | Senior Underwriter | $30,000 |
| 5 | Cooper, Diana | Senior Underwriter | $30,000 |
| 6 | Richardson, Chontaye | Senior Underwriter | $20,000 |
| 7 | Williams, Lasheries | Senior Underwriter | $30,000 |
| 8 | Dantzler, Holly | Senior Underwriter | $30,000 |
| 9 | Owighowotu, Michele | Senior Underwriter | $24,073 |
| 10 | Bertrand, Adam | Director - Underwriting Manager | $15,000 |
| 11 | Gorton, Brian M | Director - Underwriting Manager | $30,000 |
| 12 | Webb, Ann | Senior Underwriter | $20,000 |
| 13 | Rodriguez, Maraliz | Senior Underwriter | $20,000 |
| 14 | Lopez, Dora | Senior Underwriter | $20,000 |
| | | **Total** | **$359,073** |

---

[61] Bates labeled HPLANE 00005190
[62] Bates labeled HPLANE 00005190

**E.  Home Point incurred additional training costs as a result of Defendants'**

**solicitation of its already trained and experienced associates**

42.     The replacement associates were required to complete Home Point's training program before being assigned to evaluate loans. For purposes of my analysis, I relied on Lane's testimony that the new hire training takes approximately a two-week period, during which time such associates are not assigned loans[63]  – although I note that Home Point contends that the training process takes longer. During the training period, Home Point teaches associates its processes and systems, and confirms that the new hires are ready to perform their job duties as Home Point underwriters. In his declaration, Mr. Lane described Home Point's training as follows:

> "Currently, Home Point's underwriting training is completed in two weeks or less.
> During the first week of training, new hires attend a series of webinars where they
> learn how to use Home Point's software programs and the conditions Home Point
> sets for evaluating loan applicants. After this initial training, the new hires are given
> a series of active loan files to examine and review as test cases. The underwriters
> work independently through these loan files and submit their underwriting
> recommendations to Home Point's second-level review department. The only job
> responsibility of the employees in Home Point's second-level review department is
> to evaluate case studies submitted by trainees and determine if they pass or fail."[64]

43.     While new hires were undergoing training, they were being paid but were not generating revenue (because they were not underwriting loans). But for the solicitation, the experienced associates GHMC poached would have been actively underwriting loans for Home Point customers, thereby generating revenue. Thus, the salary costs incurred for the new hire replacements during their training period represent an incremental expense incurred by Home Point. Given that Mr. Lane estimates that the new hire training program takes approximately two

---

[63] Declaration of Donald Mark Lane, p.2
[64] Declaration of Donald Mark Lane, p.2

Expert Report of Robert Crandall

weeks to complete for most associates (and Home Point contends it takes longer), two weeks of base salary was used to estimate the costs incurred by Home Point in training the replacement hires. Table 4 below shows the hire date for each new associate and their hourly base rate at the time of hire, as well as an estimate of their total two-week training cost. As shown on Table 4, Home Point incurred total training costs of $49,002 for the 12 replacement associates.[65]

**Table 4**
**Total Estimated Training Costs Incurred by Home Point**

| No. | Name | Hire Date | Job Title | Base Hourly Rate | Training Hours (40 * 2) | Total Training Cost |
|-----|------|-----------|-----------|-----------------|------------------------|--------------------|
| 1 | Chapman, Kelly S | 9/28/2020 | Senior Underwriter | $55.29 | 80 | $4,423 |
| 2 | Webb-Smith, Karen Y | 9/28/2020 | Senior Underwriter | $46.64 | 80 | $3,731 |
| 3 | Bingham, Gregory | 9/28/2020 | Senior Underwriter | $45.20 | 80 | $3,616 |
| 4 | Wilson, Tyesha I | 9/28/2020 | Senior Underwriter | $51.93 | 80 | $4,154 |
| 5 | Cooper, Diana | 9/28/2020 | Senior Underwriter | $43.27 | 80 | $3,462 |
| 6 | Richardson, Chontaye | 9/28/2020 | Senior Underwriter | $55.29 | 80 | $4,423 |
| 7 | Williams, Lasheries | 9/28/2020 | Senior Underwriter | $48.08 | 80 | $3,846 |
| 8 | Dantzler, Holly | 10/19/2020 | Senior Underwriter | $52.89 | 80 | $4,231 |
| 9 | Owighowotu, Michele | 10/26/2020 | Senior Underwriter | $55.29 | 80 | $4,423 |
| 10 | McGaugh, Dontae L | 10/19/2020 | Underwriter Support Specialist | $36.06 | 80 | $2,885 |
| 11 | Bertrand, Adam | 11/30/2020 | Director - Underwriting Manager | $60.10 | 80 | $4,808 |
| 12 | Gorton, Brian | 10/12/2020 | Director - Underwriting Manager | $62.50 | 80 | $5,000 |

**Total:**    **$49,002**

---

[65] The first 11 associates on Table 4 also appear on Table 2 as having recruiting costs associated with their hiring. The 1 additional on Table 4 was hired but did not appear in the recruiting invoices that I received.

**F.   Disgorgement: GHMC avoided significant recruiting costs by using Ms. Robertson and Mr. Lane to solicit Home Point associates**

44.     Home Point incurred significant recruiting costs due to the raid in order to replace the associates Defendants solicited. Had Defendants not solicited Home Point's associates, a recruiter could have been used to attempt to lure these associates over to GHMC. However, this process would likely have been much slower, less effective, less economically efficient, and far more expensive. While Mr. Lane was able to target and contact a large number of Home Point associates quickly, a recruiter who did not have a personal relationship would need to engage in a process to get the targeted candidates to respond and not all candidates would do so. The recruitment process would be less economically efficient because the recruiter would not have the inside knowledge that Ms. Robertson and Mr. Lane had about associate performance and pay.  Consequently, the recruiter may end up recruiting lower performers and/or paying too much in economic inducements for the associate to join. The higher salaries and lower productivity would negatively impact GHMC's profits. In addition, the recruiter would likely charge significant fees under a fee structure similar to the fee structure of the recruiting firms used by Home Point. Furthermore, GHMC also saved significant administrative time and costs associated with sorting through resumes, screening, scheduling, and interviewing potential new candidates to fill its vacant positions.[66] Table 5 below presents the placement fees and estimated placement percentage that Home Point was charged for the 11 associates hired through recruiting agencies. As shown on Table 5, the average fee charged was 14.6% of total compensation of the replacement associates.

---

[66] It is my understanding that GHMC sent offers to Home Point's associates without meeting, speaking, or interviewing them. Rather, GHMC effectively delegated hiring authority to Lane and Robertson themselves; First Amended Complaint for Injunctive Relief and Damages, p.6; Motion for Preliminary Injunction Evidentiary Hearing, p.12; Motion for Preliminary Injunction Evidentiary Hearing, p.16; Motion for Preliminary Injunction Evidentiary Hearing, p.32

Expert Report of Robert Crandall

**Table 5**
**Estimated Average Recruiting Fee Percentage[67]**

| No. | Name | Base Hourly Rate | Estimated Annual Base Compensation (Base Rate * 2,080 hours) | Signing Bonus Amount | Estimated Total Annual Compensation | Recruiting Invoice Amount | Estimated Recruiting Fee Percentage |
|---|---|---|---|---|---|---|---|
| 1 | Chapman, Kelly S | $55.29 | $115,004 | $30,000 | $145,059 | $20,700 | 14.27% |
| 2 | Webb-Smith, Karen | $46.64 | $97,014 | $30,000 | $127,061 | $19,050 | 14.99% |
| 3 | Bingham, Gregory | $45.20 | $94,017 | $30,000 | $124,062 | $16,920 | 13.64% |
| 4 | Wilson, Tyesha I | $51.93 | $108,015 | $30,000 | $138,067 | $19,440 | 14.08% |
| 5 | Cooper, Diana | $43.27 | $89,999 | $30,000 | $120,042 | $18,000 | 14.99% |
| 6 | Richardson, Chontaye | $55.29 | $115,002 | $20,000 | $135,057 | $20,700 | 15.33% |
| 7 | Williams, Lasheries | $48.08 | $100,004 | $30,000 | $130,052 | $15,001 | 11.53% |
| 8 | Dantzler, Holly | $52.89 | $110,011 | $30,000 | $140,064 | $19,800 | 14.14% |
| 9 | Owighowotu, Michele | $55.29 | $115,000 | $24,073 | $139,128 | $20,700 | 14.88% |
| 10 | McGaugh, Dontae L | $36.06 | $75,005 | $0 | $75,041 | $13,500 | 17.99% |
| 11 | Bertrand, Adam | $60.10 | $125,000 | $15,000 | $140,060 | $21,000 | 14.99% |

14.62%

45.    Table 6 below presents an analysis which applies the average recruiting fee percentage to the total compensation amounts paid by GHMC for the former Home Point associates that were solicited. As shown in Table 6, had GHMC relied on recruiters to hire the solicited associates, it likely would have incurred $239,037 in recruiting expenses if a recruiter were able to successfully recruit the associates targeted by Defendants.

---

[67] Bates labeled HPLANE 00005190; Bates labeled HPLANE00004502-HPLANE00004535; HPLANE00005156 - HPLANE00005189

Expert Report of Robert Crandall

**Table 6[68]**
**GHMC's Estimated Recruiting Costs**

| No. | Associate Name | Start Date | Job Title | Starting Salary | Signing Bonus | Estimated Recruiting Costs (Compensation * 14.6%)[69] |
|-----|----------------|-----------|-----------|-----------------|---------------|--------------------------------------------------------|
| 1 | Claudio Betts | 9/30/2020 | Mortgage Loan Underwriter | $110,000 | - | $16,082 |
| 2 | Travis Braxton | 9/30/2020 | Mortgage Loan Account Manager | $85,000 | - | $12,427 |
| 3 | Chandy Burke | 9/30/2020 | Mortgage Loan Underwriter | $95,000 | $5,000 | $14,620 |
| 4 | Patricia Clark | 9/30/2020 | Mortgage Loan Underwriter | $110,000 | - | $16,082 |
| 5 | Daniel Cook | 9/30/2020 | Mortgage Loan Underwriter | $95,000 | $5,000 | $14,620 |
| 6 | Maureen Deal | 9/30/2020 | Underwriter Support | $85,000 | - | $12,427 |
| 7 | Bryan Dwyer | 9/30/2020 | Mortgage Loan Underwriter | $95,000 | $5,000 | $14,620 |
| 8 | Jarrett Herrin | 9/30/2020 | Mortgage Loan Underwriter | $95,000 | $5,000 | $14,620 |
| 9 | Michelle Izquierdo | 9/30/2020 | Mortgage Loan Underwriter | $110,000 | - | $16,082 |
| 10 | Dora Lopez | 9/30/2020 | Mortgage Loan Underwriter | $100,000 | $5,000 | $15,351 |
| 11 | Charlene Murray | 9/30/2020 | Mortgage Loan Underwriter | $110,000 | $5,000 | $16,813 |
| 12 | Carla Rigdon | 9/30/2020 | Mortgage Loan Underwriter | $110,000 | - | $16,082 |
| 13 | Maraliz Rodriguez | 9/30/2020 | Mortgage Loan Underwriter | $100,000 | $5,000 | $15,351 |
| 14 | Kristen Wahl | 9/30/2020 | Underwriter Support | $85,000 | - | $12,427 |
| 15 | Ann Webb | 9/30/2020 | Mortgage Loan Underwriter | $100,000 | $5,000 | $15,351 |
| 16 | Chris Wilkins | 9/30/2020 | Mortgage Loan Underwriter | $110,000 | - | $16,082 |

**Total: $239,037**

### G.  Disgorgement: The solicited associates contributed to GHMC's profits

46.     Finally, the associates who moved to GHMC expanded GHMC's capacity during a time period when the demand for loans was at a historic high.  The additional capacity should generate

---

[68] GHMC 002549 - GHMC 002665
[69] *See* Table 5

additional profits. It is my understanding that Home Point served requests for production of documents seeking categories of information relevant disgorgement on February 24, 2023. It is also my understanding that, to date, GHMC has not produced any documents responsive to such requests. Accordingly, I reserve the right to supplement my report to reflect information learned from any subsequent productions.

