HIGHLY CONFIDENTIAL

Page 1

1             UNITED STATES DISTRICT COURT

2              MIDDLE DISTRICT OF FLORIDA

3                 ORLANDO DIVISION

4

5     HOME POINT FINANCIAL          )

      CORPORATION,                  )

6                                   )

            PLAINTIFFS,             )

7                                   ) Case No.

            VS.                     ) 6:20-cv-01819-CEM-EJK

8                                   )

      DONALD MARK LANE, CANDACE     )

9     ROBERTSON, CHRISTOPHER        )

      WILKINS, and GUARANTY HOME    )

10    MORTGAGE CORPORATION,         )

                                    )

11          DEFENDANTS.             )

      _____)

12

13

14        VIDEOTAPED DEPOSITION OF ROBERT CRANDALL

15         TRANSCRIPT MARKED HIGHLY CONFIDENTIAL

16          TUESDAY, JUNE 13, 2023, 9:08 A.M.

17              LOS ANGELES, CALIFORNIA

18

19

20

21

22

23    Reported by Desiree Cooks, CSR No. 14075

24    Job No. 5924059

25    Pages 1 - 208

HIGHLY CONFIDENTIAL

Page 2

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

| | |
|---|---|
| HOME POINT FINANCIAL CORPORATION, | ) ) |
| | ) |
| PLAINTIFF, | ) |
| | ) Case No. |
| VS. | ) 6:20-cv-01819-CEM-EJK |
| | ) |
| DONALD MARK LANE, CANDACE ROBERTSON, CHRISTOPHER WILKINS, and GUARANTY HOME MORTGAGE CORPORATION, | ) ) ) ) |
| | ) |
| DEFENDANTS. | ) |
| _____ | ) |

THE VIDEOTAPED DEPOSITION OF ROBERT CRANDALL, taken at
333 South Grand Avenue, 47th Floor, Los Angeles,
California, on Tuesday, June 13, 2023, at 9:08 a.m.,
before Desiree Cooks, Certified Shorthand Reporter, in
and for the State of California.

HIGHLY CONFIDENTIAL

Page 3

```
 1    APPEARANCES:
 2    For the Plaintiff:
 3         MAYER BROWN LLP
           BY:  RUTH ZADIKANY, ESQ.
 4         333 South Grand Avenue, 47th Floor
           Los Angeles, California 90071
 5         (213) 621-3916
           Rzadikany@mayerbrown.com
 6
 7    For the Defendants:
 8         HILL WARD & HENDERSON, P.A.
           BY:  MATTHEW HALL, ESQ.
 9         101 East Kennedy Boulevard, Suite 3700
           Tampa, Florida 33602
10         (818) 221-3900
           Matthew.hall@hwhlaw.com
11
12    Also present:
13         Julie Luevano, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
```

HIGHLY CONFIDENTIAL

Page 4

1                              INDEX

2

3     WITNESS: ROBERT CRANDALL

4

5     EXAMINATION                                    PAGE

6     BY MR. HALL                                    10

7

8

9

10                     INFORMATION REQUESTED

11                     PAGE      LINE

12                        (NONE)

13

14                     DOCUMENTS REQUESTED

15                     PAGE      LINE

16                        (NONE)

17

18            WITNESS INSTRUCTED NOT TO ANSWER

19                     PAGE      LINE

20                        (NONE)

21

22

23

24

25

HIGHLY CONFIDENTIAL

1                         INDEX TO EXHIBITS
2
3      EXHIBIT                                        MARKED
4        Exhibit 1     Amended Notice of Taking          14
               Videotaped Deposition Duces
5              Tecum
6        Exhibit 2     Expert Report of Robert W.        16
               Crandall, MBA
7
         Exhibit 3     Rebuttal Expert Report of Robert  30
8              W. Crandall, MBA
9        Exhibit 4     Spreadsheet HPLANE5191            39
10       Exhibit 5     Memorandum dated September 3,     54
               2020
11
         Exhibit 6     Emails Bates-stamped             57
12             HPLANE00005209
13       Exhibit 7     Emails Bates-stamped             63
               HPLANE00000196 - 203
14
         Exhibit 8     Plaintiff's Objections and       66
15             Responses to Defendant Candace
               Robertson's Third Set of
16             Interrogatories
17       Exhibit 9     Memorandum dated September 21,    69
               2020
18
         Exhibit 10    Home Point Financial Pay Stub,   69
19             HPLANE00004449
20       Exhibit 11    Home Point Financial Pay Stub,   76
               HPLANE00004643 - 4644
21
         Exhibit 12    Home Point Financial Pay Stub,   78
22             HPLANE00004575 - 4576
23       Exhibit 13    Home Point Financial Pay Stub,   81
               HPLANE00004845 - 4846
24
         Exhibit 14    Home Point Financial Pay Stub,   83
25             HPLANE00004548 - 4549

HIGHLY CONFIDENTIAL

Page 6

1     Exhibit 15    Home Point Financial Pay Stub,   83
                    HPLANE00004839 - 4840

2

     Exhibit 16    Home Point Financial Pay Stub,   84
3                    HPLANE00004823 - 4824

4     Exhibit 17    Home Point Financial Pay Stub,   86
                    HPLANE00004606 - 4607

5

     Exhibit 18    Home Point Financial Pay Stub,   87
6                    HPLANE00004734 - 4735

7     Exhibit 19    Home Point Financial Pay Stub,   88
                    HPLANE00004560 - 4561

8

     Exhibit 20    Home Point Financial Pay Stub,   88
9                    HPLANE00004718 - 4719

10    Exhibit 21    Home Point Financial Pay Stub,   89
                    HPLANE00004713 - 4714

11

     Exhibit 22    Home Point Financial Pay Stub,   90
12                    HPLANE00004760

13    Exhibit 23    Home Point Financial Pay Stub,   91
                    HPLANE00004758 - 4759

14

     Exhibit 24    Emails Bates-stamped       94
15                    HPLANE00005485 - 5486

16    Exhibit 25    Emails Bates-stamped       98
                    HPLANE00005320 - 5321

17

     Exhibit 26    Emails Bates-stamped       99
18                    HPLANE00005282 - 5284

19    Exhibit 27    Emails Bates-stamped      102
                    HPLANE00005310 - 5311

20

     Exhibit 28    Home Point Financial Pay Stub    104
21                    HPLANE00004911 - 4912

22    Exhibit 29    Email Bates-stamped       108
                    HPLANE00005477

23

     Exhibit 30    Email Bates-stamped       123
24                    HPLANE00000120 - 122

25    Exhibit 31    Email Bates-stamped LANE 000219  126

HIGHLY CONFIDENTIAL

Page 7

1      Exhibit 32     Underwriter Appreciation Fund      129
2      Exhibit 33     Email Bates-stamped                129
                      HPLANE000004473 - 4474
3
       Exhibit 34     Email Bates-stamped                132
4                     HPLANE000004482 - 4483
5      Exhibit 35     Text Messages Bates-stamped        134
                      HPLANE00003052 - 3054
6
       Exhibit 36     Invoice Report Bates-stamped       138
7                     HPLANE0004509
8      Exhibit 37     Invoice Report Bates-stamped       139
                      HPLANE00004520
9
       Exhibit 38     Home Point Financial Pay Stub,     140
10                    HPLANE00005157
11     Exhibit 39     Invoice Report Bates-stamped       142
                      HPLANE00004511
12
       Exhibit 40     Email Bates-stamped                143
13                    HPLANE00000028 - 30
14     Exhibit 41     Email Bates-stamped                146
                      HPLANE00000064 - 66
15
       Exhibit 42     Email Bates-stamped                148
16                    HPLANE00000086 - 88
17     Exhibit 43     Email Bates-stamped                149
                      HPLANE00000017 - 19
18
       Exhibit 44     Email Bates-stamped                150
19                    HPLANE00000102 - 104
20     Exhibit 45     Email Bates-stamped                151
                      HPLANE00000125 - 127
21
       Exhibit 46     Email Bates-stamped                151
22                    HPLANE00000129 - 131
23     Exhibit 47     Email Bates-stamped                156
                      HPLANE00000134 - 136
24
       Exhibit 48     Email Bates-stamped                157
25                    HPLANE00000083 - 85

HIGHLY CONFIDENTIAL

Page 8

1       Exhibit 49    Email Bates-stamped               158
                      HPLANE00000023 - 25

2

        Exhibit 50    Email Bates-stamped               159
3                     HPLANE00000149 - 151
4       Exhibit 51    Email Bates-stamped               160
                      HPLANE00000089 - 91

5

        Exhibit 52    Email Bates-stamped               160
6                     HPLANE00000099 - 101
7       Exhibit 53    Email Bates-stamped               161
                      HPLANE00000011 - 13

8

        Exhibit 54    Column Labels Bates-stamped       183
9                     GHMC 003257 - 3259
10      Exhibit 55    Produced as Native,               186
                      Bates-stamped GHMC 003297

11

        Exhibit 56    Document Produced in Native File  201
12                    Format, Bates-stamped
                      HPLANE00004357

13
14
15
16
17
18
19
20
21
22
23
24
25

Veritext Legal Solutions

HIGHLY CONFIDENTIAL

Page 9

```
 1                TUESDAY, JUNE 13, 2023, 9:08 A.M.
 2                   LOS ANGELES, CALIFORNIA
 3

 4           THE VIDEOGRAPHER:  Good morning.  We are on the
 5      record.  The time is 9:08 a.m.  Today's date is
 6      June 13th, 2023.  My name is Julie Luevano, Jr.  I am the
 7      notary video technician with Veritext Legal Solutions,
 8      located in Los Angeles, California.  We are recording
 9      these proceedings at 333 South Grand Avenue, Los Angeles,
10      California.
11           This is Media 1 for the video deposition of
12      Robert W. Crandall in the action entitled Home Point
13      Financial Corp. versus Donald Mark Lane, et al.  This
14      deposition is being taken on behalf of the Plaintiffs.
15      The Case Number is 6:20-cv-01819-CEM-EJK.
16           Now, may I please have an introduction for the
17      record, beginning with noticing party.
18           MR. HALL:  This is Matthew Hall from Hill Ward
19      & Henderson out of Tampa, Florida, on behalf of the
20      Defendants.
21           MS. ZADIKANY:  Ruth Zadikany from Mayer Brown,
22      on behalf of Plaintiff, Home Point Financial Corp.
23           THE VIDEOGRAPHER:  Thank you.
24           Ms. Reporter, if you could administer the oath.
25      ///
```

HIGHLY CONFIDENTIAL

Page 10

```
1                    ROBERT CRANDALL,
2       having been first duly sworn, testifies as follows:
3                        EXAMINATION
4    BY MR. HALL:
5       Q     Mr. Crandall, my name is Matthew Hall, as I
6    stated.  It's a pleasure to meet you today.  I appreciate
7    you coming out here for your deposition.  I know you've
8    had your deposition taken many times, so I won't belabor
9    the rules too much.
10           But just a reminder that we'll try not to talk
11   over each other.  If I'm not letting you finish your
12   answers, please just let me know, and I'll try to make
13   sure I don't talk over you, and I'll let you get a
14   complete answer.  But I'll ask that you let me get my
15   question out all of the way before you answer.
16           So can you just tell me a little bit about
17   yourself?  Where did you go to school?
18           What was your highest level of education?
19      A     Do you want all the way back?  I assume we can
20   start in college.
21      Q     Yeah.
22      A     Not elementary school.
23      Q     If you want to tell me about elementary school,
24   you can.  I don't -- that's not the point of the
25   question, but.
```

HIGHLY CONFIDENTIAL

Page 11

1    A    It's not as exotic.  I have an undergrad degree

2    from USC and a master's in business administration from

3    Loyola Marymount University, LMU.

4    Q    Okay.  And what year did you get your MBA?

5    A    2001, I think.

6    Q    Okay.  And then from the -- just give me a

7    brief outline of your employment history from after your

8    undergrad.

9    A    So I interned at Price Waterhouse between my

10   junior and senior year at USC in the dispute analysis

11   group.  And then I took a job with Northwestern Mutual

12   after college immediately for a year.  Sold life

13   insurance for a year, then PW called me back, and so I

14   decided I would rather do that kind of work and started

15   Price Waterhouse in 1993.  I was there to '96.

16        I left PW with a guy that was sort of my mentor

17   there.  We started a group called the Economics and

18   Litigation Services Group for a firm called -- that's no

19   longer here at all -- it's called AM & G, to make it easy

20   on the court reporter.

21        We grew that group up to about ten or eleven

22   people.  Got acquired by Deloitte in, I want to say,

23   August of '98.  We had eight fun-filled weeks at

24   Deloitte; we didn't like it very much, and we left.  And

25   we founded Resolution Economics with about, I want to

HIGHLY CONFIDENTIAL

Page 12

1    say, six people in October of '98, so we're approaching

2    our 25th anniversary.

3            Now, we have around 285 employees with offices

4    in L.A., New York, Chicago, D.C., and Charlotte.  And

5    actually in Maryland, too.

6       Q    And you're located out in the Los Angeles

7    office?

8       A    That's correct.

9       Q    Okay.  And you referenced the MBA.

10           Do you have any other advanced degrees?

11      A    No.

12      Q    Okay.  Do you have any other certifications

13   that are pertinent to your opinion in this case?

14      A    No.

15      Q    Okay.  In this case, you've submitted an expert

16   opinion report as well as a rebuttal report; correct?

17      A    That's correct.

18      Q    Okay.  And the nature of the reports go to the

19   economic damages that are alleged in this

20   lawsuit; correct?

21      A    In response to your expert.

22      Q    And the -- this lawsuit involves a dispute

23   between two underwriting companies.

24           Do you understand that?  Mortgage underwriters?

25      A    I understand that.

HIGHLY CONFIDENTIAL

Page 13

1    Q    Okay.  Have you -- what is your prior history

2    on serving as an expert witness or giving opinions in

3    cases that involve mortgage underwriters?

4    A    I have done numerous cases, typically class

5    action allegations, in the mortgage industry.  I've done

6    cases involving underwriters, originators, funders,

7    processors.  Typically, they are claims of

8    misclassification.  There have been claims I've looked at

9    related to rest and meal breaks, operations, and

10   overtime.  So it's a lot of study of the operational

11   inputs.

12        Sometimes we're looking at, for example, for

13   mortgage originators and for underwriters, we might be

14   looking at elements of discretion and independent

15   judgment.  They may be exercising whether they're

16   offering advice for following cookbooks, prescribed

17   product.

18        For the processors and funders, those

19   traditionally have been non-exempt jobs, so typically,

20   we're looking at productivity.  And we might be looking

21   about when people are working and when they're not

22   working on various systems to identify potential breaks

23   and periods of inactivity when they may not have been

24   working, things of that nature.

25        Q    Okay.  And would it be a fair summary to say

HIGHLY CONFIDENTIAL

Page 14

1   that most of those cases involved pay disputes between

2   employee and employer?

3       A      Generally.  Dealing with a wage and hour issue

4   of some type or another.  But in connection with that, we

5   often look at the operational factors of the jobs.

6       Q      And have you ever been hired by Home Point

7   before?

8       A      Not that I'm aware of.

9       Q      Okay.  And have you ever been hired by

10  Mayer Brown before?

11      A      If I have, it's been maybe one other time.  I

12  don't really recall.

13      Q      And has your opinion testimony ever been

14  excluded in a prior case?

15      A      I've had bits and pieces of things I'm not

16  supposed to talk to a jury about over the years.

17             MR. HALL:  Okay.  I'm going to have the court

18  reporter hand you a document that we'll mark as

19  Exhibit 1.

20             (Exhibit 1 marked.)

21  BY MR. HALL:

22      Q      If you look at this document, it is the amended

23  notice of taking your deposition, as well as the subpoena

24  that was attached.

25             Do you see that?

HIGHLY CONFIDENTIAL

Page 15

1      A      Yes, I do.

2      Q      And did you receive this document?

3      A      Yes.

4      Q      Okay.  And I know -- I believe yesterday some

5   objections were served.  But this morning, I was emailed

6   the link to the documents that were produced in response

7   to this; is that correct?

8      A      That's correct.

9      Q      Do you have any other documents that were

10  responsive to this that you did not provide to counsel to

11  be produced?

12     A      Well, I think subject to Number 7, which is

13  obviously, under the federal rules, you're not entitled

14  to communications.

15     Q      Right.

16     A      So obviously, I think that's probably something

17  they objected to.

18     Q      Yeah, I just --

19     A      Actually, it says, "specifically excludes," so

20  I guess you guys -- you guys follow the rules, too.

21     Q      Try to.

22     A      You'd be surprised sometimes.

23     Q      I understand.  And I wouldn't be surprised,

24  unfortunately.  All right.

25            When were you first engaged in this lawsuit?

HIGHLY CONFIDENTIAL

Page 16

1    A    It would be either late February or early
2    March.
3    Q    Okay.
4    A    Is what I think, at least.  Certainly, I know
5    the bulk of the work for me would have been in March.
6    Q    I'm sorry.  I didn't hear you.
7    A    The bulk of the work would have been in March.
8    Q    Okay.  And that's March of 2023?
9    A    That's correct.
10        MR. HALL:  Just make this a little easier.  I
11   already got a sticker on this one.  I wasn't sure if you
12   were going to have stickers or not, but I'm super excited
13   that you did.
14        THE WITNESS:  Is that the first stack?
15        MR. HALL:  Yeah, this is --
16        THE WITNESS:  I have a copy in my binder.
17        MR. HALL:  Okay.  So she'll mark it as
18   Number 2, as Exhibit 2.
19        I'll try to make it all the way over there next
20   time.
21        THE WITNESS:  And you'll want me to
22   authenticate it, most likely.
23        (Exhibit 2 marked.)
24   BY MR. HALL:
25   Q    And if you turn to the last two pages of that

HIGHLY CONFIDENTIAL

Page 17

1    report, it's the list of materials that you relied upon?

2        A    Yes.

3        Q    Okay.  And if you need to see the rebuttal

4    report as well -- are the documents listed in your report

5    the entirety of the documents that you relied on?

6        A    It was intended to be.

7        Q    Okay.

8            MS. ZADIKANY:  Sorry.  Do you mean the expert

9    report and the rebuttal report?

10           MR. HALL:  Yeah, yeah.

11           MS. ZADIKANY:  Okay.  I just wanted to make --

12           MR. HALL:  I can give him the rebuttal report,

13   too, if he wants to see it.  But the --

14           THE WITNESS:  Yeah.

15           MS. ZADIKANY:  Well, is that --

16           THE WITNESS:  I believe I have everything --

17   anything I relied upon, I believe, is listed.

18   BY MR. HALL:

19       Q    Okay.  Did you interview any witnesses in this

20   case?

21       A    No.

22       Q    Okay.  Did you conduct any surveys in this

23   case?

24       A    No.

25       Q    I know the rebuttal report was served, and then

HIGHLY CONFIDENTIAL

Page 18

1    some additional discovery was -- occurred.

2          So have you had a chance to review the recent

3    deposition transcripts in this case?

4    A    I haven't had a chance to review, so I think I

5    have seen some -- there's been a new production of

6    another report from your expert.  I have seen that.  I

7    haven't had a chance to fully digest it.

8    Q    Okay.

9    A    But also, I understand that there's been a

10   production; there's been some other depositions.  I

11   haven't reviewed those yet, either.

12   Q    Okay.

13   A    So I would assume at some point, I'm going to

14   have some time to look at those.

15   Q    And just for some of the purposes, did you

16   review Melissa Kramer's deposition transcript?

17   A    No.

18   Q    And just to confirm, the Home Point's corporate

19   representative was recently deposed a second time.

20         And you haven't had a chance to review that

21   yet, either; correct?

22   A    I haven't looked at any new depositions.

23   Q    Did you review any market studies for the

24   mortgage underwriting industry for 2020?

25   A    Well, the MBA stuff, I mean, and some Mortgage

HIGHLY CONFIDENTIAL

Page 19

1    Daily News stuff and things like that.

2        Q     Okay.  And then I know you've worked in these

3    fields before.

4            So can you tell me your understanding of the

5    role of an underwriter?

6        A     Well, typically an underwriter is going to look

7    at whether or not a given loan meets a certain criteria.

8    It depends on what underwriting operation you have.  Are

9    you going to Fannie and Freddie?  Are they repackaging?

10           It might be different if you're in a big bank

11   that's going to keep -- if you're, like, a BofA

12   underwriter, you might have a different criteria.  So you

13   have got some loans to get packaged and sold to markets,

14   or sold through HUD and various other agencies, and then

15   you have some loans that banks will keep in their own

16   portfolio.

17           (Reporter clarification.)

18           THE WITNESS:  But anyway, the general process

19   is you would gather a variety of information related to

20   the property.  You would look at things like the

21   appraisal, sale price, et cetera, and the financial

22   characteristics of the borrower and effectively assess

23   the borrower's ability to pay and whether or not the loan

24   is going to fit into a criteria that you would market and

25   bundle or sell off or something you might keep in your

HIGHLY CONFIDENTIAL

Page 20

1   own portfolio.

2           Occasionally, there might be escalations in

3   terms of, do I want additional documentation related to

4   that?  Is the person self-employed?  What other assets

5   are there?  You're reviewing the assets and other

6   information that a borrower may provide and effectively

7   assess, can they repay the loan?  Can they afford the

8   payments?  Is the appraised value appropriate?

9           If it doesn't meet appraisal, there's other

10  issues there.  And sometimes, there may be instances

11  where you may have to escalate, and there's a

12  second-level review, and those are generally more senior

13  people that do things like that.

14  BY MR. HALL:

15      Q    And how about a loan coordinator's role?

16      A    Well, sometimes they're called coordinators,

17  sometimes they're called processors.  I kind of use the

18  industry as more processor, typically, as most of the

19  mortgage clients I have call them that.

20          But typically, their job is to organize all of

21  the documents, if you will, handle correspondence and

22  collection of information from the borrowers, and then

23  sort of effectively serve as the go-between the

24  underwriter and the borrower.

25      Q    Okay.  And then underwriting support specialist

HIGHLY CONFIDENTIAL

Page 21

```
 1    is another job title that we'll say in this case.
 2              And what's your understanding of that role?
 3        A     They may be assisting the processor -- some of
 4    the processing-related duties, collecting documents,
 5    et cetera.
 6        Q     Okay.  And do you understand the role of an
 7    underwriter at Home Point to be -- to include originating
 8    loans?
 9        A     I actually think that Home Point has its own
10    different groups of people that do that.  There are
11    salespeople that are taking what's called independent
12    originators.  And I think -- I'm not sure if their
13    structure is they also have originators as well, but I
14    know that there's sort of two tiers, I think.
15        Q     And did you inquire into that Home Point's sale
16    force, if you will, about their role in 2020?
17        A     I haven't looked at that.
18        Q     Did you learn what type of backlog of loans to
19    be underwritten Home Point had in August, September, and
20    October of 2020?
21        A     I mean, there's some testimony in the record
22    about slowdowns.  Obviously, you want to turn loans
23    around quickly in the marketplace because you have to.  A
24    lot of these deals will have a financing contingency on
25    it that has to be waived in a certain number of days.
```

HIGHLY CONFIDENTIAL

Page 22

1          And so, you know, if you are working on an

2    active deal, delaying it two weeks or three weeks will be

3    very difficult because you might miss the financing

4    contingency issue with the contract, the sale contract.

5          With that being said, though, I haven't studied

6    the days in terms of their turnaround days or any data

7    like that.

8      Q    And it's your understanding that underwriters

9    will deny loans as well; right?

10     A    Yes.

11     Q    That not everyone will get funded?

12     A    That's correct.

13     Q    Okay.

14     A    It could also be the case that someone might

15   have two loans going with competing firms, and whoever

16   gives them the best rates or the best terms might also

17   happen.  So you might have a loan that we would have

18   funded or -- "we" being a bank of some kind -- would have

19   funded that other banks may have funded as well in

20   competing product.

21     Q    So certainly, on the loans that aren't funded,

22   is it your understanding that there's no money to the

23   underwriting company that comes in?

24          Did that question make sense?

25     A    You're asking about the fees.

HIGHLY CONFIDENTIAL

Page 23

1      Q      Yes.

2      A      I think they would have an issue with the fees

3   on it if you didn't fund the loan.

4      Q      Okay.  Did you come to form an opinion as to

5   any lost profits suffered by Home Point in this matter?

6      A      Well, I've got several areas of increased

7   expense, and that would go towards lost profits.

8      Q      Okay.  And then did you form any opinions as to

9   loss of productivity for Home Point?

10     A      I haven't looked at that.

11     Q      Okay.  If you go to Paragraph 43 in your

12  report.  In the first sentence of Paragraph 43, it says,

13  "While new hires were undergoing training, they were

14  being paid but not generating revenue."

15            Do you see that?

16     A      That's correct.

17     Q      Okay.  Is that an assumption you were making,

18  or is that part of your opinion?

19     A      If you're just working on practice loans?

20     Q      Uh-huh.

21     A      If that's what they were doing, then they

22  wouldn't be generating revenue.

23     Q      Okay.  If you go to the table on Page 29,

24  Table 7.

25            Okay.  Are you there?

HIGHLY CONFIDENTIAL

Page 24

1     A     Yeah.

2     Q     Table 7 is the summary of damages amounts for

3 the initial report.  I understand it's changed for the

4 rebuttal; I'm not asking you about that specifically.

5         But the summary of damages, is your testimony,

6 in your opinion, limited to the calculation of these

7 damages, or are you also opining as to the cause of the

8 harm as well?

9     A     I'm estimating damages.  I'm not a causation

10 expert.

11     Q     Okay.  Throughout your engagement with

12 Home Point, did you inquire or review Home Point's bonus

13 structure for underwriters?

14     A     I don't believe I have their bonus structure.

15 I understand, based on some of the testimony I've seen,

16 that it seems to be pretty lucrative.

17     Q     Okay.

18     A     But I don't have the exact documents.  I don't

19 recall specifically.  Maybe it's listed in one of the

20 higher agreements.

21     Q     Okay.

22     A     But I was focused mainly on the other elements.

23     Q     Sure.  And did you learn who was eligible for

24 Home Point's bonus programs, as far as which job

25 descriptions?

HIGHLY CONFIDENTIAL

Page 25

```
 1            I don't need individuals, but as far as the
 2   types of jobs that would be eligible for bonuses?
 3      A    I'm trying to think.  I'm just focusing on the
 4   testimony.  Obviously, the underwriters, who are the
 5   primary people I was focused on.  Typically, other types
 6   of incentive compensation in industry go to people like
 7   processors and funders and, you know, those -- those
 8   kinds of jobs.
 9            But I can't recall specifically, as I sit here,
10   whether or not those are part of the bonus structure, but
11   I would imagine, on inspect, there would be some kind of
12   incentive compensation in those jobs.
13            (Reporter clarification.)
14            MS. ZADIKANY:  I just want to interpose that I
15   don't even know what bonus structure you're talking
16   about.  It's a little bit vague here.
17            MR. HALL:  Okay.
18   BY MR. HALL:
19      Q    Your rebuttal report references Home Point's
20   production bonus.
21            Did you learn how that bonus is paid, like,
22   what the requirements were for payout on that?
23      A    It's a point system, based on the testimony
24   that I reviewed.  And you have to hit a certain number,
25   and the points start accumulating, and then it's paid out
```

HIGHLY CONFIDENTIAL

Page 26

1   on a delayed basis.  So it's a retention tool as well.

2        Q     And did you gain the understanding that you had

3   to be employed at the date of payment in order to be --

4   in order to receive that bonus?

5        A     My understanding -- the specifics of what date

6   you had to be employed by, I don't recall, but I do know

7   there was some retention element of delay.  And I would

8   expect most plans have something built into that.

9        Q     So it wasn't a vested bonus, it was an unvested

10  bonus.

11             Do you understand it that way?

12       A     I'd have to look at the documents specifically,

13  but I do understand it's delayed.

14       Q     Yeah.  Okay.

15       A     Actually, I would say it's probably unvested

16  because people were worried about when they leave, they

17  might -- they were not going to get it.

18       Q     Okay.  So in your report, you talk about the

19  six employees who resigned from Home Point and joined

20  Guaranty and then came back to Home Point.

21             Do you recall those six employees?

22       A     Not by name, but yes, the boomerangs, if you

23  will.

24       Q     Did you call them rebounds?

25       A     Rebounds, boomerangs -- different expressions.

HIGHLY CONFIDENTIAL

Page 27

1       Q       I've called them -- I'm just trying to pick a

2    term so that we can understand each other going forward.

3    I've been calling them rebounds internally.

4       A       Or the go-backs.  Whatever you want to call

5    them, I understand those to be.

6       Q       If I reference the six rebounds, then you will

7    understand who I'm talking about?

8       A       Yes.

9       Q       Okay.  Very good.

10              Did you compare the salaries of the employees

11   hired by Home Point in September and October of 2020 with

12   the salaries of the rebounds that they received when they

13   came back?

14      A       So in your hypothetical, your question is,

15   okay, I've got -- they hired ten people, for example, in

16   October of 2020, and the comparison of the pay for the

17   six who returned?

18      Q       Right.

19      A       Relative to those, I didn't directly compare

20   those, no.

21      Q       Okay.  And let me simplify the hypothetical to

22   a specific thing, and then if it's different beyond this

23   one individual, it's fine.  You can explain that.

24              But what I mean is:  According to Table 1 in

25   your report, both Dora Lopez and Maraliz Rodriguez came

HIGHLY CONFIDENTIAL

Page 28

1  back on October 26th, 2020.

2          Do you see that?

3      A    Yes.

4      Q    Okay.  And then you look at on Table 2.  You've

5  got Michelle Owighowotu -- I think I'm saying that

6  correctly, maybe -- was hired on October 26th, 2020.

7      A    Okay.

8      Q    Do you see that?

9          So I guess my question is:  The salaries that

10  Ms. Rodriguez and Ms. Lopez received on -- when they came

11  back on 10-26, did you compare that to the salary that

12  the new hire received on 10-26?

13      A    No, I did not.

14      Q    Okay.  And I'm not sure if you had a chance to

15  review Home Point's responses to Ms. Robertson's third

16  set of interrogatories.

17          Was that provided for you?

18      A    There's been enough interrogatories.  I

19  probably couldn't answer that question accurately.

20      Q    Understood.

21      A    If it's on my list, it's something, then, that

22  we've added.  If it's not, it's something we haven't seen

23  yet.

24      Q    I think it would have been produced after your

25  rebuttal, so I wasn't sure.

HIGHLY CONFIDENTIAL

Page 29

```
 1     A     Okay.  Then I haven't seen it yet.

 2     Q     Okay.  One of the lines or one of the responses

 3  in that set of interrogatories goes to the average

 4  salaries of certain roles like underwriter at Home Point.

 5           So I guess I'll ask:  Did you make any

 6  comparison to the rebounds' salaries when they came back

 7  to the average salary of an underwriter at Home Point?

 8     A     No, I have not.

 9     Q     Then, would the four individuals who received

10  raises but stayed the whole time -- or close to the whole

11  time -- did you compare the raises they received to the

12  wages that Home Point was paying new hires?

13     A     No, I haven't.

14     Q     Okay.  Did you make any inquiry into what

15  Guaranty was paying its employees?  Let me phrase that

16  question a little better.  I'll strike that.

17           Did you make any inquiry into what Guaranty was

18  paying underwriters in September of 2020, besides the

19  ones that came over to join them from Home Point?

20     A     I think there's some data that I have related

21  to that.

22     Q     Okay.

23     A     But, again, I haven't focused on Guaranty's

24  employees.  And I think the other part of it is I know

25  that the Guaranty bonus, at least based on the rebounds
```

HIGHLY CONFIDENTIAL

Page 30

1    or the boomerang folks, was not as good as Home Points.

2              I think, generally, Home Point probably had a

3    little bit higher compensation was my general feel to it.

4    But as I think, like, Don Lane, some of the initial stuff

5    when Candy was emailing back and forth with him, it was

6    like, "You're higher than what they pay other people."

7              I remember that, but I didn't focus on that

8    issue because it wasn't as relevant to what I was looking

9    at.

10             MR. HALL:  I'll hand you what we'll mark as

11   Exhibit 3.  It's your rebuttal report.

12             THE WITNESS:  Okay.

13             MR. HALL:  There will never be a day that I've

14   taken a deposition that I don't have the mental fear of

15   handing the report and being like, "Ah God, was that my

16   highlighted copy?  Please don't give the witness my

17   notes."  But no, I think we did okay on this one.

18             THE WITNESS:  These are all the areas where

19   Crandall was wrong.  Skewer him here.

20             MR. HALL:  I will -- I'm not under oath, and I

21   will not disclose whether there's any curse words in any

22   of my notes, but.

23             (Exhibit 3 marked.)

24   BY MR. HALL:

25        Q    So when you have your expert report, which is

HIGHLY CONFIDENTIAL

Page 31

1  Exhibit 2, and your rebuttal report, which is Exhibit 3.

2      A      Yeah.

3      Q      Do these documents accurately represent the

4  totality of your expected opinion testimony in this case?

5      A      No.  Because things have happened since I

6  filed.  Obviously, your expert filed another report,

7  which I haven't had a chance to literally respond to.

8  There's been additional depositions.

9          Guaranty's produced more information, which I

10  haven't, you know, had a chance to really go through or

11  the corresponding testimony PMK stuff that may explain

12  some of that information.  So I would imagine there's

13  some additional things that will come out of this as I

14  review it.

15      Q      Okay.  As we sit here today, is there any

16  update that you would like to make to either one of these

17  reports?

18      A      As an update, not particularly.  I think I

19  would have to look again and process the information

20  that's been produced, the deposition testimony,

21  understand what everybody is saying, and then I can

22  decide what changes, if any, would be made, what further

23  opinions I may have, et cetera.

24      Q      So if I understand you correctly, you're

25  reserving the right to make any changes.

HIGHLY CONFIDENTIAL

Page 32

1          But as we stand here today, you haven't made

2     any changes?

3          A    I will likely be having some kind of opinion

4     regarding, for example, the -- let's call it a

5     surrebuttal or whatever your expert called it, but I'm

6     certainly going to look at that in the underlying

7     documentation.  I'll probably look at the depositions and

8     PMK stuff that's happened since my report.

9          I guess part of this is just a scheduling

10    issue.  You guys put the experts before the close of fact

11    discovery, which kind of makes it more of a rolling

12    situation as opposed to an easier fact discovery close,

13    expert discovery close; here we go.

14         Q    I understand.  And we're all living through it.

15         A    Yes.

16         Q    So as we sit here today, there's no specific

17    additional information that you've learned that would

18    alter anything in these reports; correct?

19         A    Not yet.  I mean, obviously, I want to look

20    more at the loan.

21         Q    Right.

22         A    The proffer per loan that's now in Fishkind's

23    newest report and how he got to that.  You know,

24    obviously, understanding more about that document, even

25    though it's heavily redacted, how that may have been

HIGHLY CONFIDENTIAL

1  created.  I'm assuming the deposition -- I heard it was a

2  few days ago.

3      Q    Yesterday, I think.

4      A    Okay.  Yesterday was probably the deposition

5  that explained some of this stuff, so I think that might

6  help me in understanding what was produced and what

7  factors went into that calculation.

8      Q    Okay.  And then, I guess, are there any other

9  alibis that you have before we start looking at these

10 reports?

11     A    Any other alibis?  I don't think I have an

12 alibi yet, but hopefully I won't need one later today.

13     Q    Yeah, I just -- I don't want to --

14     A    No one's been shot or killed in the connection

15 with these -- creating these reports.

16     Q    Got it.  I would hate to spend a bunch of time

17 talking about a portion of this report if something's

18 already been updated in it.  So as long as we're -- as

19 long as we're good, we'll get into the report.

20     A    For good or for bad, I've been pretty busy, so

21 I haven't really had a chance to look at this stuff.

22     Q    I just want to be efficient here with your

23 time.

24          So if we get into your initial report, the

25 first category of damages relates to Don Lane's

HIGHLY CONFIDENTIAL

Page 34

1   salary; correct?

2       A    Yes.

3       Q    And you have opined that he was due half his

4   salary because he was not focusing on his job at

5   Home Point; is that correct?

6       A    Well, I think both he and -- my opinion, your

7   expert, both sort of took the same look, and it seems

8   reasonable to say about half the time in that was going

9   towards something other than work his employment for

10  Home Point.

11      Q    You've testified in a lot of wage and hour

12  cases; correct?

13      A    That's correct.

14      Q    And you've done classifications of

15  employees; correct?

16      A    Yes.

17      Q    Okay.  And do you understand that Don Lane was

18  a salaried employee?

19      A    I understand that.

20      Q    Okay.  So whether he worked two hours or

21  80 hours in a week, he was going to get paid the same?

22      A    I would imagine that, yes -- well, any amount

23  of hours were salaried, that would be the case.

24      Q    And if he had taken time off to recruit people,

25  as he's alleged, Home Point would still have to pay him

HIGHLY CONFIDENTIAL

Page 35

1    his full salary; correct?

2           MS. ZADIKANY:  Objection.  Misstates the --

3    what's alleged.

4           THE WITNESS:  I think the issue is the

5    fiduciary duty issue.  I mean, I've seen cases like this

6    before, but this is somewhat egregious in that he's out

7    there -- at least based on the text messages I read, he's

8    out there actively working against Home Point while

9    employed by them.

10   BY MR. HALL:

11       Q     Correct.

12       A     Obviously, a trier of fact can look at that,

13   and they can decide what's fair.  He's not challenging

14   the exempt status of his job.  And it's really -- and

15   they paid him the full salary.  That's already been --

16   that's already happened.

17           It's just a question of was he devoting his

18   time, per his agreement, to Home Point, and based on the

19   text messages I saw, it appears that he was not in his

20   deposition.

21       Q     Right.  I understand that.  But I'm asking

22   about Home Point's obligation to pay Don Lane his salary,

23   specifically.

24       A     They did pay his salary.

25       Q     Correct.  And they had an obligation to do

HIGHLY CONFIDENTIAL

Page 36

1   so; correct?

2        A     Yes, they paid it.

3        Q     Okay.  And even if he worked just one hour that

4   week, they would have been obligated to pay the full

5   salary; correct?

6        A     Under the salary basis test, yes.

7        Q     Would that be just Defendant Lane that those

8   damages would be attributed to, or would it be all

9   defendants, in your opinion?  I couldn't tell.

10       A     Oh, meaning versus Guaranty?

11       Q     Uh-huh.

12       A     I think this is a Lane issue.

13       Q     Okay.  And you've done a lot of wage and hour

14   work, and so is it your opinion that Home Point can

15   recoup half the salary paid to Don Lane from Don Lane?

16             Is that how I understand your opinion?

17       A     Well, there's a more complex element.  I mean,

18   certainly, I don't know what the agreements are between

19   Lane and Guaranty on indemnification, et cetera.  There's

20   a lot of stuff that could go on behind them.  There is a

21   tort claim, and to the extent there's a tortious

22   interference where they -- there were guarantees alleged

23   to have caused Mr. Lane to breach his fiduciary duties to

24   Home Point.

25             So there is -- in theory, there's a way to --

HIGHLY CONFIDENTIAL

Page 37

```
 1    there's a way that both parties could be involved in it.
 2    And again, that's going to be a legal issue.
 3         Q    Sure.
 4         A    And a trier of fact can figure out who to ding
 5    for that.
 6         Q    For sure.  And I understand that the
 7    indemnification issues and who has got a duty to pay, who
 8    are outside your scope of your opinion.  But you do have
 9    the calculation of damages, and I just wanted to make
10    sure that I understand that your testimony is you've said
11    that the defendants -- you said -- I think you said that
12    the plaintiffs are entitled to recover half of Don Lane's
13    salary.
14              (Reporter clarification.)
15    BY MR. HALL:
16         Q    I'm just trying to figure out if your opinion
17    says that Home Point should be able to recover half of
18    the salary that was paid to Mr. Lane during his last week
19    of employment.
20              And I'm trying to figure out if your opinion
21    identifies the individual that should make that payment.
22         A    Well, as I said, I think, you know, obviously,
23    Lane took the money while not working.  And then you've
24    got Guaranty with a tort issue.
25         Q    Okay.
```

HIGHLY CONFIDENTIAL

Page 38

1      A     So a trier of fact is going to have to figure

2   that out.  That's not my -- that's not my decision.

3      Q     Yeah.  All right.  The next category of damages

4   that are in your report relate to the retention bonuses

5   that were paid by Home Point.

6      A     That's correct.

7            MR. HALL:  Okay.  And we talked before the

8   deposition; this is going to be Exhibit 4.  It's the same

9   document.  It was the document that was produced at

10  HPLANE5191.  And so I've got the larger print one that's

11  on a couple different pages that we'll start with.  If

12  there is something specific, we'll --

13           THE WITNESS:  The older guy friendlier version.

14           MR. HALL:  You know what I'll do?  We'll mark

15  the big one as Exhibit 4.

16           THE WITNESS:  Okay.

17           MR. HALL:  And then I'll give you the little

18  one --

19           THE WITNESS:  The legible --

20           MR. HALL:  As a demonstrate.  And then you

21  can --

22           THE WITNESS:  I might be able to read it.  Who

23  knows.

24           MR. HALL:  Yeah.  Then you can refer to either

25  one as you want.  Again, I'm not going to --

HIGHLY CONFIDENTIAL

Page 39

1           THE WITNESS:  Yeah.

2           MR. HALL:  I don't mean to go line by line

3   through this.  I do, but I do -- hopefully, it may be a

4   useful reference at some point.  And I will tell you that

5   this version of Home.5191, I have sorted it in the Excel

6   program alphabetically by employee name to help us find

7   people a little easier for the deposition.

8           THE WITNESS:  Okay.

9           (Reporter clarification.)

10           MS. ZADIKANY:  Meaning, you sorted it in

11   alphabetical order?

12           MR. HALL:  That's it.  That's the change to it.

13           THE WITNESS:  Yeah.  Last name, first.

14           MR. HALL:  Yeah.  Just in the table form, I hit

15   employee name and then.

16           (Discussion off the record.)

17           (Exhibit 4 marked.)

18   BY MR. HALL:

19     Q    What is your opinion as it comes to the

20   retention bonuses?

21     A    They were paid in connection with the rate, and

22   they were costs that impacted profit for Home Point.

23     Q    Okay.  Now, in your report, you state that

24   Home Point made an across-the-board payment of retention

25   bonuses?

HIGHLY CONFIDENTIAL

Page 40

1      A     To Maitland people.

2      Q     To Maitland people.  And this is where I get a

3   little bit confused in your report, so maybe you can help

4   me out.

5            Your report states that Home Point paid 203

6   retention bonuses, 202 on the list, and then one that

7   they recouped; correct?

8      A     It might have been two, but sounds about right.

9      Q     Yeah.  And we can get to your report if we

10  want -- report if we want.  But the --

11     A     I'll just go to the page.

12           Do you have the page-by-rep number?

13     Q     Yeah, I'm going to get you there.

14     A     It's Paragraph 32, I think, actually.

15     Q     Yeah.

16     A     So it is the -- 202 is the number.

17     Q     Yeah, if you go to Page 14 in Paragraph 25, and

18  you look at Footnote 40, that's where the one was paid

19  but was fully -- entirely recouped?

20     A     Yes, correct.

21     Q     So 202 were paid out, and then one additional

22  one was paid but recouped; correct?

23     A     That's my recollection, yes.

24     Q     Okay.  And so that is 203 associates in the

25  Maitland office.  And when you go to Paragraph 6 on

HIGHLY CONFIDENTIAL

Page 41

1    Page 4 of your report, you write that "Home Point

2    employed approximately 255 associates in its Maitland

3    office, including underwriters, loan coordinators, and

4    funding developers."

5          Do you see that?

6     A    I see that, yes.

7     Q    Okay.  Why do you understand there to be a

8    difference between the total number of associates in the

9    Maitland office and the total number of retention bonuses

10   paid?

11    A    My bet -- again, I don't have a full roster,

12   but my bet is there are people in other job

13   classifications that may not be in these -- the ones that

14   are at issue.  You might have admin people; you might

15   have management; you might have receptionists, et cetera,

16   that wouldn't be part of this.

17         I'm not sure the full breakdown or how they

18   came up with 255, but I do know what was in the payroll

19   data that I was provided.

20    Q    Okay.  It's not with -- I guess I'll ask you

21   this question:  Was it within the scope of your

22   engagement or in the scope of your opinion to critically

23   analyze each of the retention bonuses that was given out?

24         MS. ZADIKANY:  Objection.  Form.

25         THE WITNESS:  Critically analyze in what way?

HIGHLY CONFIDENTIAL

Page 42

1   BY MR. HALL:

2       Q       Did you look at the individual, confirm that

3   that person was in that job title, confirm that that

4   person had their bonus paid, and confirm that they were

5   paid as part of this master scale?

6       A       So we confirmed that they were paid the bonus.

7   We looked at the dates.  As you can see, they were almost

8   all paid, and 192 of them were on 9-26, and then there

9   were -- or pardon me -- 9-25.  I was off by a day.  And

10  then, I want to say another -- the last batch of ten was

11  in early October, if I have the date handy.

12          You didn't sort it by the date, did you?  Well,

13  it's probably -- it is in my report, but there's another

14  date where another ten were paid.

15      Q       Sure.

16      A       10-9.

17      Q       Yeah.  And there's only a handful that were

18  paid on October 9th; right?

19      A       Correct.

20      Q       Compared to the full --

21      A       The bulk were the 9-26 -- 9-25.  I keep

22  misspeaking.  I need to look at this one.  It's a little

23  bigger.

24      Q       And you can look at the last page of that

25  spreadsheet, big one or small one.

HIGHLY CONFIDENTIAL

Page 43

1      A      Yeah.  Okay.

2      Q      And you can see that the total number of

3  payment on this spreadsheet is the same number that you

4  have for your damages in -- for the retention

5  bonus; correct?

6      A      Yeah.  And you'll see there's two that I

7  deducted.  And that's how we tie out, correct.

8            (Reporter clarification.)

9  BY MR. HALL:

10     Q      And did you create this spreadsheet?

11     A      This is a data file.  I think this is

12  Bates-stamped.

13     Q      Yeah.  That was my understanding.

14     A      Yeah.

15     Q      I just thought maybe I misheard you.  And I was

16  like, wait, so I just wanted to make sure.  Yeah, this

17  was a document that was produced in this lawsuit.

18     A      Yeah.

19     Q      It is cited in your report.  I just want to

20  make sure I heard you correctly.

21            So your opinion as to the retention bonuses

22  paid in this spreadsheet are that 100 percent of the

23  amount paid is the damages?

24     A      Well, that's what they paid out and what they

25  haven't recouped to date, so.

HIGHLY CONFIDENTIAL

Page 44

1      Q     And does it matter to you if the payments were

2   made by mistake?

3      A     In terms of mistake, what do you mean by the

4   word "mistake"?

5      Q     Sure.  If somebody was not on the list of

6   people who were identified to receive a retention bonus,

7   but then there was a miscommunication, and a manager

8   said, "You're entitled to it," and so they got it anyway,

9   but they weren't supposed to.

10     A     I would certainly have to understand more about

11   the facts before I could evaluate that.  It would depend

12   also on maybe you have people that weren't originally on

13   the list, or maybe the list omitted a name.

14           But there are -- let's call it -- interoffice

15   social issues why you would want to ensure -- let's say

16   you leave a -- let's say, you, Ruth, and I are three

17   underwriters, and the goal is to pay a retention bonus to

18   the underwriters, and somehow Ruth's name is left off the

19   list.

20           You wouldn't want a situation where somebody

21   says, "All the coworkers are getting a retention bonus,

22   and they chose not to -- not to retain -- give me a

23   retention bonus."  That's a sign, potentially, that the

24   employer is not particularly interested in retaining you.

25           So there would be reasons why, I can see, why

HIGHLY CONFIDENTIAL

Page 45

```
 1   you may add people to something like that.  But I would
 2   have to know more about the facts of this particular
 3   circumstance before I can really articulate a response.
 4       Q     And if Home Point was committed to pay a
 5   retention bonus prior to the actions of Don Lane, should
 6   that be included in this list of damages?
 7             MS. ZADIKANY:  Objection.  Form.
 8             THE WITNESS:  Well, none of the -- you say
 9   "committed to," so you're saying that in July or August.
10   BY MR. HALL:
11       Q     September 3rd.
12       A     September 3rd, that they were going to pay a
13   retention bonus to the entire office.
14       Q     No.  What I say is if they say to Employee A,
15   who is considering different employment -- not related to
16   Don Lane -- and they say, "We'll give you a raise and a
17   $5,000 retention bonus to stay."
18       A     Okay.
19       Q     And that is on September 3rd, the day after
20   Ms. Robertson is fired and almost two weeks before
21   Don Lane resigns, if not two weeks exactly before
22   Don Lane resigns.
23             Is that retention bonus properly part of the
24   damages that should be recovered from the defendants?
25       A     A retention bonus paid on September 3rd?
```

HIGHLY CONFIDENTIAL

Page 46

1          MS. ZADIKANY:  Objection to form.

2     BY MR. HALL:

3     Q     No, it was paid on September 25th -- or

4     September 29th, with these bonuses.  But was committed to

5     and offered prior to.

6          MS. ZADIKANY:  Object to form.

7          THE WITNESS:  I'd have to look at those facts

8     and understand what they are.

9     BY MR. HALL:

10    Q     Okay.  What about individuals who were not in

11    Maitland that received a bonus?

12    A     I wouldn't -- if they weren't part of the

13    Maitland office -- my understanding is these employees

14    were all Maitland.

15    Q     If you go to last name "Diaz," which is on the

16    second page of the big list.

17    A     Okay.

18    Q     It's Bibi Alicia.

19    A     Okay.

20    Q     You can see the department that she is in is

21    "TPO operations loan coordinator futures."

22          Do you see that?

23    A     Yes.

24    Q     Okay.  That's not Maitland.

25          Do you understand that?

HIGHLY CONFIDENTIAL

Page 47

1    A    I don't know what that is, so.

2    Q    So if the testimony from this case -- which you

3    haven't had the opportunity to review yet, and I'm not

4    quizzing you on the testimony -- but if the testimony

5    comes out that that was not somebody who was in Maitland

6    or assigned to the Maitland office, would that have an

7    impact on whether that bonus should be included in the

8    damages?

9    A    I'd have to think about that if she was working

10   with them, and I'd have to understand a relationship with

11   Lane and with Robertson.  But if she was nothing to do

12   with Maitland, I might take it out.

13   Q    Okay.  And you can go to Aiesha -- scratch

14   that.

15        I believe in your rebuttal report -- and you

16   can correct me if I'm misremembering -- but you state

17   that everybody in your damages analysis was at risk of

18   being recruited by the defendants beyond the initial

19   rate; is that correct?

20   A    That's my understanding, yes.  That's what I

21   said.

22   Q    Is that an assumption that you're making for

23   the damages calculation, or is that part of your opinion?

24   A    Well, it's my assumption based on the testimony

25   I review when they're talking about multiple waves;

HIGHLY CONFIDENTIAL

Page 48

1    obviously, they hired an underwriting support person.  So
2    there was discussion of hiring more, so you're in a
3    different situation.
4        Q     Okay.
5        A     And these are the people that ran it.  I mean,
6    Candy ran the operation, so she has knowledge of all of
7    these people.  They work for her.
8        Q     And if the facts come out that these
9    individuals were not at risk of being recruited by the
10   defendants, would that impact your opinion on damages?
11       A     No.  Because I think my first report talks
12   about this pretty extensively in that the company's being
13   rated.  They don't -- it's not like Guaranty called them
14   up and said, "We're only taking this ten, or these 20, or
15   we'll stop at 50," or some other number.
16           (Reporter clarification.)
17           THE WITNESS:  And, you know, the question then
18   is the trier of fact is going to have to make the
19   decision is it reasonable for them to be concerned that
20   they would go after the whole business or at least
21   substantial portions of the business.
22           And then part of your second problem is the
23   social issue, which is, "Okay, I'm going to give these
24   five a retention bonus and tell these other five I'm not
25   concerned about them being retained."  And you create a

Page 49

```
 1   morale issue if you pick some but not others, and there's
 2   a lot of other problems there.
 3             So in the fog of war, while surviving that
 4   raid, you have to make decisions if you're a company.
 5   And I think those decisions are reasonable.  Once you
 6   start paying retention bonuses to some, but not all, you
 7   create a lot of unhappiness, I think, within the ranks.
 8             (Reporter clarification.)
 9   BY MR. HALL:
10       Q    Okay.  How do you define the group of the 203
11   or 202, depending how you want to look at it, of
12   individuals who receive the retention bonus?
13       A    The people that were basically connected to the
14   mortgage operations directly.
15       Q    Okay.  Okay.  Because that's not -- that's much
16   broader than Mr. Lane's team; right?
17       A    Well, Mr. Lane's team is only the underwriter
18   piece of it, but Ms. Robertson's team is much bigger.
19   And certainly, Mr. Lane made text messages and others
20   talking about potentially bringing more people over.
21       Q    Okay.  And that group is certainly a lot bigger
22   than people who Robertson or Lane directly
23   contacted; right?
24             MS. ZADIKANY:  Objection.  Form.
25             THE WITNESS:  Well, I think part of the issue
```

HIGHLY CONFIDENTIAL

1  here is contacted as of the time they got the cease and

2  desist.  I mean, what would have happened if the cease

3  and desist didn't happen?  So we're operating in kind of

4  a different world where you had a court intervene in this

5  process.  And, you know, at the time, before the court

6  filed that order, you didn't -- Home Point wouldn't know

7  if the court would say yes.

8         There could be a situation where the court

9  says, "I'm not going to intervene."  So you're in a

10  different situation from the business operations

11  perspective.  And I think these are reasonable steps to

12  defend that operation.

13         Obviously, if you are starting a mortgage

14  operation, you can't deal with underwriters alone.  The

15  underwriters need support.  There's a reason why these

16  other positions exist within the operation.  And so if

17  they weren't going to get them from Home Point, they have

18  to get them from somewhere.

19         My recollection -- just let me finish.  My

20  recollection is the number of folks that Guaranty had in

21  Florida was tiny at the time of this starting.

22  BY MR. HALL:

23     Q    There's several names on the list that were

24  people who were hired after Mr. Lane resigned; correct?

25     A    I would have to look, but is it possible there

HIGHLY CONFIDENTIAL

Page 51

1   are some here that are hired after?  What's the hire

2   date?  It's just date of payment.

3       Q     Yeah, date of hire.  It's the original date of

4   hire.  It's going to be on the second page.

5       A     Yeah.  Okay.

6       Q     I guess, let me ask you this this way:  Would

7   it matter to your opinion if there were individuals on

8   this list that were hired after Don Lane resigned?

9       A     Well, these are all the people that

10  potentially, you know, they're concerned about.  And

11  again, you have the social issue of giving retention

12  bonuses to some, but not all.  So obviously, Lane

13  retired -- I want to say -- or he terminated his

14  employment, you know, mid-September.

15          And these payments, for the bulk of them, went

16  out a week or so later, a couple weeks later.  So it's --

17  I don't believe they made some of those distinctions.  To

18  the extent that someone was hired in that two-week

19  period, they were there, and they were going to get the

20  retention payment.

21      Q     Okay.

22      A     But obviously, the bulk of the people were

23  there before.

24      Q     Okay.  And based on the numbers that we've

25  talked about for employees at the Maitland office and the

HIGHLY CONFIDENTIAL

Page 52

1   employees who were identified to receive a retention

2   bonus, we know this list isn't the entirety of the

3   Maitland office; correct?

4       A    Well, there's different numbers that were in

5   one of the -- one of the legal documents versus what's in

6   this file.  But again, I don't know the other positions

7   that may have been in that office.  It was a pretty big

8   operation, a couple hundred employees.

9           So there could be other support positions:

10  receptionist, janitors, admin support, assistants of

11  different kinds.  You just -- I don't know what the

12  other -- mailroom people.  There could be other kinds of

13  jobs that were probably less at risk from a poaching

14  perspective.

15      Q    Okay.  And this retention bonus certainly

16  wasn't paid company-wide; right?

17      A    They did not -- to my knowledge, they didn't

18  pay everybody else in these other locations.  You know,

19  on September 25th, there would have been a much bigger

20  cost.  It was focused primarily -- this one payment, at

21  least, was focused primarily for the Maitland folks.

22      Q    Okay.  Is that going to make the individuals in

23  Chandler, Arizona, more likely to quit because they

24  didn't receive one and Maitland did?

25          MS. ZADIKANY:  Objection.  Form.

HIGHLY CONFIDENTIAL

1          THE WITNESS:  I think those are different

2     offices.  How much communication may have happened

3     between people, I don't know.  But if they were -- it's a

4     little different than if you and I sit next to each other

5     and have lunch together every day or we talk to each

6     other, we work together, it's different than this more

7     distant office and what you may not be communicating or

8     know people there.

9     BY MR. HALL:

10         Q     Do you know where the individuals in this list

11    lived?

12         A     No.  I don't have -- to my knowledge, I mean, I

13    don't have a home address, but maybe there's something --

14    I can't recall in this case.  I don't think I have a home

15    address.

16         Q     Okay.  Is it your understanding that these are

17    all remote workers at this point?

18              MS. ZADIKANY:  Objection.  Form.

19              THE WITNESS:  There's some testimony that

20    they're remote, but I'm not sure what they had

21    office-wise or not.  Obviously, this is during the

22    pandemic when this happened, and I'm not sure if Florida

23    had, I would say, better rules than California did for

24    the pandemic.

25              So I don't know who was in the office or not on

HIGHLY CONFIDENTIAL

Page 54

1   a daily basis or what the office environment was in

2   Florida at that specific time.

3   BY MR. HALL:

4       Q     Would it matter to your opinion as to these

5   damages if they were paid to people who were not living

6   in Florida and were not in -- physically in the Maitland

7   office?

8       A     If they were part of the Candy/Don team, I

9   think that seems reasonable.

10          MR. HALL:  Okay.  We've been going a little

11  over an hour.

12          Do you want to take a quick break?

13          THE WITNESS:  Sure.

14          THE VIDEOGRAPHER:  We are going off the record.

15  The time is 10:15 a.m.

16          (Break held off the record.)

17          THE VIDEOGRAPHER:  We are back on the record.

18  The time is 10:27 a.m.

19          MR. HALL:  I'll have the court reporter hand

20  you what's been marked as Exhibit 4.

21          MS. ZADIKANY:  Five; right?

22          MR. HALL:  Five.  Correct, 5.

23          (Exhibit 5 marked.)

24  BY MR. HALL:

25      Q     Mr. Crandall, if you can take a look at this

HIGHLY CONFIDENTIAL

Page 55

1    document.  It's about a one and a half page document.  My

2    questions are going to stick to the first four

3    paragraphs, but feel free to read the rest just to

4    familiarize yourself with the document.

5         A    Okay.

6         Q    Okay.  Now, this is a document that was

7    produced by Home Point in this lawsuit, Bates Number

8    HPLANE000521.  And it is a compensation change memorandum

9    from Etta Pelletier.

10             Do you see that?

11        A    I do.

12        Q    Or -- sorry -- Etta Pelletier.  My bad.

13        A    Well, her name in the other document is

14   Harrietta (phonetic), yes.

15        Q    Yeah.  Correct.

16        A    That's -- yeah.

17        Q    So same person.

18        A    Yeah.

19        Q    But if you look, the memorandum says, "This

20   memo is to confirm our discussion about your change in

21   compensation with Home Point Financial."

22             Do you see that?

23        A    I do.

24        Q    Okay.  It is dated September 3rd?

25        A    Correct.

HIGHLY CONFIDENTIAL

Page 56

1    Q    Okay.  And the third paragraph says, "You will

2    receive a retention bonus in the amount of $5,000 paid on

3    September 25th paycheck."

4         Do you see that?

5    A    Yes.

6    Q    Okay.  So on September 3rd, do you have an

7    understanding as to whether the allegations were that

8    Don Lane and Candy Robertson had begun soliciting any

9    Home Point employees at that point?

10   A    I believe Mr. Lane's actions happened later

11   than September the 3rd.

12   Q    And the employees that left with Don Lane

13   resigned on September 17th.

14        Is that your understanding?

15   A    Correct.

16   Q    Okay.  And so this memo would have been two

17   weeks prior to Home Point learning about Mr. Lane's

18   actions; is that correct?

19   A    That's true.

20   Q    So the fact that Home Point committed to pay

21   Ms. Pelletier a retention bonus of $5,000 in the

22   September 5th paycheck prior to any -- prior to it

23   learning of any actions of Don Lane, does that have an

24   impact on your opinion as to whether the defendants

25   should be responsible for that $5,000?

HIGHLY CONFIDENTIAL

Page 57

1      A    I'm going to have to think about it a little

2    more and get a little more understanding of the facts

3    before I can give a final opinion.  Obviously, she

4    received the 20 grand on the 25th.  If you were to look

5    at exhibit -- this is 4.

6      Q    Uh-huh.

7      A    So I can think -- I'll think about it and maybe

8    to the extent if I decide to revise it, I'll let you

9    know.  But certainly, this is an indication of the social

10   element of you have to pay everybody sort of commensurate

11   with what everybody else is in these kinds of situation.

12           MR. HALL:  Okay.  And I'm going to have the

13   court reporter show you what's been marked as Exhibit 6

14   the documents that have been produced by Home Point in

15   this lawsuit.

16           (Exhibit 6 marked.)

17   BY MR. HALL:

18     Q    It shows Ms. Pelletier was not given a $20,000

19   and a $5,000, but she was given the $20,000 instead of

20   the $5,000.

21     A    I understand that.

22     Q    Okay.  In the document, Exhibit 6, you can see

23   that Jacob Seaton sends an email to Teresa Reber on

24   September 15th saying that "Etta has decided to stay if

25   we bump her base to $98,000 and provide her with a $5,000

HIGHLY CONFIDENTIAL

Page 58

1    retention bonus."

2            Do you see that?  It's the bottom email on the

3    email chain.

4        A    Oh, so this -- what this indicates, then -- is

5    this offer was never actually signed by anybody?  And so

6    it seems like this was still negotiated.

7            This was like an initial offer?

8        Q    That is -- these documents were produced

9    together.

10       A    Yeah, but the dates are different.

11       Q    Correct.

12       A    So maybe she didn't accept this?  Because they

13   came back and renegotiated for more, it looks like.

14       Q    As far as the total salary?

15       A    Well, it says they have to "bump her base," so

16   it looks like they -- this may have been an opening

17   offer.

18       Q    If you look at number 5, it looks -- they talk

19   about the increased salary.  And there's a typo in that

20   memo, but I think if you do the math, you'll find out

21   that that's pretty close to what the 98K is.

22       A    Hold on a second.  4712?  Yeah, it is about 98.

23       Q    Yeah.

24       A    Okay.

25       Q    So the decision to give Ms. Pelletier $20,000

HIGHLY CONFIDENTIAL

Page 59

1   instead of $5,000, it looks like that was made by

2   Mr. Seaton on September 21st, 2020; correct?

3       A     That's correct.

4       Q     Okay.  So would your -- would this impact your

5   opinion as to whether the full 20 should be attributable

6   to the defendants when Home Point had independently

7   committed to pay five of it already?

8       A     I mean, I might look at that, and I might

9   decide at some point it's 15, or I might decide it's 20.

10  Again, I have to think about some of these additional

11  discovery and how this may impact my opinions.

12          Again, until I've reviewed all of that and all

13  of the depositions and all of the other information

14  that's been produced, I can't tell you how I'm going to

15  make a decision today.

16      Q     Were you able to develop an understanding as to

17  whether Home Point had a practice of offering retention

18  bonuses to individuals that were threatening to leave in

19  the year 2020?

20      A     I would say, generally, that Home Point and

21  other companies would offer retention bonuses potentially

22  to employees who were threatening to leave.

23      Q     Okay.  And that was, in part, because of the

24  state of the mortgage market at that time; right?

25      A     I think it's a little more than just that.  I

HIGHLY CONFIDENTIAL

Page 60

1   mean, maybe if you were talking, you know, after the

2   rates increased, someone said they want to leave, they're

3   probably saying thank you.

4          But, you know, there's some market element of

5   that.  But 2020, again, that was a really, really busy

6   time in the mortgage industry.  So I can certainly see

7   why companies would try to retain capacity.

8          But I think the difference is -- and this is

9   kind of a critical difference -- is that when someone

10  comes up to you and says, "I'm thinking about leaving; I

11  got an offer from ABC company that's a little bit more,"

12  and you as the employer then can say, "Well, am I willing

13  to match for this person?  What else am I going to try to

14  put in place to ensure that I retain this person?"

15         And some people, you may say no one.  Some

16  people, you are like, I definitely want to retain them,

17  so yeah, I'll say, yes, and I'll try to put a retention

18  bonus or some other time element to keep that employee

19  there for a period of time.  Or at least provide a

20  financial incentive for the employee to stay.

21         So I certainly would imagine that that's not an

22  uncommon thing in the industry.  In fact, other employers

23  I know do it too.

24      Q     And so do you know if Home Point made any

25  offers of retention bonuses or raises to individuals that

HIGHLY CONFIDENTIAL

Page 61

1    had submitted their resignations with Mr. Lane?

2        A     Well, we know that some people came and

3    negotiated at a higher pay and got retention bonuses.

4              So is that what you're asking?

5        Q     Yeah.  Do you know which ones Home Point had

6    those discussions with?  Was it all of them?  Some of

7    them?  A few of them?

8              Do you have an understanding of that?

9        A     The testimony I've reviewed to date, I don't

10   have an understanding of -- I know who stayed, who

11   negotiated a higher number.  I know who boomeranged.  But

12   I don't believe -- I haven't seen a list that said, "You

13   know, I'll talk to this guy, talk to that lady, talk to

14   this guy, talk to that lady."

15             I don't know if that list exists.  At least I

16   haven't seen it.

17       Q     Okay.  Would it be pertinent to your damages

18   analysis if Home Point had chosen just to let some of the

19   people that resigned go because they didn't want them

20   there anymore?

21             MS. ZADIKANY:  Objection.  Form.

22             THE WITNESS:  So Home Point -- my

23   understanding, what was happening at the time was

24   Home Point was attempting to recruit lots of people.

25   There was a peak volume in the industry.  One of the --

HIGHLY CONFIDENTIAL

Page 62

1    just look at the graph, MBA, or Mortgage News Daily or

2    any -- you know, 2020 was one of the peaks I think we've

3    had -- one of the biggest peaks we've had in a long time,

4    maybe 20 years.

5            So it's certainly not in Home Point's interest

6    to let anybody who can do the job go.  And these were

7    sort of senior underwriters and people who knew what they

8    were doing.

9            So these are people you generally would want to

10   keep, especially if you're worried about servicing

11   customers and turning around loan files so that the end

12   client, the borrowers, can, you know, waive their

13   contingencies and keep moving through their transactions

14   if it's a purchase transaction, for example.

15           So capacity was a big issue, I think, for every

16   mortgage operation.

17   BY MR. HALL:

18       Q    And then there were certainly other retention

19   bonuses paid by Home Point in 2020 that Home Point is not

20   attributing to the actions of the Defendants; correct?

21       A    I'm sure there are, yes.

22       Q    Okay.  And it wasn't uncommon in this industry

23   for companies giving raises and paying people more if

24   they heard they were trying to leave; correct?

25       A    I think that's a general across all industries;

HIGHLY CONFIDENTIAL

Page 63

1    it depends on how much you're willing to pay.  But yes,

2    it's one of the things you may decide as an employer.

3    Someone comes to you and says, "I have an offer from ABC

4    company.  Do you want to match it?"

5           And employers may choose to match it, may

6    choose not to.  May choose to match it and put a

7    retention bonus.  There's all kinds of strategies you may

8    employ.  But that's sort of a one-by-one situation versus

9    what happened here.

10   Q     And did you gain an understanding that one of

11   the reasons that Home Point was hiring so many people in

12   September of 2020 was because of the turnover?

13   A     Well, they're certainly hiring to replace, but

14   I think that generally, the whole industry at the time

15   had capacity issues because the volume was really high

16   across everyone.

17          MR. HALL:  I'll ask the court reporter to hand

18   you what's been marked as Exhibit 7.

19          (Exhibit 7 marked.)

20   BY MR. HALL:

21   Q     And I'll ask you to skim through that document,

22   but the question I'm going to direct you to is the email

23   from Lindsay Costley on the first page.

24          But go ahead and take your time with that

25   document, get familiar with it, and let me know when

HIGHLY CONFIDENTIAL

Page 64

```
 1   you're comfortable.
 2       A     Okay.
 3       Q     Okay.  And --
 4       A     This involves Christina, so you have a
 5   different person?  You talking about this U-V-A, Uva, I
 6   guess?
 7       Q     Yeah, if you go through it, it is Christina Uva
 8   is the email name, but you can see that she signs it
 9   concerning Christina Ghiorse on --
10       A     Oh, I see, yeah.
11       Q     -- HPLANE199.
12       A     She got married or something.  Okay.
13       Q     But, you know, this is September 1, 2020.
14       A     Okay.
15       Q     When Ms. Costley says, "Won't be the last one
16   that gets a raise or promotion once they give notice,"
17   with a smiley face, and she says, "We'll just keep it
18   moving on to the next."
19             Do you see that?
20       A     Okay.
21       Q     So do you understand this email to be
22   reflective of the way Home Point was hiring in
23   September of 2020, where they were hiring people and they
24   were losing people pretty rapidly?
25       A     Well, I think this -- if I'm reading this
```

HIGHLY CONFIDENTIAL

Page 65

1    correctly, and obviously I don't know Ms. Uva or

2    Ms. Whatever her last name is, but in all the particular

3    facts around this but just looking at the emails itself,

4    it looks like somebody didn't come.

5            So in other words, this is someone that

6    probably accepted a Home Point offer and stayed at their

7    previous place.

8        Q    Sure.  You can look at -- we haven't talked to

9    Ms. Christina.  But if you look at HPLANE000198, the

10   second paragraph of her resignation email was, "After

11   careful consideration, I have accepted a promotional

12   opportunity with my current employer."

13       A    Okay.

14       Q    And then that's where Ms. Costley says, "They

15   won't be the last one that gets a raise or promotion once

16   they give notice"; right?

17       A    Okay.

18       Q    Did you gain an understanding as to the hiring

19   practices of Home Point in September and October of 2020,

20   as it came to the rapid turnover of its employees?

21       A    Well, it's not turnover.  This person never

22   actually was an employee, it looks like.  It looks like

23   she stayed at her previous employer.  But I certainly

24   know that Home Point is actively in the market to hire

25   people.

HIGHLY CONFIDENTIAL

Page 66

1    There were more people that they recruited than

2    the folks that I included on the recruiting fees damages

3    element.

4            (Reporter clarification.)

5            THE WITNESS:  And so I limited that just to the

6    folks that were replacements, if you will, as opposed to

7    the other additional hires, and I just took that

8    sequentially.

9            I just want to point out that my report is no

10   longer the coaster.  It's been your exhibit, so I don't

11   know what that means.

12           MR. HALL:  Okay.  I'm going to hand you what's

13   been marked as Exhibit 8.  And I think we asked -- I

14   don't think you saw -- I don't think you've seen these

15   before because they were assigned on May 18th.

16           THE WITNESS:  So after -- okay.

17           (Exhibit 8 marked.)

18   BY MR. HALL:

19       Q    But I will direct your attention to the

20   Interrogatory Number 20, which is found on Page 12 and

21   into 13, for the answer.  And particularly the last

22   sentence in -- on Page 13.

23       A    Okay.  So it looks like Interrogatory 20?

24       Q    Uh-huh.

25       A    It's any retention bonus between

HIGHLY CONFIDENTIAL

Page 67

1    January 1, 2019, and December 31, 2021?

2        Q     Yeah.  So we have --

3        A     Okay.

4        Q     -- 39 employees who received an additional

5    unrelated bonus in year 2020 and another two employees in

6    the calendar year 2021.

7              Do you see that?

8        A     Is there a -- there's no table here.

9              Where are you seeing that?

10       Q     If you looked at Page 13.  And you say --

11       A     So "none in 2019" is what it says.

12       Q     Yeah.  And then keep reading.  It says, "In the

13   calendar year 2020, 39 of the employees who received

14   retention, as reflected in HPLANE0004536, received

15   unrelated retention bonuses."

16             Do you see that?

17       A     Okay.

18       Q     You don't have any reason to dispute

19   that; right?

20       A     No.

21       Q     Okay.  Does it impact your opinion as to the

22   amount of damages attributable to the Defendants for the

23   retention bonuses paid by Home Point that you list in

24   your report that Home Point had a practice of paying

25   retention bonuses to employees?

HIGHLY CONFIDENTIAL

Page 68

1          MS. ZADIKANY:  Objection.  Form.

2          THE WITNESS:  Again, first of all, it doesn't

3    impact my overall opinion because I'm trying to look at

4    retention bonuses paid in connection with the event,

5    let's call it, that Ms. Robertson and Don Lane, so it

6    wouldn't impact that.

7          You know, could Home Point pay people that also

8    have other offers on a one-by-one basis?  Okay.  That's

9    fine.  It's certainly a common tool to try to retain

10   people who are potentially leaving or at risk of leaving.

11   BY MR. HALL:

12     Q    What about multiple retention bonuses on the

13   same day to a group of employees?

14          Does that -- if Home Point did that, would that

15   impact your opinion at all?

16     A    I would have to understand the circumstances of

17   why.  Again, if they had a situation like what they had

18   in Maitland, then that would make sense.  Maybe there's

19   someone else out there trying to poach employees as a

20   group.

21     Q    Okay.

22     A    So you'd have to make those different

23   decisions.

24          MR. HALL:  I'm going to hand you two documents

25   at the same time that we'll mark as -- it should be

HIGHLY CONFIDENTIAL

Page 69

```
 1   Exhibit 9 and 10.
 2            THE WITNESS:  All right.  Do I need these?
 3   Should I stack them somewhere?
 4            MR. HALL:  Stack them somewhere.
 5            THE WITNESS:  Large pile.
 6            MR. HALL:  They all still exist, and you can
 7   refer to them anytime you want.
 8            THE WITNESS:  Okay.  Great.
 9            MR. HALL:  If things come up, and especially
10   the -- I know I'll reference those interrogatory
11   responses again.
12            THE WITNESS:  Okay.
13            MR. HALL:  And obviously, Exhibit 4, if any
14   time you need to refer to it, then that's -- you don't
15   need to ask my permission.
16            THE WITNESS:  Okay.
17            MR. HALL:  Now, Exhibits 9 and 10 --
18            MS. ZADIKANY:  Can you just identify which is 9
19   and which is 10 for the record?
20            MR. HALL:  Sure.  Nine should be
21   HPLANE00004419.  And 10 is HPLANE00004449.
22            (Exhibits 9 and 10 marked.)
23   BY MR. HALL:
24      Q    Now, Mr. Crandall, I've handed you these two
25   documents more as exemplars than anything else.
```

HIGHLY CONFIDENTIAL

Page 70

1          Do you understand that Exhibit 9 contains the

2     language that was provided to each employee that received

3     a retention bonus as to the terms of the retention bonus?

4          A     This does look similar to the letters I've

5     seen.

6          Q     Okay.  I'll represent to you that Home Point

7     has produced exemplar letters with the idea that they're

8     all the same, so.

9          A     Yeah, I think they probably are.

10         Q     At least the terms are.  While the name is

11    different, obviously, but.

12         A     Yeah.

13         Q     And then Exhibit 10 is a -- just the payment

14    statement, if you will.

15         A     I see that.

16         Q     Is that lightning or the TV?  Sorry.

17               And so you can see on 10 that they have the, I

18    guess, line item for lack of a better word for retention

19    bonus.

20         A     Yes, I see that.

21         Q     Okay.  And it says, "Ms. Sandoval received a

22    $20,000 retention bonus as a senior

23    underwriter"; correct?

24         A     I see the $20,000, yes.

25         Q     Okay.  And I'll represent to you that this is

HIGHLY CONFIDENTIAL

Page 71

1   consistent with what's listed in Exhibit 4, but you can

2   check if you want to.

3       A    I'll take your word on that.  $20,000 is the

4   number for people like that.

5       Q    Yeah.  Also, on her pay stub, Ms. Sandoval's

6   pay stub, it shows the multi-signing bonus.

7            Do you see that that for $10,000?

8       A    I do.

9       Q    It doesn't matter to your opinion -- let me ask

10  that question a little bit better.

11           Does it matter to your opinion about how long

12  the employees were employed at Home Point at the time

13  they were offered a retention bonus?

14      A    No.  Because I think the issue is they were

15  trying to not differentiate between people, so you

16  wouldn't have people compare notes and say, "I got X, and

17  you have Y."  I mean, if they were, for example, doing it

18  by performance or some other metric, they might pay

19  someone 20, someone else 18, someone 15, someone 10 in

20  the same job classification.

21           But I think the morale issues of segregating

22  people that way would have a negative impact on the

23  operation.  So they pretty much gave people the same

24  amount based on their level.

25      Q    Does it affect your opinion at all that

HIGHLY CONFIDENTIAL

Page 72

1   Ms. Sandoval was located in Texas and not physically in

2   Florida?

3        A     What would impact my opinion is was she part of

4   the team that was part of this group.  And so that's

5   going to be sort of the basis of membership.

6        Q     How would you describe that team that you just

7   said?

8        A     Well, based on the documents I was provided, I

9   was provided a list, which is -- I won't give you the

10  Bates number because I don't recall it -- but it's

11  Exhibit 4.  It was represented these are the Maitland

12  team, so that's what I've relied upon.

13       Q     Okay.  Would it matter to your opinion if the

14  Maitland team had never worked for Ms. Robertson?

15       A     So this is someone that will be hired after

16  Candy left.

17       Q     Or not be under her umbrella?

18       A     If they weren't at risk in the group, if you

19  will, then it would be in a different category.

20       Q     Okay.  What about the people who were hired

21  after she left?

22       A     If they were on when the bonus happened, I

23  think there's a social reason within your company for

24  doing that, which makes sense.

25       Q     Okay.  But the geographic location of these

HIGHLY CONFIDENTIAL

Page 73

1    employees does not impact your opinion?

2        A    I'd just would have to understand who she works

3    with.  In other words, who was she likely to be comparing

4    notes with?  And if she is going to compare notes and

5    says she is on a team of five people and then get on a

6    meeting and four of the five said, "I got a retention

7    bonus," that might be pertinent information to her and

8    may be a reason why they paid.

9            So I'd have to understand more about it.

10       Q    Going back to Exhibit 9, which is the retention

11   bonus memorandum to Ms. Sandoval.  And again, I'm using

12   this as an exemplar.  This document explains that the

13   retention bonus was an "unvested advance."

14           Do you see that?

15       A    Yes, it says that.

16       Q    Okay.  Do you have an understanding that

17   Home Point had a right to recover the paid sums if the

18   employee terminated their employment prior to the

19   one-year time period?

20       A    There is a right to -- looking at this, there's

21   a practical question in terms of it's hard to recoup some

22   money that you gave to somebody, especially if your

23   employer is asking to write you a check back.

24           And then the question is if you choose to

25   litigate, at some point, you might -- the cost of

HIGHLY CONFIDENTIAL

Page 74

1    litigation may be significantly more than what you can

2    recover.  So there's a business decision there.

3            You know, it's like, okay.  I got the ten grand

4    back or three grand back, but it cost me $15,000 to do

5    it.  There may be a reason just to say, "Okay.  We're not

6    going to chase the $3,000."

7    Q    Are you aware of any efforts that Home Point

8    actually took to recoup any of the money for the

9    employees that quit before the year was up?

10   A    It wasn't in the deposition testimony that I

11   read to date, but that may be in later deposition.  I

12   would imagine maybe you guys asked them something.

13   Q    Yeah.

14   A    I don't know.  I'll read whatever was said, and

15   I'll see how that might -- I'll consider what that would

16   be and how that may or may not impact my opinion.

17   Q    And you know, your -- I understand your role as

18   an expert in this is you don't have firsthand knowledge.

19   And so if you haven't been provided the information, then

20   you have no obligation to know it yet.  That's just what

21   I'm trying to -- when I ask those questions, I'm not

22   trying to trap you into an answer.

23           I'm just trying to figure out how much

24   knowledge you had when you made this opinion so that I

25   could figure these things out.  So I appreciate you

HIGHLY CONFIDENTIAL

Page 75

1    staying with me through those questions and helping me

2    out with those.

3             Do you understand that -- let me rephrase that

4    question.

5             If Home Point had recouped any of these

6    retention bonuses that it had paid out, would that impact

7    your opinion as to the amount of damages that are

8    entitled to in this matter?

9        A    If -- so, for example, hypothetically, the

10   database that was provided that's Exhibit 4 -- right? --

11   is inaccurate, and someone else was paid 20 grand, let's

12   just say.

13       Q    Right.  Let's say --

14       A    There's, like, 28,000 in that right now or some

15   change.

16       Q    Correct.  So not to suggest that this is

17   inaccurate, but if money was recovered after this

18   spreadsheet was made; right?  So if they --

19       A    I would deduct that.

20            MR. HALL:  Okay.  I promise you we're not going

21   to go through all of the pay stubs, but I want to go

22   through a couple of the specific bonuses that were paid.

23   Similar to the Sandoval pay stub, it's just going to be

24   the pay stub, and I'll ask you a couple of questions on

25   it.

HIGHLY CONFIDENTIAL

Page 76

```
 1          So we'll start with exhibit -- I think we
 2   should be on to Exhibit 11.  Some of these are going to
 3   be landscape, and some of these are going to be portrait,
 4   and I have no ability to make or change it, so bear with
 5   me through.
 6          THE WITNESS:  It's fine.  No critiques.  At
 7   least we can both read the numbers.  That's the first
 8   starting point.
 9          (Exhibit 11 marked.)
10   BY MR. HALL:
11      Q    At, least, hopefully, they're big enough to
12   read.  That's the real goal.
13          All right.  Have you had a chance to look at
14   Exhibit 11?
15      A    I have it in my hand, yes.  Is it two pages?
16      Q    Yeah.
17      A    Okay.  It is one page, really.
18      Q    The second page just says it's Page 1 of 1,
19   such is the nature of document production.  But this is a
20   pay stub for Tiffany Clark.
21          Do you see that?
22      A    I do.
23      Q    Okay.  And this is the pay date of 9-25, and it
24   shows the retention bonus and the multi-signing bonus.
25      A    Correct.
```

HIGHLY CONFIDENTIAL

Page 77

```
1       Q    Okay.  And then it has her year-to-date hours
2   worked as 75.78; correct?
3       A    That's correct.
4       Q    Okay.  And it looks like, based on her tax
5   filing status, that she's a resident of Ohio.
6            Do you see that?
7       A    I do.
8       Q    Okay.  And the fact -- I believe your testimony
9   was the fact that she was out of state doesn't impact
10  your opinion; is that correct?
11      A    If she's part of the team that's getting these,
12  you know -- I've got multi-office teams that work on
13  similar projects.  If everybody on the team is getting
14  one, it would be -- and they compare notes, that's what
15  you're trying to avoid.
16      Q    Okay.
17      A    So if she's part of this same team, which I
18  don't know obviously, but I assume she was.
19      Q    I believe your testimony, or at least in your
20  opinion, you've attributed two weeks of training?
21      A    That's correct.
22      Q    Okay.  And I think you attribute 80 hours of
23  work for each of the new hires; is that correct?
24      A    That's correct.
25      Q    Okay.  So if Ms. Clark had less than 80 hours
```

HIGHLY CONFIDENTIAL

Page 78

```
 1    year to date working as an underwriter, would it be safe
 2    to assume that she was probably still in training?
 3         A     Or just completing it.
 4               MS. ZADIKANY:  Object to form.
 5               THE WITNESS:  Right around that time.
 6               MR. HALL:  So I had the court reporter hand you
 7    what's been marked as Exhibit 12.
 8               (Exhibit 12 marked.)
 9    BY MR. HALL:
10         Q     This is a pay statement for Leonard Thomas.
11               Do you see that?
12         A     Yes, it is.
13         Q     And you can see that he is also located in
14    Texas?
15         A     I see that.
16         Q     Okay.  And he has also worked less than the
17    80 hours that you've attributed to training time through
18    your other --
19         A     Well, he's a closer, though.  It's a different
20    job.
21         Q     Okay.  Do you understand the training to be
22    different for closing?
23         A     Well, the job's a little different, so I
24    imagine it would be different.
25         Q     Let me ask you -- yeah, let me ask you a better
```

HIGHLY CONFIDENTIAL

Page 79

1    question.

2           Do you understand the length of the training to

3    be different?

4       A    So I think I'm focusing on the underwriters in

5    terms of the training claim, so I haven't really paid

6    much attention to a closer.

7       Q    Okay.  And you can pull back to Exhibit 4.

8       A    All right.

9       Q    And look up Mr. Thomas, and you'll see that his

10   termination date is October 29th, 2020.

11      A    Okay.  I'll find him on this other one.

12           Okay.  I see him there.

13      Q    Okay.  You've got his hire date right there in

14   front of you?

15      A    Yeah.

16      Q    It was, what, 9-14-2020?

17      A    Correct.

18      Q    So he was employed for about 45 days or so?

19      A    Give or take.

20      Q    And it doesn't look like Home Point was able to

21   recoup any of the retention bonus that he was paid?

22      A    That's what the record indicates.

23      Q    Okay.  And you don't have any understanding to

24   what efforts Home Point might have taken as to

25   Mr. Leonard Thomas?

Page 80

```
1      A     No.  I don't specifically know what they did.
2      Q     Okay.  Would it matter to your opinion if they
3   didn't take any efforts to recoup the money?
4      A     You go to the difficulty of collecting, you
5   know, obviously, it looks like he also got a signing
6   bonus.  And -- which is even bigger than the retention
7   bonus.  And it may be difficult to collect.  Maybe it's
8   the cost of litigation.
9           You know, you're initiating a lawsuit and hire
10  a lawyer, and suddenly, it is a lot of fees and costs.
11  And that person may or may not have the money when you go
12  out at the end of the day.  So there could be a business
13  decision there.
14     Q     And I guess my question was a little bit more
15  specific:  Would it matter to your opinion if Home Point
16  took zero effort, like they didn't even ask for the money
17  back?
18     A     Like, didn't send a letter saying, "Please pay
19  us"?
20          (Reporter clarification.)
21  BY MR. HALL:
22     Q     Uh-huh.
23     A     I'd have to look and see what they've done, but
24  certainly, it's money they were out, and they haven't
25  received back.  Now, it's a question I can look into
```

HIGHLY CONFIDENTIAL

Page 81

```
 1   that, and I can think about it.  But I'm not really ready
 2   to give you an opinion on that one way or the other
 3   today.
 4              MR. HALL:  Okay.  I'm going to have the court
 5   reporter hand you what's been marked as Exhibit 13.
 6              (Exhibit 13 marked.)
 7   BY MR. HALL:
 8       Q     This is a pay statement for Rita Geraldo.  You
 9   can see her state filing status is North Carolina.
10       A     Okay.
11       Q     And you can see she's got about one week's
12   worth of work in there.
13       A     Okay.
14       Q     Do you see that?
15       A     That looks like that's her year to date, yes,
16   correct.
17       Q     Okay.  So again, this was another new hire that
18   was out of state that received a retention
19   bonus; correct?
20       A     Well, she's part of the operations Maitland is
21   what it says, so she's part of that team.
22       Q     Right.
23       A     So yes, I would say she's part of the Maitland
24   team, and she got a retention bonus, just like the other
25   members of that team.
```

HIGHLY CONFIDENTIAL

Page 82

1      Q      Right.  Well, just like some of the other

2  members of the team; right?

3             Because you got the 255 employees --

4             (Reporter clarification.)

5             THE WITNESS:  I think we'd have to look at who

6  are those other 250 -- those other -- the delta if you

7  will.  There could be more support positions that are not

8  related to funders or, I mean, closers, I guess, in their

9  parlance, processors, and underwriters.

10  BY MR. HALL:

11      Q      Right.  And --

12      A      Mortgage support.

13             (Reporter clarification.)

14  BY MR. HALL:

15      Q      As you sit here today, you have not done the

16  investigation as to what types of people are included in

17  the 255 that are not included in the 203; correct?

18      A      That's correct.

19      Q      Okay.  I'll also say Thomas Leonard was pretty

20  impressive to get $25,000 in bonuses and quit two weeks

21  later.  Good for him.

22      A      Well, who knows what he's doing.

23      Q      Frankly, I saw that, and I got a little

24  jealous.

25      A      I've got cases now where employers are

HIGHLY CONFIDENTIAL

Page 83

1   discovering that a lot of their remote employees were

2   working for multiple people at the same time.  That was

3   happening in tech up in San Francisco a lot.

4           MR. HALL:  The court reporter has handed you

5   what's been marked as Exhibit 14.

6           (Exhibit 14 marked.)

7   BY MR. HALL:

8       Q    This is another closer that has 42 hours worked

9   for year to date.

10          Do you see that?

11      A    Yeah.

12      Q    She's also in North Carolina?

13      A    Yeah.  She seems similar to the last --

14      Q    Ms. Geraldo?

15      A    Yeah.

16          MR. HALL:  I'll hand you what's been marked as

17  Exhibit 15, which is HPLANE4839.

18          (Exhibit 15 marked.)

19  BY MR. HALL:

20      Q    And it relates to Kewanda Epps.

21          Do you see that?

22      A    I do.

23      Q    Okay.  Now, Ms. Epps is a senior underwriter

24  with a state filing status in North Carolina.

25          Do you see that?

HIGHLY CONFIDENTIAL

Page 84

1    A    Yeah.  It looks like that's the case.  She's

2    department Maitland, obviously, underwriting.

3    Q    And based on this pay statement, she actually

4    hasn't worked any hours at Home Point?

5    A    That's what that looks like.

6    Q    Okay.  So the year-to-date total is zero,

7    essentially -- oh, sorry -- the year-to-date total is

8    equal to the sum of the retention bonus and the

9    multi-signing bonus?

10   A    Yeah.  I'm looking to see what her hire date

11   would be.  I'm assuming you have found that.

12   Q    She was hired on September 14th, 2020.  So --

13   A    What's the first -- maybe her first day worked

14   was September 20th or something.

15   Q    It's probably carried over to the next pay

16   period.

17   A    I'm speculating, but it's --

18   Q    Yeah.  It's got --

19   A    She had very good timing.

20        MR. HALL:  Yeah.  Hand you what's been marked

21   as Exhibit 16.

22        (Exhibit 16 marked.)

23   BY MR. HALL:

24   Q    And same line of questioning:  Here we have --

25   this is a senior underwriter, Charmaine Hughes.

HIGHLY CONFIDENTIAL

Page 85

1          Do you see that?

2     A     I do.

3     Q     Okay.  And this is actually from the pay date

4  of October 9th, 2020.

5     A     I see that.

6     Q     Okay.  So she's one of the --

7     A     Second group.

8     Q     -- the few people in the second group.  And she

9  had a hire date, according to document or Exhibit 4, of

10  September 21st of 2020, so she was hired -- her start

11  date or her date of hire were after Don Lane had

12  submitted his resignation.

13          Do you understand that?

14    A     I understand.

15    Q     Okay.  She's got a state filing status of

16  New Jersey?

17    A     That's correct.

18    Q     Okay.  And if you -- her year to date on 10-4,

19  it looks like she's got 79.28 hours of regular time?

20    A     It does.

21    Q     So about two weeks?

22    A     Approximately.

23          MR. HALL:  Okay.  We'll go through a couple

24  more of these and take a break.

25          THE WITNESS:  Sounds fine.

HIGHLY CONFIDENTIAL

Page 86

```
 1              (Reporter clarification.)
 2              MR. HALL:  Oh, it's 17.
 3              THE WITNESS:  The perfect system has failed.
 4              MR. HALL:  It's going to happen.
 5              (Exhibit 17 marked.)
 6    BY MR. HALL:
 7        Q    And this is the pay statement of
 8    Khendra Hunter.
 9              Do you see that?
10        A    I do.
11        Q    And Khendra Hunter had a state filing status of
12    Texas?
13        A    That's what this looks like, yes.
14        Q    And she was a funder?
15        A    Yes.
16        Q    Okay.  And she had 40. -- 40 hours and a
17    quarter of an hour of regular time at the time that she
18    received her bonus; correct?
19        A    Yes.  On this pay statement, that's correct.
20              MR. HALL:  I got this one right.  We'll hand
21    you what's been marked as Exhibit 18.  This is a pay
22    statement from 9-25-2020 for Tanya Johnson.
23              THE WITNESS:  Is this 18?
24              MR. HALL:  Yeah.
25              THE WITNESS:  Okay.  We're skipping 17?
```

HIGHLY CONFIDENTIAL

Page 87

1           MR. HALL:  Seventeen was just the one we asked

2    about.

3           THE WITNESS:  That was 16.

4           (Reporter clarification.)

5           THE WITNESS:  Oh, okay.  Yeah.  Okay.

6           (Exhibit 18 marked.)

7    BY MR. HALL:

8       Q    And so Exhibit 18 is the pay statement from

9    September 25th, 2020, for Tanya Johnson, that's a loan

10   coordinator.

11          Do you see that?

12      A    I do.

13      Q    Okay.  And she was -- she had regular hours of

14   31.67 hours worked at the time of this statement?

15      A    That was correct, yes.

16      Q    Okay.  And she had a state filing status of

17   Michigan; right?

18      A    Yes.

19      Q    Home Point's headquarters are in

20   Michigan; right?

21      A    According to the employment section.  There's

22   an address in Michigan -- employer address there, yes.

23          MR. HALL:  I've handed you what's been marked

24   as Exhibit 19, and that should be Lisa McElhenny.

25          THE WITNESS:  Okay.  I see her.

HIGHLY CONFIDENTIAL

1             (Exhibit 19 marked.)

2    BY MR. HALL:

3        Q    Okay.  And her state filing status is actually

4    Florida; right?

5        A    That's correct.

6        Q    And she had -- a senior underwriter?

7        A    Looks like it, yes.

8        Q    And she had a little over 75 hours worked for

9    the year at the time of the bonus?

10       A    Correct.

11       Q    Okay.  And the pay date on this one is another

12   one of those ones that is 10-9?

13       A    That's correct.

14       Q    Okay.  And you can double-check on Exhibit 4,

15   but Ms. McElhenny is -- has a hire date of September 21,

16   of 2020 as well.

17       A    Okay.

18       Q    So after the termination -- or after the

19   resignation of Mr. Lane.

20            Do you understand that to be true?

21       A    That's correct.  Those dates would be after.

22            MR. HALL:  Okay.  And Exhibit 20, this is a

23   loan coordinator named Ryan McGaha.

24            (Exhibit 20 marked.)

25   ///

HIGHLY CONFIDENTIAL

Page 89

1    BY MR. HALL:

2        Q     Do you see that?

3        A     I do.

4        Q     Okay.  And he has 41.83 of regular hours

5    employed at the time for year to date?

6        A     Year to date, correct.

7        Q     Okay.  And he was -- he received a retention

8    bonus of $10,000?

9        A     Yes.

10               MR. HALL:  Should be on exhibit --

11               THE WITNESS:  21.

12               (Exhibit 21 marked.)

13   BY MR. HALL:

14       Q     And Exhibit 21 is the document HPLANE00004713.

15               Do you see that?

16       A     Yes, I do.

17       Q     Okay.  And this is employee Lori Schwartz?

18       A     Correct.

19       Q     She's a loan coordinator with a state filing

20   status of New York; correct?

21       A     Yeah.  She's part of TPO Ops Maitland loan

22   coordinator, and it looks like she's in New York.

23       Q     Okay.  And then she received a retention bonus

24   of $10,000?

25       A     She did.

HIGHLY CONFIDENTIAL

1      Q      Okay.  And she's got 43 and a half regular

2  hours worked for the year?

3      A      That's what this says, yes.

4             MR. HALL:  Okay.  We'll just do two more, I

5  promise.  But I promised you one portrait one, and I

6  won't let you down.

7             THE WITNESS:  You know I was waiting for that

8  one anxiously.

9             MR. HALL:  Wait no more.  This is a -- what's

10  been marked as Exhibit 22.

11             (Exhibit 22 marked.)

12  BY MR. HALL:

13      Q      And that is a pay statement for Paul Williams.

14             Do you see that?

15      A      I do.

16      Q      Okay.  And he -- the department is TPO

17  Operations Maitland closing?

18      A      Correct.

19      Q      But his state filing status is Texas; correct?

20      A      That's correct.

21      Q      Okay.  And he received a $5,000 retention

22  bonus.

23             Do you see that?

24      A      He did.

25      Q      And he worked 41.3 regular hours to date?

HIGHLY CONFIDENTIAL

Page 91

1      A      That's what that shows, yes.

2      Q      Now, these pay stubs have been produced by

3    Home Point in this litigation, as indicated by the Bates

4    label.

5             Do you have any reason to believe that the

6    year-to-date hours on these pay stubs are not reflective

7    of how many hours the individuals had worked?

8      A      I'm assuming they're accurate.

9             MR. HALL:  Last one, Exhibit 23, is

10   Ms. Tiana Williams.

11            (Exhibit 23 marked.)

12   BY MR. HALL:

13     Q      Do you see that?

14     A      I do.

15     Q      Okay.  And she has also has a state filing of

16   Texas?

17     A      She does.

18     Q      Okay.  And she received a $10,000 retention

19   bonus and a $15,000 signing bonus?

20     A      She did.

21     Q      Okay.  And she's got 76.97 regular hours

22   worked; correct?

23     A      That's correct.

24     Q      Okay.  So those are just a sampling of the 203

25   retention bonuses that were paid, but there was a

HIGHLY CONFIDENTIAL

Page 92

1    significant number of employees who received a retention

2    bonus that were new hires; correct?

3        A    New or relatively new, yes.  I'm not sure

4    significant portion.  Obviously, there's a lot of

5    long-return people that got them as well.  But there is

6    certainly the case that people that were new received

7    them.

8        Q    And there were several employees that were

9    actually hired after Don Lane had resigned; correct?

10       A    Yes.

11       Q    Okay.

12       A    Well, it appears to be.  I don't have all of

13   their letters, but given their first day worked and when

14   the pay stub would be, it suggests that it's around that

15   time frame.

16       Q    And a significant number --

17       A    Let me fix that answer real quick.

18       Q    Yeah.

19       A    It's -- I don't know when they were hired, but

20   it looks like their first day worked would be in that

21   time frame.

22       Q    That's fair.  And then several of these

23   employees that received a retention bonus, at least based

24   by their state filing status, are located outside of the

25   state of Florida?

HIGHLY CONFIDENTIAL

Page 93

1     A     That's correct.

2     Q     Okay.  As far as underwriters who were still in

3   training at Home Point, do you think it was appropriate

4   to pay the retention bonuses to those individuals?

5           MS. ZADIKANY:  Objection.  Form.

6           THE WITNESS:  I think the question you said

7   underwriters in training at Home Point, was it

8   appropriate to pay them a retention bonus?

9           Is that the correct question?  I think there

10  was some social issues.  I mean, I don't know the

11  individual stories about that second wave.  But, you

12  know, as an outsider looking in, maybe someone said,

13  "Hey, we got 20 grand.  Did you get your 20?"

14          And these people went in back and said this is

15  some of the social issues of paying some, but not all,

16  and that might be the reason why they were compelled to

17  pay.

18  I think it's probably more based on the team because,

19  obviously, some of these folks didn't live in Florida,

20  but they're all part of the same Maitland team.

21          So it suggests that they would interact with

22  other people on the Maitland team in Florida or

23  potentially in other states.  So part of this is what's

24  the spread of this, and if they're part of that spread,

25  that might be the reason they got paid.

HIGHLY CONFIDENTIAL

Page 94

1           MR. HALL:  I promised you once we got through

2      that, we'd take a break.

3           THE WITNESS:  Let's take ten minutes or

4      something.  All right.  Want to take 15?

5           THE VIDEOGRAPHER:  We're going off the record.

6      The time is 11:35 a.m.

7           (Break held off the record.)

8           THE VIDEOGRAPHER:  We are back on the record.

9      The time is 11:50 a.m.

10           MR. HALL:  I just reshuffled my exhibits.

11           So we're on 24; right?

12           THE WITNESS:  Yeah.

13           (Exhibit 24 marked.)

14      BY MR. HALL:

15      Q    Before we get to Exhibit 24, which I just had

16      the court reporter hand to you, are you aware of any of

17      the messaging that Home Point delivered when it announced

18      the retention bonuses?

19      A    Meaning, like what they said to employees?  I'm

20      trying to think there might be some statements in

21      Teresa Reber's depo.  I'm trying to recollect that.  But

22      specifically, I don't know if I have all that was

23      communicated to employees in connection with this.

24      Q    Are you aware of any communications that were

25      delivered to the employees that received the retention

HIGHLY CONFIDENTIAL

Page 95

1    bonus relating in any way to Don Lane or Candy Robertson?

2        A    Say the question one more time?

3        Q    Sure.  Are you aware of any communication from

4    Home Point to the employees who received the retention

5    bonuses that related in any way to Don Lane or Candy

6    Robertson?

7        A    You're saying the retention bonus specifically

8    because Don Lane and Candy Robertson are trying to poach

9    you?  I'd be surprised if they specifically made that

10   communication.  That wouldn't make much sense to me if

11   you did it that way.

12           I think they want to retain you, and they're

13   aware of this threat, but I don't know if you'd want to

14   tell every employee, "Call Don," or anything like that.

15   That doesn't make much sense to me.

16       Q    So Exhibit 24 starts with a mass email from

17   Manny Rodriguez, who, based on his email signature, is

18   the senior director of closing.  And that's been my

19   understanding as well.

20       A    Okay.

21       Q    Do you see that email?

22       A    I do see that.

23       Q    Okay.  And he says in his email, "I know it's

24   been an interesting and challenging week"; right?

25       A    Okay.  I see this.

1    Q    Okay.  And then Ms. Ringman, who is a closer,

2  responds -- I guess forwards it to Teresa Reber saying,

3  "You're paying us a $10,000 bonus for what, my love?"

4        Do you see that?

5    A    $10,000 will get you a term of endearment in an

6  email.  That's a joke, for the record.  We're smiling and

7  chuckling.

8    Q    I'm not on camera.  You're just going to look

9  weird in that one.

10    A    I'm the only one smiling.

11    Q    And then Ms. Reber says, "Because it's been a

12  rough go at it.  And while it's called a retention, I

13  just want you to know that you're appreciated while we

14  work on making the process better and solidify a leader."

15        Do you see that?

16    A    Yes.

17    Q    And then Ms. Ringman says, "Oh, my God.  Is

18  this for" -- or sorry -- she says, "OMG.  Is this for the

19  December one"?

20        Do you see that?

21    A    And she also says, "I love you and good

22  morning, dear."  Yes, I see that.

23    Q    And she says it's "in addition to."  Or sorry,

24  Ms. Reber says that the $10,000 is in addition to the one

25  for December?

HIGHLY CONFIDENTIAL

Page 97

```
 1      A      Right.  Yeah, I see that.
 2      Q      And that was -- I'll represent to you that
 3   there's several retention bonuses paid to closers in
 4   December as a separate program and plan from anything
 5   that had been alleged in this lawsuit.
 6      A      It was paid in December of 2019?
 7      Q      2020.
 8      A      This is in September.
 9      Q      So Ms. Ringman references, "Is this the
10   December one?"
11      A      Meaning that there was an intention to pay a
12   retention bonus in December of 2020.
13      Q      Correct.  And so if closers had stayed until
14   December of 2020, they were going to be and were, in
15   fact, paid the retention bonus.
16             So, I guess, to the extent that the employees
17   were unsure why they were receiving a retention bonus,
18   would that fact impact your opinion at all?
19      A      No.  Because I think, generally, the issue here
20   is you're trying to create an economic incentive for
21   people to remain at the company.  In case there is an
22   attempt to be poached.
23             So that's what this process is, and there's
24   some social elements to it as well, as I previously
25   stated.
```

HIGHLY CONFIDENTIAL

Page 98

```
 1              MR. HALL:  Okay.  We'll hand you what we'll
 2    mark as Exhibit 25.
 3              (Exhibit 25 marked.)
 4    BY MR. HALL:
 5       Q     And I was asking some questions before about
 6    retention payments that were "made by mistake" is the
 7    word I used.  But if you could read the email,
 8    Exhibit 25, and familiarize yourself with this document.
 9       A     Okay.  I've reviewed the document.
10       Q     Okay.  This is an email from Stephanie Elad
11    saying that "certain individuals were informed of the
12    retention bonus, even though it was not Teresa Reber's
13    intent for them to receive the bonus."
14              Do you see -- do understand that?
15       A     I see it.
16       Q     Okay.  So the second paragraph says, "We are
17    going to pay the UWs" -- which I understand to be
18    underwriters -- "only."
19              Do you see that?
20       A     Okay.
21       Q     Okay.  And it says, "There are only four,
22    highlighted in yellow below."
23              Do you see that?
24       A     I see that.
25       Q     Okay.  And then the four that are highlighted
```

HIGHLY CONFIDENTIAL

Page 99

1  below are Charmaine Hughes, Melanie Jaworski,

2  Lisa McElhenny, and Andre Moore?

3      A    Yes.

4      Q    Okay.  The fact that these four underwriters

5  were paid a retention bonus but they were not part of the

6  original plan to pay retention bonuses based on the

7  actions of the Defendants, would that impact your opinion

8  as to whether these damages should be included?

9      A    Well, I probably --

10          MS. ZADIKANY:  Objection.  Form.

11          THE WITNESS:  I probably want to get more

12  context.  I mean, obviously, you're handing me an email,

13  and I need to understand more context of it.  Certainly,

14  you know, there's going to be social reasons why you

15  would -- if everybody is getting a bonus, why you would

16  do it.

17          So I need to understand what happened.  I'd

18  like to get a little more context before I could tell you

19  yes or no.

20          MR. HALL:  And I'll show you what we'll mark as

21  Exhibit 26.

22          (Exhibit 26 marked.)

23  BY MR. HALL:

24      Q    You should be looking at the document that's

25  Bates-labeled HPLANE00005282.

HIGHLY CONFIDENTIAL

Page 100

```
 1      A     I see that.

 2      Q     Okay.  Okay.  And if you could briefly review

 3 this document.

 4      A     Okay.  I've reviewed it.

 5      Q     Okay.  So on the second page of this three-page

 6 exhibit, Lisa Arnold, director of underwriting manager

 7 emails Jacob Seaton and says, "One of my new hires

 8 received this email yesterday and sent over to me."

 9            Do you see that?

10      A     Yeah, I see that.

11      Q     Okay.  And it says, "I will let him know it was

12 probably sent to him in error and I would let you know

13 ASAP."

14            Do you see that?

15      A     That sounds correct.  Yes, I see that.

16      Q     Okay.  And then Jacob Seaton on

17 September 22nd, 2020, replies, "Hi, Lisa.  No, that

18 doesn't apply to Lamarr."

19      A     Yeah, I see that too, yes.

20      Q     Okay.

21      A     I'm not seeing him on the list of people that

22 got paid either.  Did I miss it?

23      Q     My understanding is he's not on the list.

24      A     Okay.

25      Q     But that is one of the reasons I sorted it out
```

HIGHLY CONFIDENTIAL

Page 101

1    alphabetically by name, so I could try to find these

2    people.

3         A     My goodness.  It would have been a long day.

4         Q     Yeah.  And then Kayla Liggett, again, on

5    September 22nd, 2020 says, "I just spoke with" -- or

6    says, "Just spoke with Jacob.  Lamarr Melson is not

7    eligible and Carlos Calvo moved to UW select and will not

8    be signing the retention bonus due to not wanting to move

9    back over to Maitland."

10              Do you see that?

11        A     Yeah, I see that.

12        Q     Okay.  And I will represent to you that I was

13   not able to find Carlos Calvo on that list, either.  I do

14   believe he did not receive a retention bonus.  Apologies.

15        A     Okay.

16        Q     And then Stephanie Elad's email from

17   September 22nd forwarding to Kristin Supancich, the

18   second sentence says, "Apparently, Jacob Seaton sent an

19   announcement to his associates about the retention bonus,

20   but several of those folks weren't on our list and should

21   not be receiving the bonus."

22              Do you see that?

23        A     I see that.

24        Q     Okay.  So there are certainly people who are

25   not receiving the retention bonus who are being --

HIGHLY CONFIDENTIAL

Page 102

1    hearing about the retention bonus; correct?

2        A    Certainly, it looks like these -- I'm not sure

3    how to Lamarr.  Let me go back.

4        Q    And --

5        A    He forwarded it to Lisa Arnold.  Okay.  I see.

6        Q    So does the fact that underwriters that knew

7    about the retention bonus were not eligible for the

8    retention bonus impact your opinion in this matter?

9        A    I'd have --

10            MS. ZADIKANY:  Objection.  Form.

11            THE WITNESS:  I'd have to know more about the

12   particular circumstances here before I could say whether

13   or not it's one of the reasons.  One, one of the people

14   here says he's not in Maitland, so it seems -- it seems

15   to be a criteria, are you part of the Maitland group.

16            So I'm not -- I just don't know the specific

17   circumstances about Lamarr.  I can obviously investigate

18   and then make a decision.  His name is -- just a

19   spelling, L-A-M-A-R-R, Melson, M-E-L-S-O-N.

20            (Reporter clarification.)

21            MR. HALL:  Okay.  I'm going to have the court

22   reporter hand you what's been marked as Exhibit 27.

23            (Exhibit 27 marked.)

24   BY MR. HALL:

25       Q    If you can familiarize yourself with this email

Page 103

1    chain?

2        A    Okay.  I'm done reading it.

3        Q    Okay.  So this document on the bottom of the

4    page HPLANE00005310, which is the first page of the

5    exhibit, do you see an email from Teresa Reber to

6    Stephanie Elad on October 1 saying, "If we communicated,

7    they would get one, we need to honor.  If we didn't, then

8    I would prefer we do not pay."

9             Do you see that?

10       A    I see that.

11       Q    Okay.  And then if you go to the email from

12   Stephanie Elad on the top of the first page, October 1st

13   email to Teresa Reber, she says, "Hi.  I talked to

14   Jacob and figured out what happened.  The senior UWs

15   received an email from Jacob about the retention bonus,

16   so we definitely will get those memos out today.

17            "I will have my team let any of the closers and

18   the one loan coordinator on the list know that they

19   received the email from me in error."

20            Do you see that?

21       A    Okay.

22       Q    And then it says, "If you and Sabrina decide

23   otherwise, let me know.  I'm a little concerned about

24   handling these folks differently, but we do have a clear

25   delineation based on title, so that makes it easier to

HIGHLY CONFIDENTIAL

Page 104

1    explain if we need to."

2           Do you see that?

3    A     I do see that.

4    Q     Okay.  Do these emails give you more context as

5    to the underwriters who were paid a retention bonus while

6    they were not initially intended to receive one by

7    Teresa Reber?

8    A     Well, do they provide more context than they

9    provide additional context, certainly.

10   Q     And these documents were provided to you as

11   part of developing your opinion?

12   A     I would have to look at my documents reviewed

13   list.

14   Q     Yeah.

15   A     Let me see.

16   Q     If you look at the last page of the rebuttal,

17   which should be Exhibit 3, it's HPLANE0000001 through

18   HPLANE00005516.

19   A     Okay.  I see it here.

20          MR. HALL:  So these would be within that Bates

21   range.

22          I'm going to hand you what's been marked as

23   Exhibit 28.

24          (Exhibit 28 marked.)

25   ///

HIGHLY CONFIDENTIAL

Page 105

1   BY MR. HALL:

2       Q     And this is another payroll stub for retention

3   bonus, and this one is for Andre Moore.

4             Do you see that?

5       A     Okay.

6       Q     All right.  So we're going to play a little bit

7   of exhibit musical chairs.

8             Are you ready?

9       A     Back to 27?

10      Q     If you pull out 25, and you pull 16.  Sixteen

11  is the pay stub for Charmaine Hughes.

12      A     Okay.

13      Q     Okay.  So both Ms. Hughes, in Exhibit 16, and

14  Mr. Moore, on Exhibit 28 are listed as highlighted

15  underwriters on Exhibit 25; correct?

16      A     There's Moore and there's Hughes.  That's

17  correct.

18      Q     Okay.  If we make the assumption that these two

19  individuals were paid for a reason other than a concern

20  of the actions of Don Lane and Mrs. Robertson, would your

21  opinion be that those payments should not be included in

22  the damages to charge to the Defendants?

23            MS. ZADIKANY:  Objection.  Form.

24            THE WITNESS:  So again, I'd have had to --

25  before I would get to a final opinion on this, I would

HIGHLY CONFIDENTIAL

Page 106

1    have to get a better understanding of these individuals

2    and what the circumstances were beyond a few emails and

3    discussions.

4    BY MR. HALL:

5        Q     Sure.

6        A     Obviously, one of the things that was in one of

7    the emails that I recently read -- probably Exhibit 28, I

8    think -- it talks about "I'm concerned about the

9    delineation."  I think that email sort of referencing

10   some of the social issues that may be involved.  You pay

11   some but not all coworkers creates issues.  I get that

12   piece.

13            So I'd have to think about the particular

14   circumstances.  Certainly, if someone was outside of the

15   group, you know, someone -- like, take the Carlos guy,

16   who apparently wasn't part of Maitland, if he was paid a

17   retention bonus, I would not consider that related to

18   this.

19            But I'd have to think about the other

20   situations to get a little more context.  And then I'll

21   come up with a final opinion about whether you would keep

22   this in or take it out or, you know, obviously, you could

23   also leave it to the trier of fact.

24            You can say, "Okay, look, there is this amount

25   was paid and you can decide whether or not this is part

HIGHLY CONFIDENTIAL

Page 107

1    of this or not."

2        Q      Right.  I certainly understand that your

3    opinion is if these people were paid to -- either for a

4    social reasons of happiness within the office or for an

5    attempt to dissuade individuals from leaving to go join

6    Don Lane and Candace Robertson at Guaranty, I understand

7    that for those people, your opinion is that those

8    payments would be recoverable damages.

9        A      That's correct.

10       Q      And so I guess I'm trying to figure out the

11   breadth of your opinion.  And so if it's -- if the --

12   ultimately the factfinder says, you know, these four

13   individuals, they're in it with the rest of the group for

14   the reasons that we just discussed, then I understand

15   your opinion is that they should be -- those payments

16   made to them for retention bonuses should be included in

17   the damages.

18          And I guess the question is:  If the factfinder

19   determines that these four individuals were paid this

20   retention bonus for a different reason than for office

21   morale or to avoid potential poaching, is your opinion

22   broad enough to still reach those bonuses even if they're

23   paid for another reason?

24       A      So under your hypothetical, for example, you're

25   basically -- let me make sure I understand it --

HIGHLY CONFIDENTIAL

Page 108

1    obviously, I'm talking about the connection between, you

2    know, Lane and Robertson leave.

3            The company says, "Oh, gosh.  We've got a big

4    problem.  We're getting raided.  It's not a one-off

5    event.  Who are they going to go after next?  Fine, let's

6    bonus everybody out.  Get these people on retention

7    bonuses.

8        Q    Yeah.

9        A    (Inaudible response.)

10            And obviously, there's questions about, well,

11   if not Bobby -- if Bobby got it, why not Sue?  Well, the

12   answer is they're part of this group.  And so that way,

13   you don't have people complaining saying, "Well, they

14   value those four people but not me."

15            All of those things I think are all important.

16   So I'd have to understand the context of this.  If it's

17   for some completely different reason, I could see

18   potentially if it's not connected.

19       Q    Okay.

20       A    There's an argument there that I would be

21   willing to acknowledge, but I think you'd have to get to

22   the context of these particular ones and have that

23   discussion.

24            MR. HALL:  I'll hand you Exhibit 29.

25            (Exhibit 29 marked.)

HIGHLY CONFIDENTIAL

Page 109

1    BY MR. HALL:

2        Q     Okay.  Exhibit 29 is just a short email from

3    Jacob Seaton to Teresa Reber at HPLANE00005477.

4             Do you see that?

5        A     Yeah.  It appears to be an email about the

6    social issues that happened when paying some, but not

7    all.

8        Q     Uh-huh.  The fact that this bonus was not a

9    company-wide bonus but a Maitland office-specific

10   bonus; right?

11            Does that undercut the social aspects of it

12   where, "Why did he get one when I didn't"?

13       A     No, I mean, I think it's easier to -- if you

14   make a delineation based on job title, or you make a

15   delineation based on group, or things like that because

16   then it becomes you're not part of that job title.

17   You're not part of that group.

18            I mean, it's the same in, you know, my own

19   business.  If I were to give a bonus to a group of people

20   of a given title or a given office, I have to have a

21   reason to justify why someone isn't on the list.  I think

22   it's a lot harder if you're part of the same group and

23   the same job titles as people who got it, then you've got

24   the far bigger social issue.

25            I mean, look, this is -- any time you have to

Page 110

1   do this kind of mass response, you're kicking a hornet's

2   nest.  It's never, you know -- it's never a positive

3   thing for your business, and you've got to make some of

4   those calls.  But the more that you do, you have a real

5   potential impact on morale for folks that think they, you

6   know, should be part of the group that got paid.

7       Q    For your opinion, as you just described the --

8   what we've been calling the social aspect of it -- or the

9   social or morale I think I said a couple of times -- but

10  the social aspect of it, it doesn't matter for your

11  opinion about whether the individuals who received the

12  retention bonus were actually at risk of being poached or

13  solicited by Don Lane or Ms. Robertson; correct?

14              MS. ZADIKANY:  Objection.  Form.

15              THE WITNESS:  Can you read that back real

16  quick?

17              (The record was read as follows:

18                  "Question:  For your opinion, as you

19                  just described the -- what we've been calling

20                  the social aspect of it -- or the social or

21                  morale I think I said a couple of times -- but

22                  the social aspect of it, it doesn't matter for

23                  your opinion about whether the individuals who

24                  received the retention bonus were actually at

25                  risk of being poached or solicited by Don Lane

HIGHLY CONFIDENTIAL

Page 111

1              or Ms. Robertson; correct?")

2              THE WITNESS:  I think there's two things that

3      come to your question:  One is at the time that this

4      occurred, Home Point did not know who was at risk of

5      being poached.  So when you don't know, you might have to

6      pass -- pay a wider net.

7              So, again, you know, if Don and Candy were to

8      say here in 2023, "I didn't mean to poach name whoever,"

9      so nobody knows that on the Home Point side.  I just know

10     that people are resigning en masse.

11             I mean, if you were to take Don Lane's view of

12     the world, he was trying to create a shock to the system.

13     You know, maximum impact.  There's statements like that

14     in his -- in his texts, it seems.  So he was trying to

15     create a -- hey, look, this is a problem for you, and

16     have some shock value to it, it seems.

17             That's why he coordinated all of the

18     resignations to occur simultaneously or at least

19     attempted to.  So there's something there designed to

20     sort of be a gut punch, if you will, to Home Point.  And

21     if you don't know who they're going to approach,

22     generally, you have to pass a much wider net.

23             So you have to think about what -- who knew

24     what and when.  And the second part is going to be well,

25     okay.  If I were to -- where does this thing stop?  The

HIGHLY CONFIDENTIAL

Page 112

1    easy way to think about it -- at least the way I'm

2    looking at it too -- is that okay, the people that were

3    part of that operation, the Don and Candy operation,

4    that's Maitland.

5            I could, then, if I was Home Point, I could go

6    and explain to my employees in Phoenix or wherever,

7    "You're not -- this was just for Maitland.  This is what

8    this is."  So it's a little different.  There is a

9    delineation point you can make if it comes to you.  It's

10   not necessarily great, but I know it's much worse.

11           It's when, you know, if you and I are working

12   alongside each other, and they said, "You know, Rob gets

13   a bonus but you don't.  And we'd like Rob to be retained,

14   but we're not so sure about you," it's a pretty tough

15   message, especially if we're working alongside.  Because

16   I'm pretty sure most of these employees probably had some

17   conversation with their coworkers.

18           "Hey, I just got 20 grand or I just got 10

19   grand."  That's certainly a notable amount.  And it's

20   such a notable amount that it spread beyond just the

21   Maitland group it looks like.

22   BY MR. HALL:

23       Q     Okay.  And do you recall the date that

24   Home Point sent the cease and desist letter to Don Lane?

25       A     It would have been after his resignation, so.

HIGHLY CONFIDENTIAL

Page 113

1      Q      September 18th?

2      A      Yeah.  September 18th, somewhere around there.

3      Q      Okay.

4      A      It's either the 18 or the 21st.

5      Q      I think the 21st was the ones that went out to

6   the Home Point and the other entities, so.

7      A      Oh, okay.

8      Q      And so these retention bonuses were all paid

9   after the cease and desist letter was sent?

10     A      Yeah, but their sending the letter doesn't

11  necessarily guarantee that A, the other side will cease

12  or the court will -- a letter is a letter.  You're just

13  sort of putting someone on notice, "Potentially, we're

14  going to sue you."

15            It doesn't necessarily mean a court the will

16  even award you cease and desist.  Usually there's a

17  hearing of some kind.

18            MR. HALL:  Why don't we break for lunch now so

19  I don't start a new topic for three minutes and then by

20  the time I write down the stickers, we will --

21            We can go off the record.

22            THE VIDEOGRAPHER:  We are going off the record.

23  The time is 12:27 p.m.

24            (A lunch recess was taken.)

25            THE VIDEOGRAPHER:  We are back on the record.

HIGHLY CONFIDENTIAL

Page 114

1    The time is 1:36 p.m.

2    BY MR. HALL:

3        Q    Mr. Crandall, you produced some documents in

4    response to the subpoena today.  I just have a couple

5    questions about some of the documents.  I don't have

6    them -- I don't have them printed out.

7        A    Okay.

8        Q    From what I saw, it was just the one invoice

9    for $40,000; is that correct?

10       A    That's the first report, yes.

11       Q    Okay.  And is there a second invoice?

12       A    Not yet.  I haven't done my billing yet.

13       Q    Okay.  Understood.  But you'll have billed

14   separately for the rebuttal than the first $40,000 fee?

15       A    Yes.

16       Q    Okay.  All right.  Going back to your report,

17   the initial report, I guess we talked about the retention

18   bonuses.

19            And going to the next category of damages that

20   you list in your report are the increases in salary for

21   the ten associates; correct?

22       A    Yes.

23       Q    Okay.  I'd like to first talk about the four

24   that stayed, if you can distinguish those four from the

25   rebounds in your head.

HIGHLY CONFIDENTIAL

Page 115

1          In your -- in your rebuttal report, you
2     actually say that the raises that the four individuals
3     received, that was not in response to a general industry
4     trend; is that right?
5          A     It's my -- the ones that are there, the ones
6     that said, "I had this offer and please match," yeah,
7     that was in response to this event.
8          Q     Okay.  Did you compare the updated pay rates
9     for those four individuals with the pay rates of what the
10    new hires were receiving in September of 2020?
11         A     I think you already asked this question.  I
12    think I told you no, I haven't looked at that.  I don't
13    know necessarily if those are comparable or not.
14         Q     Yeah.  Okay.  If you go to your report on
15    Table 4, it's a document that's been marked as Exhibit 2
16    for this deposition.
17         A     Yes.  Training costs.
18         Q     Yeah.  And so this outlines the salary for the
19    individuals who were hired in replacement of the
20    associates that left; correct?
21         A     These are, yes, these are the people we've
22    identified as the first replacements.
23         Q     Okay.  And you can extrapolate those salaries
24    because I know we talk about salary, but everybody
25    that -- the four individuals that received raises, they

HIGHLY CONFIDENTIAL

Page 116

1  were on hourly; correct?

2      A      They were all hourly, yes.

3      Q      Okay.  So -- but if you extrapolate the hourly

4  rate to the annual salary for the individuals on Table 4,

5  then you can look at Ms. Chapman, Ms. Richardson, and

6  Ms. Owighowotu and see that their rates were -- sorry --

7  their pay rates were between 110- and $115,000.

8          Do you have any reason to question that

9  representation?

10     A      It's probably about right.  There's also people

11  well below that too.

12     Q      Correct.

13     A      And the key thing to remember about this is

14  that each one of these rates are going to be set

15  individually based on experience, negotiations,

16  et cetera.  So you'd have to have a little bit more

17  understanding about each of these people before you can

18  say person A is comparable to person B.

19     Q      Correct.  And so if you look at the salaries of

20  Ms. Huber, Ms. Thoennis, and Ms. Hamilton, which you've

21  listed on Page 20, Paragraph 36 of your report.

22     A      Okay.

23     Q      Then you'll see that these salaries are right

24  in line of what the individuals being hired in September

25  were making, as far as senior underwriters; correct?

HIGHLY CONFIDENTIAL

Page 117

1      A      Which salaries?

2      Q      Say that again?

3      A      Which salaries?

4      Q      So the salaries of Ms. Huber, Ms. Thoennis and

5  Hamilton, the raises that they received in September of

6  2020.

7      A      Okay.

8      Q      So it looks like they all received a raise to

9  approximately $110,000 a year?

10      A      That is correct.

11      Q      Okay.  And that was certainly within the range

12  of when they were hiring new senior underwriters in

13  September and October of 2020; correct?

14      A      Well, there's also somebody at 80 grand,

15  Christine Grant.  You know, I think this comparison is

16  kind of misleading.  You're going on a trip because you

17  don't know who compares to what.  You'd have to look at

18  the resumes.  You'd have to look at the experience.

19            You'd have to have an understanding of each of

20  the attributes of the employees and the applicants to

21  really test if they're really comparable.  You know, what

22  they've said, what they've done, what they were earning

23  at a prior firm.

24            I mean, there's a lot of variables that go into

25  setting someone's salary and that's why you see some of

HIGHLY CONFIDENTIAL

Page 118

1    the variation even in -- is it Table 4 we were talking

2    about before? -- in Table 4.  Just looking at the rate

3    differences.  Some people are at 55.  Some people are

4    4520.  Some people are at 4327; it's a senior

5    underwriter, so there's a huge range.

6           So, you know, just sort of this, oh, it's just

7    the same, that's kind of -- that's not a correct

8    comparison from my perspective.

9        Q    Okay.  Have you done any comparison to the

10   experience of Ms. Huber, Ms. Thoennis, and Ms. Hamilton

11   compared to the new hires?

12       A    No.  I don't have the resumes of any of these

13   folks.  And I do know that they approached HR and said,

14   "I want to get paid more," and they struck a deal, and

15   that's how they got the raise.

16          And the people that rebounded, same thing.

17   "I'm willing to come back, but I want more money," and

18   they got more money.

19       Q    Okay.  Do you know how their -- the rebounds

20   how their pay was determined when they returned?

21       A    Well, just looking at it, I mean, it's not a

22   standard percentage increase.  It just varied.  You know,

23   some people were up 20 percent.  Some people were up

24   10 percent.  Some were up 25 percent.  And it doesn't

25   look like they all ended up on the same number.

HIGHLY CONFIDENTIAL

Page 119

1          One person, Daniel Clark, went to 95 grand.

2   108 grand for Jared Haren.  115 for Sharlene Murray.  I'm

3   saying it's kind of all over the map.

4          And the likely explanation for this is

5   negotiations and what it took to get them back.

6      Q    I know you haven't had the benefit of reviewing

7   Melissa Kramer's deposition, but she testified that they

8   were just hired back at the market rate for underwriters

9   at the time?

10     A    No.  Because what's the market rate even mean?

11  Market rate holding constant their skills, level, and

12  experience, or human capital.  Is that what she means?

13         Is that what she meant?

14     Q    Yes.  That's what she -- she just said that was

15  the market rate for what an underwriter was being hired

16  for and she was the one that brought them back.

17     A    So I'm curious.  I'd have to look back and see

18  what these people were being paid at GHMC.

19         Are these base salaries the same or higher and

20  what was the difference?

21     Q    Would it change your opinion if these

22  individuals were just hired based on what the market rate

23  for what they rehired was?

24     A    No.  I certainly think that the facts are that

25  this is all related to the rate.  And, you know, did

HIGHLY CONFIDENTIAL

Page 120

1    everyone else get an increase of 20 percent?  15 percent?

2    I'd have to go back and look, but I don't think the basis

3    went up that much is my recollection.

4           Someone can check.  Most of the compensation

5    increases in that bonus plan, and that's where some of

6    the big numbers -- it's variable comp, which makes sense

7    because it's going to allow you to ebb and flow

8    compensation with market conditions.

9       Q    None of the ten individuals that are listed in

10   Paragraph 36 or 37 of your report were paid higher than

11   Kelly Chapman's starting salary; correct?

12      A    Kelly Chapman is -- she's on the next page?

13      Q    How much was she being paid?

14      A    5529.  So that's about a 110.

15      Q    I think it's up to 115.

16      A    There are people getting paid less than that.

17   There's one or two at 115, but there is a lot -- there is

18   people at 95.  108.  So again, I just think that

19   comparison is way too individualized to say this is the

20   market rate.  That's a simplistic argument that doesn't

21   really make sense given the economic factors that drive

22   pay.

23      Q    Okay.  So what factors did you consider on

24   determining the damages for these raises?

25      A    What they were being paid before the event and

HIGHLY CONFIDENTIAL

Page 121

1  what they got paid afterwards.  So they effectively

2  leveraged this event into higher pay.

3       Q    So you just subtracted the rates?

4       A    Just compared it, and then we took the

5  difference.  I think there's some testimony somewhere

6  that, you know, pay increases are generally two percent.

7  Some small, and most of this is, obviously, pretty

8  significant.  For the annual amount increase, generally,

9  it's not much.

10      Q    Yeah.  You can look at Exhibit 8 again, which

11  is the third set of interrogatories.  I know you didn't

12  have the luxury of this when you wrote your report.

13      A    All right.  Which page?

14      Q    If you go to the response to Number 15, which

15  is on Page 3.  But the chart that I'm going to refer you

16  to is on Page 4.  On there, you can see that the average

17  wages for a senior underwriter in 2019 were $94,974.18.

18           And then the average wages for an underwriter

19  in 2020 -- and this is without consideration of a

20  bonus -- was $108,240.09.

21      A    Okay.

22      Q    So it's about $14,000 increase?

23      A    Okay.  So you have to look at the composition

24  of the workforce.  You'd have to understand who is in

25  there.  Obviously, they've hired a lot of people.  So you

HIGHLY CONFIDENTIAL

Page 122

```
 1   have to understand the delta there.  Maybe you have some
 2   people that in 2019 were junior people who left.  Or less
 3   experienced senior underwriters.
 4        Q     Okay.
 5        A     So you just have to understand that.  But I
 6   don't know if this means much.  It's certainly not a
 7   measure of what the market is necessarily; it just could
 8   be a composition effect of who is in your employee group
 9   at the same time.
10        Q     Okay.  But you haven't done any analysis as to
11   these individuals compared to the other -- compared to
12   the pay that like individuals were receiving at --
13        A     Well, I know the pay varies.  So, I mean, the
14   average statistic is not really the most meaningful.  I
15   do think the bonus numbers, though, are pretty
16   significant.  I can see why the underwriters and senior
17   underwriters is kind of weird, to 70 grand.  That's the
18   big number.
19        Q     Right.  And I think that would include the
20   retention bonus too, so; right?
21        A     Well, I wasn't -- I don't know how they came
22   into this.  Maybe they put the retention -- is the
23   retention bonus in this?
24        Q     For 2020.
25        A     Well, then deduct 20 grand.
```

HIGHLY CONFIDENTIAL

Page 123

```
1        Q     From the -- well, that's from the bonuses paid,
2   separate column.  I was just looking --
3        A     Is that in the bonuses?  Okay.  I just don't
4   know.  Obviously, I'm speculating because I have no idea
5   what's in this thing.  It's the first time I've seen it
6   today.
7        Q     Yeah.
8        A     Even still, the bonus is probably doubling if
9   20 grand were in there.  So it was a good market in 2020.
10            MR. HALL:  For sure.  All right.  I'm going to
11   hand you what we'll mark as Exhibit 30.
12            THE WITNESS:  This interrogatory asks only
13   about Maitland, or is this asking about everywhere?  I
14   don't know what HPLANE refers to.  I know it refers to a
15   file, whatever that was.
16            (Exhibit 30 marked.)
17   BY MR. HALL:
18        Q     Yeah, HPLANE 4536 is the document that you --
19   the retention bonus.
20        A     It's the same retention bonus?  Okay.
21        Q     I've given you what's been marked as
22   Exhibit 30.  So this is an email increasing Danny Cook's
23   base salary to $85,000.
24        A     I see that.
25        Q     Okay.  Now, this email itself was dated
```

HIGHLY CONFIDENTIAL

Page 124

1    September 7th for the --

2        A      Okay.

3        Q      -- in Table 1 of your report, your salary for

4    the employees.

5        A      Yeah.

6        Q      As of 8-30-2020; is that right?

7        A      Yes.

8        Q      So that would not take into account raises that

9    were received in the first half of

10   September 2020; correct?

11       A      It would miss that first pay period in

12   September of 2020.

13       Q      And if so Danny Cook had been approved a salary

14   of $85,000 prior to his resigning, then the difference

15   per year and the difference per pay period of your

16   calculation would be reduced; correct?

17       A      It would be reduced slightly.  I mean, he

18   obviously got more than that, another ten grand.

19       Q      But you would agree that the difference between

20   what he was actually paying or what he was approved to

21   pay at the end is the correct measure for the difference

22   between what he did when he came back; right?

23              (Reporter clarification.)

24              THE WITNESS:  I'm trying to tie this to the

25   actions of, you know, the Defendants.  And if they gave

HIGHLY CONFIDENTIAL

Page 125

1  him a raise that appeared -- that's one pay period

2  between August and then when the event happened, then I

3  would make a small adjustment to account for that.

4  BY MR. HALL:

5      Q    Okay.  Because there wasn't -- there wasn't

6  anything in your report where you picked August 30th,

7  other than it was the last month -- end-of-month payment?

8           (Reporter clarification.)

9           THE WITNESS:  It was the last pay period

10  before, you know, some of the things started happening.

11  BY MR. HALL:

12      Q    Now, in Table 1 of your report, you don't take

13  into account any of the bonuses that the six rebounds

14  would have been paid had they stayed employed

15  continuously at Home Point; correct?

16           MS. ZADIKANY:  Objection.  Form.

17           THE WITNESS:  Table 1?  I missed your question.

18  In Table 1?

19  BY MR. HALL:

20      Q    In Table 1, when you're calculating the

21  difference in what their pay was from when they came back

22  to when they left, you don't take into account any of the

23  bonuses that these employees would have received had they

24  stayed employed continuously; correct?

25      A    This is just base pay.

HIGHLY CONFIDENTIAL

Page 126

```
1       Q     And why didn't you consider the bonuses that
2  would have been paid out as part of your calculation?
3       A     Because it's a comparison of base pay.
4       Q     Well, it's your opinion on damages; right?
5       A     Yes.
6       Q     Okay.  So where do you take into account that
7  they gave up bonuses by leaving in the mid-month of
8  September into your damages calculation?
9       A     I'm not looking at this here at all.  Table 1
10  is focused on a difference in base pay.  And it's focused
11  on a difference in base pay from the time they started
12  and until they eventually terminated, if they terminated.
13       Q     Do you know if Dora Lopez received any payments
14  under the underwriter appreciation fund after she
15  resigned in September 17th?
16       A     I don't know.  I'd have to look in the records.
17            MR. HALL:  I'll hand you what's been marked as
18  Exhibit 31.
19            (Exhibit 31 marked.)
20  BY MR. HALL:
21       Q     Now, this is an email from Don Lane to
22  Dora Lopez that was produced in this lawsuit.  And the
23  second paragraph, Ms. Lopez says that she's "on pace to
24  make $156,972 this year, excluding the underwriter
25  appreciation bonus rolled out at the end of August, which
```

HIGHLY CONFIDENTIAL

Page 127

1    is based on current production is slated for an

2    additional $40,000 minimum in added salary."

3            Do you see that?

4        A    I see that.

5        Q    Okay.  So if Ms. Lopez resigned and was no

6    longer eligible for the underwriter appreciation bonus,

7    then that would be money that Home Point didn't have to

8    pay; right?

9        A    So you're suggesting that this was a bonus that

10   was potentially accrued that was not paid?

11           Is that what you're asking?

12       Q    Yeah, let me give you --

13       A    While you're giving that information, the other

14   part of this that's interesting is that Candy and Don

15   offered her 100 grand, which presumably was market or a

16   little above, and she's looking for $115.  It's an

17   example of negotiation and why that might be, you know,

18   might be impacting people's salaries.

19           But anyway, let's talk about bonus.  Okay.

20       Q    So this appears to be the underwriter

21   appreciation fund that Ms. Lopez is referencing.

22       A    It could very well be, yes.

23       Q    What's that?

24       A    It could very well be.  She didn't attach the

25   document.

HIGHLY CONFIDENTIAL

Page 128

```
1      Q     Yeah.  Correct.  And Home Point has testified
2   that that's the only one that was out there.  So here,
3   the -- it says on the bottom of the page, "Any new hire
4   that has received a sign-on bonus is excluded"; right?
5      A     I see that there.
6      Q     Okay.  And the -- if the individuals had earned
7   this and they were averaging three, four, five loans per
8   day, but they were no longer employed, then Home Point
9   wouldn't pay it out.
10            Do you understand that?
11     A     I understand what this document appears to say
12  that.  I'd have to look to see how they were treated upon
13  return, and I don't know that answer yet.
14     Q     Okay.
15     A     I'd also have to look at what other
16  compensation she may have received.  Dora got 20 grand,
17  it looks like, so I'd have to understand what that would
18  be and where it would be relative to other things.  I
19  don't know what her productivity was in the last quarter.
20  There are a lot of variables that are in play.
21     Q     Would your opinion change if the six employees
22  that left were entitled to bonuses that they -- that were
23  contingent on them being employed at the time of the
24  payment?
25            Would that change your opinion?
```

HIGHLY CONFIDENTIAL

Page 129

1      A    I would have to just look at the -- you're

2  asking me questions -- I'm not sure.  I'd have to look at

3  the data, see what happened, see what they got.  You

4  know, you're asking specific questions about this

5  individual, for example, and what she got.

6      Q    Okay.

7      A    And I'd want to be able to see what her data

8  showed and what her pay was, things like that.

9      Q    Now, how many directors left to go with

10  Don Lane?

11      A    The second level, I thought it was all but one.

12      Q    Is it four or five?

13      A    I don't know.  It's somewhere around here, but

14  a decent chunk.  At least two, but I would want to say it

15  was more.  I thought it was four.

16      Q    Yeah.  In Paragraph 40, you say, "five

17  underwriting directors."

18      A    Okay.

19           MR. HALL:  So I'll give you what we'll mark as

20  Exhibit 33.

21           THE WITNESS:  Thank you.

22           (Exhibits 32 & 33 marked.)

23  BY MR. HALL:

24      Q    If you can take a look at this document.

25      A    Okay.

HIGHLY CONFIDENTIAL

Page 130

1      Q      So Mr. Bertrand is one of the individuals that

2   you've listed as being hired to replace the individuals

3   that left to go to Home Point; correct?

4      A      Yes.  I believe he was the first that came up.

5      Q      Okay.

6      A      To the best of my recollection.

7      Q      And if you look at the compensation section,

8   you will see that it says, "Starting in January of

9   '21," -- at the second bullet, so -- "Starting in January

10  of 2021, you will become eligible for an annual bonus

11  target of 10 percent of your base salary tied to

12  corporate and individual performance to be paid out

13  during Q1 of the following year."

14             Do you see that?

15     A      I do.

16     Q      Okay.  So Mr. Bertrand had a start date of

17  November 30, 2020, if you look up earlier in the

18  document.

19     A      Yeah.

20     Q      So Home Point's corporate representative has

21  testified that the directors did not get the performance

22  per loan underwriting bonus but had this kind of annual

23  bonus based on percentage of their salary.

24             Okay?

25     A      Okay.

Page 131

1    Q    It was testified that you needed to be employed

2    in Q4 of the year before to be eligible; right?

3         So this is why they -- Mr. Bertrand is not

4    eligible to get one at the end of 2020, but he's eligible

5    to get one in 2021.

6    A    Okay.

7    Q    Okay?  So had the individuals, the five

8    directors that left to go to Guaranty, had they stayed at

9    Home Point, Home Point would have had to pay them a bonus

10   that they didn't have to pay Mr. Bertrand?

11   A    Well, it depends on what numbers they achieved

12   and whatever formula was in place for 2020.  I don't have

13   the specifics on what that would be.  But if you're

14   arguing that -- it sounds like you're arguing that

15   Home Point is somehow better off by not having people

16   there and having this turmoil in its business, I'd

17   probably disagree with that.

18   Q    Okay.  My question is just:  Does it impact

19   your analysis if Home Point didn't have to pay bonuses to

20   new hires that it would have had to pay to the people

21   that left?

22   A    I'd have to think about that.  I'd probably

23   have to do some research to see what the numbers are and

24   get a better understanding of it.

25        MR. HALL:  I'll hand you Exhibit 34.

HIGHLY CONFIDENTIAL

Page 132

1          (Exhibit 34 marked.)

2     BY MR. HALL:

3          Q     This is a similar Dayforce offer of employment

4     for Brian Gorton, who's another one of the directors you

5     have listed on Table 3.

6          A     Okay.

7          Q     Not Table 3.

8          A     He's here.

9          Q     Table 4.  No, he's in three.  Okay?

10         A     He's in three and he's probably in four.

11         Q     Yeah, he's in three and four, not two.  You'll

12    see the same second bullet point except for his is an

13    annual target bonus of 15 percent of his base salary, as

14    opposed to 10 percent.  But otherwise, the same

15    conditions as with Mr. Bertrand; correct?

16         A     It doesn't say what individual performance --

17    whatever that means -- how that triggers.

18         Q     Correct.

19         A     And how it breaks it out.  It does show that

20    this appears to be more customized than just across the

21    board.  So to figure these things out, you'd probably

22    have to look at this on -- even just try to figure out

23    what your number is without looking at it person by

24    person.

25               Any way, but...

HIGHLY CONFIDENTIAL

Page 133

1    Q    Those bonuses, when comparing the cost to

2  Home Point of hiring new individuals, you didn't take

3  into account the bonuses that weren't paid to the

4  individuals that were left; correct?

5    A    Well, I can make a blanket statement I have not

6  considered any bonuses that were forgoed by people who

7  left.

8    Q    Right.  And if we --

9    A    I can make that blanket statement.  And now,

10  you're asking me to make -- I'd have to look and consider

11  that more in detail.  But right now, it's not factoring

12  into my calculation.

13    Q    And so there may have been a $30,000 signing

14  bonus paid to somebody to replace one of the individuals

15  that left, but one of the individuals that left may have

16  been entitled to a $40,000 bonus for the underwriter

17  appreciation fund had they stayed?

18    A    Well, A, you don't know what that's going to

19  be.  You don't know -- that's far more speculative

20  because then you're talking about trying to figure out

21  what work would have been apportioned to whom, and how

22  much productivity they would have had.  How hard --

23  there's -- that's much more speculative to make that

24  statement.

25    Q    I think we talked about this being the highest

HIGHLY CONFIDENTIAL

Page 134

1    volume that the market has ever been for

2    underwriters; right?

3        A     That's correct.

4        Q     And so these are performance-driven bonuses?

5        A     Well, they are, but they're also hiring more

6    underwriters and they're trying to hire to meet the

7    volume, like the entire industry is.

8             MR. HALL:  I'll hand you what's been marked as

9    Exhibit 35.  This is text messages produced by

10   Home Point, which we understand to be between

11   Kelly Hamilton and Don Lane.

12            (Exhibit 35 marked.)

13   BY MR. HALL:

14       Q     If you go to the second page, you can see that

15   Ms. Hamilton is asking about the production bonus in the

16   top text message.  She says, "I think it might say that

17   the bonus is only paid if still employed."

18            Do you see that?

19       A     Okay.

20       Q     And Kelly Hamilton remained employed, but she

21   says, "that's about $8,500 for me this month.  So I'm

22   just worried I'd lose it"; right?

23       A     Yeah.

24       Q     And so if the individuals that resigned in

25   mid-September had been owed $8,500 for the production up

HIGHLY CONFIDENTIAL

Page 135

1    to that point in September, but were not paid that

2    because they resigned, would that impact your calculation

3    of damages?

4        A     Again, I'd have to look at what they paid and

5    what they had to pay to replace and think about it --

6    about whether that would factor in or not.

7        Q     Okay.

8        A     I just need more details.

9        Q     Looking back at the Exhibit 34 and 33, which is

10   the offer letters for Bertrand and Gorton.

11       A     Yeah.

12       Q     If they had maximized their available bonus,

13   that would be the 10 percent for Bertrand of $125,000, so

14   that would be $12,500?

15       A     Right.

16       Q     Don't trust my math.  I'm a lawyer.

17             And then Gorton would be 15 percent of

18   $130,000, which is $32,000.

19       A     How much was $130,000.

20       Q     That was his base.  So --

21       A     So 15 percent of $130,000, that's not 32.

22   10 percent --

23       Q     Sorry.  It's going to be $19,500.  Like I said,

24   don't trust my math.  It's 32,000 if you add the 19,500

25   and the 12,500 together between Gorton and Bertrand.

HIGHLY CONFIDENTIAL

Page 136

1    A    Okay.

2    Q    So if they had -- if they maxed their bonuses

3    in 2021, between the two of them they would have gotten

4    $32,000?

5    A    Okay.

6    Q    And they got zero in 2021.

7    A    Well, they didn't join until Q4.

8    Q    Correct.  But they were joined as replacements

9    for people who had been there for the entire year.

10   A    Okay.

11   Q    Who would have been eligible for that bonus.

12   A    Well, not necessarily that bonus.  We have to

13   look at their base and what their bonus may have been.  I

14   mean, this -- who knows what was in their letter relative

15   to this.  I'd have to look and understand what their

16   document says, and also whether or not they had -- what

17   their performance was.

18        Partly it says -- you know, the assumption

19   you're making is they would maximize.  And who knows,

20   maybe there are reasons they would have been dinged.  You

21   just don't know until you dig into that a little deeper.

22   Q    And you've had all of these documents in your

23   file.

24        Is there anything in the documents that you

25   reviewed that you could dig into and find answers?

HIGHLY CONFIDENTIAL

Page 137

1      A      No.  I'd have to go back and see if I have

2   letters to these guys.  Not these two particular

3   individuals, but the previous people, and I'd have to

4   look at their bonus, potentially.  Obviously, I'm

5   responding to you and what your question is.

6           There's probably stuff that's not in any of the

7   documents for this case yet which relates to personal

8   performance.

9      Q      Okay.  That's just not something you used to

10  calculate your damages?

11     A      Well, I will evaluate it, but I'd have to look

12  into this.  But the notion -- you're sort of taking the

13  maximized approach, and we just don't know what that

14  would have been.  At least, I haven't considered it yet.

15  And I'll think about it and if I decide to do something

16  with it, I'll let you know.

17     Q      In Paragraph 40 of your report --

18     A      Okay.

19     Q      -- you indicate that the fee invoiced -- the

20  fee invoices show that Home Point hired over 30

21  associates during the period of September 28th, 2020,

22  through November 30, 2020?

23     A      That's correct.

24     Q      Okay.  What was the methodology that you used

25  to determine which one of those individuals was hired as

HIGHLY CONFIDENTIAL

Page 138

1    a replacement of an individual who left?

2         A     Date of hire, just like the first people.

3         Q     Okay.  Now, did you look at the --

4         A     I would say date of hire and job title.

5         Q     But you didn't include the individuals who were

6    hired on September 21, based on Footnote 59?

7         A     That's correct.

8         Q     Why not?

9         A     I'd have to go back and look at their letters

10   and see.  It might have been that they agreed to be hired

11   before.  I'd have to look.

12        Q     And other than Mr. Gorton, everybody you listed

13   included a recruiter invoice; correct?

14        A     Those people, yes.

15        Q     Why didn't you select individuals who were

16   hired that were not hired using a recruiter?

17              MS. ZADIKANY:  I couldn't hear you.

18              THE WITNESS:  He asked me why did I not select

19   people who were hired not using a recruiter.

20              I'd have to go back and look at the

21   distribution of the hires.  They may not have been the

22   first people that came in.

23              MR. HALL:  I'm going to show you what we'll

24   mark as Exhibit 36.

25              (Exhibit 36 marked.)

HIGHLY CONFIDENTIAL

Page 139

1   BY MR. HALL:

2       Q     And this is really more for reference.

3             This is the recruiting invoice from

4   Dontae McGaugh; right?

5       A     Okay.  I see that.

6       Q     And on Table 2, under "estimated recruiting

7   costs," Dontae McGaugh is number ten listed?

8       A     Yes.

9       Q     Okay.  And he is an underwriter support

10  specialist?

11      A     Okay.

12      Q     Do you see that?

13      A     I do.

14      Q     Okay.  And you have his date of hire as --

15      A     10-19.

16      Q     10-19?

17            MR. HALL:  I'm going to show you what we will

18  mark as Exhibit 37.

19            (Exhibit 37 marked.)

20  BY MR. HALL:

21      Q     All right.  So keeping 36 with us, if you look

22  at Exhibit 37, this is Chris Brown's permanent placement

23  invoice from Insight Global.

24            (Reporter clarification.)

25  ///

HIGHLY CONFIDENTIAL

Page 140

1    BY MR. HALL:

2        Q    Do you see that?

3        A    I see that.

4        Q    And his date of placement was September 28th,

5    which is in line with the hire dates of the first seven

6    individuals that you list in Table 2.

7             Do you see that?

8        A    I do see that, yes.

9        Q    Okay.  Chris Brown was hired as an underwriting

10   support specialist.

11            Do you understand that to be true?

12       A    I see that, yes.

13       Q    Okay.  And placement fee for Chris Brown was

14   over $2,000 less?

15       A    Where do you see underwriting support?  Maybe I

16   missed it.  Where does it say his job?

17       Q    Hold on one second.

18       A    I don't see the job title.

19            MR. HALL:  Right.  Let me show you what is

20   Exhibit 38.

21            (Exhibit 38 marked.)

22   BY MR. HALL:

23       Q    And you can see on Chris Brown's pay statement

24   job title underwriting support specialist.

25       A    Okay.  I can see it there, yes.

HIGHLY CONFIDENTIAL

Page 141

1      Q      What's that?

2      A      I can see it on this statement, yes.

3      Q      Okay.  So why did you include the placement fee

4    for Dontae as a replacement hire instead of the placement

5    fee for Chris Brown?

6      A      The likely reason is this has -- the one for

7    Dontae McGaugh on the document had the job title on it.

8    It's the likely reason.  Whereas Brown, you would have to

9    consult multiple documents, including a pay stub.

10     Q      So based on your methodology of job title and

11   date of hiring, would Chris Brown be in more

12   appropriate --

13     A      If he was the first hire and the underwriting

14   support specialist, I would swap him in.  But I can see

15   why he wasn't listed.

16     Q      Okay.

17     A      Because it didn't list his job title on the

18   form.

19     Q      Okay.  So you only reviewed the recruiting

20   invoices that were produced between HPLANE00004502 and

21   HPLANE00004535 in considering the individuals to list in

22   Table 2?

23     A      That's correct.

24            MR. HALL:  I've handed you what's been marked

25   as Exhibit 39.

HIGHLY CONFIDENTIAL

Page 142

1          (Exhibit 39 marked.)

2    BY MR. HALL:

3       Q     And this is an invoice from Letossia McFadden

4    or possibly Letossia McFadden.

5       A     Okay.

6       Q     She had a hire date of September 21, 2020.

7             Do you see that?

8       A     I see that here, yes.

9       Q     Okay.  So that was a week -- that was the week

10   after the individuals had resigned on

11   September 17th; correct?

12      A     That's correct that they would be after that,

13   yes -- well, it would be literally four days.

14      Q     Uh-huh.  So would Ms. McFadden be a more

15   appropriate replacement employee than

16   Michelle Owighowotu, who was hired in October 26th?

17      A     I'd have to go back and look at her offer

18   letter and some of the other individual facts and see --

19   this is a vendor report.  She may have been already hired

20   prior to -- what day is the 21st?  I don't know what day

21   of the week.

22      Q     It was a Monday, I believe.  The 17th was a

23   Thursday.

24      A     So I'm not sure when -- this may have been her

25   start date, but maybe this is already done before

HIGHLY CONFIDENTIAL

Page 143

1    resignation.

2        Q     Okay.  So if it was already done before, then

3    you don't think it would be appropriate to include her?

4        A     Well, I'll go back and look at the facts.  The

5    reality is if you swap her for one more person, it's a

6    thousand dollars here or there.  It's one way or the

7    other.  It's not a particularly large amount one way or

8    the other on the overall size of the analysis.

9            But I will take a look at the facts about

10   them -- her versus some of the others.

11           THE VIDEOGRAPHER:  We are going off the record.

12   The time is 2:33 p.m.

13           (Break held off the record.)

14           THE VIDEOGRAPHER:  We are back on the record.

15   The time is 2:45 p.m.

16           MR. HALL:  I'll hand you what we'll mark as

17   Exhibit 40 to your deposition.

18           (Exhibit 40 marked.)

19   BY MR. HALL:

20       Q     All right.  This is an offer letter to Ony

21   Agugua to serve as a senior underwriter with a start date

22   of October 5th, 2020.

23           Do you see that?

24       A     Okay.

25       Q     So he is an employee.  Ony Agugua's would be

HIGHLY CONFIDENTIAL

Page 144

1    someone who was -- had a start date prior to Holly

2    Dantzler and Michelle Owighowotu; correct?

3        A    What table am I supposed to be comparing this

4    to?

5        Q    Table 2.

6        A    And start date prior to who?

7        Q    October 5th, 2020 start date.  So for the

8    senior underwriters you have Holly Dantzler and

9    Michelle Owighowotu.

10       A    Okay.  I see those.  Okay.

11       Q    Okay.  Now, there's no recruiter invoice that

12   corresponds with this individual.

13       A    Okay.

14       Q    So you would not have seen this offer by just

15   reviewing the Bates label documents referenced at

16   Footnote 60 of your report?

17       A    That's -- if there's no recruiter invoice, she

18   wouldn't be in this.  But my point is that this is before

19   the resignations.

20       Q    Okay.  Why does that matter?

21       A    Well, they didn't hire her to replace anybody.

22   She's just hired -- they were planning to use her just as

23   an incremental increase in staff.

24       Q    Okay.  So under that theory, if you look down,

25   she says she's got a signing bonus of $30,000 paid over

HIGHLY CONFIDENTIAL

Page 145

1    the first three months.

2         Do you see that?  It's the paragraph one black

3    dot above the table at the bottom of the --

4    A     Where is she?

5    Q     What's that?  No, no, no.  In this document,

6    they make her -- Exhibit 40.

7    A     Oh, okay.

8    Q     Just Exhibit 40.  There is a signing bonus for

9    $30,000 for this employee.

10   A     Okay.

11   Q     That was offered on September 15th, 2020.  So

12   since that signing bonus was offered prior to Lane

13   resigning, then that wouldn't be attributable to --

14   A     I don't believe she's on the list in Table 3,

15   either.

16   Q     Okay.  Right.  You said the reason why she

17   wouldn't be on the list is because she wasn't hired to

18   replace --

19   A     The reason she's not on Table 2 is she was not

20   hired to replace.  And the reason she's not on Table 3 is

21   also she's not hired to replace.  If she was hired to

22   replace, I would have put her into Table 3 as well.  It

23   would have been around the $30,000 there.

24   Q     Right.  But the method for how you chose who

25   was hired to replace was just date of hire and whether

HIGHLY CONFIDENTIAL

Page 146

1    there was a recruiter invoice?

2         A    Well, it was date of -- that's how -- I'd have

3    to go look and confirm.  For example, this -- we're

4    looking at things about whether you were hired first.  If

5    there are people that are hired date of hire and it's not

6    necessarily -- I'd have to see people that don't have a

7    recruiter invoice to know if that is true.

8              I'm not sure if that person exists, but you can

9    show me one if you have one and I'll think about it.

10             MR. HALL:  I'm going to do something a little

11   different than that.

12             THE WITNESS:  41.

13             MR. HALL:  Yeah.  So what's marked as

14   Exhibit 41 is the offer letter for Kelly Chapman.

15             (Exhibit 41 marked.)

16   BY MR. HALL:

17        Q    Do you see that?

18        A    I do.

19        Q    Okay.  Kelly Chapman is listed on Table 2 and

20   on Table 3 and on Table 4; correct?

21        A    She is.

22        Q    Okay.  So for Exhibit 40, we've got Ony who was

23   given the offer on September 15th, just two days before

24   Don Lane resigned, and she wasn't to start until

25   October 5th.  But Ms. Chapman, who is on your list, was

HIGHLY CONFIDENTIAL

Page 147

1    offered the position on September 2nd.

2              Do you see that?

3        A    I do see that.

4        Q    And, in fact, Home Point committed to paying

5    her $30,000 on September 2nd; right?

6        A    That's what this document shows, yes.

7        Q    Okay.  And so Home Point paid Ms. Chapman

8    $30,000 not because of any actions from Don Lane, because

9    they wanted to expand the force; correct?

10       A    That's what this one looks like so the answer

11   would be I would take the next person on the list if I

12   would have swapped out Ms. Chapman.

13       Q    Okay.  So let's take the next person on the

14   list who is Karen Webb-Smith.

15       A    What I meant is the next person on the list of

16   people after the bottom person.

17       Q    Who are those people?

18       A    Off the top of my head, I don't have the names.

19   But there are more hires that we did not use because we

20   capped it at the first 11.  And so we can go back.  There

21   are more people that are out there.

22              I mean just look at Paragraph 40.  They hired

23   over 30 associates.

24       Q    Well, no.  In fact, they didn't; right?

25       A    What's that?

HIGHLY CONFIDENTIAL

Page 148

```
 1      Q     They did not; right?  You include Ms. Chapman
 2   in that 30 associates, and she wasn't hired during that
 3   time.
 4            She started during that time, but she didn't
 5   hire; right?
 6      A     Okay.  So there may be some others.  We'll just
 7   go down the list and take the next group of people that
 8   got hired.
 9            MR. HALL:  So let's do Exhibit 42.
10            THE WITNESS:  Just looking at this Chapman one,
11   there's discrepancies between the letter and her hire
12   date.
13            (Exhibit 42 marked.)
14   BY MR. HALL:
15      Q     Okay.
16      A     So I think maybe this one needs a little more
17   research.
18      Q     What's the discrepancy?
19      A     Well, it says her start date would be
20   September 21st.  This one has her hire date as
21   September 28th.  So I'd have to look at this and
22   understand what may have happened.
23            Maybe she didn't accept this and they had to
24   change her comp a little bit, I don't know.  So I'd have
25   to go back and see what other documents are associated
```

HIGHLY CONFIDENTIAL

Page 149

1   with this.

2       Q      Okay.  I handed you the offer letter for

3   Mr. Bingham.

4       A      Okay.  I see that.

5       Q      What's the date of that offer?

6       A      This letter is 9-10.

7       Q      Okay.  So that would have been before the

8   employees?

9       A      And this one started September 28th, so we can

10  take a look.

11      Q      Okay.  So his offer was out before the

12  individuals resigned; right?

13      A      That's correct.

14      Q      Okay.  So he --

15      A      Do we have the accepted emails?

16      Q      Don't have any accepted emails.

17      A      We don't have the date they accepted the --

18      Q      No.

19      A      Okay.

20      Q      Does it matter to your opinion?

21      A      I'm just curious how much documentation may be

22  available to look at.

23              MR. HALL:  Okay.  Should be on

24  Exhibit 43; right?

25              (Exhibit 43 marked.)

HIGHLY CONFIDENTIAL

Page 150

1    BY MR. HALL:

2        Q     All right.  Exhibit 43 is

3    Tyesha Wilson; correct?

4        A     That's correct.  Wilson.  Let me just spell it.

5    T-Y-E-S-H-A, Wilson, W-I-L-S-O-N.

6        Q     And so she's on your list of Table 2, 3, and 4;

7    right?

8        A     She's on the list certainly for two and

9    probably for three and certainly for four.

10       Q     And this is an offer for -- including the

11   $20,000 signing bonus on September 2nd; right?

12       A     That's what this email is dated.

13             MR. HALL:  Exhibit 44 is an offer letter to

14   Diana Cooper; right?

15             THE WITNESS:  It is.

16             (Exhibit 44 marked.)

17   BY MR. HALL:

18       Q     Okay.  And the date of that email is

19   September 10; correct?

20       A     Correct.

21       Q     Okay.  With a start date of September 28th?

22       A     Yes.

23       Q     And a $30,000 signing bonus?

24       A     Correct.

25       Q     Okay.  So this, again, was another offer that

HIGHLY CONFIDENTIAL

Page 151

1  was made prior to the individuals resigning?

2      A     Yes.

3            MR. HALL:  I was doing so well.

4            THE WITNESS:  Almost made it.

5            MR. HALL:  All right.  Exhibit 45 is

6  Chontaye Richardson.  C-H-O-N-T-A-Y-E, Richardson.

7            (Exhibit 45 marked.)

8  BY MR. HALL:

9      Q     Ms. Richardson is on your Table 2, Table 3, and

10  Table 4; correct?

11     A     Yes.

12     Q     Okay.  And here it is with a start date of

13  September 28th with her to receive a $30,000 signing

14  bonus; correct?

15     A     That's what this says.

16     Q     Okay.  And this offer letter was September 4th?

17     A     It appears to be that email, yes.

18     Q     Okay.  And so this would have been -- this

19  offer would have been made prior to Don Lane's

20  resignation?

21     A     That one would have been, yes.

22           MR. HALL:  This is Exhibit 46.

23           (Exhibit 46 marked.)

24  BY MR. HALL:

25     Q     This is an offer email to Holly Dantzler with

Page 152

1   her start date of October 19th, 2020, and a signing bonus

2   of $30,000.

3            Do you see that?

4       A    I do.

5       Q    This offer was made prior to Don Lane's

6   resignation?

7       A    Correct.

8       Q    Now, if we go back to Exhibit 40 and compare it

9   to 46.

10      A    Okay.

11      Q    These emails were sent on the same day.

12           Do you see that?

13      A    Yeah, I do.

14      Q    And actually, Ms. Ony Agugua's offer was made a

15  couple hours before the offer to Ms. Dantzler?

16      A    Yes.

17      Q    Okay.  And Ms. Dantzler is on your list?

18      A    Yes.

19      Q    Ms. Agugua's is not?

20      A    That's correct.

21      Q    If the offers for $30,000 signing bonuses were

22  made prior to Don Lane ever resigning, how can it be that

23  Don Lane caused that harm?

24      A    Well, I think the issue here is going to be --

25  I will have to take a look at other hires.  The

HIGHLY CONFIDENTIAL

Page 153

1    replacements -- if these were offers before, I'll look at

2    the next hires in sequence and look at their offers, and

3    those will be the replacements for the people that left.

4            So you're swapping in person A for person B.

5    Now, maybe they got paid a different signing bonus.

6    Maybe the next people in sequence were not always coming

7    from recruiters.  We can find that out, and we'll replace

8    them back in.

9            But I would agree that if they were offered to

10   be hired before Mr. Lane resigned, then it's not

11   related -- that offer is not related to Mr. Lane.  With

12   that being said, there were other hires that will replace

13   these folks on this list, at which point we'll see what

14   the difference in numbers is, if any.

15        Q    There's no replacements that were hired to

16   replace the individuals that left -- right? -- they just

17   hired en masse?

18        A    They hired people.  They need capacity.  You

19   took 11 folks you have here that we decided those were

20   the ones that were going to replace.  These were senior

21   underwriters.  And if you have to replace the people who

22   were there, certainly the capacity was needed.  And they

23   added folks.  And those people are replacements, yes.

24        Q    They lost 16 people that resigned in September?

25        A    The people came back, so we're not dinging them

HIGHLY CONFIDENTIAL

Page 154

1    for the people that came back.

2            (Reporter clarification.)

3    BY MR. HALL:

4        Q    Okay.  The 16 people who resigned in

5    September -- on September 17th of 2020, were not -- let

6    me rephrase that question.

7            Home Point did not earmark any individual hire

8    specifically to replace any of the 16 individuals that

9    resigned on September 17th; correct?

10       A    I'm not sure what you mean by "earmark."  They

11   obviously -- they've lost capacity, and they need to

12   replace that capacity.  Did they say this guy is

13   so-and-so and this person is so-and-so?

14           I'm not sure if they've done that.  But if they

15   didn't replace that capacity, then they would have issues

16   operationally potentially providing time and service on

17   their loans.

18       Q    What capacity did they lose?

19       A    They lost all of the underwriting capacity.

20       Q    What underwriter capacity did they lose?

21       A    All of the loans these people would have

22   processed.

23       Q    How did they lose them?

24       A    They got delayed and they would have to

25   reallocate that work.  So potentially, there are other

HIGHLY CONFIDENTIAL

Page 155

1    issues that would have happened.  If you need this many

2    people, companies try not to carry a bunch of excess

3    staff and eventually do a layoff.

4            And this is a peak market period, so one of

5    the -- looking at -- this stuff happened in 2020,

6    especially in Q3, Q4, the market was going bananas.  So

7    they certainly were hiring, which is why they have all of

8    these new hires coming in.  And they're going to hire or

9    replace people that leave, in addition, try and up their

10   numbers so they can handle more capacity.

11           It almost implies you're saying it didn't hurt

12   at all to lose all of these underwriters.  I would

13   disagree with that notion vehemently.  It's just not

14   true.  Capacity is important.

15       Q    What value of damages do you put on loss of

16   capacity?

17       A    I haven't measured damages in that way.  I've

18   measured damages -- because then I have to do a far more

19   complex exercise.  I would have measured it as your

20   replacement costs, who you had to hire to replace the

21   people that left due to the conduct that was in violation

22   of the non-solicitation agreements.

23       Q    Correct.  And the individuals that you

24   identified that were replacements for those people that

25   left had already been hired and already been offered by

HIGHLY CONFIDENTIAL

Page 156

1    Home Point; correct?

2        A    Okay.  And is there will be other individuals

3    in the next group that came in.  I'll just go down the

4    list and add those.  You'll see that at some point.

5        Q    So how can you identify the individuals that

6    were hired to replace the individuals that left?

7        A    I am going to assign it to the next group of

8    people that came in who have offer dates after Mr. Lane's

9    departure and the resignation.

10            (Reporter clarification.)

11            THE WITNESS:  And we'll see what that does and

12    how that may change Tables, 2, 3, and 4.  The names will

13    change.  It seems like $30,000 was a frequent signing

14    bonus amount.  We'll see, though.

15   BY MR. HALL:

16        Q    Are you only going to look at recruiter

17   invoices when you do that or are you going to look at the

18   people who were made offers even if they didn't have a

19   recruiter?

20        A    We're going to dig in and see the full list and

21   we'll see what we have.

22            MR. HALL:  I'll show you what we got marked as

23   Exhibit 47.

24            (Exhibit 47 marked.)

25   ///

HIGHLY CONFIDENTIAL

Page 157

1    BY MR. HALL:

2        Q      Now, this is an August 31st email offer to

3    Cindy Elkin.

4               Do you see that?

5        A      I do.

6        Q      So August 31st was before anybody

7    resigned; right?  Well, let me ask the question better.

8               August 31st was before Don Lane

9    resigned; right?

10       A      That's correct.

11       Q      Okay.  And the start date was

12   September 28th, 2020; right?

13       A      That's correct.

14              MR. HALL:  Okay.  Now, this is another

15   individual who does not have a recruiter invoice that was

16   produced.  So just I'm going to go through a couple of

17   these so that when you go back through it.  Here's 48.

18              (Exhibit 48 marked.)

19   BY MR. HALL:

20       Q      48 is Jason Huet.

21              Do you see that?

22       A      Yes.

23       Q      He's going to be hired as a senior underwriter

24   starting May 28th, 2020; right?

25       A      September 28th, you mean.  You misspoke.

HIGHLY CONFIDENTIAL

Page 158

1    Q    Sorry.  Yeah, thank you.

2         So no recruiter invoice from Mr. Huet?

3    A    And also offered on the 8th of September.

4         MR. HALL:  Uh-huh.  And then we've got

5    Exhibit 49.

6         (Exhibit 49 marked.)

7    BY MR. HALL:

8    Q    This is Melissa Klimovich, K-L-I-M-O-V-I-C-H.

9         Do you see that?

10   A    Okay.

11   Q    Okay.  And this is position of senior

12   underwriter starting September 21st, 2020; right?

13   A    Okay.

14   Q    Again, this is offered on September 3rd, so

15   prior to Don Lane resigning; right?

16   A    That's correct.

17   Q    Okay.  And there's no recruiter invoice that

18   corresponds with Ms. Klimovich?

19   A    I don't have those invoices in front of me.

20   But for the record, you're just making statement about

21   this.  I don't know if that's true or not, but there

22   doesn't seem to be a question about it, either.

23        MR. HALL:  Right.  These at least weren't

24   individuals -- these are individuals -- this is Jerrie

25   McCormick; right?

HIGHLY CONFIDENTIAL

Page 159

1          (Exhibit 50 marked.)

2   BY MR. HALL:

3       Q     So she had a start date of September 28th,

4   2020; right?

5       A     She did.

6       Q     Okay.  So that's the same start date that the

7   people that you initially had listed in your report as

8   replacements; correct?

9       A     She was -- it is a start date.  She has a hire

10  date or at least an offer date of 9-4.

11      Q     Correct.  But we went through several of

12  those --

13      A     So this will not be replacement name on the

14  list, basically, is what I'm saying.

15      Q     Correct.  But as far as her hire date is

16  concerned, there's no significant difference from her to

17  say Chontaye Richardson, who sent an offer letter on

18  September 4th with a start date of September 28th?

19      A     Are you asking if September 28th is the same as

20  September 28th?

21      Q     Correct.  I am asking that.

22      A     I would agree that September 28th is the same

23  day.

24          MR. HALL:  Okay.  For Exhibit 51, this is the

25  offer email to Donna Salvatorie.

HIGHLY CONFIDENTIAL

Page 160

```
 1              THE WITNESS:  Okay.

 2              (Exhibit 51 marked.)

 3   BY MR. HALL:

 4       Q     Do you see that?

 5       A     Yeah.

 6       Q     With a start date of September 28th.

 7       A     I see that.  And an offer date of

 8   September 10th.

 9       Q     Yeah.  And there's not a recruiter invoice that

10   corresponds with Donna Salvatore, at least not one that

11   you saw or relied upon?

12       A     Well, she's not on my list.

13       Q     Right.

14       A     Someone I considered.

15              MR. HALL:  I'll just do two more of these.  So

16   this will be Exhibit 52.

17              (Exhibit 52 marked.)

18   BY MR. HALL:

19       Q     This is the offer email for Diane Schmidt.

20       A     Okay.  Yes.

21       Q     Okay.  With an offer start date of

22   September 28th, 2020?

23       A     And an offer date of 9-10.

24       Q     Correct.  And so the start date is

25   September 28th, 2020; right?
```

HIGHLY CONFIDENTIAL

Page 161

```
 1     A     That's correct.
 2           MR. HALL:  Exhibit 53.
 3           (Exhibit 53 marked.)
 4   BY MR. HALL:
 5     Q     This is an email dated September 2nd, 2020.
 6           Do you see that?
 7     A     Yes.
 8     Q     Okay.  And this is an offer letter communicated
 9   through email to Shad Testa?
10     A     Okay.  Yeah.
11     Q     And that's the start date of
12   September 28th, 2020; correct?
13     A     That's correct.
14     Q     Okay.  I'd like to ask you about Table 2 for a
15   second.
16     A     Sure.
17     Q     I think you've testified that you weren't -- I
18   think the word you said is "dinging" -- you weren't
19   dinging the Defendants for the six individuals that came
20   back.
21     A     That's correct.
22     Q     So if 16 left, and six came back, there should
23   be ten replacement hires; correct?
24     A     So 16 left and six came back.  That's true.
25   That's correct.
```

HIGHLY CONFIDENTIAL

Page 162

1    Q    So Table 2 has an extra person; right?

2    A    Hold on a second.  I may have had some reason

3    at the time.  I have to think about what it was, but I

4    can't recall specifically at this time.

5    Q    Would you agree that if six came back and

6    you've got 11 indicated for recruiting costs, then that

7    would be 17 total?

8    A    That would be one extra, potentially.

9    Q    Now I want to look at Table 3, if we could.

10   A    Okay.  Go ahead.

11   Q    So Table 3 has 14 people; right?

12   A    It does.

13   Q    Okay.  And this is just related to signing

14   bonuses; right?

15   A    That's correct.

16   Q    Okay.  And Sharlene Murray, Jared Haren, and

17   Daniel Clark were rehired without signing bonuses, which

18   is why they're not included in that list; right?

19   A    Yes.

20   Q    Okay.  So if you add those three that were

21   hired without a bonus --

22   A    We're at 11, instead of ten, is your point.

23   Q    But we've also added Brian Gorton and dropped

24   Dontae McGaugh; right?

25   A    Brian Gorton is one of the directors of

HIGHLY CONFIDENTIAL

Page 163

1    underwriting.  There was five of those.  We have added

2    Brian Gorton, that's true.  And I think we dropped

3    Dontae, who was the specialist, that's correct, yes.

4         Q     Okay.  So now we're up to 18 people; right?

5         A     How are we up to 18?

6         Q     Because we've got the Dontae McGaugh.  We've

7    got Murray, Haren, and Cook, and that's four.  And then

8    we've got 14 people listed in Table 3.

9         A     I'll have to see -- I'll have to cycle through

10   these names anyway so I'll -- I know I'm revising these

11   tables.  So I'll take a look and I'll revise it and give

12   you an updated version.

13        Q     So you agree with me that under your theory

14   that you've presented, we should be dealing with a count

15   of 16 people; right?

16        A     We've got the 16 people that departed.

17        Q     Right.

18        A     And then we'll drop the people that returned.

19        Q     Correct.

20        A     Now, on the signing bonus piece, they got

21   another bonus.

22        Q     Correct.  So we should be dealing with the six

23   individuals that were rehired and then ten additional

24   people?

25        A     That's correct.

HIGHLY CONFIDENTIAL

Page 164

1   Q    Okay.  So -- and that would be the same for
2   Table 4; right?
3   A    And if I have a different rationalization once
4   I can remember it, then I'll write that up in more detail
5   in the report.
6   Q    All right.  So for training costs, we're back
7   to 12?
8   A    Yes.
9   Q    And so do you -- as you sit here today, do you
10  understand which two of those individuals should not be
11  included in Table 4?
12  A    Well, I'm going to take a look again, and
13  there's going to be probably new names -- well, I know
14  there's going to be new names.  They've hired additional
15  people, so Table 4 will be revised.  And so I will be
16  able to provide that to you when it's revised.
17       Seems that much of the pay rates, though, will
18  probably be in the same ranges.  The signing bonuses,
19  certainly for the underwriters, are probably going to be
20  in the same range.
21  Q    Because they're all plug and play; right?
22  A    Well, it seems that most of the signing bonuses
23  I'm seeing are around $30,000.  There's a couple that are
24  20, but that 20 to 30 range for outside hires seems --
25  seems to be what they've been doing.

HIGHLY CONFIDENTIAL

Page 165

1      Q      Right.  Because that was the market

2   rate; right?

3             MS. ZADIKANY:  Objection.  Form.

4             THE WITNESS:  That may have been -- I don't

5   know what the market rate was for signing bonuses.  I

6   have to study more companies and get more data.  That's

7   certainly been the rate they were using to induce people

8   in that range, if you will.

9   BY MR. HALL:

10     Q      Okay.  And that was before Don Lane ever

11  resigned; right?

12     A      Well, it's within the same month that Don Lane

13  resigned.  So we can look at the next group and see if

14  that number changes.

15     Q      When you look at the next group, are you going

16  to include people who were hired without the use of a

17  recruiter, or are you just going to look at the recruiter

18  list again?

19     A      We'll look at the next list and we'll see who

20  the X number of people are.

21     Q      Okay.  And that will be based on offer dates as

22  of September 17th?

23     A      It will be the people offered after -- after

24  the 17th.

25     Q      Okay.  You've talked a little bit about how 16

HIGHLY CONFIDENTIAL

Page 166

1   people resigning would cause some impact on the

2   productivity of Home Point; right?

3       A     Well, it certainly probably going to impact

4   your customer service because, obviously, Home Point is a

5   large operation.  But you've got things that need to be

6   turned around in the mortgage industry because you've got

7   various times to close, for example.

8             Certainly on purchases, you would have times

9   where you would have to release low contingency.  So

10  there is a time-oriented thing and people want -- if

11  you're an originator, you want to have it done.

12            So from a customer perspective, you don't want

13  to have a loan file just sitting there weeks on end.  So

14  you probably would have to redistribute that.  You might

15  incur additional overtime.  You might incur additional

16  bonus expense because maybe that gets -- given the

17  underwriter appreciation fund you had would probably up

18  certainly people's totals, if they had availability.

19            So it would impact your customer service.  It

20  would probably increase your bonus expense.  But again, I

21  haven't dug the detail on -- the amount at which that

22  would be impacting Home Point.

23      Q     Are you -- is it your understanding that the

24  individual employees who resigned on September 17th gave

25  their two-week notice?

HIGHLY CONFIDENTIAL

Page 167

1      A     I believe they gave their two weeks' notice.

2   Or at least there's some reference in the deposition

3   about giving two weeks' notice.

4      Q     And then is it your understanding that instead

5   of letting the employees work out those two weeks,

6   Home Point fired them on the spot?

7      A     I understand that Home Point terminated them

8   once they resigned.

9      Q     Without letting them work out the two

10  weeks; correct?

11     A     Well, there's a danger to that, too.  You know,

12  people participate in a mass raid who potentially could

13  be recruiting their colleagues.  So there's certainly

14  reasons why you as a business wouldn't do that.

15     Q     Okay.  But at least when it comes to the harm

16  of productivity, what it would take to get the

17  individuals that were hired to replace them up to speed

18  in the two weeks of training, that could have been

19  resolved by just keeping the individuals for another two

20  weeks?

21     A     No.  You still have to train the new people to

22  replace them.

23     Q     Correct.  But you'd get the benefit of the

24  people working there.

25     A     Well, there's a downside to that too.  I mean,

HIGHLY CONFIDENTIAL

Page 168

```
 1   you can't -- you're in the midst of a raid.  It is very
 2   clear that they're trying to impact your operation in a
 3   negative way.  This was not intended to be a friendly
 4   gesture.  This was we're all going to hit you at once.
 5   We want maximum impact.  That's what this was.  And --
 6        Q     Where do you create that assumption from?
 7        A     You read Don Lane's text.  We want to create
 8   this.  There's a shock value he was looking to do.  He
 9   wanted everybody to do it -- that's why he tried to
10   coordinate.  He could have simply had people -- ones and
11   twos and threes.
12              They could have resigned as they went.  It
13   could have been a different deal.  But he choose to try
14   to have people do it all together.  This was
15   orchestrated.
16        Q     If it was orchestrated for maximum impact as
17   you had testified, wouldn't it be everybody walk out
18   together?
19        A     Everybody is resigning on the same day.
20        Q     No, they're not.
21              They all submitted their two-week notice the
22   same day; right?
23              MS. ZADIKANY:  Objection.  Form.
24              THE WITNESS:  That's not much of a difference.
25   Come on, now.  They're all telling you, these people, all
```

HIGHLY CONFIDENTIAL

Page 169

1    of these people, are now telling the company.

2    BY MR. HALL:

3         Q     That we're going to leave at the end of the

4    month?

5         A     Yes.  And so now, the company is going to

6    scramble.  And it's not just ten, it's the bigger list at

7    that point in time.  And the other people are coming to

8    you and saying, "Gee, we want more money."  So you

9    basically put the operation into turmoil the moment that

10   happens.

11        And you know that a raid is going on because

12   it's done it en masse, and the question is when will this

13   stop?  So, you know, the notion that, "Oh, this is a nice

14   big friendly deal and we had no desire to hurt Home Point

15   whatsoever.  We'd love to help with the transition," I

16   don't think the text messages suggest that's true.

17        Q     Okay.  And you're here to testify as to the

18   economic damages; right?

19        A     I'm here to answer your questions today.

20   Obviously, the trier of facts is going to decide what

21   these things are, but you asked me a question.  I read

22   the text.  That's my reaction to those texts.

23        Q     Okay.  My question was to the productivity.  If

24   under the assumption that Home Point let the individuals

25   who put their two weeks' notice in work out that two

HIGHLY CONFIDENTIAL

Page 170

```
 1   weeks, would they not have been able to be productive for
 2   Home Point?
 3           Is that one of your assumptions?
 4      A    Well, I haven't done productivity-based damages
 5   of Home Point.  So I haven't addressed that issue.
 6      Q    Okay.  And you haven't done any analysis to
 7   determine whether the salary paid to the individuals who
 8   replaced the ten individuals who did not come back to
 9   Home Point, you haven't done any analysis to compare any
10   damages that are related to employees being hired on at a
11   higher cost; right -- a higher salary, higher pay rate,
12   if that sentence made sense.
13           Would you like me to repeat it or fix it?
14      A    Let's try it again.  Fix it.
15      Q    So in the report, you don't -- and I think we
16   touched about this earlier, so I just want to make sure
17   that nothing's changed -- there's no analysis that you
18   have that suggests the ten individuals that were hired to
19   replace the ten individuals that were left, any
20   difference in salary between those two groups of people?
21           MS. ZADIKANY:  Could you repeat that?
22           THE WITNESS:  I think what you're asking -- let
23   me just repeat what I think you're asking.  Maybe you can
24   tell me if I've got it right.
25           So person one leaves at a base rate of 100 a
```

HIGHLY CONFIDENTIAL

Page 171

1    year, and person two comes in at 105 or comes in at 95.

2    BY MR. HALL:

3        Q    Correct.

4        A    I'm not looking necessarily -- because there's

5    some market rate; I'm looking headcount to headcount

6    primarily, and we'll take whoever the next slate are, and

7    whoever those people are, that's going to be the list.

8        Q    Okay.

9        A    So we know there are more people hired.  We're

10   substituting names, and let's see what the comp

11   differences are.  Most of them are going to be in that

12   range, most likely, some a little higher, some a little

13   lower, which is the same as we had in the previous group.

14       Q    And so the numbers in Table 5 -- sorry -- the

15   numbers in Table 4 won't necessarily have to change?

16       A    Well, the people are going to change and the

17   specific numbers are going to change, but the range of

18   numbers, it's not going to have a massive impact on the

19   number most likely.

20       Q    So getting to Table 5.

21       A    Yeah.

22       Q    Which is the estimated average recruiting fee

23   percentage.

24       A    Yes.

25       Q    Do you see that?  Okay.

HIGHLY CONFIDENTIAL

Page 172

1          Can you explain your methodology here?

2      A    It's relatively simple.  It's looking at the

3  invoice amount as a percentage of total comp.  That's the

4  signing bonus plus base rate count.

5      Q    Right.  And that operates under the assumption

6  that a recruiter was used for every hire; right?

7      A    No.  This just says the percentage you would

8  typically have.  I mean, you could see the range.  It's

9  not particularly different, but the basic idea is to get

10  an idea of what a market -- this is multiple different

11  firms; it's roughly this, is what it shows.

12          And you could do it different ways.  You could

13  do it as a percentage of base, percentage of total comp.

14  I think the contracts are total first year comp from the

15  start, not variable, but.

16      Q    But if Home Point hired four out of the ten

17  people without using the recruiter, that would change

18  significantly; right?

19          MS. ZADIKANY:  Objection.  Form.

20          THE WITNESS:  It's not going to change Table 5.

21  It will just change the percentages.

22  BY MR. HALL:

23      Q    But this percentage could go to zero; right?

24          If a recruiter wasn't used --

25      A    That's not what I'm saying.  This is supposed

HIGHLY CONFIDENTIAL

Page 173

1  to be a recruiting fee percentage, so it wouldn't go to

2  zero.

3      Q    But this recruiting fee percentage requires --

4  let me back that up.

5           If you hire ten people and you use a recruiter

6  for seven of them; right?

7           So you're basing this off the 11 people that

8  you've identified in this report that were hired to

9  replace the individuals that resigned on

10 September 17th; right?

11     A    Yes, but I think you misunderstand this table.

12     Q    We went through a significant number of

13 applications that didn't have a corresponding recruiter

14 bill that were hire dates of September 28th,

15 2020; correct?  Through the exhibits?

16          Do you remember that?

17     A    I know.

18     Q    Okay.  So if you go through this revised list

19 of employees of who is going to actually be the

20 replacement of the individuals, and half of them are

21 hired through recruiters, and half of them are hired

22 organically or not through the use of recruiters, then

23 how does that -- would that impact Table 5?

24     A    No.

25     Q    Why not?

HIGHLY CONFIDENTIAL

Page 174

```
1      A    Okay.  Table 5 is an attempt to estimate the

2  market rates, what percentage a recruiter would charge.

3  Okay.  So if a recruiter is used, what percentage are

4  they charged.  So that's what that is.

5      Q    Correct.  So that assumes that a recruiter is

6  used for every hire; right?

7      A    No.  This is a simple assessment of what's the

8  market rate for recruiters.

9      Q    Okay.  So let's look at Table 6.

10     A    Okay.

11     Q    This assumes that a recruiter was hired for

12 every hire?

13     A    That's correct.

14     Q    Okay.  And Table 6 is based off of the rates in

15 Table 5; right?

16     A    The percentage is, yes.

17     Q    Okay.  So will Table 6 change?

18     A    No.

19     Q    Will Table 6 change if half of the employees at

20 Home Point were not hired through the use of recruiters?

21     A    No.

22     Q    So even though Home Point can --

23          MS. ZADIKANY:  Table 6 isn't about Home Point.

24          MR. HALL:  What's that?

25          MS. ZADIKANY:  Table 6 isn't about Home Point.
```

HIGHLY CONFIDENTIAL

Page 175

1          MR. HALL:  Thank you.

2          MS. ZADIKANY:  Oh, sorry.  I'm not following.

3          THE WITNESS:  He's trying to change Table 6

4    around and I'm -- that's why I'm disagreeing.

5          MS. ZADIKANY:  Sorry.  I was just trying to

6    make sure we're talking about the same thing.

7          THE WITNESS:  Table 6 is about GHMC, so anyway.

8    BY MR. HALL:

9      Q    Correct.  And Table 5 is used to create the

10   data that is used in the last column of Table 6; right?

11     A    It's used to create the calculation.

12     Q    Right.

13     A    The 14.6 percent.

14     Q    Right.  So you used Table 5 to make

15   Table 6; right?

16     A    I used the percentage, the average percentage

17   from Table 5 to apply to Table 6.

18     Q    Got it.  And of course, Table 5 is labeled

19   "Estimated Average Recruiting Fee Percentage"; right?

20     A    Yes.

21     Q    Okay.  So you took the result of Table 5 and

22   plugged it into the column -- the last column of Table 6

23   to generate the estimated recruiting cost for GHMC?

24     A    The basic idea is if GHMC used recruiters, this

25   is what the average cost typically would be based on this

HIGHLY CONFIDENTIAL

Page 176

```
 1   market information I have from Table 5.
 2       Q    Correct.  And doesn't the average cost of
 3   hiring somebody and their average recruiter fee, don't
 4   you have to incorporate the individuals that were hired
 5   without the use of recruiters?
 6       A    No.
 7       Q    Okay.  Why does Table 6 include all 16
 8   employees?
 9       A    Because if -- the assumption here is that these
10   employees were not planning to apply to GHMC but for
11   Mr. Lane's actions and Ms. Robertson's actions and GHMC's
12   actions combined.  And I don't think any of these folks
13   even got interviewed before they had offer letters.
14            So from that perspective, how would these
15   people find their way to GHMC without Mr. Lane's
16   involvement?  And the only logical thing for me that
17   makes sense would be using a recruiter certainly to
18   effect a mass hire.  Otherwise, it would be a
19   onesie-twosie kind of thing, not a mass ten-person deal
20   or 16 people, which is what it initially started as.
21            So you just don't -- that just doesn't happen
22   without some kind of other situation.  And typically, it
23   requires a recruiter.  So if they wanted to do this same
24   kind of thing in a but-for world, they would have to pay
25   a recruiter, most likely.
```

HIGHLY CONFIDENTIAL

Page 177

1        I don't even believe -- I don't think we have

2    any statements regarding the recruiting people at GHMC

3    and whether they contacted any of these people prior to

4    Mr. Lane or vice versa.  And I recall a lot of these

5    people probably needed assistance to find the link to

6    even apply to GHMC.

7        And I think they applied to a Tennessee

8    position is my recollection for some reason.  So anyway,

9    the assumption here is they would have to use a

10   recruiter, and these are what the fees are.  And once

11   somebody is placed, it could be the case that they're

12   just going to get paid.

13       In other words you made the placement, and now

14   it's up to -- on the employer to retain the employee.

15   Q    Okay.  You call or you label the category of

16   damages as in Section F that's inclusive of Table 5 and

17   Table 6, you called that "Disgorgement"; right?

18   A    That's correct.

19   Q    And that's disgorgement of overhead that was

20   saved?

21   A    They say cost savings in my view because they

22   didn't have to go through the step.

23   Q    Okay.  And you also have, in your rebuttal

24   report, at least, an estimated disgorgement of GHMC

25   profits; right?

HIGHLY CONFIDENTIAL

Page 178

1      A     That's right.

2      Q     So how are those not duplicative?

3      A     Well, you have two things going on.  First, you

4   have -- these are the loans that are worked on by these

5   people, and there's a profit associated in each one of

6   those loans.  And in theory, that then ties into the

7   amount of profit generated in connection with the people

8   that were taken from Home Point and brought over to GHMC.

9      Q     How do you define profit?

10     A     How do I define profit?  On a profit per loan

11  basis, it's actually going to be -- well, it's actually a

12  definition that the MBA uses for it.  It's essentially

13  revenues; there's a couple different kinds of fees and

14  things like that that go into it, subtracted by variable

15  cost, and then also some fixed cost and allocation of

16  overhead.

17     Q     Okay.  And so the fixed costs that you're

18  reducing from the products per loan, the overhead, how

19  does that not already compensate for any savings that

20  were made to -- for not using the use of recruiters?

21           Isn't that just saving an expense?

22     A     They've saved an expense.

23     Q     Right.

24     A     So your argument is that the recruiting fees

25  would have been an expense, and that expense would have

HIGHLY CONFIDENTIAL

Page 179

1  been factored in.  Well, first, on my analysis, I'm using

2  an MBA average initially, and that average could already

3  include recruiting fees.

4          So potentially, it's already there and factored

5  into the expense.  The other part of this is, you know,

6  right now, what's been produced by Guaranty, most of the

7  cost elements are redacted.  The number that Fishkind

8  came up with is based on -- it looks like, three months

9  in 2020.

10          Obviously, we don't have all of the loans

11  because these people kept working past 2020.  So there is

12  a disgorgement element that's not even being factored in

13  that, frankly, if there's additional production of data,

14  such as the loan production and the actual costs or loan

15  profit per loan in 2021 for the individuals, we would

16  have to add that back in.

17          But we don't have that data; it hasn't been

18  produced yet by GHMC.  So right now, my numbers are

19  understated.

20      Q      Let's look at Footnote 39 on your rebuttal,

21  which is Exhibit 3.

22      A      Footnote 39.  Yeah.

23      Q      It's at the bottom of Page 18.

24      A      Yeah.

25      Q      Okay.  You've got "Fully-loaded loan production

HIGHLY CONFIDENTIAL

Page 180

1   expense includes:  Personnel expenses"; right?

2       A      Correct.

3       Q      Okay.  And your analysis are monies paid to

4   recruiters for hiring employees excluded from personnel

5   expenses?

6       A      It's likely included, but again, I'm using a

7   market average.  So if we were to use a more specific

8   number associated with GHMC, and I had all of the

9   underlying data as opposed to a large redacted document,

10  I could come up with a more precise estimate.

11             But in theory, the market average would include

12  that already, as it's part of the personnel costs.

13             MR. HALL:  My phone has suggested I've been

14  sitting too long.

15             Do you want to take a five minute break, or do

16  you want to keep going?

17             THE REPORTER:  Take a break.

18             THE WITNESS:  All right.  Yeah.

19             THE VIDEOGRAPHER:  We are going off the record.

20  The time is 3:52 p.m.

21             (Break held off the record.)

22             THE VIDEOGRAPHER:  We are back on the record.

23  The time is 4:10 p.m.

24  BY MR. HALL:

25      Q      Now, in your rebuttal report, you take issue

HIGHLY CONFIDENTIAL

Page 181

1   with Mr. Fishkind stating that it is difficult to

2   calculate the profits per loan; correct?

3       A    In my rebuttal report, I do say that it is a

4   common industry metric that many -- you would expect

5   companies to track.  And you certainly have down at the

6   low level, typically -- and obviously, I haven't been

7   involved in the deposition of the PMK.

8           But I would imagine if you were to ask the CFO

9   at Guaranty or at Home Point, do you have the ability to

10  receive revenue by loan, do you know who worked on them?

11  Yes, usually, that's what happens in most of these

12  situations.

13          And you have the labor costs and you have

14  overhead calculations, you can figure out your profit by

15  loan.  And certainly, it's an industry metric that's

16  widely used in MB.  Mortgage Banker Association publishes

17  the statistic because it's so widely used.

18      Q    As you define -- sorry -- with the definition

19  of "profits per loan" that you just described, is that

20  intended to include the entirety of expenses incurred by

21  a company?

22      A    Well, it gives you an allocation.  It's not the

23  entirety.  It includes the corporate allocation.  You can

24  have companies that do -- like Bank of America can

25  calculate profits per loan, but they also have profits

HIGHLY CONFIDENTIAL

Page 182

1     from other things.

2          Q     Right.

3          A     Just looking at the heavily redacted document

4     that I just saw, I don't know what's going on with some

5     of the expenses and whether those expenses include things

6     like legal fees or sort of things that are associated

7     with this matter if you will.

8               Also, there appears to be some -- another line

9     of business, a servicing business, so I don't know how

10    much the labor is associated with that and some of the

11    expense and how it's allocated.  But if you had the

12    detail, you probably could figure it out.

13         Q     Okay.  And in your report, your rebuttal

14    report, you use the document produced at GHMC 003257.

15              And that's Footnote 40; right?

16         A     Where are you -- oh, you're all the way at --

17    yes, I've used that document.

18         Q     Okay.

19         A     That's the payroll file.

20              MR. HALL:  It's not going to be a closed book

21    test.  I'll give you the document.

22              THE WITNESS:  You have the document.  Okay.

23    Nothing like a Bates stamp to really tell you what it is.

24    Oh, wait that's the loan files.

25              MR. HALL:  Yeah.  I'm going to give you what

HIGHLY CONFIDENTIAL

Page 183

1   we'll mark as Exhibit 54, which is the document that was

2   produced at GHMC 003257.

3            THE WITNESS:  That's correct.

4            (Exhibit 54 marked.)

5   BY MR. HALL:

6       Q    Okay.  I'm going to jump around here a little

7   bit, so if I lose you, just let me know.

8            But when you go to the rebuttal report on

9   Page 17 at Exhibit R-33 of the rebuttal report.

10      A    Yes.  You mean R-5?

11      Q    What's that?

12      A    You're talking about the number of loans or

13  what are you asking me about?

14      Q    In Exhibit R-3, you've got Home Point's average

15  profit per loan.

16      A    Yes.

17      Q    Okay.  And for Exhibit R-3, I understand that

18  you use the average and not the amount for Home Point's

19  average on R-3.

20      A    I didn't use the Home Point numbers and apply

21  that to Guaranty.  I just used the industry average.

22      Q    Right.

23      A    Obviously, they're above and below.

24      Q    And that's going to be my -- that was my

25  question.  The bottom of Exhibit R-3 says, "Average

HIGHLY CONFIDENTIAL

Page 184

1    profit per TPO loan for period July 20 through March 21

2    is $6,724."

3         A    Yes.

4         Q    And that is the profit per loan funded; right?

5         A    I'd have to look and confirm.  I'd have to go

6    back and confirm that number.  Because I would think that

7    the expense is baked in, so it might be based on the

8    total.  But either one, I can go back and look and

9    confirm that.

10        Q    So the column -- I'm sorry -- the row header is

11   "TPO-funded units"?

12        A    That's correct.

13        Q    Okay.

14        A    That means it's funded, then.  That's correct.

15        Q    Okay.  Now, with the MBA reports that you

16   refer, is that profit per loan funded or profit per loan

17   underwritten?

18        A    It's likely to be funded.

19        Q    Okay.  And you understand that not all loans

20   are funded?

21        A    That's correct.

22        Q    Okay.  And the document at GHMC 003257 and 58,

23   which is Exhibit 54, is not units funded?

24        A    It doesn't have any labels.  It just has count

25   of loans.

HIGHLY CONFIDENTIAL

Page 185

1    Q    Okay.

2    A    So it doesn't let anyone know one way or the

3    other what that is.

4    Q    Right.

5    A    And obviously, it's redacted.  So it's hard

6    to -- there's not a lot of -- there's not a

7    disciplination (as said) on this page.

8    Q    Correct.  Did you review the specific requests

9    for discovery for which this document was produced?

10    A    I may have looked at it at some point, but I

11    don't recall as I'm sitting here.

12         MR. HALL:  Okay.  I think you referenced this

13    document a couple times.  I want to make sure that we're

14    on the same page.  This will be Exhibit 55, which is a

15    highly confidential document that's labeled as highly

16    confidential and was -- it's GHMC 003297 and 98.

17         (Reporter clarification.)

18         MR. HALL:  I think we'll mark the entire

19    transcript as confidential.  I think we went over the

20    confidential documents that you guys have marked.  So

21    unless you guys say otherwise, and then we'll just mark

22    this one specific portion as highly confidential.

23         MS. ZADIKANY:  You should probably

24    provisionally mark it highly confidential and then

25    designate.  I usually find that to be probably easier.

HIGHLY CONFIDENTIAL

Page 186

```
 1              MR. HALL:  That works for me.
 2              (Exhibit 55 marked.)
 3    BY MR. HALL:
 4       Q     Is this the highly redacted document that you
 5    were referring to earlier where you couldn't tell what
 6    the expenses were?
 7       A     What's that?  This is the one, yes.
 8       Q     This one?
 9       A     Yes.
10       Q     That's Exhibit 55; right?
11       A     It is now marked 55.  And this was produced for
12    the record well after.
13       Q     Correct.  Okay.  So if you look at the units
14    funded in the core earnings numbers; right?
15              Do you see that?
16       A     I see the units funding, yes.  And I do see the
17    core earnings numbers.
18       Q     Okay.  And if you look at the units funded and
19    you compare it to the monthly totals of units listed on
20    GHMC, which is Exhibit 54, you could see those totals are
21    different; right?
22       A     I do see that.  That's correct.
23       Q     Okay.  And you understand the mortgage
24    underwriting industry enough to know that if one of the
25    former Home Point employees worked on an underwriting
```

HIGHLY CONFIDENTIAL

Page 187

1    file in a month that is certainly not an indication that

2    that loan would be funded that month?

3        A     It could be funded the next month, for example.

4        Q     And it could never be funded?

5        A     That's possible.

6        Q     And we covered that at the beginning, so I

7    don't think we need to rehash it too much.

8              But when you calculate the number of loan files

9    on which the former Home Point employees worked, then

10   you're going to have an artificial loan -- or profit per

11   loan number; correct?

12       A     If you are -- this methodology, you're going to

13   have a number that says -- obviously, this doesn't say

14   this Exhibit 54 did not provide the context which we have

15   with 55.  So if you're saying that the number includes

16   too many loans because they didn't fund all of them, then

17   I would make an adjustment to address that.

18             One thing that I did note when I did see this,

19   what was interesting to me is the operation got a heck of

20   a lot better, it seems, after the Home Point people

21   arrived.

22       Q     How so?

23       A     Well, they closed a high percentage of the

24   loans.

25       Q     In what month?

HIGHLY CONFIDENTIAL

Page 188

1    A    Look at July.  There was 1,114, and they closed

2    792.  August, 1,331, they only closed 810.  Obviously, I

3    don't have the previous six months, but.

4    Q    Right.

5    A    It could be even worse based on that.  So maybe

6    they got better at underwriting when they added the

7    Home Point folks.

8    Q    Right.  And certainly --

9    A    It certainly looks that way.

10   Q    Right.  In August, they -- prior to the

11   Home Point employees coming on, they closed more loans

12   than any other month that's listed on that

13   counter; right?

14   A    They closed -- well, no, what are you talking

15   about?

16   Q    On Exhibit 54.

17   A    You're saying that August -- the 810 that they

18   closed in August is the highest?

19   Q    So if you're looking at Exhibit 54.

20   A    Yes.

21   Q    In August, they closed 1,331 loans.

22   A    Oh, I'm looking at -- sorry -- I was looking at

23   55.  So in August -- 54 is not closings.  I thought you

24   said those were loans.  And in 55 --

25   Q    Funding -- yeah, those are the loans that when

HIGHLY CONFIDENTIAL

Page 189

1    the -- those are loans underwritten, not funded; right?

2        A    Okay.  So that's -- so my point in August, they

3    had 1,331; right?  You look at August funding, 810.  You

4    look at July, 1,114.  July, 792.  Obviously, they didn't

5    produce the June similar to the new comparison in

6    previous months, which would be really helpful.

7             But if you look again what happened once the

8    Home Point people showed up, and you look at -- if you

9    look at September.

10       Q    Well, they didn't start in September; right?

11       A    I know that.  That's why I'm looking at it.

12   September, 1,216 loans; they closed 1,003.  So it got a

13   little better.  But October, 1,254; they closed 1,100.

14   So it looks like they're getting more efficient.

15            In November, they got 11 -- 1,087; they closed

16   978.  So the percentage of closed ratio appears to be

17   improving with the Home Point people.  And obviously,

18   this disgorgement theory is artificially stopped and

19   constrained because GHMC didn't produce anything past

20   2020.

21       Q    Okay.

22       A    It's not like these underwriters left, at least

23   not immediately.  They were there in January of 2020.

24   Presumably, they worked on more loans.

25       Q    Right.  And you can look as far as when you say

HIGHLY CONFIDENTIAL

Page 190

1    "they got better."

2        A     I misspoke.  I said January 2020.  It should be

3    January 2021, et cetera.

4        Q     Sorry.  When you say "they got better," you've

5    got 1000 units funded in September of 2020; right?

6        A     In September of 2020, 1,003.

7        Q     So 1,003.  But we'll call it a thousand.

8              So they saw core earnings of $6,621,000?

9        A     Yeah, there's something kind of wanky about --

10   or wonky, if you will, about the core earnings numbers.

11       Q     About what?

12       A     Just looking at them, there appears to be very

13   little relation between core earnings and loans funded.

14   So, for example, they closed 1,100 in October, but they

15   only had core earnings of $3.4 million.

16       Q     Right.

17       A     They closed 1,000 in September, so less loans,

18   6.6.  So what's in this redacted stuff, I don't know, but

19   there's a lot of information there.  They closed 1,081

20   loans in December of 2020, yet it's only $1.44 million.

21       Q     Right.

22       A     So I'd have to understand what's in this.  And

23   right now, it's hard to do because everything is

24   redacted.  The black box, I guess, would be important to

25   really properly evaluate this.

HIGHLY CONFIDENTIAL

Page 191

1    Q    Uh-huh.  And well, one of the things we know

2    they did between September and October, based on what

3    you've testified earlier, is hire a bunch of

4    people; right?

5    A    Well, I don't know who else they hired

6    necessarily.  I know they hired the Home Point people.

7    They did do that.  Maybe they hired other people outside

8    of that as well.  I'd have to go back and look at the --

9    there's an employee roster thing that I'd have to look.

10   Q    I thought you testified earlier that there

11   were -- before the Home Point people arrived, there was

12   ten employees?

13   A    Well, we're talking about where; GHMC?

14        MS. ZADIKANY:  Objection.  Misstates testimony.

15        THE WITNESS:  What are you talking about?  Are

16   you talking about the people that are in Florida?

17   BY MR. HALL:

18   Q    I thought that's what you testified.  If I

19   didn't --

20   A    No, you can see what was here.  There was

21   basically almost nothing in Florida.

22   Q    Okay.

23   A    There was -- looks like -- one, two, three

24   people that were hired before the group came over.

25   Q    Okay.

HIGHLY CONFIDENTIAL

Page 192

1    A    This is GHMC, including the other operation, so

2    it would be Tennessee and wherever else they're

3    operating.

4    Q    Okay.  Is there specific data that you think

5    you can't see or is it everything -- let me rephrase

6    that.  Let me rephrase that question and make it better.

7         Is there specific information that's redacted

8    that for rows listed or not listed that you would need to

9    complete your analysis?

10   A    Well, let me just, for the record, you can see

11   the video, they can see it's a black box.  If they take

12   off some of these black boxes, for example, I would

13   imagine their legal expense went up as a result of this

14   lawsuit.

15   Q    Uh-huh.

16   A    But I would question in my head, do you get a

17   credit because you had to pay legal fees if you are in

18   connection with this case?  A trier of fact can look at

19   that.  I don't know what the other hires were

20   potentially.  I'd have to look at that piece.

21        I don't know how much of this was servicing

22   versus origination.  So you've got sort of two things:

23   You've got mortgage banking revenue, which is your

24   origination operation where you're originating it, which

25   is kind of what we're talking about here, and then you've

HIGHLY CONFIDENTIAL

Page 193

1    got another line of business, it looks like, called

2    mortgage servicing.

3           You've got interest.  I don't know how this all

4    shakes out.  I don't know what's going into the expenses.

5    Q    What do you mean you "don't know what's going

6    into the expenses"?

7    A    Well, I've got a general category.  For example

8    did they spend a million dollars in advertising in

9    December of 2020 or is it something else?  All I do know

10   is there does not appear to be much relationship between

11   the profit numbers and the loan.

12          You know, so what's going on in the middle of

13   here, it's not a straight line.  So it would provide more

14   information, and it would allow for a more -- a better

15   estimate if this wasn't a black box.

16   Q    Is it your opinion that the profits that are

17   subject to disgorgement are at a loan level or at a

18   company level or neither?

19   A    If we're trying to measure the profits

20   associated with the work of the underwriters that went

21   over, then you have to look at the loan level.  I mean,

22   they had nothing to do with it -- it was profit and

23   mortgage servicing, for example, that had nothing to do

24   with the underwriters.

25          If there is cost to mortgage servicing, it has

HIGHLY CONFIDENTIAL

Page 194

1    nothing to do with the underwriters.

2        Q    And when you're doing the per loan calculation,

3    should it be per loan funded or per loan worked?

4        A    Well, the profit piece of it comes into the per

5    loan worked.  However, the cost associated with dead

6    loans is impacting you on the bottom line, so it's

7    already factored into that assessment.

8            Your total profit -- your revenue number is

9    your revenue number.

10       Q    Am I correct to understand that your opinions,

11   whether in the initial report or the rebuttal report, do

12   not take into account any market factors?

13       A    When you say "market factors," what do you

14   mean?  What Fishkind says?

15       Q    Yeah, you can disagree with how Mr. Fishkind

16   applies or defines the market factors.

17           But do you think that the -- how the market

18   plays for underwriters and for Home Point and for GHMC

19   should be applied in order to calculate the but-for

20   damages?

21       A    I think that the notion, for example, that --

22   they would raise pay anyway.  I think that doesn't make

23   sense to me, his market factor thing is kindly.  It's not

24   an appropriate adjustment.  It has nothing to do with it.

25           This is a case about these individuals.  And,

HIGHLY CONFIDENTIAL

Page 195

```
1    you know, if he wants to say that these individuals would
2    have eventually left, there's a statement, like, as of
3    hire today, well, gee, most of the mortgage industry has
4    been laid off at this point.  I agree with that.
5             But that doesn't mean that in 2020, during one
6    of the peak periods, when companies are making a lot of
7    money in the industry, just look at the data.  It was a
8    very good year.  You know, if the interest rates hadn't
9    risen, maybe there would be a -- it would have continued
10   being a good time, but -- for the companies in the
11   industry.
12            But if you just look at the data, 2020 was
13   really, really good.  And I mean historically.  Much
14   better than even 2019.  So it was certainly a great time
15   to have capacity.  And if you could process loans and
16   fund them, then you had a really good opportunity to make
17   good money.
18        Q    Okay.
19        A    And I do take the industry factor into account
20   by using the average in that quarter.
21        Q    To use the average of what?
22        A    In that quarter.  When I did my analysis, the
23   average profit per loan.
24        Q    So you --
25        A    And if I would have continued going, if someone
```

HIGHLY CONFIDENTIAL

Page 196

1 said, "These are the loans," either I need more detailed

2 financials from GHMC or you use the next quarter's

3 average, industry average.

4 Q    And that is as to the disgorgement

5 claim; right?

6 A    Yes.  Correct.

7 Q    Okay.  But as to the other aspects of damages

8 for which you opine on, you don't apply any external

9 market factors?

10 A    I don't think that that's an appropriate

11 application.  I just don't.  It's saying that someone --

12 it's saying they would have paid this bonus.  I think,

13 and maybe I'm wrong, but my -- I heard that GHMC didn't

14 pay retention bonuses during this time frame.

15 Maybe they weren't under attack.  They were

16 dealing with a mass raid.  And so the notion that they

17 were all being planned to be paid ahead of time, that's

18 not true.  This was a reaction, so it -- to me, it seems

19 like some hand waving.  It doesn't have, really -- it's

20 not applicable to this analysis.

21 Q    Okay.  And we do know that it wasn't provided

22 to you ahead of the report, but we do know that

23 Home Point paid retention bonuses besides this mass one?

24 A    There are other retention bonuses that may have

25 been paid.

HIGHLY CONFIDENTIAL

Page 197

1      Q      Right.

2      A      I don't think on the same scale, same time

3  frame, et cetera.  But there have been other retention

4  bonuses paid.

5      Q      So since you don't apply any external market

6  factors to the category of retention bonuses paid; right?

7      A      I'm taking the bonuses that are directly a

8  result of this action.

9      Q      And for that, you're simply taking the

10  spreadsheet that Home Point provided you and just

11  regurgitating the number; right?

12          MS. ZADIKANY:  Objection.  Form.

13          THE WITNESS:  I'm looking at the number, but

14  yeah, we're looking at that.  And this is -- this

15  retention bonus is paid to the Maitland operation, and

16  I've described in detail why I think that was an

17  appropriate response and why you would have the people in

18  the Maitland operation getting -- getting a payment at

19  that time.

20          I'm not aware that they planned on paying

21  millions in retention bonuses -- planned on that in,

22  let's say, in August of 2020, that wasn't part of the

23  plan.

24  BY MR. HALL:

25      Q      Okay.  But you're not a causation

HIGHLY CONFIDENTIAL

Page 198

1    expert; right?

2        A    I don't think there's evidence that says that,

3    either.  So this happened afterwards.  This is the

4    defense.  My understanding is these were paid in defense

5    of this raid.

6        Q    So what do you bring to the opinion as an

7    expert when you state that the retention bonuses damages

8    are $2,647,214?

9            MS. ZADIKANY:  Objection.  Form.

10           THE WITNESS:  I'm looking at the expanse of

11   what was paid, and to whom, and whether I believe that's

12   going to be a reasonable response.

13   BY MR. HALL:

14       Q    And that is as an economist?

15       A    As an economist and as a person who understands

16   the operations of these types of businesses and other

17   types of businesses.  And I believe that's a reasonable

18   response.

19       Q    Okay.

20       A    And that's the amounts they pay.  And similar,

21   some of the other costs associated with responding to

22   this rate.

23       Q    Okay.  When it comes to the signing bonuses

24   paid to the individuals that were hired to replace the

25   ten employees who left --

HIGHLY CONFIDENTIAL

Page 199

1          MS. ZADIKANY:  Objection.  Form.

2          MR. HALL:  Let me finish my question and you

3    can object.

4          MS. ZADIKANY:  Sorry.  I thought you were done.

5    BY MR. HALL:

6     Q    When it comes to the damages that you opine on,

7    as to the signing bonuses paid to the ten individuals

8    that were hired to replace those that resigned on

9    September 17th, what calculations do you make as an

10   economist to determine those benefits?

11         MS. ZADIKANY:  Objection.  Form.

12         (Reporter clarification.)

13         THE WITNESS:  I'm compiling the costs.  I'm

14   evaluating who should be included.  There's actually an

15   11th person who left.  I forgot that Mr. Lane is part of

16   that group as well, but I haven't -- it's another person

17   that's in there.

18   BY MR. HALL:

19    Q    I thought we had gone over this earlier, and I

20   thought you agreed that ten people left, ten people

21   replaced?

22         MS. ZADIKANY:  Objection to form.

23         THE WITNESS:  Except there's 16 plus, I think.

24   BY MR. HALL:

25    Q    So you are seeking to recover for the six?

HIGHLY CONFIDENTIAL

Page 200

1          A     I was trying to think about how I got to the

2     11th person.  And I think my recollection is maybe

3     there's something in there for Lane, so I've got to look

4     back and check that out.  But I'm revising those tables

5     anyway.

6                    (Reporter clarification.)

7                    MR. HALL:  So -- okay.  I'm really hopeful this

8     is the last exhibit and I'm short one sticker.

9                    THE WITNESS:  Oh my God, he's out of stickers.

10    We've got to go home now.

11                   MR. HALL:  Trying to.  Oh, no, this one has got

12    it.  This package has two.  I got one more on top of

13    this.

14                   THE WITNESS:  I will say I think 55 might be a

15    record for me.

16                   MR. HALL:  We got a lot of people involved in

17    this one.

18                   THE WITNESS:  What's that?

19                   MR. HALL:  We've got a lot of people involved

20    in this one.

21                   All right.  I'll show you what has been marked

22    as Exhibit 54 --

23                   THE REPORTER:  56.

24                   MR. HALL:  Did I write 54 on it?

25                   THE WITNESS:  You did.

HIGHLY CONFIDENTIAL

Page 201

1          MR. HALL:  Thank goodness I had that second

2     sticker.

3          THE WITNESS:  Now you're out of stickers.

4          (Exhibit 56 marked.)

5     BY MR. HALL:

6     Q    Okay.  This was a document that was produced by

7     Home Point as HPLANE00004537.

8     A    Yes.

9     Q    Okay.  And these are the 16 individuals that

10    are -- had a termination date on 9-17-2020.  And then the

11    other individuals that Home Point has asserted were

12    solicited by Don Lane to apply for a position at

13    Guaranty.

14    A    Okay.

15    Q    Are you operating on a different list than

16    this?

17    A    This list is bigger than the list that I'm

18    operating with.

19    Q    Okay.

20    A    And I don't see -- is Mr. Lane on this list at

21    all?  He's not.

22    Q    Okay.

23    A    He was solicited by Ms. Robertson, by Candy.

24         MR. HALL:  Okay.  Why don't we take just a

25    brief five-minute break.  I think I'm either done or very

HIGHLY CONFIDENTIAL

Page 202

1    close to it.

2              THE WITNESS:  Okay.

3              THE VIDEOGRAPHER:  We are going off the record.

4    The time is 4:48 p.m.

5              (Break held off the record.)

6              THE VIDEOGRAPHER:  We are back on the record.

7    The time is 4:52 p.m.

8    BY MR. HALL:

9       Q     Just one question I didn't ask earlier, and

10   hopefully, it doesn't lead to a lot more.

11             But for the six individuals that left and came

12   back --

13      A     Okay.

14      Q     -- does your opinion assume that they were

15   hired into the same role?

16      A     Senior underwriter, basically?

17      Q     Yeah, the same seat, if you will, that's still

18   your desk, and you come back, and you're just?

19      A     Well, you know, it's -- that's an interesting

20   question because if you look at how long some of these

21   people were out, it's pretty likely that some of these

22   people got replaced.

23      Q     Right.

24      A     So if you think about it -- because if, you

25   know, someone is out in -- let's take Charlene Murray;

HIGHLY CONFIDENTIAL

Page 203

1   right?

2       Q     Sure.

3       A     12-7 is when she returned.

4             So you think October 5th they're thinking she's

5   coming back?

6       Q     Right.

7       A     So they probably replaced her.  So in theory,

8   you probably might add her on the next replacement list,

9   which kind of makes my numbers more conservative.  But if

10  you were to take a look at some of these people that were

11  longer, like Jared Haren, he's gone for months.

12      Q     Right.  Yeah.

13      A     So, I mean, you could probably add additional

14  replacements, additional signing bonus people to fix

15  those people.

16      Q     Right.  But then you'd have to reduce the

17  raises they were provided; right?

18      A     Well, the raises start from the rehire.

19      Q     Right.  But if they were already replaced, you

20  couldn't replace them and charge them for a higher rate

21  that you were hiring them -- right? -- because they've

22  already been replaced?

23      A     Say that again.

24      Q     Sure.  So if -- we'll just pick a generic

25  person.  So if Shad Testa on Exhibit 53 is hired to

HIGHLY CONFIDENTIAL

Page 204

1   replace Jared Haren -- and I'm not suggesting that that's

2   what you're saying but --

3       A       Yeah, just pick a number.

4       Q       So if Shad Testa is hired to replace

5   Jared Haren and the damages are the signing bonus that

6   you had to pay Shad Testa, any recruiting costs --

7       A       Yeah.

8       Q       Those are the damages to replace Jared Haren,

9   then when Jared Haren is rehired back, he's not being

10  hired back to do the same job; right?

11      A       Well, that presumes that there's not

12  underwriting to do.  He very well could be -- in theory,

13  he probably is being hired back to the same job.

14      Q       But somebody has already filled the spot under

15  your analysis; right?

16      A       But he's now -- in a but-for world, he's going

17  to be -- if he doesn't go, then you're going to have pay

18  him X -- let's say, X, whatever he was getting paid --

19  because he left and you now have to pay him Y, whatever

20  that difference is.

21              So in a but-for world where he doesn't leave,

22  you may not have paid this difference; right?  That's

23  where that damage is coming from.

24      Q       Right.

25      A       Now, you replaced him, but you may have just

HIGHLY CONFIDENTIAL

Page 205

1    hired someone that eventually would also continue.  You

2    may have hired more people in the future and then hired

3    one less.  So it is sort of a -- I think those are kind

4    of disconnected things given that Home Point is beyond

5    just these folks here that are on this sheet.

6        Q    But in a but-for world, if the individual was

7    hired to replace Jared Haren -- right? -- then but-for

8    Jared Haren leaving, that employees is not hired; right?

9        A    Well, it assumes that they eventually aren't

10   going to be hiring more underwriters anyway.  As well,

11   there are replacement underwriters, and there are also

12   underwriters they're going to be hiring.  So it's not

13   like they're going to continually not hire underwriters.

14            I have to look at the hires.  I'll think about

15   it.  You know, maybe you'll see in my -- whatever my

16   supplemental will be, I'll have thought this through and

17   give you a view on it.

18       Q    Okay.  If they're going to hire Shad Testa no

19   matter what, then the $30,000 that they're paying for his

20   signing bonus they're going to pay no matter what; right?

21            So it's no longer but-for Don Lane's action

22   that they're paying the $30,000?

23       A    Well, it depends if they're replacing him.  I

24   see your point.  I'm going to think about it and file my

25   supplemental, then you'll have some thoughts on it.

HIGHLY CONFIDENTIAL

Page 206

1          MR. HALL:  All right.  No further questions.

2          THE WITNESS:  Okay.

3          MR. HALL:  Very good.

4          THE VIDEOGRAPHER:  This marks the conclusion of

5    today's deposition.  We're going off the record.

6    The time is 4:57 p.m.

7          (At 4:57 p.m., the deposition of

8          ROBERT CRANDALL was adjourned.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 207

1            DECLARATION UNDER PENALTY OF PERJURY

2

3        I, ROBERT CRANDALL, do hereby certify under

4    penalty of perjury that I have reviewed the foregoing

5    transcript of my deposition taken on June 13, 2023; that

6    I have made such corrections as appear noted herein in

7    ink; that my testimony as contained herein, as corrected,

8    is true and correct.

9

10       DATED this _____ day of _____,

11   20_____, at _____, California.

12

13

14

15

16

17                         _____

18                                 ROBERT CRANDALL

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 208

1                    REPORTER'S CERTIFICATION

2

3          I, Desiree Cooks, Certified Shorthand Reporter in

4     and for the State of California, do hereby certify:

5

6          That the foregoing witness was by me duly sworn;

7     that the deposition was then taken before me at the time

8     and place herein set forth; that the testimony and

9     proceedings were reported stenographically by me and

10    later transcribed into typewriting under my direction;

11    that the foregoing is a true record of the testimony and

12    proceedings taken at that time.

13         Further, that if the foregoing pertains to the

14    original transcript of a deposition in a federal case,

15    before completion of the proceedings, review of the

16    transcript [ ] was [ ] was not requested.

17

18         IN WITNESS WHEREOF, I have subscribed my name on

19    this date:

20

21

22

23

24    _____

25              Desiree Cooks, CSR No. 14075

HIGHLY CONFIDENTIAL

**[& - 16]**

| & | | | |
|---|---|---|---|
| **&**   3:8 9:19 11:19 129:22 | **10**   4:6 5:18 69:1 69:17,19,21,22 70:13,17 71:19 112:18 118:24 130:11 132:14 135:13,22 150:19 | **110,000**   117:9 **115**   119:2 120:15,17 127:16 **115,000**   116:7 **11:35**   94:6 | **14**   5:4,24 40:17 83:5,6 162:11 163:8 **14,000**   121:22 **14.6**   175:13 |

**0**

**000219**   6:25
**003257**   8:9
  182:14 183:2
  184:22
**003297**   8:10
  185:16
**01819**   1:7 2:8
  9:15

**1**

**1**   1:25 5:4 9:11
  14:19,20 27:24
  64:13 67:1
  76:18,18 103:6
  124:3 125:12,17
  125:18,20 126:9
**1,000**   190:17
**1,003**   189:12
  190:6,7
**1,081**   190:19
**1,087**   189:15
**1,100**   189:13
  190:14
**1,114**   188:1
  189:4
**1,216**   189:12
**1,254**   189:13
**1,331**   188:2,21
  189:3
**1.44**   190:20

**10,000**   71:7 89:8
  89:24 91:18
  96:3,5,24
**10-19**   139:15,16
**10-26**   28:11,12
**10-4**   85:18
**10-9**   42:16
  88:12
**100**   43:22
  127:15 170:25
**1000**   190:5
**101**   3:9 8:6
**102**   6:19
**104**   6:20 7:19
**105**   171:1
**108**   6:22 119:2
  120:18
**108,240.09.**
  121:20
**10:15**   54:15
**10:27**   54:18
**10th**   160:8
**11**   5:20 76:2,9
  76:14 147:20
  153:19 162:6,22
  173:7 189:15
**110**   116:7
  120:14

**11:50**   94:9
**11th**   199:15
  200:2
**12**   5:21 66:20
  78:7,8 164:7
**12,500**   135:14
  135:25
**12-7**   203:3
**122**   6:24
**123**   6:23
**125,000**   135:13
**126**   6:25
**127**   7:20
**129**   7:1,2
**12:27**   113:23
**13**   1:16 2:23
  5:23 8:7 9:1
  66:21,22 67:10
  81:5,6 207:5
**130,000**   135:18
  135:19,21
**131**   7:22
**132**   7:3
**134**   7:5
**136**   7:23
**138**   7:6
**139**   7:8
**13th**   9:6

**140**   7:9
**14075**   1:23
  208:25
**142**   7:11
**143**   7:12
**146**   7:14
**148**   7:15
**149**   7:17
**14th**   84:12
**15**   6:1 59:9
  71:19 83:17,18
  94:4 120:1
  121:14 132:13
  135:17,21
**15,000**   74:4
  91:19
**150**   7:18
**151**   7:20,21 8:3
**156**   7:23
**156,972**   126:24
**157**   7:24
**158**   8:1
**159**   8:2
**15th**   57:24
  145:11 146:23
**16**   5:6 6:2 84:21
  84:22 87:3
  105:10,13
  153:24 154:4,8
  161:22,24

HIGHLY CONFIDENTIAL

**[16 - 285]**

163:15,16
165:25 176:7,20
199:23 201:9
**160**   8:4,5
**161**   8:7
**17**   6:4 86:2,5,25
162:7 183:9
**17978**   208:23
**17th**   56:13
126:15 142:11
142:22 154:5,9
165:22,24
166:24 173:10
199:9
**18**   6:5 71:19
86:21,23 87:6,8
113:4 163:4,5
179:23
**183**   8:8
**186**   8:10
**18th**   66:15
113:1,2
**19**   6:7 7:17
87:24 88:1
**19,500**   135:23
135:24
**192**   42:8
**1993**   11:15
**19th**   152:1
**1:36**   114:1
**1st**   103:12

**2**

**2**   5:6 16:18,18
16:23 28:4 31:1
115:15 139:6

140:6 141:22
144:5 145:19
146:19 150:6
151:9 156:12
161:14 162:1
**2,000**   140:14
**2,647,214**   198:8
**20**   6:8 48:14
57:4 59:5,9 62:4
66:20,23 71:19
75:11 88:22,24
93:13,13 112:18
116:21 118:23
120:1 122:25
123:9 128:16
164:24,24 184:1
207:11
**20,000**   57:18,19
58:25 70:22,24
71:3 150:11
**2001**   11:5
**201**   8:11
**2019**   67:1,11
97:6 121:17
122:2 195:14
**202**   40:6,16,21
49:11
**2020**   5:10,17
18:24 21:16,20
27:11,16 28:1,6
29:18 59:2,19
60:5 62:2,19
63:12 64:13,23
65:19 67:5,13
79:10 84:12

85:4,10 87:9
88:16 97:7,12
97:14 100:17
101:5 115:10
117:6,13 121:19
122:24 123:9
124:10,12
130:17 131:4,12
137:21,22 142:6
143:22 144:7
145:11 152:1
154:5 155:5
157:12,24
158:12 159:4
160:22,25 161:5
161:12 173:15
179:9,11 189:20
189:23 190:2,5
190:6,20 193:9
195:5,12 197:22
**2021**   67:1,6
130:10 131:5
136:3,6 179:15
190:3
**2023**   1:16 2:23
9:1,6 16:8 111:8
207:5
**203**   5:13 40:5,24
49:10 82:17
91:24
**208**   1:25
**20th**   84:14
**21**   5:17 6:10
88:15 89:11,12
89:14 130:9

138:6 142:6
184:1
**213**   3:5
**21st**   59:2 85:10
113:4,5 142:20
148:20 158:12
**22**   6:11 90:10,11
**221-3900**   3:10
**22nd**   100:17
101:5,17
**23**   6:13 91:9,11
**24**   6:14 94:11,13
94:15 95:16
**25**   6:16 8:1
40:17 98:2,3,8
105:10,15
118:24
**25,000**   82:20
**250**   82:6
**255**   41:2,18 82:3
82:17
**25th**   12:2 46:3
52:19 56:3 57:4
87:9
**26**   6:17 99:21,22
**26th**   28:1,6
142:16
**27**   6:19 102:22
102:23 105:9
**28**   6:20 104:23
104:24 105:14
106:7
**28,000**   75:14
**285**   12:3

HIGHLY CONFIDENTIAL

**[28th - 4th]**

**28th**   137:21
140:4 148:21
149:9 150:21
151:13 157:12
157:24,25 159:3
159:18,19,20,22
160:6,22,25
161:12 173:14
**29**   6:22 23:23
108:24,25 109:2
**29th**   46:4 79:10
**2:33**   143:12
**2:45**   143:15
**2nd**   147:1,5
150:11 161:5

**3**

**3**   5:7,10 30:11
30:23 31:1
104:17 121:15
132:5,7 145:14
145:20,22
146:20 150:6
151:9 156:12
162:9,11 163:8
179:21 183:14
183:17,19,25
**3,000**   74:6
**3.4**   190:15
**30**   5:7 6:23 7:13
123:11,16,22
130:17 137:20
137:22 147:23
148:2 164:24
**30,000**   133:13
144:25 145:9,23

147:5,8 150:23
151:13 152:2,21
156:13 164:23
205:19,22
**3054**   7:5
**30th**   125:6
**31**   6:25 67:1
126:18,19
**31.67**   87:14
**31st**   157:2,6,8
**32**   7:1 40:14
129:22 135:21
**32,000**   135:18
135:24 136:4
**3259**   8:9
**33**   7:2 129:20,22
135:9 183:9
**333**   2:22 3:4 9:9
**33602**   3:9
**34**   7:3 131:25
132:1 135:9
**35**   7:5 134:9,12
**36**   7:6 116:21
120:10 138:24
138:25 139:21
**37**   7:8 120:10
139:18,19,22
**3700**   3:9
**38**   7:9 140:20,21
**39**   5:9 7:11 67:4
67:13 141:25
142:1 179:20,22
**3:52**   180:20
**3rd**   45:11,12,19
45:25 55:24

56:6,11 158:14

**4**

**4**   5:9 38:8,15
39:17 41:1
54:20 57:5
69:13 71:1
72:11 75:10
79:7 85:9 88:14
115:15 116:4
118:1,2 121:16
132:9 146:20
150:6 151:10
156:12 164:2,11
164:15 171:15
**40**   7:12 40:18
86:16,16 129:16
137:17 143:17
143:18 145:6,8
146:22 147:22
152:8 182:15
**40,000**   114:9,14
127:2 133:16
**41**   7:14 146:12
146:14,15
**41.3**   90:25
**41.83**   89:4
**42**   7:15 83:8
148:9,13
**43**   7:17 23:11,12
90:1 149:24,25
150:2
**4327**   118:4
**44**   7:18 150:13
150:16

**4474**   7:2
**4483**   7:4
**45**   7:20 79:18
151:5,7
**4520**   118:4
**4536**   123:18
**4549**   5:25
**4561**   6:7
**4576**   5:22
**46**   7:21 151:22
151:23 152:9
**4607**   6:4
**4644**   5:20
**47**   7:23 156:23
156:24
**4712**   58:22
**4714**   6:10
**4719**   6:9
**4735**   6:6
**4759**   6:13
**47th**   2:22 3:4
**48**   7:24 157:17
157:18,20
**4824**   6:3
**4840**   6:1
**4846**   5:23
**49**   8:1 158:5,6
**4912**   6:21
**4:10**   180:23
**4:48**   202:4
**4:52**   202:7
**4:57**   206:6,7
**4th**   151:16
159:18

**[5 - abc]**

| 5 |
|---|

**5**   5:10 54:22,23
58:18 171:14,20
172:20 173:23
174:1,15 175:9
175:14,17,18,21
176:1 177:16
183:10
**5,000**   45:17 56:2
56:21,25 57:19
57:20,25 59:1
90:21
**50**   8:2 48:15
159:1
**51**   8:4 159:24
160:2
**52**   8:5 160:16,17
**5284**   6:18
**53**   8:7 161:2,3
203:25
**5311**   6:19
**5321**   6:16
**54**   5:10 8:8
183:1,4 184:23
186:20 187:14
188:16,19,23
200:22,24
**5486**   6:15
**55**   8:10 118:3
185:14 186:2,10
186:11 187:15
188:23,24
200:14
**5529**   120:14

**56**   8:11 200:23
201:4
**57**   5:11
**58**   184:22
**59**   138:6
**5924059**   1:24
**5th**   56:22
143:22 144:7
146:25 203:4

| 6 |
|---|

**6**   5:11 40:25
57:13,16,22
174:9,14,17,19
174:23,25 175:3
175:7,10,15,17
175:22 176:7
177:17
**6,621,000**   190:8
**6,724**   184:2
**6.6.**   190:18
**60**   144:16
**621-3916**   3:5
**63**   5:13
**66**   5:14 7:14
**69**   5:17,18
**6:20**   1:7 2:8
9:15

| 7 |
|---|

**7**   5:13 15:12
23:24 24:2
63:18,19
**70**   122:17
**75**   88:8

**75.78**   77:2
**76**   5:20
**76.97**   91:21
**78**   5:21
**79.28**   85:19
**792**   188:2 189:4
**7th**   124:1

| 8 |
|---|

**8**   5:14 66:13,17
121:10
**8,500**   134:21,25
**8-30-2020**   124:6
**80**   34:21 77:22
77:25 78:17
117:14
**81**   5:23
**810**   188:2,17
189:3
**818**   3:10
**83**   5:24 6:1
**84**   6:2
**85**   7:25
**85,000**   123:23
124:14
**86**   6:4
**87**   6:5
**88**   6:7,8 7:16
**89**   6:10
**8th**   158:3

| 9 |
|---|

**9**   5:17 69:1,17
69:18,22 70:1
73:10

**9-10**   149:6
160:23
**9-14-2020**   79:16
**9-17-2020**
201:10
**9-25**   42:9,21
76:23
**9-25-2020**   86:22
**9-26**   42:8,21
**9-4**   159:10
**90**   6:11
**90071**   3:4
**91**   6:13 8:4
**94**   6:14
**94,974.18.**
121:17
**95**   119:1 120:18
171:1
**96**   11:15
**978**   189:16
**98**   6:16 11:23
12:1 58:22
185:16
**98,000**   57:25
**98k**   58:21
**99**   6:17
**9:08**   1:16 2:23
9:1,5
**9th**   42:18 85:4

| a |
|---|

**a.m.**   1:16 2:23
9:1,5 54:15,18
94:6,9
**abc**   60:11 63:3

HIGHLY CONFIDENTIAL

**[ability - amount]**

**ability** 19:23
76:4 181:9
**able** 37:17 38:22
59:16 79:20
101:13 129:7
164:16 170:1
**above** 127:16
145:3 183:23
**accept** 58:12
148:23
**accepted** 65:6
65:11 149:15,16
149:17
**account** 124:8
125:3,13,22
126:6 133:3
194:12 195:19
**accrued** 127:10
**accumulating**
25:25
**accurate** 91:8
**accurately**
28:19 31:3
**achieved** 131:11
**acknowledge**
108:21
**acquired** 11:22
**action** 9:12 13:5
197:8 205:21
**actions** 45:5
56:10,18,23
62:20 99:7
105:20 124:25
147:8 176:11,11
176:12

**active** 22:2
**actively** 35:8
65:24
**actual** 179:14
**actually** 12:5
15:19 21:9
26:15 40:14
58:5 65:22 74:8
84:3 85:3 88:3
92:9 110:12,24
115:2 124:20
152:14 173:19
178:11,11
199:14
**add** 45:1 135:24
156:4 162:20
179:16 203:8,13
**added** 28:22
127:2 153:23
162:23 163:1
188:6
**addition** 96:23
96:24 155:9
**additional** 18:1
20:3 31:8,13
32:17 40:21
59:10 66:7 67:4
104:9 127:2
163:23 164:14
166:15,15
179:13 203:13
203:14
**address** 53:13
53:15 87:22,22
187:17

**addressed** 170:5
**adjourned**
206:8
**adjustment**
125:3 187:17
194:24
**admin** 41:14
52:10
**administer** 9:24
**administration**
11:2
**advance** 73:13
**advanced** 12:10
**advertising**
193:8
**advice** 13:16
**affect** 71:25
**afford** 20:7
**agencies** 19:14
**ago** 33:2
**agree** 124:19
153:9 159:22
162:5 163:13
195:4
**agreed** 138:10
199:20
**agreement**
35:18
**agreements**
24:20 36:18
155:22
**agugua** 143:21
**agugua's** 143:25
152:14,19

**ah** 30:15
**ahead** 63:24
162:10 196:17
196:22
**aiesha** 47:13
**al** 9:13
**alibi** 33:12
**alibis** 33:9,11
**alicia** 46:18
**allegations** 13:5
56:7
**alleged** 12:19
34:25 35:3
36:22 97:5
**allocated**
182:11
**allocation**
178:15 181:22
181:23
**allow** 120:7
193:14
**alongside**
112:12,15
**alphabetical**
39:11
**alphabetically**
39:6 101:1
**alter** 32:18
**amended** 5:4
14:22
**america** 181:24
**amount** 34:22
43:23 56:2
67:22 71:24
75:7 106:24

HIGHLY CONFIDENTIAL

112:19,20 121:8
143:7 156:14
166:21 172:3
178:7 183:18
**amounts**  24:2
198:20
**analysis**  11:10
47:17 61:18
122:10 131:19
143:8 170:6,9
170:17 179:1
180:3 192:9
195:22 196:20
204:15
**analyze**  41:23
41:25
**andre**  99:2
105:3
**angeles**  1:17
2:22 3:4 9:2,8,9
12:6
**anniversary**
12:2
**announced**
94:17
**announcement**
101:19
**annual**  116:4
121:8 130:10,22
132:13
**answer**  4:18
10:14,15 28:19
66:21 74:22
92:17 108:12
128:13 147:10

169:19
**answers**  10:12
136:25
**anxiously**  90:8
**anybody**  58:5
62:6 144:21
157:6
**anymore**  61:20
**anytime**  69:7
**anyway**  19:18
44:8 127:19
163:10 175:7
177:8 194:22
200:5 205:10
**apologies**
101:14
**apparently**
101:18 106:16
**appear**  193:10
207:6
**appearances**  3:1
**appeared**  125:1
**appears**  35:19
92:12 109:5
127:20 128:11
132:20 151:17
182:8 189:16
190:12
**applicable**
196:20
**applicants**
117:20
**application**
196:11

**applications**
173:13
**applied**  177:7
194:19
**applies**  194:16
**apply**  100:18
175:17 176:10
177:6 183:20
196:8 197:5
201:12
**apportioned**
133:21
**appraisal**  19:21
20:9
**appraised**  20:8
**appreciate**  10:6
74:25
**appreciated**
96:13
**appreciation**
7:1 126:14,25
127:6,21 133:17
166:17
**approach**
111:21 137:13
**approached**
118:13
**approaching**
12:1
**appropriate**
20:8 93:3,8
141:12 142:15
143:3 194:24
196:10 197:17

**approved**
124:13,20
**approximately**
41:2 85:22
117:9
**areas**  23:6 30:18
**arguing**  131:14
131:14
**argument**
108:20 120:20
178:24
**arizona**  52:23
**arnold**  100:6
102:5
**arrived**  187:21
191:11
**articulate**  45:3
**artificial**  187:10
**artificially**
189:18
**asap**  100:13
**asked**  66:13
74:12 87:1
115:11 138:18
169:21
**asking**  22:25
24:4 35:21 61:4
73:23 98:5
123:13 127:11
129:2,4 133:10
134:15 159:19
159:21 170:22
170:23 183:13
**asks**  123:12

HIGHLY CONFIDENTIAL

**[aspect - base]**                                              Page 215

**aspect** 110:8,10
110:20,22
**aspects** 109:11
196:7
**asserted** 201:11
**assess** 19:22
20:7
**assessment**
174:7 194:7
**assets** 20:4,5
**assign** 156:7
**assigned** 47:6
66:15
**assistance** 177:5
**assistants** 52:10
**assisting** 21:3
**associated**
148:25 178:5
180:8 182:6,10
193:20 194:5
198:21
**associates** 40:24
41:2,8 101:19
114:21 115:20
137:21 147:23
148:2
**association**
181:16
**assume** 10:19
18:13 77:18
78:2 202:14
**assumes** 174:5
174:11 205:9
**assuming** 33:1
84:11 91:8

**assumption**
23:17 47:22,24
105:18 136:18
168:6 169:24
172:5 176:9
177:9
**assumptions**
170:3
**attach** 127:24
**attached** 14:24
**attack** 196:15
**attempt** 97:22
107:5 174:1
**attempted**
111:19
**attempting**
61:24
**attention** 66:19
79:6
**attributable**
59:5 67:22
145:13
**attribute** 77:22
**attributed** 36:8
77:20 78:17
**attributes**
117:20
**attributing**
62:20
**august** 11:23
21:19 45:9
125:2,6 126:25
157:2,6,8 188:2
188:10,17,18,21
188:23 189:2,3

197:22
**authenticate**
16:22
**availability**
166:18
**available**
135:12 149:22
**avenue** 2:22 3:4
9:9
**average** 29:3,7
121:16,18
122:14 171:22
175:16,19,25
176:2,3 179:2,2
180:7,11 183:14
183:18,19,21,25
195:20,21,23
196:3,3
**averaging** 128:7
**avoid** 77:15
107:21
**award** 113:16
**aware** 14:8 74:7
94:16,24 95:3
95:13 197:20

**b**

**b** 116:18 153:4
**back** 10:19
11:13 26:20
27:13 28:1,11
29:6 30:5 54:17
58:13 73:10,23
74:4,4 79:7
80:17,25 93:14
94:8 101:9

102:3 105:9
110:15 113:25
114:16 118:17
119:5,8,16,17
120:2 124:22
125:21 135:9
137:1 138:9,20
142:17 143:4,14
147:20 148:25
152:8 153:8,25
154:1 157:17
161:20,22,24
162:5 164:6
170:8 173:4
179:16 180:22
184:6,8 191:8
200:4 202:6,12
202:18 203:5
204:9,10,13
**backlog** 21:18
**backs** 27:4
**bad** 33:20 55:12
**baked** 184:7
**bananas** 155:6
**bank** 19:10
22:18 181:24
**banker** 181:16
**banking** 192:23
**banks** 19:15
22:19
**base** 57:25
58:15 119:19
123:23 125:25
126:3,10,11
130:11 132:13

135:20 136:13
170:25 172:4,13
**based** 24:15
25:23 29:25
35:7,18 47:24
51:24 71:24
72:8 77:4 84:3
92:23 93:18
95:17 99:6
103:25 109:14
109:15 116:15
119:22 127:1
130:23 138:6
141:10 165:21
170:4 174:14
175:25 179:8
184:7 188:5
191:2
**basic** 172:9
175:24
**basically** 49:13
107:25 159:14
169:9 191:21
202:16
**basing** 173:7
**basis** 26:1 36:6
54:1 68:8 72:5
120:2 178:11
**batch** 42:10
**bates** 5:11,13
6:14,16,17,19
6:22,23,25 7:2,3
7:5,6,8,11,12,14
7:15,17,18,20
7:21,23,24 8:1,2

8:4,5,7,8,10,12
43:12 55:7
72:10 91:3
99:25 104:20
144:15 182:23
**bear** 76:4
**beginning** 9:17
187:6
**begun** 56:8
**behalf** 9:14,19
9:22
**belabor** 10:8
**believe** 15:4
17:16,17 24:14
47:15 51:17
56:10 61:12
77:8,19 91:5
101:14 130:4
142:22 145:14
167:1 177:1
198:11,17
**benefit** 119:6
167:23
**benefits** 199:10
**bertrand** 130:1
130:16 131:3,10
132:15 135:10
135:13,25
**best** 22:16,16
130:6
**bet** 41:11,12
**better** 29:16
53:23 70:18
71:10 78:25
96:14 106:1

131:15,24 157:7
187:20 188:6
189:13 190:1,4
192:6 193:14
195:14
**beyond** 27:22
47:18 106:2
112:20 205:4
**bibi** 46:18
**big** 19:10 38:15
42:25 46:16
52:7 62:15
76:11 108:3
120:6 122:18
169:14
**bigger** 42:23
49:18,21 52:19
80:6 109:24
169:6 201:17
**biggest** 62:3
**bill** 173:14
**billed** 114:13
**billing** 114:12
**binder** 16:16
**bingham** 149:3
**bit** 10:16 25:16
30:3 40:3 60:11
71:10 80:14
105:6 116:16
148:24 165:25
183:7
**bits** 14:15
**black** 145:2
190:24 192:11
192:12 193:15

**blanket** 133:5,9
**board** 39:24
132:21
**bobby** 108:11
108:11
**bofa** 19:11
**bonus** 24:12,14
24:24 25:10,15
25:20,21 26:4,9
26:10 29:25
42:4,6 43:5 44:2
44:17,21,23
45:5,13,17,23
45:25 46:11
47:7 48:24
49:12 52:2,15
56:2,21 58:1
60:18 63:7
66:25 67:5 70:3
70:3,19,22 71:6
71:13 72:22
73:7,11,13
76:24,24 79:21
80:6,7 81:19,24
84:8,9 86:18
88:9 89:8,23
90:22 91:19,19
92:2,23 93:8
95:1,7 96:3
97:12,15,17
98:12,13 99:5
99:15 101:8,14
101:19,21,25
102:1,7,8
103:15 104:5

HIGHLY CONFIDENTIAL

**[bonus - call]**                                                                Page 217

105:3 106:17
107:20 108:6
109:8,9,10,19
110:12,24
112:13 120:5
121:20 122:15
122:20,23 123:8
123:19,20
126:25 127:6,9
127:19 128:4
130:10,22,23
131:9 132:13
133:14,16
134:15,17
135:12 136:11
136:12,13 137:4
144:25 145:8,12
150:11,23
151:14 152:1
153:5 156:14
162:21 163:20
163:21 166:16
166:20 172:4
196:12 197:15
203:14 204:5
205:20
**bonuses** 25:2
38:4 39:20,25
40:6 41:9,23
43:21 46:4 49:6
51:12 59:18,21
60:25 61:3
62:19 67:15,23
67:25 68:4,12
75:6,22 82:20

91:25 93:4
94:18 95:5 97:3
99:6 107:16,22
108:7 113:8
114:18 123:1,3
125:13,23 126:1
126:7 128:22
131:19 133:1,3
133:6 134:4
136:2 152:21
162:14,17
164:18,22 165:5
196:14,23,24
197:4,6,7,21
198:7,23 199:7
**book** 182:20
**boomerang** 30:1
**boomeranged**
61:11
**boomerangs**
26:22,25
**borrower** 19:22
20:6,24
**borrower's**
19:23
**borrowers**
20:22 62:12
**bottom** 58:2
103:3 128:3
145:3 147:16
179:23 183:25
194:6
**boulevard** 3:9
**box** 190:24
192:11 193:15

**boxes** 192:12
**breach** 36:23
**breadth** 107:11
**break** 54:12,16
85:24 94:2,7
113:18 143:13
180:15,17,21
201:25 202:5
**breakdown**
41:17
**breaks** 13:9,22
132:19
**brian** 132:4
162:23,25 163:2
**brief** 11:7
201:25
**briefly** 100:2
**bring** 198:6
**bringing** 49:20
**broad** 107:22
**broader** 49:16
**brought** 119:16
178:8
**brown** 3:3 9:21
14:10 140:9,13
141:5,8,11
**brown's** 139:22
140:23
**built** 26:8
**bulk** 16:5,7
42:21 51:15,22
**bullet** 130:9
132:12
**bump** 57:25
58:15

**bunch** 33:16
155:2 191:3
**bundle** 19:25
**business** 11:2
48:20,21 50:10
74:2 80:12
109:19 110:3
131:16 167:14
182:9,9 193:1
**businesses**
198:16,17
**busy** 33:20 60:5

**c**

**c** 151:6 158:8
**calculate** 137:10
181:2,25 187:8
194:19
**calculating**
125:20
**calculation** 24:6
33:7 37:9 47:23
124:16 126:2,8
133:12 135:2
175:11 194:2
**calculations**
181:14 199:9
**calendar** 67:6
67:13
**california** 1:17
2:23,25 3:4 9:2
9:8,10 53:23
207:11 208:4
**call** 20:19 26:24
27:4 32:4 44:14
68:5 95:14

HIGHLY CONFIDENTIAL

**[call - charmaine]**                                                    Page 218

177:15 190:7
**called**  11:13,17
11:18,19 20:16
20:17 21:11
27:1 32:5 48:13
96:12 177:17
193:1
**calling**  27:3
110:8,19
**calls**  110:4
**calvo**  101:7,13
**camera**  96:8
**candace**  1:8 2:9
5:15 107:6
**candy**  30:5 48:6
54:8 56:8 72:16
95:1,5,8 111:7
112:3 127:14
201:23
**capacity**  60:7
62:15 63:15
153:18,22
154:11,12,15,18
154:19,20
155:10,14,16
195:15
**capital**  119:12
**capped**  147:20
**careful**  65:11
**carlos**  101:7,13
106:15
**carolina**  81:9
83:12,24
**carried**  84:15

**carry**  155:2
**case**  1:7 2:7
9:15 12:13,15
14:14 17:20,23
18:3 21:1 22:14
31:4 34:23 47:2
53:14 84:1 92:6
97:21 137:7
177:11 192:18
194:25 208:14
**cases**  13:3,4,6
14:1 34:12 35:5
82:25
**category**  33:25
38:3 72:19
114:19 177:15
193:7 197:6
**causation**  24:9
197:25
**cause**  24:7
166:1
**caused**  36:23
152:23
**cease**  50:1,2
112:24 113:9,11
113:16
**cem**  1:7 2:8 9:15
**certain**  19:7
21:25 25:24
29:4 98:11
**certainly**  16:4
22:21 32:6
36:18 44:10
49:19,21 52:15
57:9 60:6,21

62:5,18 63:13
65:23 68:9
80:24 92:6
99:13 101:24
102:2 104:9
106:14 107:2
112:19 117:11
119:24 122:6
150:8,9 153:22
155:7 164:19
165:7 166:3,8
166:18 167:13
176:17 181:5,15
187:1 188:8,9
195:14
**certification**
208:1
**certifications**
12:12
**certified**  2:24
208:3
**certify**  207:3
208:4
**cetera**  19:21
21:5 31:23
36:19 41:15
116:16 190:3
197:3
**cfo**  181:8
**chain**  58:3
103:1
**chairs**  105:7
**challenging**
35:13 95:24

**chance**  18:2,4,7
18:20 28:14
31:7,10 33:21
76:13
**chandler**  52:23
**change**  39:12
55:8,20 75:15
76:4 119:21
128:21,25
148:24 156:12
156:13 171:15
171:16,17
172:17,20,21
174:17,19 175:3
**changed**  24:3
170:17
**changes**  31:22
31:25 32:2
165:14
**chapman**  116:5
120:12 146:14
146:19,25 147:7
147:12 148:1,10
**chapman's**
120:11
**characteristics**
19:22
**charge**  105:22
174:2 203:20
**charged**  174:4
**charlene**  202:25
**charlotte**  12:4
**charmaine**
84:25 99:1
105:11

**chart** 121:15
**chase** 74:6
**check** 71:2
  73:23 88:14
  120:4 200:4
**chicago** 12:4
**chontaye** 151:6
  159:17
**choose** 63:5,6,6
  73:24 168:13
**chose** 44:22
  145:24
**chosen** 61:18
**chris** 139:22
  140:9,13,23
  141:5,11
**christina** 64:4,7
  64:9 65:9
**christine** 117:15
**christopher** 1:9
  2:9
**chuckling** 96:7
**chunk** 129:14
**cindy** 157:3
**circumstance**
  45:3
**circumstances**
  68:16 102:12,17
  106:2,14
**cited** 43:19
**claim** 36:21
  79:5 196:5
**claims** 13:7,8
**clarification**
  19:17 25:13

37:14 39:9 43:8
48:16 49:8 66:4
80:20 82:4,13
86:1 87:4
102:20 124:23
125:8 139:24
154:2 156:10
185:17 199:12
200:6
**clark** 76:20
  77:25 119:1
  162:17
**class** 13:4
**classification**
  71:20
**classifications**
  34:14 41:13
**clear** 103:24
  168:2
**client** 62:12
**clients** 20:19
**close** 29:10
  32:10,12,13
  58:21 166:7
  202:1
**closed** 182:20
  187:23 188:1,2
  188:11,14,18,21
  189:12,13,15,16
  190:14,17,19
**closer** 78:19
  79:6 83:8 96:1
**closers** 82:8
  97:3,13 103:17

**closing** 78:22
  90:17 95:18
**closings** 188:23
**coaster** 66:10
**colleagues**
  167:13
**collect** 80:7
**collecting** 21:4
  80:4
**collection** 20:22
**college** 10:20
  11:12
**column** 8:8
  123:2 175:10,22
  175:22 184:10
**combined**
  176:12
**come** 23:4 31:13
  48:8 65:4 69:9
  106:21 111:3
  118:17 168:25
  170:8 180:10
  202:18
**comes** 22:23
  39:19 47:5
  60:10 63:3
  112:9 167:15
  171:1,1 194:4
  198:23 199:6
**comfortable**
  64:1
**coming** 10:7
  153:6 155:8
  169:7 188:11
  203:5 204:23

**commensurate**
  57:10
**committed** 45:4
  45:9 46:4 56:20
  59:7 147:4
**common** 68:9
  181:4
**communicated**
  94:23 103:6
  161:8
**communicating**
  53:7
**communication**
  53:2 95:3,10
**communicatio...**
  15:14 94:24
**comp** 120:6
  148:24 171:10
  172:3,13,14
**companies**
  12:23 59:21
  60:7 62:23
  155:2 165:6
  181:5,24 195:6
  195:10
**company** 22:23
  49:4 52:16
  60:11 63:4
  72:23 97:21
  108:3 109:9
  169:1,5 181:21
  193:18
**company's**
  48:12

HIGHLY CONFIDENTIAL

**[comparable - coordinators]**                    Page 220

**comparable**
  115:13 116:18
  117:21
**compare**  27:10
  27:19 28:11
  29:11 71:16
  73:4 77:14
  115:8 152:8
  170:9 186:19
**compared**  42:20
  118:11 121:4
  122:11,11
**compares**
  117:17
**comparing**  73:3
  133:1 144:3
**comparison**
  27:16 29:6
  117:15 118:8,9
  120:19 126:3
  189:5
**compelled**  93:16
**compensate**
  178:19
**compensation**
  25:6,12 30:3
  55:8,21 120:4,8
  128:16 130:7
**competing**
  22:15,20
**compiling**
  199:13
**complaining**
  108:13

**complete**  10:14
  192:9
**completely**
  108:17
**completing**  78:3
**completion**
  208:15
**complex**  36:17
  155:19
**composition**
  121:23 122:8
**concern**  105:19
**concerned**
  48:19,25 51:10
  103:23 106:8
  159:16
**concerning**  64:9
**conclusion**
  206:4
**conditions**
  120:8 132:15
**conduct**  17:22
  155:21
**confidential**
  1:15 185:15,16
  185:19,20,22,24
**confirm**  18:18
  42:2,3,4 55:20
  146:3 184:5,6,9
**confirmed**  42:6
**confused**  40:3
**connected**  49:13
  108:18
**connection**  14:4
  33:14 39:21

68:4 94:23
  108:1 178:7
  192:18
**conservative**
  203:9
**consider**  74:15
  106:17 120:23
  126:1 133:10
**consideration**
  65:11 121:19
**considered**
  133:6 137:14
  160:14
**considering**
  45:15 141:21
**consistent**  71:1
**constant**  119:11
**constrained**
  189:19
**consult**  141:9
**contacted**  49:23
  50:1 177:3
**contained**  207:7
**contains**  70:1
**context**  99:12
  99:13,18 104:4
  104:8,9 106:20
  108:16,22
  187:14
**contingencies**
  62:13
**contingency**
  21:24 22:4
  166:9

**contingent**
  128:23
**continually**
  205:13
**continue**  205:1
**continued**  195:9
  195:25
**continuously**
  125:15,24
**contract**  22:4,4
**contracts**
  172:14
**conversation**
  112:17
**cook**  124:13
  163:7
**cook's**  123:22
**cookbooks**
  13:16
**cooks**  1:23 2:24
  208:3,25
**cooper**  150:14
**coordinate**
  168:10
**coordinated**
  111:17
**coordinator**
  46:21 87:10
  88:23 89:19,22
  103:18
**coordinator's**
  20:15
**coordinators**
  20:16 41:3

HIGHLY CONFIDENTIAL

**[copy - creating]**                                                    Page 221

**copy**   16:16
   30:16
**core**   186:14,17
   190:8,10,13,15
**corp**   9:13,22
**corporate**   18:18
   130:12,20
   181:23
**corporation**   1:5
   1:10 2:6,10
**correct**   12:8,16
   12:17,20 15:7,8
   16:9 18:21
   22:12 23:16
   32:18 34:1,5,12
   34:13,15 35:1
   35:11,25 36:1,5
   38:6 40:7,20,22
   42:19 43:5,7
   47:16,19 50:24
   52:3 54:22
   55:15,25 56:15
   56:18 58:11
   59:2,3 62:20,24
   70:23 75:16
   76:25 77:2,3,10
   77:21,23,24
   79:17 81:16,19
   82:17,18 85:17
   86:18,19 87:15
   88:5,10,13,21
   89:6,18,20
   90:18,19,20
   91:22,23 92:2,9
   93:1,9 97:13

100:15 102:1
105:15,17 107:9
110:13 111:1
114:9,21 115:20
116:1,12,19,25
117:10,13 118:7
120:11 124:10
124:16,21
125:15,24 128:1
130:3 132:15,18
133:4 134:3
136:8 137:23
138:7,13 141:23
142:11,12 144:2
146:20 147:9
149:13 150:3,4
150:19,20,24
151:10,14 152:7
152:20 154:9
155:23 156:1
157:10,13
158:16 159:8,11
159:15,21
160:24 161:1,12
161:13,21,23,25
162:15 163:3,19
163:22,25
167:10,23 171:3
173:15 174:5,13
175:9 176:2
177:18 180:2
181:2 183:3
184:12,14,21
185:8 186:13,22
187:11 194:10

196:6 207:8
**corrected**   207:7
**corrections**
   207:6
**correctly**   28:6
   31:24 43:20
   65:1
**correspondence**
   20:21
**corresponding**
   31:11 173:13
**corresponds**
   144:12 158:18
   160:10
**cost**   52:20 73:25
   74:4 80:8 133:1
   170:11 175:23
   175:25 176:2
   177:21 178:15
   178:15 179:7
   193:25 194:5
**costley**   63:23
   64:15 65:14
**costs**   39:22
   80:10 115:17
   139:7 155:20
   162:6 164:6
   178:17 179:14
   180:12 181:13
   198:21 199:13
   204:6
**counsel**   15:10
**count**   163:14
   172:4 184:24

**counter**   188:13
**couple**   38:11
   51:16 52:8
   75:22,24 85:23
   110:9,21 114:4
   152:15 157:16
   164:23 178:13
   185:13
**course**   175:18
**court**   1:1 2:1
   11:20 14:17
   50:4,5,7,8 54:19
   57:13 63:17
   78:6 81:4 83:4
   94:16 102:21
   113:12,15
**covered**   187:6
**coworkers**
   44:21 106:11
   112:17
**crandall**   1:14
   2:21 4:3 5:6,8
   9:12 10:1,5
   30:19 54:25
   69:24 114:3
   206:8 207:3,18
**create**   43:10
   48:25 49:7
   97:20 111:12,15
   168:6,7 175:9
   175:11
**created**   33:1
**creates**   106:11
**creating**   33:15

**credit**  192:17
**criteria**  19:7,12
  19:24 102:15
**critical**  60:9
**critically**  41:22
  41:25
**critiques**  76:6
**csr**  1:23 208:25
**curious**  119:17
  149:21
**current**  65:12
  127:1
**curse**  30:21
**customer**  166:4
  166:12,19
**customers**  62:11
**customized**
  132:20
**cv**  1:7 2:8 9:15
**cycle**  163:9

**d**

**d.c.**  12:4
**daily**  19:1 54:1
  62:1
**damage**  204:23
**damages**  12:19
  24:2,5,7,9 33:25
  36:8 37:9 38:3
  43:4,23 45:6,24
  47:8,17,23
  48:10 54:5
  61:17 66:2
  67:22 75:7 99:8
  105:22 107:8,17
  114:19 120:24

126:4,8 135:3
137:10 155:15
155:17,18
169:18 170:4,10
177:16 194:20
196:7 198:7
199:6 204:5,8
**danger**  167:11
**daniel**  119:1
  162:17
**danny**  123:22
  124:13
**dantzler**  144:2,8
  151:25 152:15
  152:17
**data**  22:6 29:20
  41:19 43:11
  129:3,7 165:6
  175:10 179:13
  179:17 180:9
  192:4 195:7,12
**database**  75:10
**date**  9:5 26:3,5
  42:11,12,14
  43:25 51:2,2,3,3
  61:9 74:11
  76:23 77:1 78:1
  79:10,13 81:15
  83:9 84:6,7,10
  85:3,9,11,11,18
  88:11,15 89:5,6
  90:25 91:6
  112:23 130:16
  138:2,4 139:14
  140:4 141:11

142:6,25 143:21
144:1,6,7
145:25 146:2,5
148:12,19,20
149:5,17 150:18
150:21 151:12
152:1 157:11
159:3,6,9,10,10
159:15,18 160:6
160:7,21,23,24
161:11 201:10
208:19
**dated**  5:10,17
  55:24 123:25
  150:12 161:5
  207:10
**dates**  42:7 58:10
  88:21 140:5
  156:8 165:21
  173:14
**day**  30:13 42:9
  45:19 53:5
  68:13 80:12
  84:13 92:13,20
  101:3 128:8
  142:20,20
  152:11 159:23
  168:19,22
  207:10
**dayforce**  132:3
**days**  21:25 22:6
  22:6 33:2 79:18
  142:13 146:23
**dead**  194:5

**deal**  22:2 50:14
  118:14 168:13
  169:14 176:19
**dealing**  14:3
  163:14,22
  196:16
**deals**  21:24
**dear**  96:22
**december**  67:1
  96:19,25 97:4,6
  97:10,12,14
  190:20 193:9
**decent**  129:14
**decide**  31:22
  35:13 57:8 59:9
  59:9 63:2
  103:22 106:25
  137:15 169:20
**decided**  11:14
  57:24 153:19
**decision**  38:2
  48:19 58:25
  59:15 74:2
  80:13 102:18
**decisions**  49:4,5
  68:23
**declaration**
  207:1
**deduct**  75:19
  122:25
**deducted**  43:7
**deeper**  136:21
**defend**  50:12
**defendant**  5:15
  36:7

**defendants** 1:11
2:11 3:7 9:20
36:9 37:11
45:24 47:18
48:10 56:24
59:6 62:20
67:22 99:7
105:22 124:25
161:19
**defense** 198:4,4
**define** 49:10
178:9,10 181:18
**defines** 194:16
**definitely** 60:16
103:16
**definition**
178:12 181:18
**degree** 11:1
**degrees** 12:10
**delay** 26:7
**delayed** 26:1,13
154:24
**delaying** 22:2
**delineation**
103:25 106:9
109:14,15 112:9
**delivered** 94:17
94:25
**deloitte** 11:22
11:24
**delta** 82:6 122:1
**demonstrate**
38:20
**deny** 22:9

**departed**
163:16
**department**
46:20 84:2
90:16
**departure** 156:9
**depend** 44:11
**depending**
49:11
**depends** 19:8
63:1 131:11
205:23
**depo** 94:21
**deposed** 18:19
**deposition** 1:14
2:21 5:4 9:11,14
10:7,8 14:23
18:3,16 30:14
31:20 33:1,4
35:20 38:8 39:7
74:10,11 115:16
119:7 143:17
167:2 181:7
206:5,7 207:5
208:7,14
**depositions**
18:10,22 31:8
32:7 59:13
**describe** 72:6
**described** 110:7
110:19 181:19
197:16
**descriptions**
24:25

**designate**
185:25
**designed** 111:19
**desire** 169:14
**desiree** 1:23
2:24 208:3,25
**desist** 50:2,3
112:24 113:9,16
**desk** 202:18
**detail** 133:11
164:4 166:21
182:12 197:16
**detailed** 196:1
**details** 135:8
**determine**
137:25 170:7
199:10
**determined**
118:20
**determines**
107:19
**determining**
120:24
**develop** 59:16
**developers** 41:4
**developing**
104:11
**devoting** 35:17
**diana** 150:14
**diane** 160:19
**diaz** 46:15
**difference** 41:8
60:8,9 119:20
121:5 124:14,15
124:19,21

125:21 126:10
126:11 153:14
159:16 168:24
170:20 204:20
204:22
**differences**
118:3 171:11
**different** 19:10
19:12 21:10
26:25 27:22
38:11 45:15
48:3 50:4,10
52:4,11 53:1,4,6
58:10 64:5
68:22 70:11
72:19 78:19,22
78:23,24 79:3
107:20 108:17
112:8 146:11
153:5 164:3
168:13 172:9,10
172:12 178:13
186:21 201:15
**differentiate**
71:15
**differently**
103:24
**difficult** 22:3
80:7 181:1
**difficulty** 80:4
**dig** 136:21,25
156:20
**digest** 18:7
**ding** 37:4

HIGHLY CONFIDENTIAL

**[dinged - drop]**

**dinged**   136:20
**dinging**   153:25
   161:18,19
**direct**   63:22
   66:19
**direction**
   208:10
**directly**   27:19
   49:14,22 197:7
**director**   95:18
   100:6
**directors**   129:9
   129:17 130:21
   131:8 132:4
   162:25
**disagree**   131:17
   155:13 194:15
**disagreeing**
   175:4
**disciplination**
   185:7
**disclose**   30:21
**disconnected**
   205:4
**discovering**
   83:1
**discovery**   18:1
   32:11,12,13
   59:11 185:9
**discrepancies**
   148:11
**discrepancy**
   148:18
**discretion**   13:14

**discussed**
   107:14
**discussion**
   39:16 48:2
   55:20 108:23
**discussions**   61:6
   106:3
**disgorgement**
   177:17,19,24
   179:12 189:18
   193:17 196:4
**dispute**   11:10
   12:22 67:18
**disputes**   14:1
**dissuade**   107:5
**distant**   53:7
**distinctions**
   51:17
**distinguish**
   114:24
**distribution**
   138:21
**district**   1:1,2
   2:1,2
**division**   1:3 2:3
**document**   8:11
   14:18,22 15:2
   32:24 38:9,9
   43:17 55:1,1,4,6
   55:13 57:22
   63:21,25 73:12
   76:19 85:9
   89:14 98:8,9
   99:24 100:3
   103:3 115:15

   123:18 127:25
   128:11 129:24
   130:18 136:16
   141:7 145:5
   147:6 180:9
   182:3,14,17,21
   182:22 183:1
   184:22 185:9,13
   185:15 186:4
   201:6
**documentation**
   20:3 32:7
   149:21
**documents**   4:14
   15:6,9 17:4,5
   20:21 21:4
   24:18 26:12
   31:3 52:5 57:14
   58:8 68:24
   69:25 72:8
   104:10,12 114:3
   114:5 136:22,24
   137:7 141:9
   144:15 148:25
   185:20
**doing**   23:21
   62:8 71:17
   72:24 82:22
   151:3 164:25
   194:2
**dollars**   143:6
   193:8
**don**   30:4 33:25
   34:17 35:22
   36:15,15 37:12

   45:5,16,21,22
   51:8 54:8 56:8
   56:12,23 68:5
   85:11 92:9 95:1
   95:5,8,14
   105:20 107:6
   110:13,25 111:7
   111:11 112:3,24
   126:21 127:14
   129:10 134:11
   146:24 147:8
   151:19 152:5,22
   152:23 157:8
   158:15 165:10
   165:12 168:7
   201:12 205:21
**donald**   1:8 2:9
   9:13
**donna**   159:25
   160:10
**dontae**   139:4,7
   141:4,7 162:24
   163:3,6
**dora**   27:25
   126:13,22
   128:16
**dot**   145:3
**double**   88:14
**doubling**   123:8
**downside**
   167:25
**drive**   120:21
**driven**   134:4
**drop**   163:18

HIGHLY CONFIDENTIAL

**[dropped - employees]**

**dropped** 162:23
163:2
**duces** 5:4
**due** 34:3 101:8
155:21
**dug** 166:21
**duly** 10:2 208:6
**duplicative**
178:2
**duties** 21:4
36:23
**duty** 35:5 37:7

**e**

**e** 102:19 150:5
151:6
**earlier** 130:17
170:16 186:5
191:3,10 199:19
202:9
**early** 16:1 42:11
**earmark** 154:7
154:10
**earned** 128:6
**earning** 117:22
**earnings** 186:14
186:17 190:8,10
190:13,15
**easier** 16:10
32:12 39:7
103:25 109:13
185:25
**east** 3:9
**easy** 11:19
112:1

**ebb** 120:7
**economic** 12:19
97:20 120:21
169:18
**economics**
11:17,25
**economist**
198:14,15
199:10
**education** 10:18
**effect** 122:8
176:18
**effectively** 19:22
20:6,23 121:1
**efficient** 33:22
189:14
**effort** 80:16
**efforts** 74:7
79:24 80:3
**egregious** 35:6
**eight** 11:23
**either** 16:1
18:11,21 31:16
38:24 100:22
101:13 107:3
113:4 145:15
158:22 184:8
196:1 198:3
201:25
**ejk** 1:7 2:8 9:15
**elad** 98:10 103:6
103:12
**elad's** 101:16
**element** 26:7
36:17 57:10

60:4,18 66:3
179:12
**elementary**
10:22,23
**elements** 13:14
24:22 97:24
179:7
**eleven** 11:21
**eligible** 24:23
25:2 101:7
102:7 127:6
130:10 131:2,4
131:4 136:11
**elkin** 157:3
**email** 6:22,23,25
7:2,3,12,14,15
7:17,18,20,21
7:23,24 8:1,2,4
8:5,7 57:23 58:2
58:3 63:22 64:8
64:21 65:10
95:16,17,21,23
96:6 98:7,10
99:12 100:8
101:16 102:25
103:5,11,13,15
103:19 106:9
109:2,5 123:22
123:25 126:21
150:12,18
151:17,25 157:2
159:25 160:19
161:5,9
**emailed** 15:5

**emailing** 30:5
**emails** 5:11,13
6:14,16,17,19
65:3 100:7
104:4 106:2,7
149:15,16
152:11
**employ** 63:8
**employed** 20:4
26:3,6 35:9 41:2
71:12 79:18
89:5 125:14,24
128:8,23 131:1
134:17,20
**employee** 14:2
34:18 39:6,15
45:14 60:18,20
65:22 70:2
73:18 89:17
95:14 122:8
142:15 143:25
145:9 177:14
191:9
**employees** 12:3
26:19,21 27:10
29:15,24 34:15
46:13 51:25
52:1,8 56:9,12
59:22 65:20
67:4,5,13,25
68:13,19 71:12
73:1 74:9 82:3
83:1 92:1,8,23
94:19,23,25
95:4 97:16

HIGHLY CONFIDENTIAL

**[employees - exhibit]**                                                                                   Page 226

112:6,16 117:20
124:4 125:23
128:21 149:8
166:24 167:5
170:10 173:19
174:19 176:8,10
180:4 186:25
187:9 188:11
191:12 198:25
205:8
**employer**   14:2
44:24 60:12
63:2 65:12,23
73:23 87:22
177:14
**employers**
60:22 63:5
82:25
**employment**
11:7 34:9 37:19
45:15 51:14
73:18 87:21
132:3
**en**   111:10
153:17 169:12
**endearment**
96:5
**ended**   118:25
**engaged**   15:25
**engagement**
24:11 41:22
**ensure**   44:15
60:14
**entire**   45:13
134:7 136:9

185:18
**entirely**   40:19
**entirety**   17:5
52:2 181:20,23
**entities**   113:6
**entitled**   9:12
15:13 37:12
44:8 75:8
128:22 133:16
**environment**
54:1
**epps**   83:20,23
**equal**   84:8
**error**   100:12
103:19
**escalate**   20:11
**escalations**   20:2
**especially**   62:10
69:9 73:22
112:15 155:6
**esq**   3:3,8
**essentially**   84:7
178:12
**estimate**   174:1
180:10 193:15
**estimated**   139:6
171:22 175:19
175:23 177:24
**estimating**   24:9
**et**   9:13 19:21
21:5 31:23
36:19 41:15
116:16 190:3
197:3

**etta**   55:9,12
57:24
**evaluate**   44:11
137:11 190:25
**evaluating**
199:14
**event**   68:4 108:5
115:7 120:25
121:2 125:2
**eventually**
126:12 155:3
195:2 205:1,9
**everybody**
31:21 47:17
52:18 57:10,11
77:13 99:15
108:6 115:24
138:12 168:9,17
168:19
**evidence**   198:2
**exact**   24:18
**exactly**   45:21
**examination**   4:5
10:3
**example**   13:12
27:15 32:4
62:14 71:17
75:9 107:24
127:17 129:5
146:3 166:7
187:3 190:14
192:12 193:7,23
194:21
**excel**   39:5

**except**   132:12
199:23
**excess**   155:2
**excited**   16:12
**excluded**   14:14
128:4 180:4
**excludes**   15:19
**excluding**
126:24
**exemplar**   70:7
73:12
**exemplars**
69:25
**exempt**   13:19
35:14
**exercise**   155:19
**exercising**   13:15
**exhibit**   5:3,4,6,7
5:9,10,11,13,14
5:17,18,20,21
5:23,24 6:1,2,4
6:5,7,8,10,11,13
6:14,16,17,19
6:20,22,23,25
7:1,2,3,5,6,8,9
7:11,12,14,15
7:17,18,20,21
7:23,24 8:1,2,4
8:5,7,8,10,11
14:19,20 16:18
16:23 30:11,23
31:1,1 38:8,15
39:17 54:20,23
57:5,13,16,22
63:18,19 66:10

| | | | |
|---|---|---|---|
| 66:13,17 69:1 | 151:7,22,23 | **experience** | **fact** 32:10,12 |
| 69:13 70:1,13 | 152:8 156:23,24 | 116:15 117:18 | 35:12 37:4 38:1 |
| 71:1 72:11 | 157:18 158:5,6 | 118:10 119:12 | 48:18 56:20 |
| 73:10 75:10 | 159:1,24 160:2 | **experienced** | 60:22 77:8,9 |
| 76:1,2,9,14 78:7 | 160:16,17 161:2 | 122:3 | 97:15,18 99:4 |
| 78:8 79:7 81:5,6 | 161:3 179:21 | **expert** 5:6,7 | 102:6 106:23 |
| 83:5,6,17,18 | 183:1,4,9,14,17 | 12:15,21 13:2 | 109:8 147:4,24 |
| 84:21,22 85:9 | 183:25 184:23 | 17:8 18:6 24:10 | 192:18 |
| 86:5,21 87:6,8 | 185:14 186:2,10 | 30:25 31:6 32:5 | **factfinder** |
| 87:24 88:1,14 | 186:20 187:14 | 32:13 34:7 | 107:12,18 |
| 88:22,24 89:10 | 188:16,19 200:8 | 74:18 198:1,7 | **factor** 135:6 |
| 89:12,14 90:10 | 200:22 201:4 | **experts** 32:10 | 194:23 195:19 |
| 90:11 91:9,11 | 203:25 | **explain** 27:23 | **factored** 179:1,4 |
| 94:13,15 95:16 | **exhibits** 5:1 | 31:11 104:1 | 179:12 194:7 |
| 98:2,3,8 99:21 | 69:17,22 94:10 | 112:6 172:1 | **factoring** |
| 99:22 100:6 | 129:22 173:15 | **explained** 33:5 | 133:11 |
| 102:22,23 103:5 | **exist** 50:16 69:6 | **explains** 73:12 | **factors** 14:5 |
| 104:17,23,24 | **exists** 61:15 | **explanation** | 33:7 120:21,23 |
| 105:7,13,14,15 | 146:8 | 119:4 | 194:12,13,16 |
| 106:7 108:24,25 | **exotic** 11:1 | **expressions** | 196:9 197:6 |
| 109:2 115:15 | **expand** 147:9 | 26:25 | **facts** 44:11 45:2 |
| 121:10 123:11 | **expanse** 198:10 | **extensively** | 46:7 48:8 57:2 |
| 123:16,22 | **expect** 26:8 | 48:12 | 65:3 119:24 |
| 126:18,19 | 181:4 | **extent** 36:21 | 142:18 143:4,9 |
| 129:20 131:25 | **expected** 31:4 | 51:18 57:8 | 169:20 |
| 132:1 134:9,12 | **expense** 23:7 | 97:16 | **failed** 86:3 |
| 135:9 138:24,25 | 166:16,20 | **external** 196:8 | **fair** 13:25 35:13 |
| 139:18,19,22 | 178:21,22,25,25 | 197:5 | 92:22 |
| 140:20,21 | 179:5 180:1 | **extra** 162:1,8 | **familiar** 63:25 |
| 141:25 142:1 | 182:11 184:7 | **extrapolate** | **familiarize** 55:4 |
| 143:17,18 145:6 | 192:13 | 115:23 116:3 | 98:8 102:25 |
| 145:8 146:14,15 | **expenses** 180:1 | | **fannie** 19:9 |
| 146:22 148:9,13 | 180:5 181:20 | **f** | **far** 24:24 25:1 |
| 149:24,25 150:2 | 182:5,5 186:6 | **f** 177:16 | 58:14 93:2 |
| 150:13,16 151:5 | 193:4,6 | **face** 64:17 | 109:24 116:25 |

HIGHLY CONFIDENTIAL

**[far - forgoed]**

133:19 155:18
159:15 189:25
**fear** 30:14
**february** 16:1
**federal** 15:13
208:14
**fee** 114:14
137:19,20
140:13 141:3,5
171:22 173:1,3
175:19 176:3
**feel** 30:3 55:3
**fees** 22:25 23:2
66:2 80:10
177:10 178:13
178:24 179:3
182:6 192:17
**fiduciary** 35:5
36:23
**fields** 19:3
**figure** 37:4,16
37:20 38:1
74:23,25 107:10
132:21,22
133:20 181:14
182:12
**figured** 103:14
**file** 8:11 43:11
52:6 123:15
136:23 166:13
182:19 187:1
205:24
**filed** 31:6,6 50:6
**files** 62:11
182:24 187:8

**filing** 77:5 81:9
83:24 85:15
86:11 87:16
88:3 89:19
90:19 91:15
92:24
**filled** 11:23
204:14
**final** 57:3
105:25 106:21
**financial** 1:5 2:5
5:18,20,21,23
5:24 6:1,2,4,5,7
6:8,10,11,13,20
7:9 9:13,22
19:21 55:21
60:20
**financials** 196:2
**financing** 21:24
22:3
**find** 39:6 58:20
79:11 101:1,13
136:25 153:7
176:15 177:5
185:25
**fine** 27:23 68:9
76:6 85:25
108:5
**finish** 10:11
50:19 199:2
**fired** 45:20
167:6
**firm** 11:18
117:23

**firms** 22:15
172:11
**first** 10:2 15:25
16:14 23:12
33:25 39:13
48:11 55:2
63:23 68:2 76:7
84:13,13 92:13
92:20 103:4,12
114:10,14,23
115:22 123:5
124:9,11 130:4
138:2,22 140:5
141:13 145:1
146:4 147:20
172:14 178:3
179:1
**firsthand** 74:18
**fishkind** 179:7
181:1 194:14,15
**fishkind's** 32:22
**fit** 19:24
**five** 48:24,24
54:21,22 59:7
73:5,6 128:7
129:12,16 131:7
163:1 180:15
201:25
**fix** 92:17 170:13
170:14 203:14
**fixed** 178:15,17
**floor** 2:22 3:4
**florida** 1:2 2:2
3:9 9:19 50:21
53:22 54:2,6

72:2 88:4 92:25
93:19,22 191:16
191:21
**flow** 120:7
**focus** 30:7
**focused** 24:22
25:5 29:23
52:20,21 126:10
126:10
**focusing** 25:3
34:4 79:4
**fog** 49:3
**folks** 30:1 50:20
52:21 66:2,6
93:19 101:20
103:24 110:5
118:13 153:13
153:19,23
176:12 188:7
205:5
**follow** 15:20
**following** 13:16
130:13 175:2
**follows** 10:2
110:17
**footnote** 40:18
138:6 144:16
179:20,22
182:15
**force** 21:16
147:9
**foregoing** 207:4
208:6,11,13
**forgoed** 133:6

HIGHLY CONFIDENTIAL

**forgot** 199:15
**form** 23:4,8
39:14 41:24
45:7 46:1,6
49:24 52:25
53:18 61:21
68:1 78:4 93:5
99:10 102:10
105:23 110:14
125:16 141:18
165:3 168:23
172:19 197:12
198:9 199:1,11
199:22
**format** 8:12
**former** 186:25
187:9
**formula** 131:12
**forth** 30:5 208:8
**forward** 27:2
**forwarded**
102:5
**forwarding**
101:17
**forwards** 96:2
**found** 66:20
84:11
**founded** 11:25
**four** 29:9 55:2
73:6 98:21,25
99:4 107:12,19
108:14 114:23
114:24 115:2,9
115:25 128:7
129:12,15

132:10,11
142:13 150:9
163:7 172:16
**frame** 92:15,21
196:14 197:3
**francisco** 83:3
**frankly** 82:23
179:13
**freddie** 19:9
**free** 55:3
**frequent** 156:13
**friendlier** 38:13
**friendly** 168:3
169:14
**front** 79:14
158:19
**full** 35:1,15 36:4
41:11,17 42:20
59:5 156:20
**fully** 18:7 40:19
179:25
**fun** 11:23
**fund** 7:1 23:3
126:14 127:21
133:17 166:17
187:16 195:16
**funded** 22:11,18
22:19,19,21
184:4,11,14,16
184:18,20,23
186:14,18 187:2
187:3,4 189:1
190:5,13 194:3
**funder** 86:14

**funders** 13:6,18
25:7 82:8
**funding** 41:4
186:16 188:25
189:3
**further** 31:22
206:1 208:13
**future** 205:2
**futures** 46:21

**g**

**g** 11:19
**gain** 26:2 63:10
65:18
**gather** 19:19
**gee** 169:8 195:3
**general** 19:18
30:3 62:25
115:3 193:7
**generally** 14:3
20:12 30:2
59:20 62:9
63:14 97:19
111:22 121:6,8
**generate** 175:23
**generated** 178:7
**generating**
23:14,22
**generic** 203:24
**geographic**
72:25
**geraldo** 81:8
83:14
**gesture** 168:4
**getting** 44:21
77:11,13 99:15

108:4 120:16
171:20 189:14
197:18,18
204:18
**ghiorse** 64:9
**ghmc** 8:9,10
119:18 175:7,23
175:24 176:10
176:15 177:2,6
177:24 178:8
179:18 180:8
182:14 183:2
184:22 185:16
186:20 189:19
191:13 192:1
194:18 196:2,13
**ghmc's** 176:11
**give** 11:6 17:12
30:16 38:17
44:22 45:16
48:23 57:3
58:25 64:16
65:16 72:9
79:19 81:2
104:4 109:19
127:12 129:19
163:11 182:21
182:25 205:17
**given** 19:7 41:23
57:18,19 92:13
109:20,20
120:21 123:21
146:23 166:16
205:4

**gives** 22:16
181:22
**giving** 13:2
51:11 62:23
127:13 167:3
**global** 139:23
**go** 10:17 12:18
20:23 23:7,11
23:23 25:6 27:4
31:10 32:13
36:20 39:2
40:11,17,25
46:15 47:13
48:20 61:19
62:6 63:24 64:7
75:21,21 80:4
80:11 85:23
96:12 102:3
103:11 107:5
108:5 112:5
113:21 115:14
117:24 120:2
121:14 129:9
130:3 131:8
134:14 137:1
138:9,20 142:17
143:4 146:3
147:20 148:7,25
152:8 156:3
157:16,17
162:10 172:23
173:1,18 177:22
178:14 183:8
184:5,8 191:8
200:10 204:17

**goal** 44:17 76:12
**god** 30:15 96:17
200:9
**goes** 29:3
**going** 14:17
16:12 18:13
19:6,9,11,24
22:15 26:17
27:2 32:6 34:8
34:21 37:2 38:1
38:8,25 40:13
45:12 48:18,23
50:9,17 51:4,19
52:22 54:10,14
55:2 57:1,12
59:14 60:13
63:22 66:12
68:24 72:5 73:4
73:10 74:6
75:20,23 76:2,3
81:4 86:4 94:5
96:8 97:14
98:17 99:14
102:21 104:22
105:6 108:5
111:21,24
113:14,22
114:16,19
116:14 117:16
120:7 121:15
123:10 133:18
135:23 138:23
139:17 143:11
146:10 152:24
153:20 155:6,8

156:7,16,17,20
157:16,23
164:12,13,14,19
165:15,17 166:3
168:4 169:3,5
169:11,20 171:7
171:11,16,17,18
172:20 173:19
177:12 178:3,11
180:16,19 182:4
182:20,25 183:6
183:24 187:10
187:12 193:4,5
193:12 195:25
198:12 202:3
204:16,17
205:10,12,13,18
205:20,24 206:5
**good** 9:4 27:9
30:1 33:19,20
82:21 84:19
96:21 123:9
195:8,10,13,16
195:17 206:3
**goodness** 101:3
201:1
**gorton** 132:4
135:10,17,25
138:12 162:23
162:25 163:2
**gosh** 108:3
**gotten** 136:3
**grand** 2:22 3:4
9:9 57:4 74:3,4
75:11 93:13

112:18,19
117:14 119:1,2
122:17,25 123:9
124:18 127:15
128:16
**grant** 117:15
**graph** 62:1
**great** 69:8
112:10 195:14
**grew** 11:21
**group** 11:11,17
11:18,21 49:10
49:21 68:13,20
72:4,18 85:7,8
102:15 106:15
107:13 108:12
109:15,17,19,22
110:6 112:21
122:8 148:7
156:3,7 165:13
165:15 171:13
191:24 199:16
**groups** 21:10
170:20
**guarantee**
113:11
**guarantees**
36:22
**guaranty** 1:9
2:10 26:20
29:15,17,25
36:10,19 37:24
48:13 50:20
107:6 131:8
179:6 181:9

HIGHLY CONFIDENTIAL

**[guaranty - hard]** Page 231

183:21 201:13
**guaranty's**
29:23 31:9
**guess** 15:20 28:9
29:5 32:9 33:8
41:20 51:6 64:6
70:18 80:14
82:8 96:2 97:16
107:10,18
114:17 190:24
**gut** 111:20
**guy** 11:16 38:13
61:13,14 106:15
154:12
**guys** 15:20,20
32:10 74:12
137:2 185:20,21

**h**

**h** 150:5 151:6
158:8
**half** 34:3,8
36:15 37:12,17
55:1 90:1 124:9
173:20,21
174:19
**hall** 3:8 4:6 9:18
9:18 10:4,5
14:17,21 16:10
16:15,17,24
17:10,12,18
20:14 25:17,18
30:10,13,20,24
35:10 37:15
38:7,14,17,20
38:24 39:2,12

39:14,18 42:1
43:9 45:10 46:2
46:9 49:9 50:22
53:9 54:3,10,19
54:22,24 57:12
57:17 62:17
63:17,20 66:12
66:18 68:11,24
69:4,6,9,13,17
69:20,23 75:20
76:10 78:6,9
80:21 81:4,7
82:10,14 83:4,7
83:16,19 84:20
84:23 85:23
86:2,4,6,20,24
87:1,7,23 88:2
88:22 89:1,10
89:13 90:4,9,12
91:9,12 94:1,10
94:14 98:1,4
99:20,23 102:21
102:24 104:20
105:1 106:4
108:24 109:1
112:22 113:18
114:2 123:10,17
125:4,11,19
126:17,20
129:19,23
131:25 132:2
134:8,13 138:23
139:1,17,20
140:1,19,22
141:24 142:2

143:16,19
146:10,13,16
148:9,14 149:23
150:1,13,17
151:3,5,8,22,24
154:3 156:15,22
157:1,14,19
158:4,7,23
159:2,24 160:3
160:15,18 161:2
161:4 165:9
169:2 171:2
172:22 174:24
175:1,8 180:13
180:24 182:20
182:25 183:5
185:12,18 186:1
186:3 191:17
197:24 198:13
199:2,5,18,24
200:7,11,16,19
200:24 201:1,5
201:24 202:8
206:1,3
**hamilton**
116:20 117:5
118:10 134:11
134:15,20
**hand** 14:18
30:10 54:19
63:17 66:12
68:24 76:15
78:6 81:5 83:16
84:20 86:20
94:16 98:1

102:22 104:22
108:24 123:11
126:17 131:25
134:8 143:16
196:19
**handed** 69:24
83:4 87:23
141:24 149:2
**handful** 42:17
**handing** 30:15
99:12
**handle** 20:21
155:10
**handling** 103:24
**handy** 42:11
**happen** 22:17
50:3 86:4
176:21
**happened** 31:5
32:8 35:16 50:2
53:2,22 56:10
63:9 72:22
99:17 103:14
109:6 125:2
129:3 148:22
155:1,5 189:7
198:3
**happening**
61:23 83:3
125:10
**happens** 169:10
181:11
**happiness** 107:4
**hard** 73:21
133:22 185:5

190:23
**harder** 109:22
**haren** 119:2
162:16 163:7
203:11 204:1,5
204:8,9 205:7,8
**harm** 24:8
152:23 167:15
**harrietta** 55:14
**hate** 33:16
**head** 114:25
147:18 192:16
**headcount**
171:5,5
**header** 184:10
**headquarters**
87:19
**hear** 16:6
138:17
**heard** 33:1
43:20 62:24
196:13
**hearing** 102:1
113:17
**heavily** 32:25
182:3
**heck** 187:19
**held** 54:16 94:7
143:13 180:21
202:5
**help** 33:6 39:6
40:3 169:15
**helpful** 189:6
**helping** 75:1

**henderson** 3:8
9:19
**hey** 93:13
111:15 112:18
**hi** 100:17
103:13
**high** 63:15
187:23
**higher** 24:20
30:3,6 61:3,11
119:19 120:10
121:2 170:11,11
170:11 171:12
203:20
**highest** 10:18
133:25 188:18
**highlighted**
30:16 98:22,25
105:14
**highly** 1:15
185:15,15,22,24
186:4
**hill** 3:8 9:18
**hire** 28:12 51:1
51:3,4 65:24
79:13 80:9
81:17 84:10
85:9,11 88:15
128:3 134:6
138:2,4 139:14
140:5 141:4,13
142:6 144:21
145:25 146:5
148:5,11,20
154:7 155:8,20

159:9,15 172:6
173:5,14 174:6
174:12 176:18
191:3 195:3
205:13,18
**hired** 14:6,9
27:11,15 28:6
48:1 50:24 51:1
51:8,18 72:15
72:20 84:12
85:10 92:9,19
115:19 116:24
119:8,15,22
121:25 130:2
137:20,25 138:6
138:10,16,16,19
140:9 142:16,19
144:22 145:17
145:20,21,21,25
146:4,5 147:22
148:2,8 153:10
153:15,17,18
155:25 156:6
157:23 162:21
164:14 165:16
167:17 170:10
170:18 171:9
172:16 173:8,21
173:21 174:11
174:20 176:4
191:5,6,7,24
198:24 199:8
202:15 203:25
204:4,10,13
205:1,2,2,7,8

**hires** 23:13
29:12 66:7
77:23 92:2
100:7 115:10
118:11 131:20
138:21 147:19
152:25 153:2,12
155:8 161:23
164:24 192:19
205:14
**hiring** 48:2
63:11,13 64:22
64:23 65:18
117:12 133:2
134:5 141:11
155:7 176:3
180:4 203:21
205:10,12
**historically**
195:13
**history** 11:7
13:1
**hit** 25:24 39:14
168:4
**hold** 58:22
140:17 162:2
**holding** 119:11
**holly** 144:1,8
151:25
**home** 1:5,9 2:5
2:10 5:18,20,21
5:23,24 6:1,2,4
6:5,7,8,10,11,13
6:20 7:9 9:12,22
14:6 18:18 21:7

21:9,15,19 23:5
23:9 24:12,12
24:24 25:19
26:19,20 27:11
28:15 29:4,7,12
29:19 30:1,2
34:5,10,25 35:8
35:18,22 36:14
36:24 37:17
38:5 39:22,24
40:5 41:1 45:4
50:6,17 53:13
53:14 55:7,21
56:9,17,20
57:14 59:6,17
59:20 60:24
61:5,18,22,24
62:5,19,19
63:11 64:22
65:6,19,24
67:23,24 68:7
68:14 70:6
71:12 73:17
74:7 75:5 79:20
79:24 80:15
84:4 87:19 91:3
93:3,7 94:17
95:4 111:4,9,20
112:5,24 113:6
125:15 127:7
128:1,8 130:3
130:20 131:9,9
131:15,19 133:2
134:10 137:20
147:4,7 154:7

156:1 166:2,4
166:22 167:6,7
169:14,24 170:2
170:5,9 172:16
174:20,22,23,25
178:8 181:9
183:14,18,20
186:25 187:9,20
188:7,11 189:8
189:17 191:6,11
194:18 196:23
197:10 200:10
201:7,11 205:4
**home.5191** 39:5
**honor** 103:7
**hopeful** 200:7
**hopefully** 33:12
39:3 76:11
202:10
**hornet's** 110:1
**hour** 14:3 34:11
36:3,13 54:11
86:17
**hourly** 116:1,2
116:3
**hours** 34:20,21
34:23 77:1,22
77:25 78:17
83:8 84:4 85:19
86:16 87:13,14
88:8 89:4 90:2
90:25 91:6,7,21
152:15
**hplane** 123:14
123:18

**hplane0000001**
104:17
**hplane000000...**
8:7
**hplane000000...**
7:17
**hplane000000...**
8:1
**hplane000000...**
7:13
**hplane000000...**
7:14
**hplane000000...**
7:25
**hplane000000...**
7:16
**hplane000000...**
8:4
**hplane000000...**
8:6
**hplane000001...**
7:19
**hplane000001...**
6:24
**hplane000001...**
7:20
**hplane000001...**
7:22
**hplane000001...**
7:23
**hplane000001...**
8:3
**hplane000001...**
5:13

**hplane000004...**
7:2
**hplane000004...**
7:4
**hplane000030...**
7:5
**hplane000043...**
8:12
**hplane000044...**
69:21
**hplane000044...**
5:19 69:21
**hplane000045...**
141:20
**hplane000045...**
7:11
**hplane000045...**
7:8
**hplane000045...**
141:21
**hplane000045...**
201:7
**hplane000045...**
5:25
**hplane000045...**
6:7
**hplane000045...**
5:22
**hplane000046...**
6:4
**hplane000046...**
5:20
**hplane000047...**
6:10 89:14

HIGHLY CONFIDENTIAL

**[hplane00004718 - including]**                    Page 234

hplane000047...
6:9
hplane000047...
6:6
hplane000047...
6:13
hplane000047...
6:12
hplane000048...
6:3
hplane000048...
6:1
hplane000048...
5:23
hplane000049...
6:21
hplane000051...
7:10
hplane000052...
5:12
hplane000052...
6:18 99:25
hplane000053...
6:19 103:4
hplane000053...
6:16
hplane000054...
6:22 109:3
hplane000054...
6:15
hplane000055...
104:18
hplane000198
65:9

hplane0004509
7:7
hplane0004536
67:14
hplane000521
55:8
hplane199
64:11
hplane4839
83:17
hplane5191   5:9
38:10
hr   118:13
huber   116:20
117:4 118:10
hud   19:14
huet   157:20
158:2
huge   118:5
hughes   84:25
99:1 105:11,13
105:16
huh   23:20 36:11
57:6 66:24
80:22 109:8
142:14 158:4
191:1 192:15
human   119:12
hundred   52:8
hunter   86:8,11
hurt   155:11
169:14
hwhlaw.com
3:10

hypothetical
27:14,21 107:24
hypothetically
75:9

**i**

idea   70:7 123:4
172:9,10 175:24
identified   44:6
52:1 115:22
155:24 173:8
identifies   37:21
identify   13:22
69:18 156:5
imagine   25:11
31:12 34:22
60:21 74:12
78:24 181:8
192:13
immediately
11:12 189:23
impact   47:7
48:10 56:24
59:4,11 67:21
68:3,6,15 71:22
72:3 73:1 74:16
75:6 77:9 97:18
99:7 102:8
110:5 111:13
131:18 135:2
166:1,3,19
168:2,5,16
171:18 173:23
impacted   39:22
impacting
127:18 166:22

194:6
implies   155:11
important
108:15 155:14
190:24
impressive
82:20
improving
189:17
inaccurate
75:11,17
inactivity   13:23
inaudible   108:9
incentive   25:6
25:12 60:20
97:20
include   21:7
122:19 138:5
141:3 143:3
148:1 165:16
176:7 179:3
180:11 181:20
182:5
included   45:1
47:7 66:2 82:16
82:17 99:8
105:21 107:16
138:13 162:18
164:11 180:6
199:14
includes   180:1
181:23 187:15
including   41:3
141:9 150:10
192:1

inclusive  177:16
incorporate
  176:4
increase  118:22
  120:1 121:8,22
  144:23 166:20
increased  23:6
  58:19 60:2
increases
  114:20 120:5
  121:6
increasing
  123:22
incremental
  144:23
incur  166:15,15
incurred  181:20
indemnification
  36:19 37:7
independent
  13:14 21:11
independently
  59:6
index  4:1 5:1
indicate  137:19
indicated  91:3
  162:6
indicates  58:4
  79:22
indication  57:9
  187:1
individual
  27:23 37:21
  42:2 93:11
  129:5 130:12

132:16 138:1
142:18 144:12
154:7 157:15
166:24 205:6
individualized
  120:19
individually
  116:15
individuals  25:1
  29:9 46:10 48:9
  49:12 51:7
  52:22 53:10
  59:18 60:25
  91:7 93:4 98:11
  105:19 106:1
  107:5,13,19
  110:11,23 115:2
  115:9,19,25
  116:4,24 119:22
  120:9 122:11,12
  128:6 130:1,2
  131:7 133:2,4
  133:14,15
  134:24 137:3,25
  138:5,15 140:6
  141:21 142:10
  149:12 151:1
  153:16 154:8
  155:23 156:2,5
  156:6 158:24,24
  161:19 163:23
  164:10 167:17
  167:19 169:24
  170:7,8,18,19
  173:9,20 176:4

179:15 194:25
195:1 198:24
199:7 201:9,11
202:11
induce  165:7
industries  62:25
industry  13:5
  18:24 20:18
  25:6 60:6,22
  61:25 62:22
  63:14 115:3
  134:7 166:6
  181:4,15 183:21
  186:24 195:3,7
  195:11,19 196:3
information
  4:10 19:19 20:6
  20:22 31:9,12
  31:19 32:17
  59:13 73:7
  74:19 127:13
  176:1 190:19
  192:7 193:14
informed  98:11
initial  24:3 30:4
  33:24 47:18
  58:7 114:17
  194:11
initially  104:6
  159:7 176:20
  179:2
initiating  80:9
ink  207:7
inputs  13:11

inquire  21:15
  24:12
inquiry  29:14
  29:17
insight  139:23
inspect  25:11
instances  20:10
instructed  4:18
insurance  11:13
intended  17:6
  104:6 168:3
  181:20
intent  98:13
intention  97:11
interact  93:21
interest  62:5
  193:3 195:8
interested  44:24
interesting
  95:24 127:14
  187:19 202:19
interference
  36:22
internally  27:3
interned  11:9
interoffice
  44:14
interpose  25:14
interrogatories
  5:16 28:16,18
  29:3 121:11
interrogatory
  66:20,23 69:10
  123:12

HIGHLY CONFIDENTIAL

**[intervene - know]**                                                Page 236

**intervene**  50:4,9
**interview**  17:19
**interviewed**
  176:13
**introduction**
  9:16
**investigate**
  102:17
**investigation**
  82:16
**invoice**  7:6,8,11
  114:8,11 138:13
  139:3,23 142:3
  144:11,17 146:1
  146:7 157:15
  158:2,17 160:9
  172:3
**invoiced**  137:19
**invoices**  137:20
  141:20 156:17
  158:19
**involve**  13:3
**involved**  14:1
  37:1 106:10
  181:7 200:16,19
**involvement**
  176:16
**involves**  12:22
  64:4
**involving**  13:6
**issue**  14:3 22:4
  23:2 30:8 32:10
  35:4,5 36:12
  37:2,24 41:14
  48:23 49:1,25

51:11 62:15
71:14 97:19
109:24 152:24
170:5 180:25
**issues**  20:10
  37:7 44:15
  63:15 71:21
  93:10,15 106:10
  106:11 109:6
  154:15 155:1
**item**  70:18

## j

**jacob**  57:23
  100:7,16 101:6
  101:18 103:14
  103:15 109:3
**janitors**  52:10
**january**  67:1
  130:8,9 189:23
  190:2,3
**jared**  119:2
  162:16 203:11
  204:1,5,8,9
  205:7,8
**jason**  157:20
**jaworski**  99:1
**jealous**  82:24
**jerrie**  158:24
**jersey**  85:16
**job**  1:24 11:11
  20:20 21:1
  24:24 34:4
  35:14 41:12
  42:3 62:6 71:20
  78:20 109:14,16

109:23 138:4
140:16,18,24
141:7,10,17
204:10,13
**job's**  78:23
**jobs**  13:19 14:5
  25:2,8,12 52:13
**johnson**  86:22
  87:9
**join**  29:19 107:5
  136:7
**joined**  26:19
  136:8
**joke**  96:6
**jr**  9:6
**judgment**  13:15
**julie**  3:13 9:6
**july**  45:9 184:1
  188:1 189:4,4
**jump**  183:6
**june**  1:16 2:23
  9:1,6 189:5
  207:5
**junior**  11:10
  122:2
**jury**  14:16
**justify**  109:21

## k

**k**  158:8
**karen**  147:14
**kayla**  101:4
**keep**  19:11,15
  19:25 42:21
  60:18 62:10,13
  64:17 67:12

106:21 180:16
**keeping**  139:21
  167:19
**kelly**  120:11,12
  134:11,20
  146:14,19
**kennedy**  3:9
**kept**  179:11
**kewanda**  83:20
**key**  116:13
**khendra**  86:8
  86:11
**kicking**  110:1
**killed**  33:14
**kind**  11:14
  20:17 22:18
  25:11 32:3,11
  50:3 60:9 110:1
  113:17 117:16
  118:7 119:3
  122:17 130:22
  176:19,22,24
  190:9 192:25
  203:9 205:3
**kindly**  194:23
**kinds**  25:8
  52:11,12 57:11
  63:7 178:13
**klimovich**  158:8
  158:18
**knew**  62:7 102:6
  111:23
**know**  10:7,12
  15:4 16:4 17:25
  19:2 21:14 22:1

25:7,15 26:6
29:24 31:10
32:23 36:18
37:22 38:14
41:18 45:2 47:1
48:17 50:5,6
51:10,14 52:2,6
52:11,18 53:3,8
53:10,25 57:9
60:1,4,23,24
61:2,5,10,11,13
61:15 62:2,12
63:25 64:13
65:1,24 66:11
68:7 69:10 74:3
74:14,17,20
77:12,18 80:1,5
80:9 90:7 92:19
93:10,12 94:22
95:13,23 96:13
99:14 100:11,12
102:11,16
103:18,23
106:15,22
107:12 108:2
109:18 110:2,6
111:4,5,7,9,13
111:21 112:10
112:11,12
115:13,24
117:15,17,21
118:6,13,19,22
119:6,25 121:6
121:11 122:6,13
122:21 123:4,14

123:14 124:25
125:10 126:13
126:16 127:17
128:13,19 129:4
129:13 133:18
133:19 136:18
136:21 137:13
137:16 142:20
146:7 148:24
158:21 163:10
164:13 165:5
167:11 169:11
169:13 171:9
173:17 179:5
181:10 182:4,9
183:7 185:2
186:24 189:11
190:18 191:1,5
191:6 192:19,21
193:3,4,5,9,12
195:1,8 196:21
196:22 202:19
202:25 205:15
**knowledge** 48:6
52:17 53:12
74:18,24
**knows** 38:23
82:22 111:9
136:14,19
**kramer's** 18:16
119:7
**kristin** 101:17

**l**

**l** 102:19,19
150:5 158:8
**l.a.** 12:4
**label** 91:4
144:15 177:15
**labeled** 99:25
175:18 185:15
**labels** 8:8
184:24
**labor** 181:13
182:10
**lack** 70:18
**lady** 61:13,14
**laid** 195:4
**lamarr** 100:18
101:6 102:3,17
**landscape** 76:3
**lane** 1:8 2:9
6:25 9:13 30:4
34:17 35:22
36:7,12,15,15
36:19,23 37:18
37:23 45:5,16
45:21,22 47:11
49:19,22 50:24
51:8,12 56:8,12
56:23 61:1 68:5
85:11 88:19
92:9 95:1,5,8
105:20 107:6
108:2 110:13,25
112:24 126:21
129:10 134:11
145:12 146:24

147:8 152:22,23
153:10,11 157:8
158:15 165:10
165:12 177:4
199:15 200:3
201:12,20
**lane's** 33:25
37:12 49:16,17
56:10,17 111:11
151:19 152:5
156:8 168:7
176:11,15
205:21
**language** 70:2
**large** 69:5 143:7
166:5 180:9
**larger** 38:10
**late** 16:1
**lawsuit** 12:20
12:22 15:25
43:17 55:7
57:15 80:9 97:5
126:22 192:14
**lawyer** 80:10
135:16
**layoff** 155:3
**lead** 202:10
**leader** 96:14
**learn** 21:18
24:23 25:21
**learned** 32:17
**learning** 56:17
56:23
**leave** 26:16
44:16 59:18,22

60:2 62:24
106:23 108:2
155:9 169:3
204:21
**leaves** 170:25
**leaving** 60:10
68:10,10 107:5
126:7 205:8
**left** 11:16,24
44:18 56:12
72:16,21 115:20
122:2 125:22
128:22 129:9
130:3 131:8,21
133:4,7,15,15
138:1 153:3,16
155:21,25 156:6
161:22,24
170:19 189:22
195:2 198:25
199:15,20
202:11 204:19
**legal** 9:7 37:2
52:5 182:6
192:13,17
**legible** 38:19
**length** 79:2
**leonard** 78:10
79:25 82:19
**letossia** 142:3,4
**letter** 80:18
112:24 113:9,10
113:12,12
136:14 142:18
143:20 146:14

148:11 149:2,6
150:13 151:16
159:17 161:8
**letters** 70:4,7
92:13 135:10
137:2 138:9
176:13
**letting** 10:11
167:5,9
**level** 10:18
20:12 71:24
119:11 129:11
181:6 193:17,18
193:21
**leveraged** 121:2
**life** 11:12
**liggett** 101:4
**lightning** 70:16
**likely** 16:22
32:3 52:23 73:3
119:4 141:6,8
171:12,19
176:25 180:6
184:18 202:21
**limited** 24:6
66:5
**lindsay** 63:23
**line** 4:11,15,19
39:2,2 70:18
84:24 116:24
140:5 182:8
193:1,13 194:6
**lines** 29:2
**link** 15:6 177:5

**lisa** 87:24 99:2
100:6,17 102:5
**list** 17:1 28:21
40:6 44:5,13,13
44:19 45:6
46:16 50:23
51:8 52:2 53:10
61:12,15 67:23
72:9 100:21,23
101:13,20
103:18 104:13
109:21 114:20
140:6 141:17,21
145:14,17
146:25 147:11
147:14,15 148:7
150:6,8 152:17
153:13 156:4,20
159:14 160:12
162:18 165:18
165:19 169:6
171:7 173:18
201:15,17,17,20
203:8
**listed** 17:4,17
24:19 71:1
105:14 116:21
120:9 130:2
132:5 138:12
139:7 141:15
146:19 159:7
163:8 186:19
188:12 192:8,8
**literally** 31:7
142:13

**litigate** 73:25
**litigation** 11:18
74:1 80:8 91:3
**little** 10:16
16:10 25:16
29:16 30:3
38:17 39:7 40:3
42:22 53:4
54:10 57:1,2
59:25 60:11
71:10 78:23
80:14 82:23
88:8 99:18
103:23 105:6
106:20 112:8
116:16 127:16
136:21 146:10
148:16,24
165:25 171:12
171:12 183:6
189:13 190:13
**live** 93:19
**lived** 53:11
**living** 32:14
54:5
**llp** 3:3
**lmu** 11:3
**loaded** 179:25
**loan** 19:7,23
20:7,15 22:17
23:3 32:20,22
41:3 46:21
62:11 87:9
88:23 89:19,21
103:18 130:22

HIGHLY CONFIDENTIAL

166:13 178:10
178:18 179:14
179:14,15,25
181:2,10,15,19
181:25 182:24
183:15 184:1,4
184:16,16 187:2
187:8,10,11
193:11,17,21
194:2,3,3,5
195:23

**loans** 19:13,15
21:8,18,22 22:9
22:15,21 23:19
128:7 154:17,21
178:4,6 179:10
183:12 184:19
184:25 187:16
187:24 188:11
188:21,24,25
189:1,12,24
190:13,17,20
194:6 195:15
196:1

**located** 9:8 12:6
72:1 78:13
92:24

**location** 72:25

**locations** 52:18

**logical** 176:16

**long** 33:18,19
62:3 71:11 92:5
101:3 180:14
202:20

**longer** 11:19
66:10 127:6
128:8 203:11
205:21

**look** 14:5,22
18:14 19:6,20
26:12 28:4
31:19 32:6,7,19
33:21 34:7
35:12 40:18
42:2,22,24 46:7
49:11 50:25
54:25 55:19
57:4 58:18 59:8
62:1 65:8,9 68:3
70:4 76:13 79:9
79:20 80:23,25
82:5 96:8
104:12,16
106:24 109:25
111:15 116:5,19
117:17,18
118:25 119:17
120:2 121:10,23
126:16 128:12
128:15 129:1,2
129:24 130:7,17
132:22 133:10
135:4 136:13,15
137:4,11 138:3
138:9,11,20
139:21 142:17
143:4,9 144:24
146:3 147:22
148:21 149:10

149:22 152:25
153:1,2 156:16
156:17 162:9
163:11 164:12
165:13,15,17,19
174:9 179:20
184:5,8 186:13
186:18 188:1
189:3,4,7,8,9,25
191:8,9 192:18
192:20 193:21
195:7,12 200:3
202:20 203:10
205:14

**looked** 13:8
18:22 21:17
23:10 42:7
67:10 115:12
185:10

**looking** 13:12
13:14,20,20
30:8 33:9 65:3
73:20 84:10
93:12 99:24
112:2 118:2,21
123:2 126:9
127:16 132:23
135:9 146:4
148:10 155:5
168:8 171:4,5
172:2 182:3
188:19,22,22
189:11 190:12
197:13,14
198:10

**looks** 58:13,16
58:18 59:1 65:4
65:22,22 66:23
77:4 80:5 81:15
84:1,5 85:19
86:13 88:7
89:22 92:20
102:2 112:21
117:8 128:17
147:10 179:8
188:9 189:14
191:23 193:1

**lopez** 27:25
28:10 126:13,22
126:23 127:5,21

**lori** 89:17

**los** 1:17 2:22 3:4
9:2,8,9 12:6

**lose** 134:22
154:18,20,23
155:12 183:7

**losing** 64:24

**loss** 23:9 155:15

**lost** 23:5,7
153:24 154:11
154:19

**lot** 13:10 21:24
34:11 36:13,20
49:2,7,21 80:10
83:1,3 92:4
109:22 117:24
120:17 121:25
128:20 177:4
185:6 187:20
190:19 195:6

200:16,19
202:10
**lots** 61:24
**love** 96:3,21
169:15
**low** 166:9 181:6
**lower** 171:13
**loyola** 11:3
**lucrative** 24:16
**luevano** 3:13
9:6
**lunch** 53:5
113:18,24
**luxury** 121:12

**m**

**m** 102:19,19
158:8
**made** 31:22
32:1 39:24 44:2
49:19 51:17
59:1 60:24
74:24 75:18
95:9 98:6
107:16 151:1,4
151:19 152:5,14
152:22 156:18
170:12 177:13
178:20 207:6
**mailroom** 52:12
**maitland** 40:1,2
40:25 41:2,9
46:11,13,14,24
47:5,6,12 51:25
52:3,21,24 54:6
68:18 72:11,14

81:20,23 84:2
89:21 90:17
93:20,22 101:9
102:14,15
106:16 109:9
112:4,7,21
123:13 197:15
197:18
**make** 10:12
11:19 16:10,19
17:11 22:24
29:5,14,17
31:16,25 37:9
37:21 43:16,20
48:18 49:4
52:22 59:15
68:18,22 76:4
95:10,15 102:18
105:18 107:25
109:14,14 110:3
112:9 120:21
125:3 126:24
133:5,9,10,23
145:6 170:16
175:6,14 185:13
187:17 192:6
194:22 195:16
199:9
**makes** 32:11
72:24 103:25
120:6 176:17
203:9
**making** 23:17
47:22 96:14
116:25 136:19

158:20 195:6
**management**
41:15
**manager** 44:7
100:6
**manny** 95:17
**map** 119:3
**maraliz** 27:25
**march** 16:2,5,7
16:8 184:1
**mark** 1:8 2:9
9:13 14:18
16:17 30:10
38:14 68:25
98:2 99:20
123:11 129:19
138:24 139:18
143:16 183:1
185:18,21,24
**marked** 1:15 5:3
14:20 16:23
30:23 39:17
54:20,23 57:13
57:16 63:18,19
66:13,17 69:22
76:9 78:7,8 81:5
81:6 83:5,6,16
83:18 84:20,22
86:5,21 87:6,23
88:1,24 89:12
90:10,11 91:11
94:13 98:3
99:22 102:22,23
104:22,24
108:25 115:15

123:16,21
126:17,19
129:22 132:1
134:8,12 138:25
139:19 140:21
141:24 142:1
143:18 146:13
146:15 148:13
149:25 150:16
151:7,23 156:22
156:24 157:18
158:6 159:1
160:2,17 161:3
183:4 185:20
186:2,11 200:21
201:4
**market** 18:23
19:24 59:24
60:4 65:24
119:8,10,11,15
119:22 120:8,20
122:7 123:9
127:15 134:1
155:4,6 165:1,5
171:5 172:10
174:2,8 176:1
180:7,11 194:12
194:13,16,17,23
196:9 197:5
**marketplace**
21:23
**markets** 19:13
**marks** 206:4
**married** 64:12

HIGHLY CONFIDENTIAL

**[maryland - minute]**

| | | | |
|---|---|---|---|
| **maryland**  12:5 | **mayer**  3:3 9:21 | 157:25 167:25 | **memorandum** |
| **marymount** | 14:10 | 172:8 183:10 | 5:10,17 55:8,19 |
| 11:3 | **mayerbrown.c...** | 193:5,21 194:14 | 73:11 |
| **mass**  95:16 | 3:5 | 195:5,13 203:13 | **memos**  103:16 |
| 110:1 167:12 | **mb**  181:16 | **meaning**  36:10 | **mental**  30:14 |
| 176:18,19 | **mba**  5:6,8 11:4 | 39:10 94:19 | **mentor**  11:16 |
| 196:16,23 | 12:9 18:25 62:1 | 97:11 | **message**  112:15 |
| **masse**  111:10 | 178:12 179:2 | **meaningful** | 134:16 |
| 153:17 169:12 | 184:15 | 122:14 | **messages**  7:5 |
| **massive**  171:18 | **mccormick** | **means**  66:11 | 35:7,19 49:19 |
| **master**  42:5 | 158:25 | 119:12 122:6 | 134:9 169:16 |
| **master's**  11:2 | **mcelhenny** | 132:17 184:14 | **messaging** |
| **match**  60:13 | 87:24 88:15 | **meant**  119:13 | 94:17 |
| 63:4,5,6 115:6 | 99:2 | 147:15 | **method**  145:24 |
| **materials**  17:1 | **mcfadden**  142:3 | **measure**  122:7 | **methodology** |
| **math**  58:20 | 142:4,14 | 124:21 193:19 | 137:24 141:10 |
| 135:16,24 | **mcgaha**  88:23 | **measured** | 172:1 187:12 |
| **matter**  23:5 | **mcgaugh**  139:4 | 155:17,18,19 | **metric**  71:18 |
| 44:1 51:7 54:4 | 139:7 141:7 | **media**  9:11 | 181:4,15 |
| 71:9,11 72:13 | 162:24 163:6 | **meet**  10:6 20:9 | **michelle**  28:5 |
| 75:8 80:2,15 | **meal**  13:9 | 134:6 | 142:16 144:2,9 |
| 102:8 110:10,22 | **mean**  17:8 | **meeting**  73:6 | **michigan**  87:17 |
| 144:20 149:20 | 18:25 21:21 | **meets**  19:7 | 87:20,22 |
| 182:7 205:19,20 | 27:24 32:19 | **melanie**  99:1 | **mid**  51:14 126:7 |
| **matthew**  3:8 | 35:5 36:17 39:2 | **melissa**  18:16 | 134:25 |
| 9:18 10:5 | 44:3 48:5 50:2 | 119:7 158:8 | **middle**  1:2 2:2 |
| **matthew.hall** | 53:12 59:8 60:1 | **melson**  101:6 | 193:12 |
| 3:10 | 71:17 82:8 | 102:19 | **midst**  168:1 |
| **maxed**  136:2 | 93:10 99:12 | **members**  81:25 | **million**  190:15 |
| **maximize** | 109:13,18,25 | 82:2 | 190:20 193:8 |
| 136:19 | 111:8,11 113:15 | **membership** | **millions**  197:21 |
| **maximized** | 117:24 118:21 | 72:5 | **minimum**  127:2 |
| 135:12 137:13 | 119:10 122:13 | **memo**  55:20 | **minute**  180:15 |
| **maximum** | 124:17 136:14 | 56:16 58:20 | 201:25 |
| 111:13 168:5,16 | 147:22 154:10 | | |

HIGHLY CONFIDENTIAL

**minutes**  94:3
    113:19
**misclassificati...**
    13:8
**miscommunic...**
    44:7
**misheard**  43:15
**misleading**
    117:16
**misrememberi...**
    47:16
**missed**  125:17
    140:16
**misspeaking**
    42:22
**misspoke**
    157:25 190:2
**misstates**  35:2
    191:14
**mistake**  44:2,3,4
    98:6
**misunderstand**
    173:11
**moment**  169:9
**monday**  142:22
**money**  22:22
    37:23 73:22
    74:8 75:17 80:3
    80:11,16,24
    118:17,18 127:7
    169:8 195:7,17
**monies**  180:3
**month**  125:7,7
    126:7 134:21
    165:12 169:4

187:1,2,3,25
    188:12
**monthly**  186:19
**months**  145:1
    179:8 188:3
    189:6 203:11
**moore**  99:2
    105:3,14,16
**morale**  49:1
    71:21 107:21
    110:5,9,21
**morning**  9:4
    15:5 96:22
**mortgage**  1:10
    2:10 12:24 13:3
    13:5,13 18:24
    18:25 20:19
    49:14 50:13
    59:24 60:6 62:1
    62:16 82:12
    166:6 181:16
    186:23 192:23
    193:2,23,25
    195:3
**move**  101:8
**moved**  101:7
**moving**  62:13
    64:18
**multi**  71:6 76:24
    77:12 84:9
**multiple**  47:25
    68:12 83:2
    141:9 172:10
**murray**  119:2
    162:16 163:7

202:25
**musical**  105:7
**mutual**  11:11

**n**

**n**  102:19 150:5
    151:6
**name**  9:6 10:5
    26:22 39:6,13
    39:15 44:13,18
    46:15 55:13
    64:8 65:2 70:10
    101:1 102:18
    111:8 159:13
    208:18
**named**  88:23
**names**  50:23
    147:18 156:12
    163:10 164:13
    164:14 171:10
**native**  8:10,11
**nature**  12:18
    13:24 76:19
**necessarily**
    112:10 113:11
    113:15 115:13
    122:7 136:12
    146:6 171:4,15
    191:6
**need**  17:3 25:1
    33:12 42:22
    50:15 69:2,14
    69:15 99:13,17
    103:7 104:1
    135:8 153:18
    154:11 155:1

166:5 187:7
    192:8 196:1
**needed**  131:1
    153:22 177:5
**needs**  148:16
**negative**  71:22
    168:3
**negotiated**  58:6
    61:3,11
**negotiation**
    127:17
**negotiations**
    116:15 119:5
**neither**  193:18
**nest**  110:2
**net**  111:6,22
**never**  30:13
    58:5 65:21
    72:14 110:2,2
    187:4
**new**  12:4 18:5
    18:22 23:13
    28:12 29:12
    77:23 81:17
    85:16 89:20,22
    92:2,3,3,6 100:7
    113:19 115:10
    117:12 118:11
    128:3 131:20
    133:2 155:8
    164:13,14
    167:21 189:5
**newest**  32:23
**news**  19:1 62:1

nice   169:13
nine   69:20
non   13:19
   155:22
north   81:9
   83:12,24
northwestern
   11:11
notable   112:19
   112:20
notary   9:7
note   187:18
noted   207:6
notes   30:17,22
   71:16 73:4,4
   77:14
nothing's
   170:17
notice   5:4 14:23
   64:16 65:16
   113:13 166:25
   167:1,3 168:21
   169:25
noticing   9:17
notion   137:12
   155:13 169:13
   194:21 196:16
november
   130:17 137:22
   189:15
number   9:15
   15:12 16:18
   21:25 25:24
   40:12,16 41:8,9
   43:2,3 48:15

50:20 55:7
58:18 61:11
66:20 71:4
72:10 92:1,16
118:25 121:14
122:18 132:23
139:7 165:14,20
171:19 173:12
179:7 180:8
183:12 184:6
187:8,11,13,15
194:8,9 197:11
197:13 204:3
numbers   51:24
   52:4 76:7 120:6
   122:15 131:11
   131:23 153:14
   155:10 171:14
   171:15,17,18
   179:18 183:20
   186:14,17
   190:10 193:11
   203:9
numerous   13:4

**o**

o   102:19 150:5
   151:6 158:8
oath   9:24 30:20
object   46:6 78:4
   199:3
objected   15:17
objection   35:2
   41:24 45:7 46:1
   49:24 52:25
   53:18 61:21

68:1 93:5 99:10
102:10 105:23
110:14 125:16
165:3 168:23
172:19 191:14
197:12 198:9
199:1,11,22
objections   5:14
   15:5
obligated   36:4
obligation   35:22
   35:25 74:20
obviously   15:13
   15:16 21:22
   25:4 31:6 32:19
   32:24 35:12
   37:22 48:1
   50:13 51:12,22
   53:21 57:3 65:1
   69:13 70:11
   77:18 80:5 84:2
   92:4 93:19
   99:12 102:17
   106:6,22 108:1
   108:10 121:7,25
   123:4 124:18
   137:4 154:11
   166:4 169:20
   179:10 181:6
   183:23 185:5
   187:13 188:2
   189:4,17
occasionally
   20:2

occur   111:18
occurred   18:1
   111:4
october   12:1
   21:20 27:11,16
   28:1,6 42:11,18
   65:19 79:10
   85:4 103:6,12
   117:13 142:16
   143:22 144:7
   146:25 152:1
   189:13 190:14
   191:2 203:4
offer   58:5,7,17
   59:21 60:11
   63:3 65:6 115:6
   132:3 135:10
   142:17 143:20
   144:14 146:14
   146:23 149:2,5
   149:11 150:10
   150:13,25
   151:16,19,25
   152:5,14,15
   153:11 156:8
   157:2 159:10,17
   159:25 160:7,19
   160:21,23 161:8
   165:21 176:13
offered   46:5
   71:13 127:15
   145:11,12 147:1
   153:9 155:25
   158:3,14 165:23

| | | | |
|---|---|---|---|
| **offering**  13:16 | 28:7,14 29:1,2 | 87:13,16,25 | 135:7 136:1,5 |
| 59:17 | 29:14,22 30:12 | 88:3,11,14,17 | 136:10 137:9,18 |
| **offers**  60:25 | 30:17 31:15 | 88:22 89:4,7,17 | 137:24 138:3 |
| 68:8 152:21 | 33:4,8 34:17,20 | 89:23 90:1,4,16 | 139:5,9,11,14 |
| 153:1,2 156:18 | 36:3,13 37:25 | 90:21 91:15,18 | 140:9,13,25 |
| **office**  12:7 | 38:7,16 39:8,23 | 91:21,24 92:11 | 141:3,16,19 |
| 40:25 41:3,9 | 40:24 41:7,20 | 93:2 95:20,23 | 142:5,9 143:2 |
| 45:13 46:13 | 43:1 45:18 | 95:25 96:1 98:1 | 143:24 144:10 |
| 47:6 51:25 52:3 | 46:10,17,19,24 | 98:9,10,16,20 | 144:10,11,13,20 |
| 52:7 53:7,21,25 | 47:13 48:4,23 | 98:21,25 99:4 | 144:24 145:7,10 |
| 54:1,7 77:12 | 49:10,15,15,21 | 100:2,2,4,5,11 | 145:16 146:19 |
| 107:4,20 109:9 | 51:5,21,24 | 100:16,20,24 | 146:22 147:7,13 |
| 109:20 | 52:15,22 53:16 | 101:12,15,24 | 148:6,15 149:2 |
| **offices**  12:3 53:2 | 54:10 55:5,6,24 | 102:5,21 103:2 | 149:4,7,11,14 |
| **oh**  36:10 58:4 | 56:1,6,16 57:12 | 103:3,11,21 | 149:19,23 |
| 64:10 84:7 86:2 | 57:22 58:24 | 104:4,19 105:5 | 150:18,21,25 |
| 87:5 96:17 | 59:4,23 61:17 | 105:12,13,18 | 151:12,16,18 |
| 108:3 113:7 | 62:22 64:2,3,12 | 106:24 108:19 | 152:10,17 154:4 |
| 118:6 145:7 | 64:14,20 65:13 | 109:2 111:25 | 156:2 157:11,14 |
| 169:13 175:2 | 65:17 66:12,16 | 112:2,23 113:3 | 158:10,11,13,17 |
| 182:16,24 | 66:23 67:3,17 | 113:7 114:7,11 | 159:6,24 160:1 |
| 188:22 200:9,11 | 67:21 68:8,21 | 114:13,16,23 | 160:20,21 161:8 |
| **ohio**  77:5 | 69:8,12,16 70:6 | 115:8,14,23 | 161:10,14 |
| **okay**  11:4,6 | 70:21,25 72:13 | 116:3,22 117:7 | 162:10,13,16,20 |
| 12:9,12,15,18 | 72:20,25 73:16 | 117:11 118:9,19 | 163:4 164:1 |
| 13:1,25 14:9,17 | 74:3,5 75:20 | 120:23 121:21 | 165:10,21,25 |
| 15:4 16:3,8,17 | 76:17,23 77:1,4 | 121:23 122:4,10 | 167:15 169:17 |
| 17:3,7,11,19,22 | 77:8,16,22,25 | 123:3,20,25 | 169:23 170:6 |
| 18:8,12 19:2 | 78:16,21 79:7 | 124:2 125:5 | 171:8,25 173:18 |
| 20:25 21:6 | 79:11,12,13,23 | 126:6 127:5,19 | 174:1,3,9,10,14 |
| 22:13 23:4,8,11 | 80:2 81:4,10,13 | 128:6,14 129:6 | 174:17 175:21 |
| 23:17,23,25 | 81:17 82:19 | 129:18,25 130:5 | 176:7 177:15,23 |
| 24:11,17,21 | 83:23 84:6 85:3 | 130:16,24,25 | 178:17 179:25 |
| 25:17 26:14,18 | 85:6,15,18,23 | 131:6,7,18 | 180:3 182:13,18 |
| 27:9,15,21 28:4 | 86:16,25 87:5,5 | 132:6,9 134:19 | 182:22 183:6,17 |

184:13,15,19,22
185:1,12 186:13
186:18,23 189:2
189:21 191:22
191:25 192:4
195:18 196:7,21
197:25 198:19
198:23 200:7
201:6,9,14,19
201:22,24 202:2
202:13 205:18
206:2
**older**  38:13
**omg**  96:18
**omitted**  44:13
**once**  49:5 64:16
65:15 94:1
164:3 167:8
168:4 177:10
189:7
**one's**  33:14
**ones**  29:19
41:13 61:5
88:12 108:22
113:5 115:5,5
153:20 168:10
**onesie**  176:19
**ony**  143:20,25
146:22 152:14
**opening**  58:16
**operates**  172:5
**operating**  50:3
192:3 201:15,18
**operation**  19:8
48:6 50:12,14

50:16 52:8
62:16 71:23
112:3,3 166:5
168:2 169:9
187:19 192:1,24
197:15,18
**operational**
13:10 14:5
**operationally**
154:16
**operations**  13:9
46:21 49:14
50:10 81:20
90:17 198:16
**opine**  196:8
199:6
**opined**  34:3
**opining**  24:7
**opinion**  12:13
12:16 14:13
23:4,18 24:6
31:4 32:3 34:6
36:9,14,16 37:8
37:16,20 39:19
41:22 43:21
47:23 48:10
51:7 54:4 56:24
57:3 59:5 67:21
68:3,15 71:9,11
71:25 72:3,13
73:1 74:16,24
75:7 77:10,20
80:2,15 81:2
97:18 99:7
102:8 104:11

105:21,25
106:21 107:3,7
107:11,15,21
110:7,11,18,23
119:21 126:4
128:21,25
149:20 193:16
198:6 202:14
**opinions**  13:2
23:8 31:23
59:11 194:10
**opportunity**
47:3 65:12
195:16
**opposed**  32:12
66:6 132:14
180:9
**ops**  89:21
**orchestrated**
168:15,16
**order**  26:3,4
39:11 50:6
194:19
**organically**
173:22
**organize**  20:20
**oriented**  166:10
**original**  51:3
99:6 208:14
**originally**  44:12
**originating**  21:7
192:24
**origination**
192:22,24

**originator**
166:11
**originators**  13:6
13:13 21:12,13
**orlando**  1:3 2:3
**outline**  11:7
**outlines**  115:18
**outside**  37:8
92:24 106:14
164:24 191:7
**outsider**  93:12
**overall**  68:3
143:8
**overhead**
177:19 178:16
178:18 181:14
**overtime**  13:10
166:15
**owed**  134:25
**owighowotu**
28:5 116:6
142:16 144:2,9
**own**  19:15 20:1
21:9 109:18

**p**

**p.a.**  3:8
**p.m.**  113:23
114:1 143:12,15
180:20,23 202:4
202:7 206:6,7
**pace**  126:23
**package**  200:12
**packaged**  19:13
**page**  4:5,11,15
4:19 23:23

**[page - paycheck]**

40:11,12,17
41:1 42:24
46:16 51:4 55:1
63:23 66:20,22
67:10 76:17,18
76:18 100:5,5
103:4,4,12
104:16 116:21
120:12 121:13
121:15,16 128:3
134:14 179:23
183:9 185:7,14
**pages** 1:25
16:25 38:11
76:15
**paid** 23:14
25:21,25 34:21
35:15 36:2,15
37:18 38:5
39:21 40:5,18
40:21,22 41:10
42:4,5,6,8,14,18
43:22,23,24
45:25 46:3
52:16 54:5 56:2
62:19 67:23
68:4 73:8,17
75:6,11,22 79:5
79:21 91:25
93:25 97:3,6,15
99:5 100:22
104:5 105:19
106:16,25 107:3
107:19,23 110:6
113:8 118:14

119:18 120:10
120:13,16,25
121:1 123:1
125:14 126:2
127:10 130:12
133:3,14 134:17
135:1,4 144:25
147:7 153:5
170:7 177:12
180:3 196:12,17
196:23,25 197:4
197:6,15 198:4
198:11,24 199:7
204:18,22
**pandemic** 53:22
53:24
**paragraph**
23:11,12 40:14
40:17,25 56:1
65:10 98:16
116:21 120:10
126:23 129:16
137:17 145:2
147:22
**paragraphs**
55:3
**pardon** 42:9
**parlance** 82:9
**part** 23:18
25:10 29:24
32:9 41:16 42:5
45:23 46:12
47:23 48:22
49:25 54:8
59:23 72:3,4

77:11,17 81:20
81:21,23 89:21
93:20,23,24
99:5 102:15
104:11 106:16
106:25 108:12
109:16,17,22
110:6 111:24
112:3 126:2
127:14 179:5
180:12 197:22
199:15
**participate**
167:12
**particular** 45:2
65:2 102:12
106:13 108:22
137:2
**particularly**
31:18 44:24
66:21 143:7
172:9
**parties** 37:1
**partly** 136:18
**party** 9:17
**pass** 111:6,22
**past** 179:11
189:19
**paul** 90:13
**pay** 5:18,20,21
5:23,24 6:1,2,4
6:5,7,8,10,11,13
6:20 7:9 14:1
19:23 27:16
30:6 34:25

35:22,24 36:4
37:7 44:17 45:4
45:12 52:18
56:20 57:10
59:7 61:3 63:1
68:7 71:5,6,18
75:21,23,24
76:20,23 78:10
80:18 81:8 84:3
84:15 85:3 86:7
86:19,21 87:8
88:11 90:13
91:2,6 92:14
93:4,8,17 97:11
98:17 99:6
103:8 105:11
106:10 111:6
115:8,9 116:7
118:20 120:22
121:2,6 122:12
122:13 124:11
124:15,21 125:1
125:9,21,25
126:3,10,11
127:8 128:9
129:8 131:9,10
131:19,20 135:5
140:23 141:9
164:17 170:11
176:24 192:17
194:22 196:14
198:20 204:6,17
204:19 205:20
**paycheck** 56:3
56:22

HIGHLY CONFIDENTIAL

**paying**   29:12,15
   29:18 49:6
   62:23 67:24
   93:15 96:3
   109:6 124:20
   147:4 197:20
   205:19,22
**payment**   26:3
   37:21 39:24
   43:3 51:2,20
   52:20 70:13
   125:7 128:24
   197:18
**payments**   20:8
   44:1 51:15 98:6
   105:21 107:8,15
   126:13
**payout**   25:22
**payroll**   41:18
   105:2 182:19
**peak**   61:25
   155:4 195:6
**peaks**   62:2,3
**pelletier**   55:9,12
   56:21 57:18
   58:25
**penalty**   207:1,4
**people**   11:22
   12:1 13:21
   20:13 21:10
   25:5,6 26:16
   27:15 30:6
   34:24 39:7 40:1
   40:2 41:12,14
   44:6,12 45:1

48:5,7 49:13,20
49:22 50:24
51:9,22 52:12
53:3,8 54:5
60:15,16 61:2
61:19,24 62:7,9
62:23 63:11
64:23,24 65:25
66:1 68:7,10
71:4,15,16,22
71:23 72:20
73:5 82:16 83:2
85:8 92:5,6
93:14,22 97:21
100:21 101:2,24
102:13 107:3,7
108:6,13,14
109:19,23
111:10 112:2
115:21 116:10
116:17 118:3,3
118:4,16,23,23
119:18 120:16
120:18 121:25
122:2,2 131:15
131:20 133:6
136:9 137:3
138:2,14,19,22
146:5,6 147:16
147:17,21 148:7
153:3,6,18,21
153:23,24,25
154:1,4,21
155:2,9,21,24
156:8,18 159:7

162:11 163:4,8
163:15,16,18,24
164:15 165:7,16
165:20,23 166:1
166:10 167:12
167:21,24
168:10,14,25
169:1,7 170:20
171:7,9,16
172:17 173:5,7
176:15,20 177:2
177:3,5 178:5,7
179:11 187:20
189:8,17 191:4
191:6,7,11,16
191:24 197:17
199:20,20
200:16,19
202:21,22
203:10,14,15
205:2
**people's**   127:18
   166:18
**percent**   43:22
   118:23,24,24
   120:1,1 121:6
   130:11 132:13
   132:14 135:13
   135:17,21,22
   175:13
**percentage**
   118:22 130:23
   171:23 172:3,7
   172:13,13,23
   173:1,3 174:2,3

174:16 175:16
   175:16,19
   187:23 189:16
**percentages**
   172:21
**perfect**   86:3
**performance**
   71:18 130:12,21
   132:16 134:4
   136:17 137:8
**period**   51:19
   60:19 73:19
   84:16 124:11,15
   125:1,9 137:21
   155:4 184:1
**periods**   13:23
   195:6
**perjury**   207:1,4
**permanent**
   139:22
**permission**
   69:15
**person**   20:4
   42:3,4 48:1
   55:17 60:13,14
   64:5 65:21
   80:11 116:18,18
   119:1 132:23,24
   143:5 146:8
   147:11,13,15,16
   153:4,4 154:13
   162:1 170:25
   171:1 176:19
   198:15 199:15
   199:16 200:2

HIGHLY CONFIDENTIAL

**[person - position]**                                    Page 248

203:25

**personal**  137:7

**personnel**  180:1
180:4,12

**perspective**
50:11 52:14
118:8 166:12
176:14

**pertains**  208:13

**pertinent**  12:13
61:17 73:7

**phoenix**  112:6

**phone**  180:13

**phonetic**  55:14

**phrase**  29:15

**physically**  54:6
72:1

**pick**  27:1 49:1
203:24 204:3

**picked**  125:6

**piece**  49:18
106:12 163:20
192:20 194:4

**pieces**  14:15

**pile**  69:5

**place**  60:14 65:7
131:12 208:8

**placed**  177:11

**placement**
139:22 140:4,13
141:3,4 177:13

**plaintiff**  2:7 3:2
9:22

**plaintiff's**  5:14

**plaintiffs**  1:6
9:14 37:12

**plan**  97:4 99:6
120:5 197:23

**planned**  196:17
197:20,21

**planning**  144:22
176:10

**plans**  26:8

**play**  105:6
128:20 164:21

**plays**  194:18

**please**  9:16
10:12 30:16
80:18 115:6

**pleasure**  10:6

**plug**  164:21

**plugged**  175:22

**plus**  172:4
199:23

**pmk**  31:11 32:8
181:7

**poach**  68:19
95:8 111:8

**poached**  97:22
110:12,25 111:5

**poaching**  52:13
107:21

**point**  1:5 2:5
5:18,20,21,23
5:24 6:1,2,4,5,7
6:8,10,11,13,20
7:9 9:12,22
10:24 14:6
18:13 21:7,9,19

23:5,9 24:12
25:23 26:19,20
27:11 29:4,7,12
29:19 30:2 34:5
34:10,25 35:8
35:18 36:14,24
37:17 38:5 39:4
39:22,24 40:5
41:1 45:4 50:6
50:17 53:17
55:7,21 56:9,9
56:17,20 57:14
59:6,9,17,20
60:24 61:5,18
61:22,24 62:19
62:19 63:11
64:22 65:6,19
65:24 66:9
67:23,24 68:7
68:14 70:6
71:12 73:17,25
74:7 75:5 76:8
79:20,24 80:15
84:4 91:3 93:3,7
94:17 95:4
111:4,9,20
112:5,9,24
113:6 125:15
127:7 128:1,8
130:3 131:9,9
131:15,19
132:12 133:2
134:10 135:1
137:20 144:18
147:4,7 153:13

154:7 156:1,4
162:22 166:2,4
166:22 167:6,7
169:7,14,24
170:2,5,9
172:16 174:20
174:22,23,25
178:8 181:9
183:20 185:10
186:25 187:9,20
188:7,11 189:2
189:8,17 191:6
191:11 194:18
195:4 196:23
197:10 201:7,11
205:4,24

**point's**  18:18
21:15 24:12,24
25:19 28:15
35:22 62:5
87:19 130:20
183:14,18

**points**  25:25
30:1

**portfolio**  19:16
20:1

**portion**  33:17
92:4 185:22

**portions**  48:21

**portrait**  76:3
90:5

**position**  147:1
158:11 177:8
201:12

positions   50:16
52:6,9 82:7
positive   110:2
possible   50:25
187:5
possibly   142:4
potential   13:22
107:21 110:5
potentially
44:23 49:20
51:10 59:21
68:10 93:23
108:18 113:13
127:10 137:4
154:16,25 162:8
167:12 179:4
192:20
practical   73:21
practice   23:19
59:17 67:24
practices   65:19
precise   180:10
prefer   103:8
prescribed
13:16
present   3:12
presented
163:14
presumably
127:15 189:24
presumes
204:11
pretty   24:16
33:20 48:12
52:7 58:21

64:24 71:23
82:19 112:14,16
121:7 122:15
202:21
previous   65:7
65:23 137:3
171:13 188:3
189:6
previously
97:24
price   11:9,15
19:21
primarily   52:20
52:21 171:6
primary   25:5
print   38:10
printed   114:6
prior   13:1 14:14
45:5 46:5 56:17
56:22,22 73:18
117:23 124:14
142:20 144:1,6
145:12 151:1,19
152:5,22 158:15
177:3 188:10
probably   15:16
26:15 28:19
30:2 32:7 33:4
42:13 52:13
60:3 65:6 70:9
78:2 84:15
93:18 99:9,11
100:12 106:7
112:16 116:10
123:8 131:17,22

132:10,21 137:6
150:9 164:13,18
164:19 166:3,14
166:17,20 177:5
182:12 185:23
185:25 203:7,8
203:13 204:13
problem   48:22
108:4 111:15
problems   49:2
proceedings   9:9
208:9,12,15
process   19:18
31:19 50:5
96:14 97:23
195:15
processed
154:22
processing   21:4
processor   20:18
21:3
processors   13:7
13:18 20:17
25:7 82:9
produce   189:5
189:19
produced   8:10
8:11 15:6,11
28:24 31:9,20
33:6 38:9 43:17
55:7 57:14 58:8
59:14 70:7 91:2
114:3 126:22
134:9 141:20
157:16 179:6,18

182:14 183:2
185:9 186:11
201:6
product   13:17
22:20
production   18:5
18:10 25:20
76:19 127:1
134:15,25
179:13,14,25
productive
170:1
productivity
13:20 23:9
128:19 133:22
166:2 167:16
169:23 170:4
products   178:18
proffer   32:22
profit   39:22
178:5,7,9,10,10
179:15 181:14
183:15 184:1,4
184:16,16
187:10 193:11
193:22 194:4,8
195:23
profits   23:5,7
177:25 181:2,19
181:25,25
193:16,19
program   39:6
97:4
programs   24:24

HIGHLY CONFIDENTIAL

**[projects - ready]**                                                          Page 250

**projects**  77:13
**promise**  75:20
   90:5
**promised**  90:5
   94:1
**promotion**
   64:16 65:15
**promotional**
   65:11
**properly**  45:23
   190:25
**property**  19:20
**provide**  15:10
   20:6 57:25
   60:19 104:8,9
   164:16 187:14
   193:13
**provided**  28:17
   41:19 70:2 72:8
   72:9 74:19
   75:10 104:10
   196:21 197:10
   203:17
**providing**
   154:16
**provisionally**
   185:24
**publishes**
   181:16
**pull**  79:7 105:10
   105:10
**punch**  111:20
**purchase**  62:14
**purchases**  166:8

**purposes**  18:15
**put**  32:10 60:14
   60:17 63:6
   122:22 145:22
   155:15 169:9,25
**putting**  113:13
**pw**  11:13,16

**q**

**q1**  130:13
**q3**  155:6
**q4**  131:2 136:7
   155:6
**quarter**  86:17
   128:19 195:20
   195:22
**quarter's**  196:2
**question**  10:15
   10:25 22:24
   27:14 28:9,19
   29:16 35:17
   41:21 48:17
   63:22 71:10
   73:21,24 75:4
   79:1 80:14,25
   93:6,9 95:2
   107:18 110:18
   111:3 115:11
   116:8 125:17
   131:18 137:5
   154:6 157:7
   158:22 169:12
   169:21,23
   183:25 192:6,16
   199:2 202:9,20

**questioning**
   84:24
**questions**  55:2
   74:21 75:1,24
   98:5 108:10
   114:5 129:2,4
   169:19 206:1
**quick**  54:12
   92:17 110:16
**quickly**  21:23
**quit**  52:23 74:9
   82:20
**quizzing**  47:4

**r**

**r**  102:19,19
   183:9,10,14,17
   183:19,25
**raid**  49:4 167:12
   168:1 169:11
   196:16 198:5
**raided**  108:4
**raise**  45:16
   64:16 65:15
   117:8 118:15
   125:1 194:22
**raises**  29:10,11
   60:25 62:23
   115:2,25 117:5
   120:24 124:8
   203:17,18
**ran**  48:5,6
**range**  104:21
   117:11 118:5
   164:20,24 165:8
   171:12,17 172:8

**ranges**  164:18
**ranks**  49:7
**rapid**  65:20
**rapidly**  64:24
**rate**  39:21 47:19
   116:4 118:2
   119:8,10,11,15
   119:22,25
   120:20 165:2,5
   165:7 170:11,25
   171:5 172:4
   174:8 198:22
   203:20
**rated**  48:13
**rates**  22:16 60:2
   115:8,9 116:6,7
   116:14 121:3
   164:17 174:2,14
   195:8
**rather**  11:14
**ratio**  189:16
**rationalization**
   164:3
**reach**  107:22
**reaction**  169:22
   196:18
**read**  35:7 38:22
   55:3 74:11,14
   76:7,12 98:7
   106:7 110:15,17
   168:7 169:21
**reading**  64:25
   67:12 103:2
**ready**  81:1
   105:8

HIGHLY CONFIDENTIAL

**[real - recruiter]**

**real**  76:12 92:17
110:4,15
**reality**  143:5
**reallocate**
154:25
**really**  14:12
31:10 33:21
35:14 45:3 60:5
60:5 63:15
76:17 79:5 81:1
117:21,21
120:21 122:14
139:2 182:23
189:6 190:25
195:13,13,16
196:19 200:7
**reason**  50:15
67:18 72:23
73:8 74:5 91:5
93:16,25 105:19
107:20,23
108:17 109:21
116:8 141:6,8
145:16,19,20
162:2 177:8
**reasonable**  34:8
48:19 49:5
50:11 54:9
198:12,17
**reasons**  44:25
63:11 99:14
100:25 102:13
107:4,14 136:20
167:14

**reber**  57:23
96:2,11,24
103:5,13 104:7
109:3
**reber's**  94:21
98:12
**rebounded**
118:16
**rebounds**  26:24
26:25 27:3,6,12
29:6,25 114:25
118:19 125:13
**rebuttal**  5:7
12:16 17:3,9,12
17:25 24:4
25:19 28:25
30:11 31:1
47:15 104:16
114:14 115:1
177:23 179:20
180:25 181:3
182:13 183:8,9
194:11
**recall**  14:12
24:19 25:9 26:6
26:21 53:14
72:10 112:23
162:4 177:4
185:11
**receive**  15:2
26:4 44:6 49:12
52:1,24 56:2
98:13 101:14
104:6 151:13
181:10

**received**  27:12
28:10,12 29:9
29:11 46:11
57:4 67:4,13,14
70:2,21 80:25
81:18 86:18
89:7,23 90:21
91:18 92:1,6,23
94:25 95:4
100:8 103:15,19
110:11,24 115:3
115:25 117:5,8
124:9 125:23
126:13 128:4,16
**receiving**  97:17
101:21,25
115:10 122:12
**recent**  18:2
**recently**  18:19
106:7
**receptionist**
52:10
**receptionists**
41:15
**recess**  113:24
**recollect**  94:21
**recollection**
40:23 50:19,20
120:3 130:6
177:8 200:2
**record**  9:5,17
21:21 39:16
54:14,16,17
69:19 79:22
94:5,7,8 96:6

110:17 113:21
113:22,25
143:11,13,14
158:20 180:19
180:21,22
186:12 192:10
200:15 202:3,5
202:6 206:5
208:11
**recording**  9:8
**records**  126:16
**recoup**  36:15
73:21 74:8
79:21 80:3
**recouped**  40:7
40:19,22 43:25
75:5
**recover**  37:12
37:17 73:17
74:2 199:25
**recoverable**
107:8
**recovered**  45:24
75:17
**recruit**  34:24
61:24
**recruited**  47:18
48:9 66:1
**recruiter**  138:13
138:16,19
144:11,17 146:1
146:7 156:16,19
157:15 158:2,17
160:9 165:17,17
172:6,17,24

173:5,13 174:2
174:3,5,11
176:3,17,23,25
177:10
**recruiters**  153:7
173:21,22 174:8
174:20 175:24
176:5 178:20
180:4
**recruiting**  66:2
139:3,6 141:19
162:6 167:13
171:22 173:1,3
175:19,23 177:2
178:24 179:3
204:6
**redacted**  32:25
179:7 180:9
182:3 185:5
186:4 190:18,24
192:7
**redistribute**
166:14
**reduce**  203:16
**reduced**  124:16
124:17
**reducing**  178:18
**refer**  38:24 69:7
69:14 121:15
184:16
**reference**  27:6
39:4 69:10
139:2 167:2
**referenced**  12:9
144:15 185:12

**references**
25:19 97:9
**referencing**
106:9 127:21
**referring**  186:5
**refers**  123:14,14
**reflected**  67:14
**reflective**  64:22
91:6
**regarding**  32:4
177:2
**regular**  85:19
86:17 87:13
89:4 90:1,25
91:21
**regurgitating**
197:11
**rehash**  187:7
**rehire**  203:18
**rehired**  119:23
162:17 163:23
204:9
**relate**  38:4
**related**  13:9
19:19 20:3 21:4
29:20 45:15
82:8 95:5
106:17 119:25
153:11,11
162:13 170:10
**relates**  33:25
83:20 137:7
**relating**  95:1
**relation**  190:13

**relationship**
47:10 193:10
**relative**  27:19
128:18 136:14
**relatively**  92:3
172:2
**release**  166:9
**relevant**  30:8
**relied**  17:1,5,17
72:12 160:11
**remain**  97:21
**remained**
134:20
**remember**  30:7
116:13 164:4
173:16
**reminder**  10:10
**remote**  53:17,20
83:1
**renegotiated**
58:13
**rep**  40:12
**repackaging**
19:9
**repay**  20:7
**repeat**  170:13
170:21,23
**rephrase**  75:3
154:6 192:5,6
**replace**  63:13
130:2 133:14
135:5 144:21
145:18,20,21,22
145:25 153:7,12
153:16,20,21

154:8,12,15
155:9,20 156:6
167:17,22
170:19 173:9
198:24 199:8
203:20 204:1,4
204:8 205:7
**replaced**  170:8
199:21 202:22
203:7,19,22
204:25
**replacement**
115:19 138:1
141:4 142:15
155:20 159:13
161:23 173:20
203:8 205:11
**replacements**
66:6 115:22
136:8 153:1,3
153:15,23
155:24 159:8
203:14
**replacing**
205:23
**replies**  100:17
**report**  5:6,7 7:6
7:8,11 12:16,16
17:1,4,4,9,9,12
17:25 18:6
23:12 24:3
25:19 26:18
27:25 30:11,15
30:25 31:1,6
32:8,23 33:17

| | | | |
|---|---|---|---|
| 33:19,24 38:4 | 200:6,23 208:3 | resigned 26:19 | responsible |
| 39:23 40:3,5,9 | reporter's 208:1 | 50:24 51:8 | 56:25 |
| 40:10 41:1 | reports 12:18 | 56:13 61:19 | responsive |
| 42:13 43:19 | 31:17 32:18 | 92:9 126:15 | 15:10 |
| 47:15 48:11 | 33:10,15 184:15 | 127:5 134:24 | rest 13:9 55:3 |
| 66:9 67:24 | represent 31:3 | 135:2 142:10 | 107:13 |
| 114:10,16,17,20 | 70:6,25 97:2 | 146:24 149:12 | result 175:21 |
| 115:1,14 116:21 | 101:12 | 153:10,24 154:4 | 192:13 197:8 |
| 120:10 121:12 | representation | 154:9 157:7,9 | resumes 117:18 |
| 124:3 125:6,12 | 116:9 | 165:11,13 | 118:12 |
| 137:17 142:19 | representative | 166:24 167:8 | retain 44:22 |
| 144:16 159:7 | 18:19 130:20 | 168:12 173:9 | 60:7,14,16 68:9 |
| 164:5 170:15 | represented | 199:8 | 95:12 177:14 |
| 173:8 177:24 | 72:11 | resigning | retained 48:25 |
| 180:25 181:3 | requested 4:10 | 111:10 124:14 | 112:13 |
| 182:13,14 183:8 | 4:14 208:16 | 145:13 151:1 | retaining 44:24 |
| 183:9 194:11,11 | requests 185:8 | 152:22 158:15 | retention 26:1,7 |
| 196:22 | requirements | 166:1 168:19 | 38:4 39:20,24 |
| reported 1:23 | 25:22 | resigns 45:21,22 | 40:6 41:9,23 |
| 208:9 | requires 173:3 | resolution 11:25 | 43:4,21 44:6,17 |
| reporter 2:24 | 176:23 | resolved 167:19 | 44:21,23 45:5 |
| 9:24 11:20 | research 131:23 | respond 31:7 | 45:13,17,23,25 |
| 14:18 19:17 | 148:17 | responding | 48:24 49:6,12 |
| 25:13 37:14 | reserving 31:25 | 137:5 198:21 | 51:11,20 52:1 |
| 39:9 43:8 48:16 | reshuffled | responds 96:2 | 52:15 56:2,21 |
| 49:8 54:19 | 94:10 | response 12:21 | 58:1 59:17,21 |
| 57:13 63:17 | resident 77:5 | 15:6 45:3 108:9 | 60:17,25 61:3 |
| 66:4 78:6 80:20 | resignation | 110:1 114:4 | 62:18 63:7 |
| 81:5 82:4,13 | 65:10 85:12 | 115:3,7 121:14 | 66:25 67:14,15 |
| 83:4 86:1 87:4 | 88:19 112:25 | 197:17 198:12 | 67:23,25 68:4 |
| 94:16 102:20,22 | 143:1 151:20 | 198:18 | 68:12 70:3,3,18 |
| 124:23 125:8 | 152:6 156:9 | responses 5:15 | 70:22 71:13 |
| 139:24 154:2 | resignations | 28:15 29:2 | 73:6,10,13 75:6 |
| 156:10 180:17 | 61:1 111:18 | 69:11 | 76:24 79:21 |
| 185:17 199:12 | 144:19 | | 80:6 81:18,24 |

HIGHLY CONFIDENTIAL

**[retention - rodriguez]**                                    Page 254

84:8 89:7,23
90:21 91:18,25
92:1,23 93:4,8
94:18,25 95:4,7
96:12 97:3,12
97:15,17 98:6
98:12 99:5,6
101:8,14,19,25
102:1,7,8
103:15 104:5
105:2 106:17
107:16,20 108:6
110:12,24 113:8
114:17 122:20
122:22,23
123:19,20
196:14,23,24
197:3,6,15,21
198:7
**retired**   51:13
**return**   92:5
128:13
**returned**   27:17
118:20 163:18
203:3
**revenue**   23:14
23:22 181:10
192:23 194:8,9
**revenues**   178:13
**review**   18:2,4
18:16,20,23
20:12 24:12
28:15 31:14
47:3,25 100:2
185:8 208:15

**reviewed**   18:11
25:24 59:12
61:9 98:9 100:4
104:12 136:25
141:19 207:4
**reviewing**   20:5
119:6 144:15
**revise**   57:8
163:11
**revised**   164:15
164:16 173:18
**revising**   163:10
200:4
**richardson**
116:5 151:6,6,9
159:17
**right**   15:15,24
22:9 27:18
31:25 32:21
35:21 38:3 40:8
42:18 49:16,23
52:16 54:21
59:24 65:16
67:19 69:2
73:17,20 75:10
75:13,14,18
76:13 78:5 79:8
79:13 81:22
82:1,2,11 86:20
87:17,20 88:4
94:4,11 95:24
97:1 105:6
107:2 109:10
114:16 115:4
116:10,23

121:13 122:19
122:20 123:10
124:6,22 126:4
127:8 128:4
131:2 133:8,11
134:2,22 135:15
139:4,21 140:19
143:20 145:16
145:24 147:5,24
148:1,5 149:12
149:24 150:2,7
150:11,14 151:5
153:16 157:7,9
157:12,24
158:12,15,23,25
159:4 160:13,25
162:1,11,14,18
162:24 163:4,15
163:17 164:2,6
164:21 165:1,2
165:11 166:2
168:22 169:18
170:11,24 172:5
172:6,18,23
173:6,10 174:6
174:15 175:10
175:12,14,15,19
177:17,25 178:1
178:23 179:6,18
180:1,18 182:2
182:15 183:22
184:4 185:4
186:10,14,21
188:4,8,10,13
189:1,3,10,25

190:5,16,21,23
191:4 196:5
197:1,6,11
198:1 200:21
202:23 203:1,6
203:12,16,17,19
203:21 204:10
204:15,22,24
205:7,8,20
206:1
**ringman**   96:1
96:17 97:9
**risen**   195:9
**risk**   47:17 48:9
52:13 68:10
72:18 110:12,25
111:4
**rita**   81:8
**rob**   112:12,13
**robert**   1:14 2:21
4:3 5:6,7 9:12
10:1 206:8
207:3,18
**robertson**   1:9
2:9 45:20 47:11
49:22 56:8 68:5
72:14 95:1,6,8
105:20 107:6
108:2 110:13
111:1 201:23
**robertson's**
5:15 28:15
49:18 176:11
**rodriguez**   27:25
28:10 95:17

HIGHLY CONFIDENTIAL

**[role - see]**

**role**  19:5 20:15
21:2,6,16 74:17
202:15
**roles**  29:4
**rolled**  126:25
**rolling**  32:11
**roster**  41:11
191:9
**rough**  96:12
**roughly**  172:11
**row**  184:10
**rows**  192:8
**rules**  10:9 15:13
15:20 53:23
**ruth**  3:3 9:21
44:16
**ruth's**  44:18
**ryan**  88:23
**rzadikany**  3:5

**s**

**s**  102:19 150:5,5
**sabrina**  103:22
**safe**  78:1
**salaried**  34:18
34:23
**salaries**  27:10
27:12 28:9 29:4
29:6 115:23
116:19,23 117:1
117:3,4 119:19
127:18
**salary**  28:11
29:7 34:1,4 35:1
35:15,22,24
36:5,6,15 37:13

37:18 58:14,19
114:20 115:18
115:24 116:4
117:25 120:11
123:23 124:3,13
127:2 130:11,23
132:13 170:7,11
170:20
**sale**  19:21 21:15
22:4
**salespeople**
21:11
**salvatore**
160:10
**salvatorie**
159:25
**sampling**  91:24
**san**  83:3
**sandoval**  70:21
72:1 73:11
75:23
**sandoval's**  71:5
**saved**  177:20
178:22
**saving**  178:21
**savings**  177:21
178:19
**saw**  35:19 66:14
82:23 114:8
160:11 182:4
190:8
**saying**  28:5
31:21 45:9
57:24 60:3
80:18 95:7 96:2

98:11 103:6
108:13 119:3
155:11 159:14
169:8 172:25
187:15 188:17
196:11,12 204:2
**says**  15:19 23:12
37:17 44:21
50:9 55:19 56:1
58:15 60:10
63:3 64:15,17
65:14 67:11,12
70:21 73:5,15
76:18 81:21
90:3 95:23
96:11,17,18,21
96:23,24 98:16
98:21 100:7,11
101:5,6,18
102:14 103:13
103:22 107:12
108:3 126:23
128:3 130:8
134:16,21
136:16,18
144:25 148:19
151:15 172:7
183:25 187:13
194:14 198:2
**scale**  42:5 197:2
**scheduling**  32:9
**schmidt**  160:19
**school**  10:17,22
10:23

**schwartz**  89:17
**scope**  37:8
41:21,22
**scramble**  169:6
**scratch**  47:13
**seat**  202:17
**seaton**  57:23
59:2 100:7,16
101:18 109:3
**second**  18:19
20:12 46:16
48:22 51:4
58:22 65:10
76:18 85:7,8
93:11 98:16
100:5 101:18
111:24 114:11
126:23 129:11
130:9 132:12
134:14 140:17
161:15 162:2
201:1
**section**  87:21
130:7 177:16
**see**  14:25 17:3
17:13 23:15
28:2,8 41:5,6
42:7 43:2,6
44:25 46:20,22
55:10,22 56:4
57:22 58:2 60:6
64:8,10,19 67:7
67:16 70:15,17
70:20,24 71:7
73:14 74:15

| | | | |
|---|---|---|---|
| 76:21 77:6 | 146:6,17 147:2 | **self** 20:4 | 45:11,12,19,25 |
| 78:11,13,15 | 147:3 148:25 | **sell** 19:25 | 46:3,4 51:14 |
| 79:9,12 80:23 | 149:4 152:3,12 | **send** 80:18 | 52:19 55:24 |
| 81:9,11,14 | 153:13 156:4,11 | **sending** 113:10 | 56:3,6,11,13,22 |
| 83:10,21,25 | 156:14,20,21 | **sends** 57:23 | 57:24 59:2 |
| 84:10 85:1,5 | 157:4,21 158:9 | **senior** 11:10 | 63:12 64:13,23 |
| 86:9 87:11,25 | 160:4,7 161:6 | 20:12 62:7 | 65:19 84:12,14 |
| 89:2,15 90:14 | 163:9 165:13,19 | 70:22 83:23 | 85:10 87:9 |
| 90:23 91:13 | 171:10,25 172:8 | 84:25 88:6 | 88:15 97:8 |
| 95:21,22,25 | 186:15,16,16,20 | 95:18 103:14 | 100:17 101:5,17 |
| 96:4,15,20,22 | 186:22 187:18 | 116:25 117:12 | 113:1,2 115:10 |
| 97:1 98:14,15 | 191:20 192:5,10 | 118:4 121:17 | 116:24 117:5,13 |
| 98:19,23,24 | 192:11 201:20 | 122:3,16 143:21 | 124:1,10,12 |
| 100:1,9,10,14 | 205:15,24 | 144:8 153:20 | 126:8,15 134:25 |
| 100:15,19 | **seeing** 67:9 | 157:23 158:11 | 135:1 137:21 |
| 101:10,11,22,23 | 100:21 164:23 | 202:16 | 138:6 140:4 |
| 102:5 103:5,9 | **seeking** 199:25 | **sense** 22:24 | 142:6,11 145:11 |
| 103:10,20 104:2 | **seem** 158:22 | 68:18 72:24 | 146:23 147:1,5 |
| 104:3,15,19 | **seems** 24:16 | 95:10,15 120:6 | 148:20,21 149:9 |
| 105:4 108:17 | 34:7 54:9 58:6 | 120:21 170:12 | 150:11,19,21 |
| 109:4 116:6,23 | 83:13 102:14,14 | 176:17 194:23 | 151:13,16 |
| 117:25 119:17 | 111:14,16 | **sent** 100:8,12 | 153:24 154:5,5 |
| 121:16 122:16 | 156:13 164:17 | 101:18 112:24 | 154:9 157:12,25 |
| 123:24 127:3,4 | 164:22,24,25 | 113:9 152:11 | 158:3,12,14 |
| 128:5,12 129:3 | 187:20 196:18 | 159:17 | 159:3,18,18,19 |
| 129:3,7 130:8 | **seen** 18:5,6 | **sentence** 23:12 | 159:20,22 160:6 |
| 130:14 131:23 | 24:15 28:22 | 66:22 101:18 | 160:8,22,25 |
| 132:12 134:14 | 29:1 35:5 61:12 | 170:12 | 161:5,12 165:22 |
| 134:18 137:1 | 61:16 66:14 | **separate** 97:4 | 166:24 173:10 |
| 138:10 139:5,12 | 70:5 123:5 | 123:2 | 173:14 189:9,10 |
| 140:2,3,7,8,12 | 144:14 | **separately** | 189:12 190:5,6 |
| 140:15,18,23,25 | **segregating** | 114:14 | 190:17 191:2 |
| 141:2,14 142:7 | 71:21 | **september** 5:10 | 199:9 |
| 142:8,18 143:23 | **select** 101:7 | 5:17 21:19 | **sequence** 153:2 |
| 144:10 145:2 | 138:15,18 | 27:11 29:18 | 153:6 |

HIGHLY CONFIDENTIAL

**[sequentially - solicited]**                                    Page 257

sequentially
66:8
serve 20:23
143:21
served 15:5
17:25
service 154:16
166:4,19
services 11:18
servicing 62:10
182:9 192:21
193:2,23,25
serving 13:2
set 5:15 28:16
29:3 116:14
121:11 208:8
setting 117:25
seven 140:5
173:6
seventeen 87:1
several 23:6
50:23 92:8,22
97:3 101:20
159:11
shad 161:9
203:25 204:4,6
205:18
shakes 193:4
sharlene 119:2
162:16
she'll 16:17
sheet 205:5
shock 111:12,16
168:8

short 109:2
200:8
shorthand 2:24
208:3
shot 33:14
show 57:13
99:20 132:19
137:20 138:23
139:17 140:19
146:9 156:22
200:21
showed 129:8
189:8
shows 57:18
71:6 76:24 91:1
147:6 172:11
side 111:9
113:11
sign 44:23 128:4
signature 95:17
208:23
signed 58:5
significant 92:1
92:4,16 121:8
122:16 159:16
173:12
significantly
74:1 172:18
signing 71:6
76:24 80:5 84:9
91:19 101:8
133:13 144:25
145:8,12 150:11
150:23 151:13
152:1,21 153:5

156:13 162:13
162:17 163:20
164:18,22 165:5
172:4 198:23
199:7 203:14
204:5 205:20
signs 64:8
similar 70:4
75:23 77:13
83:13 132:3
189:5 198:20
simple 172:2
174:7
simplify 27:21
simplistic
120:20
simply 168:10
197:9
simultaneously
111:18
sit 25:9 31:15
32:16 53:4
82:15 164:9
sitting 166:13
180:14 185:11
situation 32:12
44:20 48:3 50:8
50:10 57:11
63:8 68:17
176:22
situations
106:20 181:12
six 12:1 26:19
26:21 27:6,17
125:13 128:21

161:19,22,24
162:5 163:22
188:3 199:25
202:11
sixteen 105:10
size 143:8
skewer 30:19
skills 119:11
skim 63:21
skipping 86:25
slate 171:6
slated 127:1
slightly 124:17
slowdowns
21:22
small 42:25
121:7 125:3
smiley 64:17
smiling 96:6,10
smith 147:14
social 44:15
48:23 51:11
57:9 72:23
93:10,15 97:24
99:14 106:10
107:4 109:6,11
109:24 110:8,9
110:10,20,20,22
sold 11:12 19:13
19:14
solicitation
155:22
solicited 110:13
110:25 201:12
201:23

HIGHLY CONFIDENTIAL

**[soliciting - stating]**                                      Page 258

| | | | |
|---|---|---|---|
| **soliciting** 56:8 | **south** 2:22 3:4 | **spread** 93:24,24 | 189:10 203:18 |
| **solidify** 96:14 | 9:9 | 112:20 | **started** 11:14,17 |
| **solutions** 9:7 | **specialist** 20:25 | **spreadsheet** 5:9 | 125:10 126:11 |
| **somebody** 44:5 | 139:10 140:10 | 42:25 43:3,10 | 148:4 149:9 |
| 44:20 47:5 65:4 | 140:24 141:14 | 43:22 75:18 | 176:20 |
| 73:22 117:14 | 163:3 | 197:10 | **starting** 50:13 |
| 133:14 176:3 | **specific** 27:22 | **stack** 16:14 69:3 | 50:21 76:8 |
| 177:11 204:14 | 32:16 38:12 | 69:4 | 120:11 130:8,9 |
| **someone's** | 54:2 75:22 | **staff** 144:23 | 157:24 158:12 |
| 117:25 | 80:15 102:16 | 155:3 | **starts** 95:16 |
| **something's** | 109:9 129:4 | **stamp** 182:23 | **state** 2:25 39:23 |
| 33:17 | 171:17 180:7 | **stamped** 5:11 | 47:16 59:24 |
| **somewhat** 35:6 | 185:8,22 192:4 | 5:13 6:14,16,17 | 77:9 81:9,18 |
| **sorry** 16:6 17:8 | 192:7 | 6:19,22,23,25 | 83:24 85:15 |
| 55:12 70:16 | **specifically** | 7:2,3,5,6,8,11 | 86:11 87:16 |
| 84:7 96:18,23 | 15:19 24:4,19 | 7:12,14,15,17 | 88:3 89:19 |
| 116:6 135:23 | 25:9 26:12 | 7:18,20,21,23 | 90:19 91:15 |
| 158:1 171:14 | 35:23 80:1 | 7:24 8:1,2,4,5,7 | 92:24,25 198:7 |
| 175:2,5 181:18 | 94:22 95:7,9 | 8:8,10,12 43:12 | 208:4 |
| 184:10 188:22 | 154:8 162:4 | **stand** 32:1 | **stated** 10:6 |
| 190:4 199:4 | **specifics** 26:5 | **standard** | 97:25 |
| **sort** 11:16 20:23 | 131:13 | 118:22 | **statement** 70:14 |
| 21:14 34:7 | **speculating** | **start** 10:20 | 78:10 81:8 84:3 |
| 42:12 57:10 | 84:17 123:4 | 25:25 33:9 | 86:7,19,22 87:8 |
| 62:7 63:8 72:5 | **speculative** | 38:11 49:6 76:1 | 87:14 90:13 |
| 106:9 111:20 | 133:19,23 | 85:10 113:19 | 133:5,9,24 |
| 113:13 118:6 | **speed** 167:17 | 130:16 142:25 | 140:23 141:2 |
| 137:12 182:6 | **spell** 150:4 | 143:21 144:1,6 | 158:20 195:2 |
| 192:22 205:3 | **spelling** 102:19 | 144:7 146:24 | **statements** |
| **sorted** 39:5,10 | **spend** 33:16 | 148:19 150:21 | 94:20 111:13 |
| 100:25 | 193:8 | 151:12 152:1 | 177:2 |
| **sounds** 40:8 | **spoke** 101:5,6 | 157:11 159:3,6 | **states** 1:1 2:1 |
| 85:25 100:15 | **spot** 167:6 | 159:9,18 160:6 | 40:5 93:23 |
| 131:14 | 204:14 | 160:21,24 | **stating** 181:1 |
| | | 161:11 172:15 | |

HIGHLY CONFIDENTIAL

**[statistic - systems]**                                          Page 259

**statistic** 122:14
  181:17
**status** 35:14
  77:5 81:9 83:24
  85:15 86:11
  87:16 88:3
  89:20 90:19
  92:24
**stay** 45:17 57:24
  60:20
**stayed** 29:10
  61:10 65:6,23
  97:13 114:24
  125:14,24 131:8
  133:17
**staying** 75:1
**stenographica...**
  208:9
**step** 177:22
**stephanie** 98:10
  101:16 103:6,12
**steps** 50:11
**stick** 55:2
**sticker** 16:11
  200:8 201:2
**stickers** 16:12
  113:20 200:9
  201:3
**stop** 48:15
  111:25 169:13
**stopped** 189:18
**stories** 93:11
**straight** 193:13
**strategies** 63:7

**strike** 29:16
**struck** 118:14
**structure** 21:13
  24:13,14 25:10
  25:15
**stub** 5:18,20,21
  5:23,24 6:1,2,4
  6:5,7,8,10,11,13
  6:20 7:9 71:5,6
  75:23,24 76:20
  92:14 105:2,11
  141:9
**stubs** 75:21 91:2
  91:6
**studied** 22:5
**studies** 18:23
**study** 13:10
  165:6
**stuff** 18:25 19:1
  30:4 31:11 32:8
  33:5,21 36:20
  137:6 155:5
  190:18
**subject** 15:12
  193:17
**submitted** 12:15
  61:1 85:12
  168:21
**subpoena** 14:23
  114:4
**subscribed**
  208:18
**substantial**
  48:21

**substituting**
  171:10
**subtracted**
  121:3 178:14
**suddenly** 80:10
**sue** 108:11
  113:14
**suffered** 23:5
**suggest** 75:16
  169:16
**suggested**
  180:13
**suggesting**
  127:9 204:1
**suggests** 92:14
  93:21 170:18
**suite** 3:9
**sum** 84:8
**summary** 13:25
  24:2,5
**sums** 73:17
**supancich**
  101:17
**super** 16:12
**supplemental**
  205:16,25
**support** 20:25
  48:1 50:15 52:9
  52:10 82:7,12
  139:9 140:10,15
  140:24 141:14
**supposed** 14:16
  44:9 144:3
  172:25

**sure** 10:13
  16:11 21:12
  24:23 28:14,25
  37:3,6,10 41:17
  42:15 43:16,20
  44:5 53:20,22
  54:13 62:21
  65:8 69:20 92:3
  95:3 102:2
  106:5 107:25
  112:14,16
  123:10 129:2
  142:24 146:8
  154:10,14
  161:16 170:16
  175:6 185:13
  203:2,24
**surprised** 15:22
  15:23 95:9
**surrebuttal**
  32:5
**surveys** 17:22
**surviving** 49:3
**swap** 141:14
  143:5
**swapped** 147:12
**swapping** 153:4
**sworn** 10:2
  208:6
**system** 25:23
  86:3 111:12
**systems** 13:22

HIGHLY CONFIDENTIAL

**[t - testimony]**                                                 Page 260

| t |
|---|

**t** 150:5 151:6
**table** 23:23,24
24:2 27:24 28:4
39:14 67:8
115:15 116:4
118:1,2 124:3
125:12,17,18,20
126:9 132:5,7,9
139:6 140:6
141:22 144:3,5
145:3,14,19,20
145:22 146:19
146:20,20 150:6
151:9,9,10
161:14 162:1,9
162:11 163:8
164:2,11,15
171:14,15,20
172:20 173:11
173:23 174:1,9
174:14,15,17,19
174:23,25 175:3
175:7,9,10,14
175:15,17,17,18
175:21,22 176:1
176:7 177:16,17
**tables** 156:12
163:11 200:4
**take** 47:12
54:12,25 63:24
71:3 79:19 80:3
85:24 94:2,3,4
106:15,22
111:11 124:8

125:12,22 126:6
129:24 133:2
143:9 147:11,13
148:7 149:10
152:25 163:11
164:12 167:16
171:6 180:15,17
180:25 192:11
194:12 195:19
201:24 202:25
203:10
**taken** 2:21 9:14
10:8 30:14
34:24 79:24
113:24 178:8
207:5 208:7,12
**talk** 10:10,13
14:16 26:18
53:5 58:18
61:13,13,13,14
114:23 115:24
127:19
**talked** 38:7
51:25 65:8
103:13 114:17
133:25 165:25
**talking** 25:15
27:7 33:17
47:25 49:20
60:1 64:5 108:1
118:1 133:20
175:6 183:12
188:14 191:13
191:15,16
192:25

**talks** 48:11
106:8
**tampa** 3:9 9:19
**tanya** 86:22
87:9
**target** 130:11
132:13
**tax** 77:4
**team** 49:16,17
49:18 54:8 72:4
72:6,12,14 73:5
77:11,13,17
81:21,24,25
82:2 93:18,20
93:22 103:17
**teams** 77:12
**tech** 83:3
**technician** 9:7
**tecum** 5:5
**tell** 10:16,23
19:4 36:9 39:4
48:24 59:14
95:14 99:18
170:24 182:23
186:5
**telling** 168:25
169:1
**ten** 11:21 27:15
42:10,14 48:14
74:3 94:3
114:21 120:9
124:18 139:7
161:23 162:22
163:23 169:6
170:8,18,19

172:16 173:5
176:19 191:12
198:25 199:7,20
199:20
**tennessee** 177:7
192:2
**teresa** 57:23
94:21 96:2
98:12 103:5,13
104:7 109:3
**term** 27:2 96:5
**terminated**
51:13 73:18
126:12,12 167:7
**termination**
79:10 88:18
201:10
**terms** 20:3 22:6
22:16 44:3 70:3
70:10 73:21
79:5
**test** 36:6 117:21
182:21
**testa** 161:9
203:25 204:4,6
205:18
**testified** 34:11
119:7 128:1
130:21 131:1
161:17 168:17
191:3,10,18
**testifies** 10:2
**testify** 169:17
**testimony** 14:13
21:21 24:5,15

HIGHLY CONFIDENTIAL

**[testimony - time]**                                                    Page 261

| | | | |
|---|---|---|---|
| 25:4,23 31:4,11 | 106:6 108:15 | 111:23 112:1 | 188:23 191:10 |
| 31:20 37:10 | 109:15 111:2 | 113:5 115:11,12 | 191:18 199:4,19 |
| 47:2,4,4,24 | 125:10 128:18 | 117:15 119:24 | 199:20 205:16 |
| 53:19 61:9 | 129:8 132:21 | 120:2,15,18 | **thoughts**  205:25 |
| 74:10 77:8,19 | 146:4 166:5 | 121:5 122:15,19 | **thousand**  143:6 |
| 121:5 191:14 | 169:21 178:3,14 | 131:22 133:25 | 190:7 |
| 207:7 208:8,11 | 182:1,5,6 191:1 | 134:16 135:5 | **threat**  95:13 |
| **texas**  72:1 78:14 | 192:22 205:4 | 137:15 143:3 | **threatening** |
| 86:12 90:19 | **think**  11:5 15:12 | 146:9 148:16 | 59:18,22 |
| 91:16 | 15:16 16:4 18:4 | 152:24 161:17 | **three**  22:2 44:16 |
| **text**  7:5 35:7,19 | 21:9,12,14 23:2 | 161:18 162:3 | 74:4 100:5 |
| 49:19 134:9,16 | 25:3 28:5,24 | 163:2 169:16 | 113:19 128:7 |
| 168:7 169:16,22 | 29:20,24 30:2,4 | 170:15,22,23 | 132:9,10,11 |
| **texts**  111:14 | 30:17 31:18 | 172:14 173:11 | 145:1 150:9 |
| 169:22 | 33:3,5,11 34:6 | 176:12 177:1,7 | 162:20 179:8 |
| **thank**  9:23 60:3 | 35:4 36:12 | 184:6 185:12,18 | 191:23 |
| 129:21 158:1 | 37:11,22 40:14 | 185:19 187:7 | **threes**  168:11 |
| 175:1 201:1 | 43:11 47:9 | 192:4 194:17,21 | **thursday** |
| **theory**  36:25 | 48:11 49:5,7,25 | 194:22 196:10 | 142:23 |
| 144:24 163:13 | 50:11 53:1,14 | 196:12 197:2,16 | **tiana**  91:10 |
| 178:6 180:11 | 54:9 57:1,7,7 | 198:2 199:23 | **tie**  43:7 124:24 |
| 189:18 203:7 | 58:20 59:10,25 | 200:1,2,14 | **tied**  130:11 |
| 204:12 | 60:8 62:2,15,25 | 201:25 202:24 | **tiers**  21:14 |
| **thing**  27:22 | 63:14 64:25 | 203:4 205:3,14 | **ties**  178:6 |
| 60:22 110:3 | 66:13,14,14 | 205:24 | **tiffany**  76:20 |
| 111:25 116:13 | 70:9 71:14,21 | **thinking**  60:10 | **time**  9:5 14:11 |
| 118:16 123:5 | 72:23 76:1 | 203:4 | 16:20 18:14,19 |
| 166:10 175:6 | 77:22 79:4 81:1 | **third**  5:15 28:15 | 29:10,11 33:16 |
| 176:16,19,24 | 82:5 93:3,6,9,18 | 56:1 121:11 | 33:23 34:8,24 |
| 187:18 191:9 | 94:20 95:12 | **thoennis**  116:20 | 35:18 50:1,5,21 |
| 194:23 | 97:19 106:8,9 | 117:4 118:10 | 54:2,15,18 |
| **things**  13:24 | 106:13,19 | **thomas**  78:10 | 59:24 60:6,18 |
| 14:15 19:1,20 | 108:15,21 | 79:9,25 82:19 | 60:19 61:23 |
| 20:13 31:5,13 | 109:13,21 110:5 | **thought**  43:15 | 62:3 63:14,24 |
| 63:2 69:9 74:25 | 110:9,21 111:2 | 129:11,15 | 68:25 69:14 |

HIGHLY CONFIDENTIAL

**[time - two]**                                    Page 262

71:12 73:19
78:5,17 83:2
85:19 86:17,17
87:14 88:9 89:5
92:15,21 94:6,9
95:2 109:25
111:3 113:20,23
114:1 119:9
122:9 123:5
126:11 128:23
143:12,15 148:3
148:4 154:16
162:3,4 166:10
169:7 180:20,23
195:10,14
196:14,17 197:2
197:19 202:4,7
206:6 208:7,12
**times** 10:8 110:9
110:21 166:7,8
185:13
**timing** 84:19
**tiny** 50:21
**title** 21:1 42:3
103:25 109:14
109:16,20 138:4
140:18,24 141:7
141:10,17
**titles** 109:23
**today** 10:6
31:15 32:1,16
33:12 59:15
81:3 82:15
103:16 114:4
123:6 164:9

169:19 195:3
**today's** 9:5
206:5
**together** 53:5,6
58:9 135:25
168:14,18
**told** 115:12
**took** 11:11 34:7
37:23 66:7 74:8
80:16 119:5
121:4 153:19
175:21
**tool** 26:1 68:9
**top** 103:12
134:16 147:18
200:12
**topic** 113:19
**tort** 36:21 37:24
**tortious** 36:21
**total** 41:8,9 43:2
58:14 84:6,7
162:7 172:3,13
172:14 184:8
194:8
**totality** 31:4
**totals** 166:18
186:19,20
**touched** 170:16
**tough** 112:14
**towards** 23:7
34:9
**tpo** 46:21 89:21
90:16 184:1,11
**track** 181:5

**traditionally**
13:19
**train** 167:21
**training** 23:13
77:20 78:2,17
78:21 79:2,5
93:3,7 115:17
164:6 167:18
**transaction**
62:14
**transactions**
62:13
**transcribed**
208:10
**transcript** 1:15
18:16 185:19
207:5 208:14,16
**transcripts** 18:3
**transition**
169:15
**trap** 74:22
**treated** 128:12
**trend** 115:4
**tried** 168:9
**trier** 35:12 37:4
38:1 48:18
106:23 169:20
192:18
**triggers** 132:17
**trip** 117:16
**true** 56:19 88:20
140:11 146:7
155:14 158:21
161:24 163:2
169:16 196:18

207:8 208:11
**trust** 135:16,24
**try** 10:10,12
15:21 16:19
60:7,13,17 68:9
101:1 132:22
155:2,9 168:13
170:14
**trying** 25:3 27:1
37:16,20 62:24
68:3,19 71:15
74:21,22,23
77:15 94:20,21
95:8 97:20
107:10 111:12
111:14 124:24
133:20 134:6
168:2 175:3,5
193:19 200:1,11
**tuesday** 1:16
2:23 9:1
**turmoil** 131:16
169:9
**turn** 16:25
21:22
**turnaround**
22:6
**turned** 166:6
**turning** 62:11
**turnover** 63:12
65:20,21
**tv** 70:16
**two** 12:23 16:25
21:14 22:2,15
34:20 40:8 43:6

HIGHLY CONFIDENTIAL

**[two - underwriters]**                                      Page 263

45:20,21 51:18
56:16 67:5
68:24 69:24
76:15 77:20
82:20 85:21
90:4 105:18
111:2 120:17
121:6 129:14
132:11 136:3
137:2 146:23
150:8 160:15
164:10 166:25
167:1,3,5,9,18
167:19 168:21
169:25,25
170:20 171:1
178:3 191:23
192:22 200:12
**twos**   168:11
**twosie**   176:19
**tyesha**   150:3
**type**   14:4 21:18
**types**   25:2,5
82:16 198:16,17
**typewriting**
208:10
**typically**   13:4,7
13:19 19:6
20:18,20 25:5
172:8 175:25
176:22 181:6
**typo**   58:19

**u**

**u**   64:5
**uh**   23:20 36:11
57:6 66:24
80:22 109:8
142:14 158:4
191:1 192:15
**ultimately**
107:12
**umbrella**   72:17
**uncommon**
60:22 62:22
**under**   15:13
30:20 36:6
72:17 107:24
126:14 139:6
144:24 163:13
169:24 172:5
196:15 204:14
207:1,3 208:10
**undercut**
109:11
**undergoing**
23:13
**undergrad**   11:1
11:8
**underlying**   32:6
180:9
**understand**
12:24,25 15:23
18:9 21:6 24:3
24:15 26:11,13
27:2,5,7 31:21
31:24 32:14
34:17,19 35:21

36:16 37:6,10
41:7 44:10 46:8
46:25 47:10
57:21 64:21
68:16 70:1 73:2
73:9 74:17 75:3
78:21 79:2
85:13,14 88:20
98:14,17 99:13
99:17 107:2,6
107:14,25
108:16 121:24
122:1,5 128:10
128:11,17
134:10 136:15
140:11 148:22
164:10 167:7
183:17 184:19
186:23 190:22
194:10
**understanding**
19:4 21:2 22:8
22:22 26:2,5
32:24 33:6
43:13 46:13
47:20 53:16
56:7,14 57:2
59:16 61:8,10
61:23 63:10
65:18 73:16
79:23 95:19
100:23 106:1
116:17 117:19
131:24 166:23
167:4 198:4

**understands**
198:15
**understated**
179:19
**understood**
28:20 114:13
**underwriter**   7:1
19:5,6,12 20:24
21:7 29:4,7
49:17 70:23
78:1 83:23
84:25 88:6
118:5 119:15
121:17,18
126:14,24 127:6
127:20 133:16
139:9 143:21
154:20 157:23
158:12 166:17
202:16
**underwriters**
12:24 13:3,6,13
22:8 24:13 25:4
29:18 41:3
44:17,18 50:14
50:15 62:7 79:4
82:9 93:2,7
98:18 99:4
102:6 104:5
105:15 116:25
117:12 119:8
122:3,16,17
134:2,6 144:8
153:21 155:12
164:19 189:22

193:20,24 194:1
194:18 205:10
205:11,12,13
**underwriting**
12:23 18:24
19:8 20:25
22:23 48:1 84:2
100:6 129:17
130:22 140:9,15
140:24 141:13
154:19 163:1
186:24,25 188:6
204:12
**underwritten**
21:19 184:17
189:1
**unfortunately**
15:24
**unhappiness**
49:7
**united**  1:1 2:1
**units**  184:11,23
186:13,16,18,19
190:5
**university**  11:3
**unrelated**  67:5
67:15
**unsure**  97:17
**unvested**  26:9
26:15 73:13
**update**  31:16,18
**updated**  33:18
115:8 163:12
**usc**  11:2,10

**use**  20:17
144:22 147:19
165:16 173:5,22
174:20 176:5
177:9 178:20
180:7 182:14
183:18,20
195:21 196:2
**used**  98:7 137:9
137:24 172:6,24
174:3,6 175:9
175:10,11,14,16
175:24 181:16
181:17 182:17
183:21
**useful**  39:4
**uses**  178:12
**using**  73:11
138:16,19 165:7
172:17 176:17
178:20 179:1
180:6 195:20
**usually**  113:16
181:11 185:25
**uva**  64:5,7 65:1
**uw**  101:7
**uws**  98:17
103:14

**v**

**v**  64:5 158:8
**vague**  25:16
**value**  20:8
108:14 111:16
155:15 168:8

**variable**  120:6
172:15 178:14
**variables**
117:24 128:20
**variation**  118:1
**varied**  118:22
**varies**  122:13
**variety**  19:19
**various**  13:22
19:14 166:7
**vehemently**
155:13
**vendor**  142:19
**veritext**  9:7
**versa**  177:4
**version**  38:13
39:5 163:12
**versus**  9:13
36:10 52:5 63:8
143:10 192:22
**vested**  26:9
**vice**  177:4
**video**  9:7,11
192:11
**videographer**
3:13 9:4,23
54:14,17 94:5,8
113:22,25
143:11,14
180:19,22 202:3
202:6 206:4
**videotaped**  1:14
2:21 5:4
**view**  111:11
177:21 205:17

**violation**  155:21
**volume**  61:25
63:15 134:1,7
**vs**  1:7 2:8

**w**

**w**  5:6,8 9:12
150:5
**wage**  14:3 34:11
36:13
**wages**  29:12
121:17,18
**wait**  43:16 90:9
182:24
**waiting**  90:7
**waive**  62:12
**waived**  21:25
**walk**  168:17
**wanky**  190:9
**want**  10:19,23
11:22,25 16:21
20:3 21:22
25:14 27:4
32:19 33:13,22
38:25 40:10,10
42:10 43:19
44:15,20 49:11
51:13 54:12
60:2,16 61:19
62:9 63:4 66:9
69:7 71:2 75:21
94:4 95:12,13
96:13 99:11
118:14,17 129:7
129:14 162:9
166:10,11,12

HIGHLY CONFIDENTIAL

**[want - workers]** Page 265

168:5,7 169:8
170:16 180:15
180:16 185:13
**wanted** 17:11
37:9 43:16
147:9 168:9
176:23
**wanting** 101:8
**wants** 17:13
195:1
**war** 49:3
**ward** 3:8 9:18
**waterhouse**
11:9,15
**wave** 93:11
**waves** 47:25
**waving** 196:19
**way** 10:15,19
16:19 26:11
36:25 37:1
41:25 51:6
64:22 71:22
81:2 95:1,5,11
108:12 112:1,1
120:19 132:25
143:6,7 155:17
168:3 176:15
182:16 185:2
188:9
**ways** 172:12
**we've** 28:22
51:24 54:10
62:2,3 108:3
110:8,19 115:21
146:22 158:4

162:23 163:6,6
163:8,16 200:10
200:19
**webb** 147:14
**week** 34:21 36:4
37:18 51:16,18
95:24 142:9,9
142:21 166:25
168:21
**week's** 81:11
**weeks** 11:23
22:2,2 45:20,21
51:16 56:17
77:20 82:20
85:21 166:13
167:1,3,5,10,18
167:20 169:25
170:1
**weird** 96:9
122:17
**went** 33:7 51:15
93:14 113:5
119:1 120:3
159:11 168:12
173:12 185:19
192:13 193:20
**whatsoever**
169:15
**whereof** 208:18
**wide** 52:16
109:9
**widely** 181:16
181:17
**wider** 111:6,22

**wilkins** 1:9 2:10
**williams** 90:13
91:10
**willing** 60:12
63:1 108:21
118:17
**wilson** 150:3,4,5
**wise** 53:21
**witness** 4:3,18
13:2 16:14,16
16:21 17:14,16
19:18 30:12,16
30:18 35:4
38:13,16,19,22
39:1,8,13 41:25
45:8 46:7 48:17
49:25 53:1,19
54:13 61:22
66:5,16 68:2
69:2,5,8,12,16
76:6 78:5 82:5
85:25 86:3,23
86:25 87:3,5,25
89:11 90:7 93:6
94:3,12 99:11
102:11 105:24
110:15 111:2
123:12 124:24
125:9,17 129:21
138:18 146:12
148:10 150:15
151:4 156:11
160:1 165:4
168:24 170:22
172:20 175:3,7

180:18 182:22
183:3 191:15
197:13 198:10
199:13,23 200:9
200:14,18,25
201:3 202:2
206:2 208:6,18
**witnesses** 17:19
**wonky** 190:10
**word** 44:4 70:18
71:3 98:7
161:18
**words** 30:21
65:5 73:3
177:13
**work** 11:14 16:5
16:7 34:9 36:14
48:7 53:6 77:12
77:23 81:12
96:14 133:21
154:25 167:5,9
169:25 193:20
**worked** 19:2
34:20 36:3
72:14 77:2
78:16 83:8 84:4
84:13 87:14
88:8 90:2,25
91:7,22 92:13
92:20 178:4
181:10 186:25
187:9 189:24
194:3,5
**workers** 53:17

HIGHLY CONFIDENTIAL

**[workforce - zero]**                                                    Page 266

**workforce**
  121:24
**working**  13:21
  13:22,24 22:1
  23:19 35:8
  37:23 47:9 78:1
  83:2 112:11,15
  167:24 179:11
**works**  73:2
  186:1
**world**  50:4
  111:12 176:24
  204:16,21 205:6
**worried**  26:16
  62:10 134:22
**worse**  112:10
  188:5
**worth**  81:12
**write**  41:1 73:23
  113:20 164:4
  200:24
**wrong**  30:19
  196:13
**wrote**  121:12

**x**

**x**  71:16 165:20
  204:18,18

**y**

**y**  71:17 150:5
  151:6 204:19
**yeah**  10:21
  15:18 16:15
  17:10,10,14
  24:1 26:14 31:2

33:13 38:3,24
39:1,13,14 40:9
40:13,15,17
42:17 43:1,6,13
43:14,16,18
51:3,5 55:15,16
55:18 58:10,22
58:23 60:17
61:5 64:7,10
67:2,12 70:9,12
71:5 74:13
76:16 78:25
79:15 83:11,13
83:15 84:1,10
84:18,20 86:24
87:5 89:21
92:18 94:12
97:1 100:10,19
101:4,11 104:14
108:8 109:5
113:2,10 115:6
115:14,18
121:10 123:7,18
124:5 127:12
128:1 129:16
130:19 132:11
134:23 135:11
146:13 152:13
158:1 160:5,9
161:10 171:21
179:22,24
180:18 182:25
188:25 190:9
194:15 197:14
202:17 203:12

204:3,7
**year**  11:4,10,12
  11:13 59:19
  67:5,6,13 73:19
  74:9 77:1 78:1
  81:15 83:9 84:6
  84:7 85:18 88:9
  89:5,6 90:2 91:6
  117:9 124:15
  126:24 130:13
  131:2 136:9
  171:1 172:14
  195:8
**years**  14:16 62:4
**yellow**  98:22
**yesterday**  15:4
  33:3,4 100:8
**york**  12:4 89:20
  89:22

**z**

**zadikany**  3:3
  9:21,21 17:8,11
  17:15 25:14
  35:2 39:10
  41:24 45:7 46:1
  46:6 49:24
  52:25 53:18
  54:21 61:21
  68:1 69:18 78:4
  93:5 99:10
  102:10 105:23
  110:14 125:16
  138:17 165:3
  168:23 170:21
  172:19 174:23

174:25 175:2,5
185:23 191:14
197:12 198:9
199:1,4,11,22
**zero**  80:16 84:6
136:6 172:23
173:2

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.