### H. Total Amount in Controversy to Date

47.    Table 7 below summarizes the total estimated damages to date.

**Table 7**
**Summary of Damages Amounts**

| | |
|---|---|
| Estimated Damages Due to Home Point Payment of Lane's Salary In Early September 2020 | $2,773 |
| Estimated Damages Due to Retention Bonuses Paid by Home Point | $2,647,214 |
| Estimated Damages Due to Salary Increases Paid by Home Point | $298,301 |
| Estimated Damages Due to Recruiting Costs for Replacement Associates | $204,811 |
| Estimated Damages Due to Signing Bonuses Paid to Replace Underwriting Managers | $359,073 |
| Estimated Damages Due to Training Costs Associated with Replacement Associates | $49,002 |
| Estimated Disgorgement Due to GHMC's Avoidance of Recruiting Costs for Solicited Associates from Home Point | $239,073 |
| Estimated Disgorgement of GHMC Profits | TBD |

                                                        **Total:    $3,800,247**

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief. This declaration was executed in Los Angeles, California on March 31, 2023.

_____

Robert W. Crandall

-29-                                                    Expert Report of Robert Crandall

# Attachment A



1925 Century Park East
15th Floor
Los Angeles, CA 90067
Office.310.275.9137
Fax.310.275.9086
RCrandall@resecon.com

# ROBERT W. CRANDALL, PARTNER

Robert W. Crandall is a Partner in the litigation consulting practice of Resolution Economics LLC.  He has a M.B.A. from Loyola Marymount University and a B.A. in History from the University of Southern California.  Prior to the formation of Resolution Economics, Mr. Crandall was with the Dispute Consulting Group at Deloitte & Touche, the Economics & Litigation Services Group at Altschuler, Melvoin & Glasser, and the Dispute Analysis & Corporate Recovery Group at Price Waterhouse.

Mr. Crandall provides consulting services and expert witness testimony related to a variety of practice areas.  He has provided expert testimony in deposition, trial, arbitration, and other forums. He specializes in estimating damages, evaluating business issues and business operations, designing and conducting observation studies and surveys related to work activities, assessing economic and statistical approaches to litigation issues, and performing forensic programming and analysis of large complex databases.  Mr. Crandall has significant experience in analyzing complex data for the purpose of assisting counsel in evaluating class certification and liability.  He is frequently asked to present findings related to class certification, merits, and economic exposure for alternative dispute resolution forums such as mediation, settlement conferences, and arbitration.

## Professional Experience

Mr. Crandall has considerable experience in providing economic and/or statistical analyses related to employment litigation matters. Also, he performs general damages analysis, forensic accounting, business valuations, and statistical analysis in a broad range of matters where the underlying issues are: breach of contract, antitrust, intellectual property, environmental claims, and insurance coverage.  In addition, Mr. Crandall has considerable expertise in financial modeling, creating large databases from paper records and diverse data sources, designing, implementing, and analyzing surveys, and conducting statistical analysis related to complex data intensive litigation assignments.  Finally, Mr. Crandall is experienced in analyzing job duties and content and business operations.

## Employment Discrimination Liability Analysis

Mr. Crandall has performed numerous statistical analyses of liability related to class action, multi-plaintiff, and single plaintiff claims of employment discrimination.  He is experienced at analyzing claims alleging discrimination in hiring, promotion, placement, termination, discipline, and pay equity.  Assignments representative of Mr. Crandall's experience in employment discrimination include the following:

- Provided consulting services to defense counsel in a class action matter alleging racial discrimination in the officer disciplinary process at a very large police department.  Services included statistical analysis of data to test plaintiffs' allegations and work related to rebutting analysis proffered by plaintiffs' expert.



- Provided consulting services to defense counsel in a class action matter, brought by the EEOC, alleging discrimination in recruiting, hiring and placement at a hotel.  Created an applicant database, and performed SAS programming and statistical analysis related all three issues.  Analyzed opposing expert analysis and assisted counsel in developing cross-examination.

- Provided consulting services to defense counsel in a class-action matter brought by the EEOC alleging age discrimination in terminations at a major law firm.  Services included building analytical databases from multiple sources of information, performing statistical analysis related to the discrimination claim, estimating economic exposure for mediation/ settlement discussions.

- Provided consulting services to defense counsel in multi-plaintiff action alleging age discrimination at a major clothing retailer.  Services included researching external labor market characteristics for individuals with the plaintiff's occupation. Created financial models to calculate damages under a variety of offset scenarios.

- Provided consulting services to defense counsel in multi-plaintiff action alleging racial discrimination in work assignments at a government agency.  Services included performing statistical analysis to determine if minority workers received a disproportionate share of unfavorable work assignments.

- Provided consulting services to defense counsel in a multi-plaintiff action alleging gender discrimination in promotions at a large city police department. Services included performing statistical analysis of promotions and placements into coveted positions.

- Provided consulting services to defense counsel in multi-plaintiff action alleging age discrimination following a reduction of force at a hospital. Services included performing statistical analysis of liability and critiquing the analyses proffered by plaintiffs' expert.

- Provided consulting services to defense counsel in a large national class action employment dispute alleging gender discrimination at a warehouse style home and garden center retailer. Performed SAS programming and statistical analyses related to hiring, initial placement, and initial pay of applicants. Performed statistical analyses of female availability in the external labor market. Provided deposition support to counsel including drafting questions for the deposition of the opposing expert witness.

- Provided consulting services to defense counsel in a class action employment matter brought by the EEOC. Constructed a damage model that placed minority applicants in jobs awarded to White employees through analysis of the difference between actual and expected hires based on various flexible assumptions. Developed a random placement model testing both minority and non-minority placements. After placing the minority applicants at an appropriate rate during the damages period, the model calculated the damages of the applicants based on the time of their placement and other labor market factors.

- Provided consulting services to defense counsel in a single plaintiff action alleging age discrimination by a large international food company. Performed SAS programming and statistical analysis of terminations. Analyzed the work product of opposing expert. Assisted in drafting questions for use at deposition.



- Provided consulting services to defense counsel in a class action matter alleging age discrimination at a major drug store chain.  Performed statistical analysis related to terminations of store managers and assistant managers, reviewed and critiqued analysis of opposing experts.

- Provided consulting services to defense counsel in a single plaintiff matter alleging age discrimination in terminations resulting from a reduction in force.  Services included performing statistical analysis of termination claims.

- Provided consulting services to defense counsel in a multi-plaintiff matter alleging national origin discrimination at a waste management company. Performed statistical analyses to test plaintiffs' claims. Developed external labor market benchmarks.

- Provided consulting services to outside counsel in connection to performing statistical analysis of proposed workforce reductions at a publishing company.  Tested various reductions in force scenarios for statistical significance.  Assisted counsel in creating a RIF plan that avoided adverse impact on protected classes.

- Provided consulting services to outside counsel in connection to performing statistical analysis of proposed workforce reductions at a medical supply manufacturing company.  Tested various reductions in force scenarios for statistical significance.  Assisted counsel in creating a RIF plan that avoided adverse impact on protected classes.

- Provided consulting services to defense counsel in a wrongful termination matter alleging racial discrimination at a major defense contractor. Examined workforce composition in response to allegations of systematic discrimination based on race.  Analyzed external labor market availability to determine minority representation in the industry by job classification. Created a visual representation of results to be used as exhibits in trial.  Calculated loss of earnings related to the termination. Drafted cross-examination questions for the examination of plaintiff's expert.

## Class Action Wage and Hour Claims

Mr. Crandall has been involved in more than 500 class action wage and hour matters.  He is highly experienced in analyzing liability, damages, and class-member commonality related to wage and hour claims.  He is experienced in designing, implementing, and analyzing surveys and time-in-motion studies and performing forensic data analysis related to job content, exempt / non-exempt status, independent contractor / employee status, hours worked, uncompensated time, meal and rest breaks, improper pay calculations, and other issues. Finally, Mr. Crandall has significant experience in assisting counsel at mediation where he presents findings related to class certification and merits issues, evaluates economic exposure under a variety of legal theories, and assists in structuring the settlement terms. In this role, Mr. Crandall has worked for a party or as a neutral expert. Assignments representative of Mr. Crandall's wage and hour experience include:

- Provided consulting services to defense counsel in a national class-action wage and hour matter alleging that several thousand loan originators at a large banking institution were misclassified under FLSA. Conducted statistical analyses of hours worked records, compensation data, plaintiffs' declarations, and other data to determine if select groups of plaintiffs would be representative of class.  Assisted counsel in developing an approach for trial, estimating economic damages, and critiquing plaintiff's trial plan and damages analyses.



- Provided consulting services and expert services to defense counsel in a class action wage and hour matter alleging several hundred insurance sales originators at a call center were misclassified as exempt workers. Services included analyzing phone system data containing over 5.5 million records and computer login / logout data containing over 250,000 records to estimate overtime hours worked each workweek and the number of missed meal and rest periods.  Analyzed compensation data and estimated economic damages for the class.

- Provided consulting services to defense counsel in a wage and hour matter alleging that several hundred loan originators were misclassified as exempt workers.  Services included analyzing phone system data containing over 5.3 million records and over 1 million door swipe records to estimate overtime hours worked and the number of missed meals and rest periods each workweek.  Analyzed compensation data and estimated damages and penalties for the class for mediation.  Also, developed an economic model that estimated exposure based on the probability and economic consequences associated with winning or losing a variety of legal rulings.

- Provided consulting services to defense counsel in a wage and hour matter alleging that several thousand General Managers and Assistant Managers at a large office supply retailer were misclassified as exempt employees.  Services included designing and conducting a survey to examine whether class members were appropriately classified, analyzing the company's labor model and human resources data, and conducting statistical analysis related to a variety of class certification issues.

- Provided consulting services and expert witness testimony to defense counsel in a matter alleging hourly workers at a large chain of convenience stores were denied meal and rest periods, that all workers lost vacation pay, and that the employer placed employees on unpaid leave prior to termination to avoid waiting time penalties.  Services included data and statistical analysis of over 25 million time clock records in order to examine a variety of issues related to shift duration and break opportunities, analysis of vacation data to determine the number employees impacted by the policy, and analysis of termination records to demonstrate that there was no systematic practice of placing employees on LOA status prior to termination.

- Provided consulting services to defense counsel in a wage and hours matter alleging store managers and assistant store managers at a chain of retail discount stores were misclassified.  Services included creating and implementing a survey to examine whether class members were classified appropriately and conducting statistical analysis related to commonality of class-members and other class certification issues.  Also, analyzed and critiqued a survey conducted by plaintiffs, assisted counsel in opposing expert depositions, and estimated economic damages for mediation.

- Provided consulting services to defense counsel in a wage and hours matter alleging store managers at a chain of convenience stores were misclassified.  Services included creating and implementing a survey to examine whether class members were classified appropriately, analyzing labor models, conducting statistical analysis related to commonality of class-members, assisting counsel in estimating damages for mediation.

- Provided consulting services to defense counsel in a class-action wage and hour matter alleging uncompensated meal periods and breaks, unpaid overtime wages, and minimum wage violations at a field maintenance company.  Services included creating a database of hours worked from paper and electronic records, and then providing damages estimates based on a variety of assumptions and legal theories.



- Provided consulting services to defense counsel in a multi-plaintiff wage and hour matter alleging that the defendant employer failed to compensate security guards for uniform changing time and other claims of off-the-clock work.  Services included designing and conducting an observation study to measure time associated with various activities and estimating damages for mediation.

- Provided consulting services to defense counsel in a wage and hours matter alleging store managers and assistant store managers at a chain of clothing retail stores were misclassified.  Services included creating and implementing a survey to examine whether class members were classified appropriately and conducting statistical analysis related to commonality of class-members and other class certification issues.

- Provided consulting services to defense counsel in a class action matter alleging a variety of wage and hour violations for hourly workers at chain of warehouse stores.  Services included analyzing over 5.5 million time clock records and payroll data to evaluate allegations of improper time adjustments, missed meal and rest periods, uncompensated split shifts, reporting time violations, overtime and regular rate issues, and off-the-clock work.  Also, estimated damages for mediation.

- Provided consulting services to defense counsel in a class action matter alleging a variety of wage and hour violations related to time spent donning and doffing at a food factory.  Services included designing a statistical sampling approach, conducting a time and motion study to measure donning and doffing time, and estimating economic damages related to various claims.

- Provided consulting services to defense counsel in a class action wage and hour matter alleging meal and rest period violations for hourly workers at chain of disabled adult services centers.  Services included designing and conducting an observation study to estimate breaks taken and break opportunities.  Also, assisted counsel in examining class certification issues and the representativeness of the name plaintiffs' claims.

- Provided consulting services to defense counsel in a national class action wage and hour matter alleging off-the-clock work at a storage company.  Services included analyzing company hours data to test plaintiffs' legal theory, reviewing, analyzing, and critiquing a survey conducted by plaintiffs, conducting statistical analyses related to class certification, designing a conducting a survey related to management and timekeeping practices, and estimating economic damages for mediation.

- Provided consulting services to defense counsel in a class action wage and hour matter alleging that several hundred managers were misclassified as exempt workers by a large restaurant chain.  Analyzed data and assisted counsel in developing approaches to class certification.

- Provided consulting services to defense counsel in a wage and hour class action matter alleging that the defendant grocery store chain misclassified several hundred non-exempt assistant managers as exempt workers.  Services included creating database of hours worked, designing a flexible financial model, and computing damages under a variety of counsel specified scenarios for the purposes of mediation.



- Provided consulting services to defense counsel in several wage and hour matters alleging that police officers should be compensated for donning and doffing and other tasks.  Services included analyzing survey data and time clock data to determine class certification issues for other off-the-clock tasks and constructed measures of donning and doffing time.

- Provided consulting services to defense counsel in a class action matter alleging failure to pay overtime wages to independent sales and service representatives for a large national tool franchiser.  Services included designing and implementing an hours survey to determine whether the additional hours worked claimed by some plaintiffs was representative of the additional hours worked by the class as a whole. Determined that the problem were isolated to certain geographic areas rather than nationwide.

- Provided consulting services to defense counsel in a matter alleging that a class of several hundred independent contractors were misclassified employees.  Services included designing a sampling scheme, building and analyzing a database of business expenses, analyzing the business model, and performing business valuations related to a number of businesses.

- Provided consulting services and expert witness testimony to defense counsel in a NLRB matter alleging that independent contractors package delivery drivers were misclassified employees.  Services included analyzing the business model, productivity data, and other business records, and performing business valuations related to several businesses.

- Provided consulting services to defense counsel in a class action matter alleging that independent contractors and their employees/ workers were misclassified employees of the defendant and a large national hardware chain.  Services included analysis of the business model to evaluate whether the business model meets the criteria for a business.

- Provided consulting services to defense counsel in a multi-district class action matter alleging that independent contractors in the package delivery business were misclassified employees.  Services included analyzing the business model, conducting a variety of surveys, and responding to the class certification report of plaintiffs' expert.

- Provided consulting services to defense counsel in a matter alleging uncompensated time for donning and doffing at a chain of quick oil lube establishments.  Services included designing and conducting a time and motion study to estimate total time spent donning and doffing and designing a survey to determine uniform practices to assess class certification and de minimis issues.

- Provided consulting services to defense counsel in a class action matter alleging that product marketing testers performed off-the-clock work and were denied meals and rest periods.   Services included designing and conducting an online survey to evaluate commonality issues.



## Employment Damages Analysis

Mr. Crandall has assisted counsel in estimating employment related economic damages in more than 100 cases. He has expertise in evaluating but-for earnings, job search efforts, mitigation opportunities, and losses related to stock options and other forms of equity. Assignments representative of Mr. Crandall's experience estimating economic damages include the following:

- Provided consulting services to defense counsel in numerous matters alleging to wrongful termination of police officers, failure to promote police officers, and failure to hire police officers from a variety of police agencies. Services included analyzing labor market opportunities for police officers and creating economic models to estimate economic damages under a variety of career paths and/or retirement scenarios and critiquing the analyses of opposing experts.

- Provided consulting services to defense counsel in numerous matters alleging wrongful termination, or failure to promote government employees at a variety of city level agencies.  Services included creating economic models to estimate damages under a variety of career paths and retirement scenarios.

- Provided consulting services to defense counsel in numerous matters alleging wrongful termination in the grocery industry.   Services included creating models to estimate economic damages, analyzing mitigation opportunities, and critiquing the work of opposing experts.

- Provided consulting services to defense counsel in numerous matters alleging wrongful termination in the retail industry.   Services included creating models to estimate economic damages, analyzing mitigation opportunities, and critiquing the work of opposing experts.

- Provided consulting services to defense counsel where the underlying issue was a class action failure to hire complaint brought by the EEOC.  Services included creating financial models for estimating damages for the ten named plaintiffs, as well as, estimating potential damages for the class.

- Provided consulting services to defense counsel in a breach of contract matter where the underlying issue was related to an alleged failure to deliver stock options to an executive in the high-tech industry.  Analyzed options value under a variety of trading strategies.

- Provided consulting services to plaintiff counsel in a National Labor Relations Act right to work case. Services included calculating the economic losses suffered by twenty-five plaintiffs due to alleged illegal acts by their union.

- Provided consulting services to defense counsel in a multi-plaintiff action alleging wrongful terminations by an aerospace and defense contractor.  Evaluated plaintiff's expert report, and developed cross-examination questions for deposition and trial. Also, provided a rebuttal analysis of economic damages.

- Provided consulting services to plaintiff's counsel in a matter alleging wrongful termination and breach of contract for a high-ranking executive at a health care company.  Evaluated labor market earnings potential, calculated economic damages, reviewed defendant's expert analyses, and drafted a report of findings and a rebuttal report.



- Provided consulting services to plaintiff's counsel in a matter alleging wrongful termination and breach of contract for a highly compensated sales employee in the high-tech industry.  Evaluated labor market earnings potential, calculated economic damages, created exhibits for use at mediation, and created trial exhibits.

- Provided consulting services to defense counsel in a wrongful termination matter that alleged discrimination based on national origin brought by a former project manager at a large engineering corporation.  Analyzed mitigation factors and calculated loss of earnings.

## Insurance Coverage/Environment/Statistics

Assignments representative of Mr. Crandall's experience in related to insurance converge, environmental claims, and other statistical matters include:

- Provided consulting services to defense counsel in connection with a Department of Justice investigation regarding allegations of racial profiling by a large city police department.  Analyzed departmental data related to over 130,000 traffic stops, pedestrian stops, and other types of police contacts that occurred in four selected weeks in 1997 and four selected weeks in 1999.  Cross-referenced traffic stops data with other departmental information sources including human resources data, precinct level paper records, and the officer discipline system to test various hypotheses.

- Provided consulting services to defense counsel in a 17200 action alleging that the defendant insurer was using inappropriate condition adjustments when settling vehicle total loss claims. Services included analyzing theoretical issues related to used car pricing, conducting regression analysis to estimate coefficients for various condition adjustments, and determining the fairness of the settlements amounts for the name plaintiffs vehicles.

- Provided consulting services to coverage counsel in a CERCLA cost recovery action. Created a database of costs relating to the clean-up of several sites once used by an aerospace and defense contractor.  Performed analysis to apportion clean up costs between covered and not covered.

- Provided consulting services supporting coverage counsel in a binding arbitration where the underlying issue was coverage for thousands of asbestos claims.  Performed SAS programming, statistical analysis, created summary exhibits, and drafted a report of findings.

- Provided consulting services to coverage counsel in a class action matter alleging overcharging in workman's compensation insurance. Analyzed the difference in aggregate premium paid and the economic impact of reclassifying certain medical and legal costs.

- Provided consulting services to coverage counsel for an underlying class action case alleging damages from exposure to asbestos.  Analyzed through SAS programming defense and settlement costs for over 100,000 claims.  Constructed a model to apportion costs between various insurers and covered and not covered claims.



- Provided consulting services to defense counsel in a class action ADA matter brought against a government transit agency. Created databases from hard copy paper records, analyzed internal agency data, and merged all data to develop a comprehensive database of access failures.  Assisted in the design of a statistical sampling scheme for future monitoring of access to the disabled.

## Forensic Accounting/Business Valuations/Commercial Damages

Assignments representative of Mr. Crandall's experience related to general damages analysis, forensic accounting, finance, and antitrust include:

- Provided consulting services and expert witness testimony to defense counsel in a breach of contract matter. Services included analyzing financial records, estimating damages, and performing a valuation analysis of the plaintiff's business.

- Provided consulting services to defense counsel in a breach of contract matter where the underlying issue was fraudulent inducement of employment.  Services included analyzing financial records to determine the value of shareholder equity at various points in time, creating financial models related to economic losses, analysis of financial performance of an unrelated third party to assess but-for opportunity.

- Provided consulting services to plaintiffs' counsel in class-action matter where the underlying issue was fraudulent overcharges of California consumers. Services included estimating the range of potential damages under a variety of scenarios.  Filed declaration.

- Provided consulting services to plaintiff's counsel in lender liability arbitration involving a complex financial transaction.  Created a financial model that demonstrated the feasibility of the transaction under various interest rate and market return scenarios.

- Provided consulting services to defense counsel in a class action matter alleging unfair business practices related to gift certificate redemptions at a major national retailer.  Services included creating survey to determine redemption patterns and analysis of company data.

- Provided consulting services to plaintiff's counsel in a breach of contract matter related to the testing of an innovative dental implant product.  Analyzed plaintiff's sales, products, marketing, and sales of plaintiff's competitors, analyzed the products, marketing, and sales of potential market entrants, and developed damages analyses based on a market share approach.

- Provided consulting services to defense counsel in a case alleging usury and fraud.  Analyzed accounting records and other data, determined the appropriate interest charges, and quantified overcharge.

- Provided consulting services to plaintiffs and cross-defense counsel in a tort matter alleging interference with recruiting for high-tech salespeople.  Analyzed labor markets and internal recruiting data, and developed damages theory and analyses related to the expected economic return on investments in human capital.  Drafted declaration and provided deposition and strategy support.



- Provided consulting services to plaintiff's counsel in a breach of contract matter related to financing sub-prime equipment leases.  Reviewed financial records of plaintiff's business, industry data, and cohort data, and developed a financial model projecting lost profits under a variety of default scenarios.

- Provided consulting services to defense counsel in an antitrust matter alleging anti-competitive behavior in large-scale model industry. Performed forensic accounting involving the reconstruction of sales and purchases of a multi-million dollar closely held-entity. Managed process of converting numerous paper records into computerized format and developed database to analyze sales, purchases, and gross profit margins through SAS programming. Performed accounting to determine if the plaintiff was committing fraudulent practices. Provided deposition support including drafting questions for counsel in the depositions of several fact and expert witnesses.

- Provided consulting services to plaintiff's counsel in a breach of contract matter involving a medical device. Performed SAS programming to create a database of sales and customers.  Researched the market for the product in question and developed a damages model based on a market share approach.

- Provided consulting services to defense counsel in a medical malpractice action where the underlying damages issue was valuing an income stream from a closely held cash business.  Performed accounting of plaintiff's financial records to determine existence and extent of fraud. Created financial models to calculate damages under a variety of scenarios.

## Intellectual Property

Assignments representative of Mr. Crandall's experience related to intellectual property, trademark, and trade dress disputes include:

- Provided consulting services to plaintiff's counsel in a patent infringement action against a bedding manufacturer. Created database of sales of the patented product by the defendant and plaintiff. Analyzed price erosion caused by the sales of the competing product to the plaintiff's customers and the consequential damages resulting from the diminution of margins.

- Consulting to plaintiff's counsel in a trademark infringement action.  Converted paper records to computerized format and created a database of sales attributed to the trademarked product.  Analyzed data to calculate profits and consequential damages.

- Provided consulting services to defense counsel in a patent infringement action involving a high-end coffee cup manufacturer.  Analyzed sales data and assisted counsel in determining an appropriate amount for settlement.

- Provided consulting services to defense counsel in a trademark infringement/breach of contract matter. Services included valuing the future income generated through use of the trademark and developing financial models and analyses of damages related to a breach of contract cross-complaint related to potential products that exploited the trademark.



- Provided consulting services to claimant's counsel in a matter alleging patent infringement, trademark infringement, and breach of contract claim involving a food additive.  Services included evaluating the market potential for the product and estimating economic damages.

## Education

**Loyola Marymount University**
Masters of Business Administration

**University of Southern California**
Bachelor of Arts, History

## Employment History

**Resolution Economics LLC**
    1998–Present: Partner, Project Manager, Senior Consultant

**Deloitte & Touche, LLP**
    1998:        Senior Consultant, Dispute Consulting Services (Los Angeles)

**Altschuler, Melvoin and Glasser LLP**
    1996-1998:    Staff and Senior Consultant and Marketing Manager, Economics and Litigation Services (Los Angeles)

**Price Waterhouse LLP**
    1993-1996:    Marketing Manager, Dispute Analysis and Corporate Recovery Group (Los Angeles)

## Publications

"Surveys Can Help Court Decide Issues of Commonality", *Los Angeles Daily Journal,* January 28, 2004, Robert W. Crandall and Karyn Model

"Pros and Cons of Anonymous Surveys", December 2011, Richard Goldberg and Robert W. Crandall

"Wage and Hour Litigation", chapter in <u>Litigation Services Handbook</u>, ed. by Roman Weil, et al., 2012

## Memberships

Los Angeles County Bar Association – Labor and Employment Section

Society for Human Resources Management

resolution economics LLC

**Robert W. Crandall, M.B.A.**
**Attachment to Resume**

## TESTIMONY AND AFFIDAVITS PRESENTED (2018-2023)

In the matter of <u>Valerie Alberts, et al. v. Aurora Behavioral Health Care et al.</u>, Case No: BC419340, related to data analysis of labor code violation claims and class certification issues, Declaration Filed December 5, 2012. Deposition testimony March 19, 2013.  Rebuttal report filed February 28, 2018. Deposition testimony April 19, 2018.

In the matter of <u>Nate Booker, et. al., v. Tanintco, Inc., et al.</u>, Case No: BC 349267, And related cases: BC351252, BC354230, related to statistical analysis of data, rebuttal of plaintiffs' expert report, and response to plaintiffs' trial plan.  Report filed June 9, 2015.  Deposition testimony July 14, 2015. Report filed October 20, 2017.  Report filed July 27, 2018. Report filed September 10, 2019. Deposition testimony September 13, 2019.   Trial testimony February 7, 2020, February 10, 2020, and February 11, 2020.

In the matter of <u>Archivaldo Marquez, et al. v. Weber Distribution,</u> Case No. BC 512269, related to rebuttal of plaintiffs' trial plan and proposed survey.  Report filed March 11, 2016. Rebuttal report filed May 16, 2016.  Deposition testimony March 20, 2018.

In the matter of <u>Christopher Levanoff, et al. v. SoCal Wings LLC., et al.</u>, Case No: 30-2011-00511808-CU-OE-CXC, related to statistical analysis of data, rebuttal of opposing expert, evaluation of trial plan, rebuttal of opposing expert's survey.  Reports filed on April 26, 2016, June 3, 2016, July 7, 2016, September 23, 2016, January 24, 2017, September 6, 2017, September 19, 2017 and January 18, 2018.  Deposition testimony October 5, 2016.  Trial testimony June 26, 2018, June 27, 2018. Trial testimony June 26, 2018 and June 27, 2018.

In the matter of <u>Troy Slack, et al. v. Swift Transportation CO. of Arizona, LLC.,</u> Case No: 3:11-cv-05843-BHS. Related to statistical analysis of data, analysis of economic damages, and rebuttal to plaintiffs' expert report.  Report filed March 10, 2017.   Trial testimony July 18, 2017.

In the matter of <u>Naomi Slaton, et. al. v. Dole Packaged Foods</u>, et al., Case No: CVM016111.  Related to evaluation of trial plan and statistical analysis of data.  Report filed March 22, 2017. Supplemental report filed July 10, 2017. Rebuttal report filed March 28, 2018.

In the matter of <u>Donna Busik, et. al. v. Maplebear Inc., et al.</u>, JAMS reference #1100081511, related to statistical analysis of data and business model to evaluate independent contractor status.

In the matter of <u>Party City Wage and Hour Cases</u>, JCCP Case No. 4781. Related to statistical analysis of data in connection with class certification issues.  Report filed May 31, 2017.  Deposition testimony July 26, 2017.  Report Filed March 19, 2019.

**ATTACHMENT A**

resolution economics LLC                    **Robert W. Crandall, M.B.A.**

In the matter of <u>William Helmick, et. al. v. Air Methods Corp., et. al.</u>, Case No: RG133665373, PMK deposition regarding a wage and hour audit.  Deposition testimony June 5, 2017.  Expert report related to class certification issues filed on September 29, 2017. Damages report filed July 30, 2018. Deposition testimony August 2, 2018. Deposition testimony July 7, 2019.  Trial testimony July 22, 2019.

In the matter of <u>Eric Chavez et al. v. Converse, Inc., et al.</u>, Case No: 5-cv-03746-NC.  Related to statistical analysis of data.  Report filed June 23, 2017.  Rebuttal report filed September 20, 2017.  Report filed March 20, 2020.

In the matter of <u>Jorge Estrada, et al. v. Royal Carpet Mills, Inc.</u>, Case No: 30-2013-00692890-CU-OE-CXC, related to statistical analysis of data and trial plan issues.  Report filed July 19, 2017.  Trial Testimony April 29, 2019.

In the matter of <u>Westfall, et. al,  v. Ball Metal Beverage Container Corporation</u>, Case No:  2:16-cv-02632-KJM-GGH, related to statistical analysis of data.  Report filed August 28, 2017.  Supplemental report filed January 28, 2019.

In the matter of <u>Gray et al. v. Hansel Ford, Inc.</u>, Case No:  SCV258850, related to statistical analysis of data.  Report filed August 30, 2017. Additional report file in response to Plaintiffs' Motion for Summary Adjudication on January 31, 2020.

In the matter of <u>Mary Andrews, et. al. v. TRG Customer Solutions, Inc., et. al.</u>, Case No: 1:14-cv-00135, related to statistical analysis of data for class certification and merits.  Report filed September 11, 2017.  Deposition testimony February 13, 2018. Rebuttal Report filed March 16, 2018.

In the matter of <u>Robyn James, et. al. v. American Corporate Security, et. al.</u>, Case No: BC525388, related to response to plaintiffs' PAGA trial plan.  Report filed October 2, 2017.  Supplemental report filed May 29, 2018.

In the matter of <u>Balapuwaduge Mendis, et. al. v. Schneider National Carriers, Inc. et al.</u>, Case No: 2:15-cv-00144 JCC, statistical analysis of data, evaluation of merits and damages issues.  Report filed October 30, 2017.  Rebuttal report filed December 15, 2017. Deposition testimony February 8, 2018.  Report filed March 23, 2018.

In the matter of <u>Eric Bahra v. County of San Bernardino</u>.  Case No. 5:16-cv-01756-JGB-SP, related to analysis of economic damages.  Report filed November 20, 2017.  Trial testimony July 14, 2021.

In the matter of <u>Irean Amaro, et. al. v. Anaheim Arena Management LLC</u>, Case No: 30-2017-00917542, related to the fairness of class action settlement.  Report filed January 11, 2018.  Supplemental Report filed April 20, 2018.

In the matter of <u>Robert Shaw, et al. v. AMN Services LLC</u>, Case No: 3:16-cv-02816 JCS, related to statistical analysis of data related to class certification issues.  Report filed January 15, 2018. Deposition April 26, 2018.

**ATTACHMENT A**

resolution economics LLC                                    **Robert W. Crandall, M.B.A.**

In the matter of <u>Miguel Rojas-Cifuentes et. al. v. ACX Pacific Northwest Inc. et. al.</u>, Case No: 2:14-cv-00697-JAM-CKD, related to statistical analysis of data for class certification issues, rebuttal of opposing expert.  Report filed January 19, 2018.

In the matter of <u>Juan Barajas, et. al. v. WHM LLC, et. al.</u>, Case No: BC491045, related to analysis of reporting time pay.  Report filed January 31, 2018.

In the matter of <u>Emily Howell, et. al. v. Advantage RN LLC, et. al.</u>, Case No: 3:17-cv-00883-JLS-BLM, related to statistical analysis of data.  Report filed February 2, 2018.  Supplemental report filed May 23, 2019.

In the matter of <u>Diana Vasquez, et. al. v. Warren Distributing Inc., et. al.</u>, Case No: BC549552, related to statistical analysis of data for class certification issues.  Report filed February 2, 2018. Deposition March 20, 2018.  Rebuttal report Filed May 1, 2018.

In the matter of <u>Maria Juarez, et. al. v. Columbia Riverside Inc., et al</u>. Case No: RIC1509204, related to statistical analysis of data for class certification issues and rebuttal of opposing expert.  Report filed February 5, 2018. Deposition testimony March 7, 2018.

In the matter of <u>Jose Nevarez v. Foster Farms LLC,</u> Case No: 13CECG02624, related to statistical analysis of data in support of Defendant's Motion for Summary Adjudication.  Report filed February 28, 2018.  Related to statistical analysis of data and trial plan issues for class certification. Report filed July 11, 2019.

In the matter of <u>Landon Fulmer, et. al., v. Golden State Drilling, Inc.</u>, Case No:  S-1500-CV-279707, Related to analysis of data for liability and damages purposes and rebuttal of opposing expert. Deposition testimony April 30, 2018.

In the matter of <u>Felipe Alverez, et. al. v. YRC Inc., et al.</u>, Case No:  CV 12-0134-TJH-F, related to statistical analysis of data for class certification purposes.  Report filed May 7, 2018.

In the matter of <u>Jaime Maradriaga, et al. v. PIH Health, et al.</u>, Case No: BC597115, related to statistical analysis of data in connection with class certification issues.  Report filed May 23, 2018. Deposition testimony August 21, 2018.  Rebuttal report September 20, 2018.

In the matter of <u>Sephora Wage and Hour Cases,</u> Judicial Council Coordination Proceeding No.: 4911, related to statistical analysis of data for class certification purposes.  Report filed May 29, 2018.  Deposition June 14, 2018. Report related to merits issues and responding to survey filed August 5, 2020.

In the matter of <u>Daniel Rodriguez, et. al., v. TC Mel Trucking, Big E Transportation, et al.</u>, Case No: 219-2017-CV-00327, related to analysis of trucking company business model.  Report filed July 5, 2018.  Report filed March 15, 2019.  Deposition testimony April 5, 2019.

**ATTACHMENT A**

resolution economics LLC                                        **Robert W. Crandall, M.B.A.**

In the matter of CRST Expedited, Inc. v. Swift Transportation Co. of Arizona, LLC, Case No: 1:17-cv-00025-CJW, related to analysis of claims and rebuttal of damages. Report Filed July 20, 2018. Rebuttal Report filed September 28, 2018. Trial testimony July 19, 2019.

In the matter of Ricardo Gomez, et al.  v. USF Reddaway Inc., et al., Case No: 2.16-cv-05572-JAK (FFM), related to statistical analysis of data for class certification purposes. Report filed July 30, 2018.

In the matter of John May v. Inter-Con Security Systems, Inc., Case No. BC645310, related to analysis of economic damages and mitigation opportunities.  Deposition testimony August 3, 2018.

In the matter of Norma Gonzalez, et al. v. Waterway Plastics, Case No. 56-2014-00460995-CU-OE-VTA, related to statistical analysis of data for class certification.  Report filed August 11, 2018. Supplemental report filed June 14, 2019.

In the matter of Juan Towle, et al. v. Cummins Pacific, et al., Case No: 3:18-cv-00083-LAB-JLB, related to statistical analysis of data for class certification and rebuttal of opposing expert.  Report filed August 31, 2018.  Deposition testimony September 5, 2018.

In the matter of Robert Chase and Preston Epps v. Haliburton Energy Services, Arbitration No: 1210034965, related to economic damages.  Deposition testimony September 24, 2018.  Arbitration testimony October 11-12.

In the matter of the State of Washington Employment Security Department v. Zimride Inc., dba Lyft, Case No: 021729 related to analysis of independent contractor status.  Report filed October 11, 2018.

In the matter of Devon Isbell v. Party City Corporation, Case No: 3:17-cv-00709-MMD-VPC, related to analysis of economic damages.  Report filed October 19, 2018.  Deposition testimony November 6, 2018.

In the matter of Ronald Pineda v. Abbot Laboratories Inc., et al. Case No: CV18-3395 SVW (RAOx). Related to analysis of economic damages.  Report filed November 1, 2018.  Rebuttal report filed November 16, 2018. Deposition testimony November 27, 2018.  Supplemental report filed July 27, 2021.  Supplemental rebuttal report filed August 4, 2021.

In the matter of CRST Expedited Inc. v. JB Hunt Transport Inc., Case No: 1:17-cv-00026-LRR, related to analysis of claims and rebuttal of damages.  Report filed November 2, 2018.

In the matter of Matthew Ogura, et. al. v. Thrifty Payless Inc., et. al, Case No: BC605968.  Related to statistical analysis of data for class certification. Report filed November 16, 2018.  Deposition testimony March 18, 2019.  Supplemental Report filed July 16, 2019.

In the matter of Johnny Moody, et. al. v. Infotree Service Inc., et. al. Case No: BC673011. Related to statistical analysis of data.  Report filed November 16, 2018.

In the matter of Mark Prado, et. al. v. Wal-Mart Stores Inc., et al. Case No: 2:17-cv-05630-AB KK, related to analysis of claims and rebuttal of trial plan.  Report filed November 30, 2018.

**ATTACHMENT A**

resolution economics LLC                                          **Robert W. Crandall, M.B.A.**

In the matter of Rodrigo Reqeudan v. Centerplate of Delaware Inc., Case No: 17-cv-03828-LHK, related to statistical analysis of data for class certification. Report filed December 3, 2018

In the matter of Marriage of Najarian, Case No: BD634136, related to reasonable compensation of executives of closely held corporation.  Report filed December 12, 2018.

In the matter of Richard Hose, et al. v. Washington Inventory Service, et al., Case No: 3:14-cv-02869-WQH-AGS, related to rebuttal of opposing experts. Report filed December 17, 2018

In the matter of Perez De Leon v. Dunn-Edwards Corporation. Case No: 17-CV-306134, related to analysis of economic damages. Deposition testimony January 8, 2019.  Arbitration testimony February 25, 2019. Report filed April 20, 2020.

In the matter of Timothy Quick v. The County of San Bernardino, Case No: 5:18-cv-00105-JVS (SPx), related to analysis of economic damages.  Report filed January 30, 2019.

In the matter of Rexann Jasso v. Walmart Stores Inc., Case No: 2:18-cv-02344-ODW-JC, related to analysis of economic damages.  Report filed February 4, 2019.

In the matter of Patricia Rodriguez v. Jack in the Box., Case No: RG17847828, related to statistical analysis of data.  Deposition testimony March 4, 2019.  Trial testimony May 15-16, 2019.

In the matter of Carol Lear, et al. v. Hitachi Automotive Systems, Case No: 5:17-CV-00186-JMH, related to analysis of timekeeping and payroll data with regard to exemption issues, including rebuttal to plaintiffs' expert report.  Report filed March 11, 2019.  Supplemental report filed June 24, 2021. Rebuttal report filed July 23, 2021.  Deposition testimony August 24, 2021.

In the matter of Stephanie Heredia, et al. v. Eddie Bauer LLC, Case No: 5:16-cv-06236-BLF, related to statistical analysis of data.  Report filed March 29, 2019.  Report filed April 30, 2019.  Deposition Testimony May 3, 2019.

In the matter of William Edwards, et al. v. Leaders in Community Alternatives, Inc., Case No: 4:18-cv-4609, related to statistical analysis of data.  Report filed April 8, 2019.

In the matter of Carolyn Medina v. SCPMG, Case No: BC613714, related to analysis of economic damages.  Report filed April 15, 2019.  Deposition Testimony April 18, 2019.  Deposition testimony October 7, 2019.

In the matter of William Richards v. County of San Bernardino, Case No: 17-cv-00497-SJO-SP, related to analysis of economic damages.  Report filed May 7, 2019.

In the matter of Pike v. County of San Bernardino, Case No: 5:17-cv-01680, related to statistical analysis of data and rebuttal of opposing expert.  Report filed May 13, 2019.

**ATTACHMENT A**

resolution economics LLC                              **Robert W. Crandall, M.B.A.**

In the matter of Scot Lee Allison vs. Halliburton Energy Services, Inc., Arbitration No: 12100035811, related to economic damages.  Deposition testimony May 17, 2019.  Deposition testimony October 30, 2019.  Arbitration testimony November 11, 2019.

In the matter of Shaon Robinson, et al vs. The Chef's Warehouse, Inc., Case No: 3:15-cv-05421-RS, related to statistical analysis of data and rebuttal of opposing expert.  Report filed May 30, 2019.

In the matter of La Tasha Coates, et al vs. United Parcel Services, Inc., Case No: 2:18-cv-03012-PSG-AFM, related to statistical analysis of data and rebuttal of opposing expert.  Report filed June 3, 2019.

In the matter of Cindy Castillo, et. al. v. Bank of America, et. al., Case No: 8:17-cv-00580-DOC (KESx), related to statistical analysis of data for class certification. Report filed June 17, 2019.

In the matter of Azizi Baranauskas, et al., v. Healthcare Manager Services LLC, et. al, Case No:  37-2017-00013171-CU-OE-NC, related to statistical analysis of data for class certification purposes. Report filed July 5, 2019.  Deposition Testimony July 10, 2019.

In the matter of Manuel Vigueras, et. al. v. Red Robin International Inc., et. al, Case No: 8:17-cv-1422, related to statistical analysis of data, rebuttal of trial plan.  Report filed July 8, 2019. Supplemental report filed January 21, 2020.  Rebuttal report filed February 5, 2020.  Deposition testimony February 18, 2020.

In the matter of Barbara Ruotolo, Edward Williams, and Chris Kalhoon v. Lyft, Inc., Case No: AAA 01-18-0003-9788, 01-18-0003-9782, 01-18-0003-9777, related to statistical analysis of data, discussion of business model and control issues. Report filed August 14, 2019.  Deposition testimony August 20, 2019.

In the matter of Alejandra Del Aguila v. Herbalife International of America Inc., Case No: BC689113, related to analysis of economic damages.  Report filed September 3, 2019.

In the matter of Amber Pardue, et al. v. CBC Restaurant Corp., et al., Case No: 2:19-cv-03920-R (SKx), related to statistical analysis of data in connection with class certification and rebuttal of opposing expert. Report filed September 9, 2019.

In the matter of Esmat Yadkouri v. Wal-Mart, Case No. BC620135, related to analysis of economic damages.  Deposition testimony September 20, 2019.

In the matter of Gene Sugimoto v. Intercon Security, Case No: 3:19 –CV-0025 DMS-BLM, related to analysis of economic damages. Report filed September 26, 2019.

In the matter of Patricia Harvey, et. al. v. Bed Bath & Beyond et al., Case No: RG17885153, related to analysis of seating claims in connection with evaluation of the settlement fairness. Report filed September 30, 2019.

**ATTACHMENT A**

**resolution economics** LLC                                    **Robert W. Crandall, M.B.A.**

In the matter of <u>Irma Frausto et. al. v. Bank of America, National Association</u>, Case No: 3:18-cv-01983-LB (Frausto)/3:18-cv-01202-LB (Suarez), related to class certification. Report filed October 11, 2019.  Rebuttal report filed November 15, 2019.

In the matter of <u>John Utne, et. al., v. The Home Depot USA, Inc</u>., Case No: 3:16-CV-01854-RS, related to video study of claims.  Report filed October 16, 2019. Supplemental Declaration filed December 20, 2019. Rebuttal report filed April 30, 2020.  Sur-rebuttal report filed December 17, 2021.  Deposition testimony February 4, 2022. Deposition testimony August 23, 2022.

In the matter of <u>Ashley Broussard v. The Geo Group, et. al.</u>, Case No. CIVDS1722295, related to analysis of economic damages.  Deposition testimony October 31, 2019.

In the matter of <u>Melody Cunningham, et. al, v. Lyft Inc., et al</u>., Case No: 1:19-CV-11974-IT, related to statistical analysis of data. Reports filed November 6, 2019 and April 3, 2020.

In the matter of <u>Roberto Tellez, et. al. v. Harvest Container Co., et al</u>, Case No:  VCU264528, related to statistical analysis of data for class certification. Report filed December 16, 2019.

In the matter of <u>Andrew Gordon, et. al, v. TBC Retail Group, Inc</u>., et.al, Case No: 2:14-cv-03365-DCN, related to statistical analysis of data.  Report filed November 20, 2019.  Deposition testimony January 17, 2020.

In the matter of <u>Robert Cole and Kristie King v. Sallyport Global Holdings, Inc</u>., Case No: 2018-2951, related to analysis of economic damages.  Report filed January 2, 2020.

In the matter of <u>Arliss Villalta, et. al. v. Leonardo's Restaurant Inc., et. al.</u>, Case No: BC542133, related to discussion of trial plan.  Report filed January 20, 2020.  Deposition testimony February 24, 2020.

In the matter of the <u>People of the State of California v. Maplebear Inc., dba Instacart</u>, Case No:37-2019-00048731-CU-MC-CTL, related to statistical analysis of data.  Report filed February 2, 2020.

In the matter of <u>Mesfin Haile v. LA Auto Distributors</u>, Case No: 18-3162-MDM, related to analysis of economic damages and rebuttal of opposing expert.  Deposition testimony March 10, 2020.

In the matter of <u>John Rogers, et al. v. Lyft</u>, Case No: CGC-20-583685, related to statistical analysis of data.  Report filed March 25, 2020.  Report filed April 16, 2020.

In the matter of <u>Christopher Lyons, et al., v. Air Methods Corp., et al</u>, Case No: 3:20-cv-01700-PJH (DMR), related to potential amounts in controversy. Report filed April 22, 2020.

In the matter of re: <u>Westamerica Wage and Hours Issues</u>, Case No JCCP004921, related to trial plan issues. Report filed April 30, 2020.   Report filed November 13, 2020.  Deposition December 1, 2020.

**ATTACHMENT A**

resolution economics LLC                                    **Robert W. Crandall, M.B.A.**

In the matter of Scott Stout, et. al. v. GEO Group, et. al., Case No: 37-2019-00000650-CU-CR-CTL, related to statistical analysis of data and class certification issues. Report filed June 18, 2020.

In the matter of Christine Andersen, et. al. v. RSCR California Inc., et. al., Case No: 5:18-cv-02474-JAK-KK, related to statistical analysis of data, trial plan, and survey issues. Report filed June 30, 2020. Deposition testimony August 27, 2020. Supplemental Report October 1, 2020.

In the matter of Nick Nichols v. City of Burbank, Case No EC06467, related to analysis of economic damages. Deposition testimony July 15, 2020

In the matter of Audrey Heredia, et. al. v. Sunrise Senior Living, et. al., Case No: 8:18-cv-01974-JLS-JDE. Related to rebuttal of opposing expert. Report filed September 1, 2020. Deposition Testimony October 22, 2020. Supplemental report June 23, 2021. Supplemental declaration August 16, 2021.

In the matter of Omar Ahmad v. Lyft, Case No: AAA Action No. 01-20-0001-7550, related to data analysis, independent contractor status, and damages. Report filed September 4, 2020.

In the matter of Emilia Santos, et al. v. United Parcel Service Inc., Case No: 3:18-cv-01377-EMC, related to statistical analysis of data, rebuttal, and trial plan issues. Report filed September 18, 2020. Deposition September 25, 2020.

In the matter of HFR R&B Holdings, LLC v. Mapletree SR Management Pte. Ltd, JAMS Reference No: 1220061992, analysis of wage and hour issues in connection with a purchase price dispute. Report filed September 21, 2020. Arbitration testimony November 20, 2020.

In the matter of Lisa Boczko v. Lyft, Inc., Case No: AAA Action No. 01-20-0000-7324, related to data analysis, independent contractor status, and damages. Report filed September 18, 2020.

In the matter of Oscar Granados v. The GEO Group., Case No: 8:20-cv-00478-DOC-DFM, related to calculating loss of earnings capacity in a personal injury matter. Report filed October 9, 2020.

In the matter of Charles Hoffman v. Lyft, Inc., Case No: AAA Action No. 01-20-0001-6875, related to data analysis, independent contractor status, and damages. Report filed October 15, 2020.

In the matter of Larry Roach, et al. v. Wal-Mart Stores, Inc., Case No: 5:18-CV-02536 AB-KK, related to rebuttal of opposing expert. Report filed October 30, 2020.

In the matter of Roberto Ruiz, et al., v. Unity Courier Services, et. al., Case No: BC724435, related to statistical analysis of data in support of motion to strike. Report filed November 11, 2020. Deposition testimony February 25, 2021.

In the matter of Daniel Barnett v. Lyft, Inc., Case No: AAA Action No: 01-20-0001-7323, related to data analysis, independent contractor status, and damages. Report filed December 9, 2020.

**ATTACHMENT A**

resolution economics LLC                                    **Robert W. Crandall, M.B.A.**

In the matter of Deena Asamurai, et. al. v. First Technology Federal Credit Union, Case No: S-CV-0044446, related to statistical issues associated with trial plan.  Report filed December 14, 2020.

In the matter of Dean A. Robbins, et al, v. Phillips 66 Company, et al., Case No: 3:18-cv-00292-RS (consolidated Case No. 19-cv-01558-RS), related to statistical analysis of data and statistical issues associated with trial plan.  Report filed December 21, 2020.  Deposition testimony January 15, 2021.

In the matter of Michael Lavigne, et. al. v. Herbalife Ltd., Case No: 2:18-cv-07480-JAK (MRWx), related to statistical analysis of the relationship between earnings and event attendance of Herbalife distributors. Report filed January 11, 2021. Deposition testimony February 2, 2021.

In the matter of Michelle Hinds, et, al. v. FedEx Ground Package Systems, Case No: 4:18-cv-01431-JSW (AGT), related to trial plan issues, rebuttal of opposing expert. Report filed February 5, 2021. PAGA declaration filed February 25, 2022.  Deposition testimony April 8, 2022.

In the matter of Mary Jane Gonzales, et. al., v. Healthcare Services Group, Inc, et al. Case No: CGC-18-570988, related to statistical analysis of data and trial plan issues.  Report filed February 11, 2021.  Supplemental report filed May 30, 2021.

In the matter of Louis Ibarra, et al. v. Artisan Screen Printing, et. al., Case No: BC644708, related to statistical analysis of data in connection with class certification issues.  Report filed February 19, 2021. Deposition testimony March 27, 2021.

In the matter of Victor Polina, et. al. v. Skechers USA Inc., et al., Case No: 19STCV20234, related to video observation study and statistical analysis of data in connection with suitable seating claims. Report filed March 2, 2021.  Deposition testimony March 5, 2021.

In the matter of Eric Ayala, et. al., v. UPS Supply Chain Solutions, et al., Case No: 5:20-cv-00117 PSG-AFM, related to statistical analysis of data, video observation, rebuttal of opposing expert, and critique of trial plan.  Report filed March 15, 2021. Deposition testimony April 7, 2021.

In the matter of John Elmy, et. al. v. Western Express, et. al., Case No: 3:17-CV-01199, related to statistical analysis of data related to class certification issues.  Report filed March 17, 2021.

In the matter of Kevin Anderson et. al. v. Equinox Holdings Inc., et. al., Case No: 37-2018-00014364-CU-OE-CTL, related to statistical analysis of data, discussion of trial plan issues, rebuttal of opposing experts, and rebuttal of survey conducted by opposing counsel.  Report filed April 2, 2021.

In the mater of Michelle Frey v. Creative Artists Agency, Case No: 1210037212, related to analysis of economic damages.  Declaration filed April 20, 2021. Arbitration testimony May 13, 2021.

In the matter of Herman Overpeck, et. al. v. FedEx Corporation, et. al., Case No:  4:18-cv-07553-PJH (DMR), related to statistical analysis of data and rebuttal of opposing expert.  Report filed June 1, 2021.  Deposition testimony August 10, 2021.

**ATTACHMENT A**

resolution economics LLC                                      **Robert W. Crandall, M.B.A.**

In the matter of <u>Hernan Hernandez v. Restoration Hardware, et. al</u>., Case No: CIVDS1723322, related to statistical of data and rebuttal of opposing expert.  Report filed June 4, 2021.  Deposition testimony June 18, 2021.  Supplemental report filed September 2, 2021.

In the matter of <u>Ronald Held, et. al. v. Hitachi Automotive Systems Americas</u>, et. al., Case No: 18-CI-00294, related to statistical analysis of data.  Report filed June 28, 2021. Rebuttal report filed July 23, 2021.  Deposition testimony August 24, 2021.

In the matter of <u>Randy Salinas, et. al. v. The Cornwell Quality Tools Company, et al.</u>,  Case No: 5:19-cv-02275-FLA-SP, related to statistical analysis of data and discussion of business model issues.  Report filed July 2, 2021.   Deposition testimony July 20, 2021.

In the matter of <u>Christine Crump, et al. v. Hyatt Corporation, et. al</u>., Case No: 4:20-cv-00295-HSG, related to statistical analysis of data, critique of opposing experts, and trial plan.  Report filed July 15, 2021.

In the matter of <u>Marvin Nash, et. al. v. Horizon Freight System Inc., et. al</u>., Case No: 3:19-cv-01833-VC, related to rebuttal of opposing experts survey and data study.  Report filed July 23, 2021.  Rebuttal report filed September 10, 2021.

In the matter of <u>Earnest Cuadra, et. al. v. FedEx Ground Package System, et. al</u>., Case No: 2:20-cv-10719-JFW (SKx), related to rebuttal of opposing expert's survey.  Report filed July 26, 2021.  Deposition testimony July 27, 2021. Supplemental report filed August 16, 2021.

In the matter of <u>Natalie Haaverson, et al. vs. Tavistock Freebirds LLC et al.</u>, Case No: RG19030716, related to analysis of restaurant operations.  Report filed August 16, 2021.  Supplemental report filed September 20, 2021.

In the matter of <u>Claudia Alvarado, et. al. v. Wal-Mart Associates Inc., et. al</u>, Case No: 2:20-cv-01926-AB-KK, related to analysis of class certification issues and critique of opposing expert.  Report filed August 16, 2021. Deposition testimony September 23, 2021.

In the matter of <u>Kathleen Williams and Michael Hill v. City of Long Beach, et al</u>, Case No: 2:18-cv-01069-AB-JC, related to discussion of data and racial profiling claims.  Report filed August 20, 2021.  Rebuttal report filed September 17, 2021.  Deposition testimony October 8, 2021.

In the matter of <u>Yolanda Bennett v. AT&T Services Inc</u>., Case No: 4:20-cv-03581-JST, related to analysis of economic damages.  Report filed August 31, 2021.  Rebuttal report filed September 30, 2021.

In the matter of <u>Sherman Garnett v. County of San Bernardino, et al.</u>, Case No: CIVDS1938394, related to analysis of economic damages.  Deposition testimony September 3, 2021.

**ATTACHMENT A**

resolution economics LLC                    **Robert W. Crandall, M.B.A.**

In the matter of <u>Elsie Romero, et. al. v. Select Employment Services, et al</u>., Case No: 2:19-cv-06369-AB-AGR, related to statistical analysis of data and trial plan issues. Report filed September 10, 2021.

In the matter of <u>Valerie Sampson, et. al. v. Knight Transportation</u>, et. al.,  Case No: 2:17-cv-00028 JCC, related to statistical analysis of data and labor market benchmarking.  Report filed October 12, 2021.  Rebuttal report filed October 29, 2021.  Supplemental declaration December 22, 2021.

In the matter of <u>Brian Dittman, et. al. v. Medical Solutions Inc</u>., Case No: 2:17-cv- 01851-MCE-CKD, related to statistical analysis of data and labor market benchmarking.  Report filed October 14, 2021.

In the matter of <u>Marlea Dell Anno v. City of San Diego</u>, Case No: 37-2017-00000118-CU-OE-CTL, related to analysis of economic damages.  Report filed October 15, 2021.  Deposition testimony October 20, 2021.  Trial testimony March 15, 2022.

In the matter of <u>Donna Preston v. Lyft</u>, AAA Action No. 01-20-0005-0881, related to data analysis, independent contractor status, and damages.  Report filed October 19, 2020.

In the matter of <u>Joseph Kennedy v. Lyft</u>, AAA Action No. 01-20-0005-0613, related to data analysis, independent contractor status, and damages.  Report filed October 19, 2020.

In the matter of <u>Daniel McCoy v. Lyft</u>, AAA Action No. 01-20-0005-0878, related to data analysis, independent contractor status, and damages.  Report filed October 19, 2020.

In the matter of <u>Camille Green, et. al. v. Cornerstone Services Inc., et al</u>., Case No: 1:20-cv-00706-MWM, related to statistical analysis of data.  Report filed October 22, 2021.

In the matter of <u>Stephen Kohr v. ULINE Inc., et. al.</u>, Case No: CIVIDS1912069, related to statistical analysis of data.  Report filed October 25, 2021.  Deposition testimony November 4, 2021.

In the matter <u>Julian Vargas, et. a. v. Quest Diagnostics Clinical Laboratories Inc</u>., et. al., Case No: 2:19-cv-08108-DMG, related to statistical issues and trial management plan.  Report filed November 1, 2021.  Deposition testimony November 15, 2021.

In the matter of <u>Anthony Mostajo, et. al. v. Nationwide Mutual Insurance, et. al</u>., Case No: 2:17-CV-00350-JAM-AC, related to statistical analysis of data and rebuttal of survey.  Report filed November 5, 2021.

In the matter of <u>Giuliana Mendiola v. Regents of the University of California</u>, et. al., Case No: 5:20-cv-00832-ODW-KK, related to analysis of economic damages.  Report filed December 24, 2021.

In the matter of <u>George Stickles, et. al. v. Atria Senior Living, et al</u>., Case No: 3:20-cv-09220-WHA, related to statistical analysis of data and rebuttal of opposing expert.  Report filed December 31, 2021.

**ATTACHMENT A**

resolution economics LLC                                    **Robert W. Crandall, M.B.A.**

In the matter of <u>Karen Hartstein, et. al. v. Hyatt Corporation, et. al</u>., Case No: 2:20-cv-04874-DSF-JPR, related to rebuttal of opposing experts.  Report filed January 7, 2022.

In the matter of <u>Frank Fodera, et. al. v. Equinox Holdings Inc., et al</u>., Case No: 3:19-cv-05072-WHO, related to statistical analysis of data and rebuttal of opposing experts.  Report filed February 4, 2022. Rebuttal report filed February 23, 2022. Supplemental report filed August 3, 2022.

In the matter of <u>Sharey Thomas, et. al. v. Maximus Inc</u>., Case No: 3:21-cv-00498-DJN, related to statistical analysis of data.  Report filed February 10, 2022. Supplemental report filed March 1, 2022.

In the matter of <u>Harjus Birk v. The Regents of the University of California</u>, Case No: 37-2020-00007663-CUWT-CTL, related to analysis of economic damages.  Report filed March 4, 2022.

In the matter of <u>Brian Koos v. The Regents of the University of California</u>, Case No: 18STCV00470, related to analysis of economic damages.  Report filed March 7, 2022.

In the matter of <u>Verna Clarke, et. al. v. AMN Services Inc</u>., Case No:. 2:16-cv-4132 DSF (KSx), related to statistical analysis of data.  Report filed March 8, 2022.

In the matter of <u>Farzin Morena v. Tesla Inc</u>. Jams Arbitration No: 1240023994, related to economic damages.  Report filed March 11, 2022.  Supplemental report filed April 24, 2022. Deposition testimony April 26, 2022.

In the matter of <u>Hekmatollah Yosifi v. The Regents of the University of California</u>, Case No: BC724191, related to economic damages.  Deposition testimony March 14, 2022.

In the matter of <u>Alfredo Martinez and Justin Page v. Southern California Edison</u>, et. al., Case No: BC670461, related to analysis of economic damages.  Deposition testimony March 17, 2022. Trial testimony May 24, 2022.

In the matter of <u>George Chacon, et. al. v. Express Fashion Operations LLC, et al.</u>., Case No: 8:19-CV-00564 JLS (DFMx), related to statistical analysis of data.  Report filed March 24, 2022. Deposition testimony April 18, 2022 and April 28, 2022.

In the matter of <u>Maurice Frank, et. al. v. Golden Gate Bell, et. al</u>., Case No: RG18913275, related to statistical analysis of data.  Report filed March 25, 2022.

In the matter of <u>Dawn Winship v. PruCo Securities</u>, FINRA Case No: 19-00083, related to analysis of economic damages and rebuttal of opposing expert.  Report filed March 24, 2022.  Arbitration testimony March 30, 2022.

In the matter of <u>Racklin v. Zeta Global Corp</u>, United States District Court for the Eastern District of Virginia – Alexandria Division, Civil Action No: 1:21-cv-01035-AJT-JFA related to analysis of economic damages.  Co-authored with Richard Goldberg. Report filed on April 13, 2022.

**ATTACHMENT A**

resolution economics LLC                                    **Robert W. Crandall, M.B.A.**

In the matter of <u>Todd Hearn v. Pacific Gas & Electric Company</u>, Case No: 20CV000391, related to analysis of economic damages and rebuttal of opposing expert.  Deposition testimony April 21, 2022.  Trial testimony October 3, 2022.

In the matter of <u>Vanna Troung v. American Red Cross, et. al.,</u> Case No: 2:21-cv-05789 GW(GJSx), related to analysis of economic damages.  Report filed May 2, 2022. Rebuttal Report May 23, 2022.

In the matter of <u>Cecilia Rodriguez, et. Al. v. Wal-Mart Associates, Inc.,</u>  Case No: 2:20-cv-07045, related to rebuttal of opposing expert's proposed survey.  Report filed May 10, 2022.

In the matter of <u>Carla Sanchez, et. al. v. Sam's West Inc., et. al.,</u> Case No: 2:21-CV-05122-SVW-JC, related to rebuttal of opposing expert's proposed survey. Report filed May 11, 2022.  Deposition testimony May 27, 2022.

In the matter of <u>Andres Lopez v. Giorgio Armani Corporation,</u> Case No: BC71329, related to statistical analysis of data and rebuttal of plaintiff's trial plan.  Report filed May 20, 2022.  Deposition testimony November 10, 2022.

In the matter of <u>Amanda Bowers, et. al. v. Prolink Staffing Services</u>, et al., Case No: 21STCV22188, related to statistical analysis of data.  Report filed June 1, 2022. Supplemental report filed March 29, 2023.

In the matter of <u>Jennifer Hua v. Western Asset Management Company</u>, et. al., Case No: 19STCV31305, related to analysis of economic damages and rebuttal of opposing expert. Deposition testimony August 25, 2022.

In the matter of <u>Roberts v. TransAm</u>, et al., Case No: 2:21-cv-02073-JWB-GEB, related to analysis of minimum wage and allegations of fraud.  Declaration filed July 22, 2022. Declaration filed September 6, 2022.  Deposition testimony October 27, 2022.

In the matter of <u>Jennifer Brum, et. al. v. MarketSource Inc., et. al</u>., Case No: 2:17–CV–00241–KJM–JDP, related to statistical analysis of data, rebuttal of opposing experts, and discussion of trial plan. Report filed August 9, 2022. Deposition testimony September 7, 2022.

In the matter of <u>Gregory Andrews v. US Bank</u>, Case No: 8:22-cv-00117-DOC-DF, related to analysis of economic damages. Report filed September 7, 2022.  Rebuttal report filed October 7, 2022.

In the matter of <u>Nicholas Tomaszewski v. City of Palmdale, et. al.,</u> Case No: MC026483, related to analysis of economic damages and rebuttal of opposing expert.  Deposition testimony September 12, 2022.

In the matter of <u>Michael Gonzalez, et. al. v. Charter Communications, et al</u>., Case No: 2:20-cv-08299-SB-AS, related to statistical analysis of data.  Report filed September 20, 2022.  Rebuttal report filed October 10, 2022.

**ATTACHMENT A**

resolution economics LLC                                    **Robert W. Crandall, M.B.A.**

In the matter of <u>Anthony Jones v. City of Alhambra, et. al.</u>, Case No: 19STCV11721, related to analysis of economic damages and rebuttal of opposing expert.  Report filed September 20, 2022.  Deposition testimony September 22, 2022.

In the matter of <u>Bonnie Gawf v. City of Monterrey,</u> Case No: 20CV003232, related to analysis of economic damages and rebuttal of opposing expert.  Report filed September 20, 2022.  Deposition testimony September 23, 2022.

In the matter of <u>Kyle Walker v. Howmedica Osteonics Corp., et al.</u>, Case No: 22-cv-002640-MMA-JLB, related to analysis of economic damages.  Report filed October 14, 2022.  Rebuttal report filed November 4, 2022.  Deposition testimony December 8, 2022.

In the matter of <u>Julio Garcia, et. al. v. Walmart, et al.</u>, Case No: 18-cv-00500-L-MDD, related to statistical analysis of data and rebuttal of opposing expert.  Report filed October 21, 2022.  Rebuttal report filed December 9, 2022.  Deposition testimony January 5, 2023.

In the matter of <u>Austin Works, et. al. v. Flowers Foods Inc., et al</u>. Case No: 3:21-cv-03567, related to analysis of data and independent contractor issues.  Report filed October 17, 2022.  Deposition testimony November 29, 2022.

In the matte of <u>Desmond Augustine, et. al.  v. United Parcel Service, et. al.</u>, Case No: BC636468, related to statistical analysis of data and rebuttal of opposing experts.  Report filed October 24, 2022.

In the matter of <u>Carla Janzen v. Regents of the University of California, et. al.</u>, Case No: 19STCV24840, related to analysis of economic damages and rebuttal of opposing expert.  Trial testimony October 28, 2022.

In the matter of <u>Martin J. Walsh, Secretary of Labor, et al. v. Nursing Home Care Management Inc., et. al.</u>, Case No: 21-2583-CFK.  Related to analysis of potential unpaid wages and rebuttal of opposing expert. Report filed November 18, 2022.

In the matters of <u>Stephanie Walker v. Lyft</u>, <u>Steven Ortega v. Lyft</u>, <u>Michael Foster v. Lyft</u>, <u>Gabriel Lopez v. Lyft</u>, <u>Michael Ayres v. Lyft</u>, and <u>Antonio Alves v. Lyft</u>,  AAA Action Nos. 01-22-0001-7556, 01-22-0001-7557, 01-22-0001-7521, 01-22-0001-7463, 01-22-0001-7402, and 01-22-0001-7417,  respectively, related to data analysis, independent contractor status, and damages.  Reports filed December 2, 2022.

In the matter of <u>Lucio Lemus, et. al. v. Owens Brockway Container Glass Company</u>, Case No: 2:21-CV-00146 FLA (AFMx), related to statistical analysis of data and rebuttal of opposing expert.  Report filed December 9, 2022. Deposition testimony January 9, 2022.

In the matter of <u>Armando Haro, et. al. v. Walmart Inc</u>., Case No: 1:21-cv-00147, related to analysis of video data.  Report filed December 14, 2022.  Deposition testimony January 4, 2023.

**ATTACHMENT A**

resolution economics LLC                                    **Robert W. Crandall, M.B.A.**

In the matter of <u>Nicholas Lara, et al. v. Z Golf Food & Beverage Services, et al.,</u> Case No: RIC1905177, related to statistical analysis of data and rebuttal of opposing expert.  Report filed December 16, 2022.  Deposition testimony January 6, 2023.

In the matter of <u>Juan Carlos Corral, et al. v. Staples the Office Superstore LLC,</u> Case No: 2:22-cv-01254-MCS-(PVCx), related to statistical analysis of data and rebuttal of opposing expert.  Report filed January 27, 2023.

In the matter of <u>Kathy Arrison, et al. v. Walmart Inc., et. al.</u>, Case No: CV-21-00481-PHXSMB, related to the scientific collection of data and statistical analysis of data.  Report filed February 3, 2023. Deposition testimony March 16, 2023.

In the matter of <u>Joseph Ash, et al. v. Flowers Foods Inc, et al.</u>, Case No: 1:21-CV-03566, related to analysis of independent contractor issues.  Report filed February 16, 2023.

In the matter of <u>David Padilla, et al. v. Walt Disney Parks and Resorts, et al.,</u> Case No: 2019-01077209-CU-OECXC, related to statistical analysis of data, scientific collection of data, and rebuttal of opposing expert.  Report filed February 17, 2023.  Deposition testimony March 24, 2023.

In the matter of <u>Edward Castillo v. Burrtec Industries, et al,</u>. Case No: 19STCV31323, related to analysis of economic damages.  Report filed March 14, 2023.  Deposition testimony March 17, 2023.

In the matter of <u>Antoine Richard, et al. v. Flowers Foods Inc, et al.,</u> Case No: 6:15-CV-02557, related to analysis of independent contractor issues.  Report filed March 15, 2023.

In the matter of <u>Raymond Knight, at. al, v. Flowers Foods Inc., et. al.,</u> Case No: NO. 21cv3568, related to analysis of independent contractor issues. Report filed March 16, 2023.

**ATTACHMENT A**

# Attachment B

**<u>List of Materials Relied Upon</u>**

- Verified Complaint for Injunctive Relief and Damages and Demand for Jury Trial

- Verified First Amended Complaint for Injunctive Relief and Damages and Demand for Jury Trial

- Deposition Testimonies:
  - Deposition Transcript of Chip Adkins
  - Deposition Transcript of Teresa Reber
  - Deposition Transcript of Donald Mark Lane
  - Deposition Transcript of Candace Robertson
  - Deposition Transcript of Christopher Wilkins

- Declaration of Donald Mark Lane

- Order Granting in Part and Denying in Part Motion for Preliminary Injunction

- Plaintiff's Initial Disclosures

- Defendants' Initial Disclosures

- Transcript of Motion for Expedited Discovery Hearing Before the Honorable Embry J. Kidd United States Magistrate Judge

- Transcript of Motion for Preliminary Injunction Evidentiary Hearing Before the Honorable Carlos E. Mendoza United States District Judge

- Candace Robertson's First Request for Production of Documents to Home Point Financial Corporation

- Candace Robertson's First Set of Interrogatories to Home Point Financial Corporation

- Plaintiff's Objections and Responses to Defendant Donald Mark Lane's First Set of Interrogatories

- Plaintiff's Objections and Responses to Defendant Christopher Wilkin's First Set of Interrogatories

- Plaintiff's Objections and Responses to Defendant Candace Robertson's First Set of Interrogatories

- Plaintiff's Objections and Responses to Candace Robertson's First Request for Production of Documents

- Plaintiff Home Point Financial Corporation's Supplemental Rule 26(a)(1) Disclosures

- Defendant Guaranty Home Mortgage Corporation's Response to Plaintiff's Second Set of Requests for Production

Expert Report of Robert Crandall

- Cease and Desist Letters:
    - HPLANE00005083
    - HPLANE00005086
    - HPLANE00005093
    - HPLANE00005100
    - HPLANE00005105
    - HPLANE00005112
    - HPLANE00005121
    - HPLANE00005134
    - HPLANE00005141
    - HPLANE00005150

- First Pay Stubs for Recruits
    - HPLANE00005156 - HPLANE00005189

- Defendant GHMC Production
    - GHMC 000001 - GHMC 003256

- Plaintiff Home Point Productions:
    - HPLANE 0000001 - HPLANE 00005190

- Defendant Lane Productions:
    - LANE 000001 - LANE 000991

- Defendant Robertson Productions
    - ROBERTSON 000001 - ROBERTSON 000396

- Defendant Wilkins Productions:
    - WILKINS 000001 - WILKINS 000283

- Mortgage News Daily, https://www.mortgagenewsdaily.com/data/mortgage-applications